1  Laurence M. Rosen, Esq. (SBN 219683)
2  THE ROSEN LAW FIRM, P.A.
3  355 South Grand Avenue, Suite 2450
   Los Angeles, CA 90071
4  Telephone: (213) 785-2610
   Facsimile: (213) 226-4684
5  Email: lrosen@rosenlegal.com
6
7  *Counsel for Lead Plaintiff and the Class*

8              UNITED STATES DISTRICT COURT
9              CENTRAL DISTRICT OF CALIFORNIA

10 | JOE ELEK, THOMAS BARTSCH, | Case No: 2:15-cv-05146-CAS-JEM |
11 | JEFFREY FROHWERK, LARRY |  |
   | BRANDOW, DIANA CHOI, BEN | **CONSOLIDATED AMENDED** |
12 | POTARACKE, CHARLES | **CLASS ACTION COMPLAINT FOR** |
   | MONTGOMERY, JEDRZEJ | **VIOLATION OF THE FEDERAL** |
13 | BOROWCZYK, AND CHARLES | **SECURITIES LAWS** |
14 | REMMEL, Individually and on behalf of |  |
   | all others similarly situated, | JURY TRIAL DEMANDED |
15 |  |  |
16 |  |  |
17 |      Plaintiffs, |  |
18 |  |  |
   |      v. |  |
19 |  |  |
20 | SILVER WHEATON CORP.,  RANDY |  |
   | V. J. SMALLWOOD, PETER BARNES, |  |
21 | AND GARY BROWN, |  |
22 |  |  |
   |      Defendants. |  |
23 |  |  |

24
25     Lead Plaintiff Joe Elek, and named Plaintiffs Thomas Bartsch, Jeffrey
26 Frohwerk, Larry Brandow, Diana Choi, Ben Potaracke, Charles Montgomery, Jedrzej
27 Borowczyk, and Charles Remmel (together "Plaintiffs"), by Plaintiffs undersigned
28 attorneys, individually and on behalf of all other persons similarly situated, alleges

the following based upon personal knowledge as to Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Silver Wheaton Corp. ("SW", "SW Canada", or the "Company"), interviews with former SW employees, consultation with Canadian operational and legal experts on Canadian tax transfer pricing rules, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action brought on behalf of a class consisting of all persons and entities, other than defendants and their affiliates, who purchased or otherwise acquired the securities of SW from March 30, 2011 to July 6, 2015, inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of federal securities laws (the "Class").

2.      SW is a precious metals streaming company. From 2005 to 2010, the relevant "Period", in exchange for upfront payments, SW received guaranteed delivery of silver production from mines that SW did not own or operate.  These are known in the industry as "streams".

3.       During the Period from 2005 to 2010, SW derived its revenue principally from the purchase and sale of silver streams entered into by its Cayman Islands subsidiary ("SW Cayman").

4.      SW Cayman paid no income tax in the Cayman Islands on it profits under Cayman Islands law.  Nor did SW pay any income tax in Canada on the profits earned by its subsidiary, SW Cayman, because SW took the position that SW

Consolidated Amended Class Action Complaint

Cayman was a separate entity and no income tax on SW Cayman's profits was payable to Canada.

5.    During the relevant Period, 2005 to 2010, Canada had enacted Transfer Pricing Rules seek to eliminate the opportunity for multi-national enterprises to obtain a tax advantage by adopting intra-group pricing strategies that shift income to a related party that is resident in a low tax jurisdiction.

6.    Between 2005 and 2010, SW underreported $567 million of taxable income to Canadian authorities, by violating Canada's Transfer Pricing Rules that required SW to record a fair market value for all transactions between SW and SW Cayman.

7.    In each annual financial statement filed with the SEC during the Class Period, by violating Canadian tax law, Defendants concealed over $207 million of Canadian income tax liabilities for SW, failing to recognize and record SW's tax position liabilities on SW's financial statements, in violation of applicable accounting principles.

8.    On July 6, 2015, the Company issued a press release, announcing that the Canada Revenue Agency ("CRA") has determined that the transfer pricing provisions of the Income Tax Act (Canada) relating to income earned by SW's foreign subsidiaries outside of Canada should be applied such that SW's taxable income should be increased approximately $567 million for the period between 2005 and 2010, resulting in additional taxes and penalties assessed against the Company in excess of $207 million.

9.    On this news, the Company's shares fell $2.08 per share or almost 12% to close at $15.46 per share on July 7, 2015.

10.    Shortly thereafter several Wall Street analysts commented that the news that CRA had determined that SW's transfer pricing tax position violated Canadian tax laws had reduced SW's net asset value by 30-40%.

11.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.   The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 8 240.10b-5).

13.   This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

14.   Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as the misleading statements entered into this District.

15.   In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

16.   Lead Plaintiff Joe Elek acquired SW stock and call options, and sold SW put options at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.  His PSLRA certification was previously filed with the Court.

17.   Plaintiffs Thomas Bartsch, Jeffrey Frohwerk, Larry Brandow, Diana Choi, Ben Potaracke, Charles Montgomery, Jedrzej Borowczyk, and Charles Remmel, as set forth in their attached Certifications, acquired SW securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures.

Consolidated Amended Class Action Complaint

18.    Defendant SW provides precious metal streaming services. SW is headquartered in Vancouver, British Columbia, Canada and trades on the NYSE under the ticker symbol "SLW."

19.    At all relevant times SW's business was to purchase the rights, called "streaming agreements" for all or a portion of silver production from mines located in politically stable regions around the word such as Canada, Mexico, Portugal, Brazil, Peru, and Sweden. Currently, SW has streaming agreements for 21 operating mines and 6 developmental stage projects.

20.    Defendant Randy V. J. Smallwood ("Smallwood") has served as the Company's President since January 2010 and as Chief Executive Officer ("CEO") from April 11, 2011 to the present.  Smallwood is one of the founding members of Silver Wheaton. In 2005, he joined Silver Wheaton full time as Executive Vice President of Corporate Development, primarily focusing on growing the Company through the evaluation and acquisition of silver stream opportunities.

21.    Defendant Peter Barnes ("Barnes") served as the Company's CEO and a director from 2006 until his resignation effective April 11, 2011.  Mr. Barnes is a Chartered Accountant and was one of Silver Wheaton's founders in 2004. He served as Silver Wheaton's Executive Vice President and Chief Financial Officer from 2004 until his appointment as Chief Executive Officer in April 2006.

22.    Defendant Gary Brown ("Brown") has served as the Company's Chief Financial Officer ("CFO") throughout the entire Class Period and joined SW in 2008.

23.     Smallwood, Barnes and Brown are sometimes referred to herein as the "Individual Defendants."

24.    Defendant SW and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## RELEVANT NON-PARTY WITNESS

25.    Former Employee 1 ("FE1") was an Accountant at Silver Wheaton's Cayman Islands office from December 2007 to November 2013.

Consolidated Amended Class Action Complaint

26.   FE1 was hired in December 2007 to help open Silver Wheaton's Cayman Islands office in March 2008. She was one the first employees hired in that country. She performed bookkeeping tasks, such as reconciliation, data entry and making sure the company was receiving payments it was expecting.

27.   FE1 reported to Brad Carpenter and Nik Tatarkin.

28.   Carpenter was initially the Controller of SW Cayman until 2013, when he became Director of Contract Compliance at SW Cayman.

29.   Nik Tatarkin, was Executive Director of SW Cayman from December 2008 until December 2012, when he became President of the Cayman Islands office.

30.   FE1 also reported to Giselle Fedalizo, who was Manager of Corporate Accounting at SW Canada, when Fedalizo began working as the Assistant Controller in the Cayman Islands office in July 2013.

## ALLEGATIONS OF WRONGFUL CONDUCT

### Canadian Transfer Pricing Rules Related to Income Taxes

**(a)    *Background of Transfer Pricing Rules in Canada***

31.   Corporations that are resident in Canada for the purposes of the Income Tax Act (Canada)[1] (the "Tax Act") are subject to tax on their worldwide income from all sources.[2]

32.   When computing taxable income, Canadian tax law generally does not look to the economic substance of a transaction to determine its tax treatment. Instead, absent a sham or other vitiating circumstances, the Canadian tax treatment of a transaction is normally based on the actual form of the transaction.[3]

---

[1] R.S.C. 1985, c. 1 (5th Supp.), as amended.
[2] *Ibid*. at ss. 2(1).
[3]   *Shell Canada Ltd. v. The Queen*, [1999] 3 S.C.R. 622, 99 D.T.C. 5669.

33.     Nevertheless, the Canadian government quickly recognized that, in an effort to reduce the aggregate amount of income tax payable, parties not dealing with one another at arm's length will frequently be motivated to structure their dealings in a manner that deviates from what would prevail in the open market.  In particular, absent statutory restrictions, parties may seek to execute transactions that, while legally effective, are premised on pricing that is not consistent with the pricing that would have been agreed to by parties dealing with one another at "arm's length".

34.     In light of such concerns, the government enacted a detailed set of "transfer pricing" provisions to ensure that, for tax purposes, the amounts included in the income of a Canadian taxpayer in respect of transactions entered into with non-resident persons with which the taxpayer does not deal at arm's length ("Related Non-Residents") accurately reflect the pricing that would have been established if the transactions had instead been undertaken by independent parties at arm's length (the "Transfer Pricing Rules").

**(b)**     ***The Transfer Pricing Rules – First Principles***

35.     From a tax perspective, the price paid for property, services, commercial opportunities, the assumption of risk, or any other right or advantage (collectively, "Property") is of great significance.  Most notably, a person that sells Property is generally required to include the amount receivable in exchange for the Property when computing its taxable income.[4]

36.     When a transaction is undertaken by parties that do not deal with one another at "arm's length", a natural incentive may arise to price the transaction in a manner that artificially increases or decreases the price payable for Property.  For instance, if the seller of Property is subject to high income tax rates, or the purchaser will derive limited benefit from being able to claim a tax deduction in respect of the

---

[4]   Tax Act, *supra* note 1 at Part I, Division B.

Consolidated Amended Class Action Complaint

1   amount paid for the Property, the parties may attempt to minimize the operative

2   transfer price.

3       37.    The Transfer Pricing Rules seek to eliminate the opportunity for multi-

4   national enterprises to obtain a tax advantage by adopting intra-group pricing

5   strategies that shift income to a related party that is resident in a low tax jurisdiction.

6       38.    In very simple terms, the Transfer Pricing Rules apply to adjust the

7   amounts paid by one party for Property provided by another party with which it does

8   not deal at "arm's length" to reflect market prices.

9       39.    Statutory provisions substantively similar to the Transfer Pricing Rules

10  have been widely adopted by most developed nations.  The Transfer Pricing Rules are

11  premised on the "arm's length principle" (the "Arm's Length Principle"), which has

12  been endorsed by the member states of the Organisation for Economic Co-operation

13  and Development (the "OECD"), including Canada,[5] as the international standard to

14  be applied when determining transfer prices for tax purposes.

15      40.    The Arm's Length Principle provides that where:

16
17          conditions are made or imposed between…two enterprises in
            their commercial or financial relations which differ from those
18          which would be made between independent enterprises, then
            any profits which would, but for those conditions, have
19          accrued to one of the enterprises, but, by reason of those
            conditions, have not so accrued, may be included in the profits
20          of that enterprise and taxed accordingly.[6]
21
22
23      **(c)    *The Transfer Pricing Rules – Statutory Framework***

24
25
_____

26  [5]    M.N.R., Information Circular 87-2R "International Transfer Pricing" (27

27  September 1999).

28  [6]    OECD, *Transfer Pricing Guidelines for Multinational Enterprises and Tax
    Administrations*, (Paris: OECD, 2001) at para. 1.6.

41.     The Transfer Pricing Rules took effect in 1988 and are found principally in section 247 of the Tax Act.

42.     The range of transactions that may fall within the ambit of the Transfer Pricing Rules is extremely broad.  The sale of goods and services, the licensing of intellectual property, the provision of commercial opportunities, the assignment of existing contractual rights, and a host of different types of lending, hedging, insurance, and derivative arrangements are all potentially subject to the Transfer Pricing Rules.

43.     The Transfer Pricing Rules apply in respect of transactions between parties that do not deal with one another at "arm's length".[7]    The circumstances under which persons are considered not to be dealing with one another at "arm's length" are set out in section 251 of the Tax Act.

44.     Both "related persons" and persons that factually do not deal with one another at arm's length are defined by statute as not dealing with one another at "arm's length".[8]  (The Tax Act describes the categories of persons that are deemed to

---

[7]  Tax Act, *supra* note 1 at ss. 247(2).

[8]   The Canadian courts have frequently been called upon to consider when parties may factually be considered not to deal with one another at arm's length.  During the "Period" (as defined herein), the Canada Revenue Agency summarized the applicable jurisprudence in this regard by stating:

> The following criteria have generally been used by the courts in determining whether parties to a transaction are not dealing at "arm's length":
>
> - was there a common mind which directs the bargaining for both parties to a transaction;
>
> - were the parties to a transaction acting in concert without separate interests; and
>
> - was there "*de facto*" control.

[M.N.R., Interpretation Bulletin IT-419R2 "Meaning of Arm's Length" (8 June 2004) at para. 23.]

Consolidated Amended Class Action Complaint

1   be "related persons",[9] which include a corporation and its wholly owned subsidiary,
2   and two corporations that are controlled by the same person or group of persons.[10] )

3          *(i)*     *Charging Provision*

4          45.    Subsection 247(2) of the Tax Act is the main charging provision in the
5   Transfer Pricing Rules.   Subsection 247(2) provides that where a taxpayer and a
6   Related Non Resident are participants in a transaction or a series of transactions (a
7   "Related Party Transaction") and

8          (a)  the terms or conditions made or imposed between any of the participants in
9                respect of the transaction or series differ from those that would have been made
10               between persons dealing at arm's length, or

11         (b)     the transaction or series

12                 (i)    would not have been entered into between persons dealing at
13                        arm's length, and

14                 (ii)   can reasonably be considered not to have been entered into
15                        primarily for bona fide purposes other than to obtain a tax
16                        benefit,[11]

17         any amounts that, but for the transfer pricing rules and certain other anti-
18   avoidance provisions, would be determined for the purposes of the Tax Act in
19   respect of the taxpayer are to be adjusted to equal the amounts that would have
20   been determined if,

---

[9]  Tax Act, *supra* note 1 at ss. 251(2).
[10]  In this context, "control" is defined as *de jure* control, which typically is considered to arise in a corporate context where a person has the right to exercise "effective control" over the affairs of the corporation.   Effective control of a corporation generally is considered to exist where a person enjoys the right to elect a majority of the directors of the corporation.
[11]  For these purposes, a "tax benefit" is defined as including a reduction, avoidance or deferral of tax or other amounts payable under the Tax Act.

Consolidated Amended Class Action Complaint

(c)     where only paragraph (a) applies, the terms and conditions made or imposed between the participants in respect of the transaction or series had been those that would have been made between persons dealing at arm's length, or

(d)     where paragraph (b) applies, the transaction or series is recharacterized to reflect the transaction or series that would have been entered into between persons dealing at arm's length, under terms and conditions that would have been made between persons dealing at arm's length.

46.     In effect, the Transfer Pricing Rules may, for tax purposes, adjust the prices agreed to by a Canadian taxpayer and a Related Non-Resident in two different ways.  First, if the subject transaction would otherwise have occurred in the market between persons dealing at arm's length, the pricing of the transaction is adjusted to reflect the pricing that would have arisen in an arm's length context.  Second, if the transaction would not have been entered into between persons dealing at arm's length, and it can reasonably be considered not to have been entered into primarily for bona fide purposes other than to obtain a tax advantage, the pricing of the transaction is adjusted to reflect the pricing that would have been set in a replacement transaction that would have been entered into between persons dealing at arm's length, under terms and conditions that would have been agreeable to arm's length parties.

47.     If the Canadian tax authority, the Canada Revenue Agency (the "CRA"), believes that a taxpayer has contravened the Transfer Pricing Rules (i.e., the transactions between the taxpayer and the Related Non-Resident do not reflect arm's length transfer prices), the CRA may (i) recompute the taxable income of the taxpayer on the basis of the arm's length transfer prices that the CRA believes would have applied to the subject transactions, and (ii) reassess the income tax payable by the taxpayer by applying the applicable income tax rate to the adjusted taxable

- 11 -

income of the taxpayer.[12]   Where a taxpayer is assessed for additional income tax payable, late filing or other penalties may also be assessed.[13]

    *(ii)*    *Penalty Provision*

48.   In addition to potentially increasing the taxable income arising from a Related Party Transaction, the application of the Transfer Pricing Rules can also result in the assessment of a special transfer pricing penalty.[14]

49.   A taxpayer may be liable for the special transfer pricing penalty where the relevant transfer pricing adjustment exceeds a prescribed threshold.[15] If applicable, the special transfer pricing penalty is generally equal to 10% of the sum of (i) the relevant transfer pricing adjustments, minus (ii) the total of all transfer pricing adjustments that relate to transactions for which the taxpayer has made "reasonable efforts to determine [and use] arm's length transfer prices".

50.   In determining whether a taxpayer has made reasonable efforts to determine and use arm's length transfer prices, the CRA has stated that it will consider whether the taxpayer took all reasonable steps to ensure that its transfer prices conformed with the Arm's Length Principle.[16]   However, a Canadian taxpayer will be deemed not to have made reasonable efforts to determine and use arm's length transfer prices if it does not make or obtain "contemporaneous documentation" in

---

[12]   Tax Act, *supra* note 1 at s. 152 and ss. 247(11).

[13]   See, for example, *ibid*. at s. 162-163.

[14]   *Ibid*. at ss. 247(3).

[15]   The Transfer Pricing Rules generally provide that a taxpayer may only be subject to the special transfer pricing penalty if the "net adjustment" from the application of the Transfer Pricing Rules is greater than the lesser of (i) CDN$5 million, and (ii) 10% of the Canadian taxpayer's prescribed gross revenue for the year.

[16]   Information Circular 87-2R, *supra* note 5 at para. 179.

Consolidated Amended Class Action Complaint

respect of the transaction on or before the "documentation-due date"[17] for the taxation year in which the transaction occurred.[18]

51.    The Transfer Pricing Rules define "contemporaneous documentation" as records or documents that provide a description that is complete and accurate in all material respects of

(i)     the property or services to which the transaction relates,

(ii)    the terms and conditions of the transaction and their relationship, if any, to the terms and conditions of each other transaction entered into between the participants in the transaction,

(iii)   the identity of the participants in the transaction and their relationship to each other at the time the transaction was entered into,

(iv)    the functions performed, the property used or contributed and the risks assumed in respect of the transaction by the participants in the transaction,

(v)     the data and methods considered and the analysis performed to determine the transfer prices in respect of the transaction, and

(vi)    the assumptions, strategies and policies, if any, that influenced the determination of the appropriate transfer prices in respect of the transaction.

### (d)    *Application of the Transfer Pricing Rules*

52.    The Transfer Pricing Rules require a Canadian taxpayer transacting with a Related Non-Resident to (i) fully and accurately define the Property being provided by one party to another, and (ii) ascertain and adopt the price that would be paid for such Property by parties dealing with one another at arm's length.

53.    The CRA has published a large number of statements that outline the agency's interpretation of section 247 of the Tax Act.

---

[17]    The "documentation-due date" is typically the date on which the Canadian taxpayer is required to file its income tax return.
[18]    Tax Act, *supra* note 1 at ss. 247(4).

Consolidated Amended Class Action Complaint

54.     In September 1999, the CRA issued a detailed Information Circular that set out its views on the application of section 247 and the related transfer pricing compliance obligations of Canadian taxpayers (the "CRA Circular").[19]   The CRA Circular contains an extensive discussion of the attributes of each property, service or advantage provided by a Canadian taxpayer to a Related Non-Resident that need to be considered when assessing the applicable arm's length transfer price of such Property.

55.     The CRA Circular states that, in the absence of independent comparable transactions from which arm's length transfer prices may be derived, the determination of an arm's length transfer price in respect of a transaction generally requires that each of the functions performed, the assets used or applied, and the risks assumed by each party be fully delineated and quantified.   The relevance of such criteria is affirmed by the express wording of section 247 of the Tax Act, which stipulates that the contemporaneous documentation maintained by a taxpayer must provide a complete and accurate description of "the functions performed, the property used or contributed and the risks assumed, in respect of the transaction, by the participants in the transaction".

56.     The CRA Circular incorporates by reference many of the interpretive principles expressed by the OECD in its Transfer Pricing Guidelines for Multinational Enterprises and Tax Administrations (the "OECD Guidelines").[20] OECD Guidelines provide that compensation between independent enterprises "usually will reflect the functions that each enterprise performs (taking into account assets used and risks assumed)".[21]   In this regard, the OECD Guidelines direct that

---

[19]   Information Circular 87-2R, *supra* note 5.  The CRA Memorandum contains a broad cross-referencing paragraph that reads "The OECD Guidelines should be consulted for a more detailed discussion of the principles contained in Parts 2 to 6 of this circular."  (Parts 2 to 6 contain the core sections of the CRA Circular.
[20]  OECD Guidelines, *supra* note 6.
[21]  *Ibid*. at para. 1.20.

Consolidated Amended Class Action Complaint

1  the "functional analysis [to be performed as part of a transfer pricing analysis] is
2  incomplete unless the material risks assumed by each party have been considered
3  since the assumption or allocation of risks would influence the conditions of
4  transactions between the associated enterprises".[22]   In considering the allocation of
5  risk, the OECD Guidelines also caution that it is necessary to consider whether the
6  purported allocation of risk by the parties to a transaction is consistent with the
7  economic substance of the transaction.[23]

8  **<u>Silver Wheaton Corporation – Canadian Transfer Pricing Obligations</u>**
9  **<u>During the Period</u>**

10  *(a)      Cross-Border Arrangements Subject to the Transfer Pricing Rules*

11      57.      During each taxation year in the period from January 1, 2005 through
12  December 31, 2010 (the "Period"), Silver Wheaton Corp. ("SW Canada") provided
13  an extensive range of services, commercial opportunities, capital, know-how,
14  intellectual property, strategic support, contractual support, back-office functions, and
15  other Property to Silver Wheaton (Caymans) Ltd. ("SW Cayman") that were critical
16  to generating the revenue purportedly earned by SW Cayman. [24]

17      58.      In respect of each taxation year during the Period, all substantive
18  strategic, managerial and operational direction relating to the activities of SW
19  Cayman was provided by SW Canada.  FE1 states that a significant majority of the
20  staff of the Silver Wheaton corporate group were employed by SW Canada during the
21  Period, including all senior staff.  FE1 reports that, during the Period, SW Cayman
22  had six employees (including two purely administrative staff); however, the Annual

---

22  *Ibid*. at para. 1.23.
23  *Ibid*. at para. 1.26.
24      SW has an offshore subsidiary, Silverstone Resources (Barbados) Corp. ("SRB"),
beginning in fiscal 2009.  Its operations were immaterial to SW's revenue and income
relative to SW Cayman and therefore SRB is not addressed herein.

Consolidated Amended Class Action Complaint

Information Forms[25] filed by SW Canada during the Period (each, an "AIF") indicated that Silver Wheaton had 18 employees by 2008 (as per the AIF for the period ending December 31, 2007) and later 24 employees (as per the AIF for the period ending December 31, 2010).

59.     FE1 states that she observed and/or was informed by her SW Cayman superiors that all material operational and strategic decisions in respect of SW Cayman were subject to the direction and approval of officers or employees of SW Canada, and substantially all material agreements to which SW Cayman was a party were drafted by, and executed with the required approval of, officers or representatives of SW Canada.  FE1 states that, with the exception of those that performed clerical or local compliance tasks, all employees of SW Cayman reported to, or accepted instructions from, officers or employees of SW Canada.

60.     The AIFs of SW Canada indicate that none of the senior officers of the Silver Wheaton corporate group during the Period were situated in the Cayman Islands.  FE1 reports that none of the employees of SW Cayman had meaningful, unfettered strategic or managerial decision-making authority.

61.     The professional experience of the employees of SW Cayman indicates that they lacked both the training and experience necessary to identify the commercial opportunities purportedly sought by SW Cayman and negotiate the relevant arrangements, as well as the ability to administer the complicated agreements and activities that were purportedly executed by SW Cayman during the Period.

62.     For instance, the resume of Nik Tatarkin (the "Tartarkin Resume"),[26] who was presented externally as the Executive Director of Silver Wheaton's Cayman Islands office throughout the Period, with the exception of 10 months in the treasury

---

[25]   An Annual Information Form in Canada is similar to the Form 10-K annual report that is filed with the U.S. Securities & Exchange Commission, except that it doesn't have audited financial statements in it, which are filed separately.
[26]   LinkedIn profile of Nik Tatarkin <accessed online on December 17, 2015>.

Consolidated Amended Class Action Complaint

department of Silver Wheaton, evidences no previous training with respect to the natural resources industries, nor any previous experience working for companies in the natural resources sector prior to becoming Executive Director of SW Cayman as its highest ranking officer.  In fact, prior to joining Silver Wheaton, he only had about 6 years of experience following university graduation, none of which related in any way to the commodities or mining business.

63.   FE1 said that Tatarkin typically visited mines and clients together with SW Canada employees.  Tatarkin told FE1 that his participation in negotiations of SW Cayman's streaming contracts and other material agreements was "on behalf of SW as a whole and not just SW Cayman."  Indeed, FE1 noticed CEO Smallwood''s signature on a number of SW Cayman's contracts with mines.  And FE1 stated that she never saw anyone at the SW Cayman office preparing the contract documents, and she believes "they were prepared in the SW corporate office in Canada."

64.   On a number of occasions, Tatarkin told FE1 he was not his own boss, usually when she was making a request for something that needed his financial approval.  FE1 recalled how Tatarkin put it to her: "You report to Brad, Brad reports to me, I, in turn, am not my own person."

65.   Tatarkin made it clear to FE1 that he "had to report to [SW CEO] Randy [Smallwood]" regarding any financial decisions that were outside Tatarkin's pre-approved authority.

66.   Substantially all material back-office and other operational responsibilities of SW Cayman during the Period were provided by SW Canada or pursuant to agreements negotiated by SW Canada.  FE1 reports that all accounting functions were ultimately guided by SW Canada staff in Canada, principally by Giselle Fedalizo and CFO Gary Brown (who replaced Nolan Watson) from the offices of SW Canada in Vancouver, British Columbia.

67.   FE1 states that all material operational matters were subject to the oversight and/or approval of senior officers or employees of SW Canada, principally

Consolidated Amended Class Action Complaint

1   Peter Barnes and Randy Smallwood, again from the offices of SW Canada in
2   Vancouver, British Columbia.

3        68.     FE1 reports that, prior to 2008, SW Cayman did not even possess its
4   own independent office space in the Cayman Islands, instead conducting activities
5   from a single desk in the office of Endeavor Mining Corporation in the Cayman
6   Islands.  FE1 made clear that SW Cayman was simply not institutionally oriented
7   toward operating on an autonomous basis during the Period.

8        69.     Compliance with foreign governmental interactions and tax audits was
9   managed and directed by SW Canada during the Period.  FE1 reports that, prior to a
10  visit to the offices of SW Cayman by Canadian governmental authorities in May of
11  2011, SW Canada sent a team of internal accountants and auditors to the Cayman
12  Islands to prepare the staff of SW Cayman, led by the Vice President, Tax of SW
13  Canada, Bettina Charpentier.  FE1 reports that Ms. Charpentier actively participated
14  in discussions with the Canadian government officials during their visit to SW
15  Cayman.

16       70.     The 2006 Annual Report of SW Canada emphasized the significance of
17  the "Silver Wheaton brand name" to the business operations of the Silver Wheaton
18  corporate group during the Period.   There is no evidence to indicate that any
19  reputational or brand-related intellectual property or any material, sophisticated
20  know-how that was utilized by SW Cayman during the Period was internally
21  developed by SW Cayman, rather than obtained from SW Canada.

22       71.     Substantially all streaming contracts to which SW Cayman was a party
23  were identified, originated, and secured by the efforts of SW Canada.  Substantially
24  all commercial leads, introductions, opportunities and agreements were pursued and
25  executed by, or at the direction of, SW Canada and were provided to SW Cayman
26  without consideration.

27       72.     In addition to performing all material commercial functions for SW
28  Cayman, SW Canada also assumed all material financial and contractual risks on

Consolidated Amended Class Action Complaint

behalf of SW Cayman during the Period, whether through the funding of agreements to which SW Cayman was a party in respect of future streaming rights, or through guarantees under agreements to which SW Cayman was a party. FE1 states that SW Cayman basically functioned as a conduit for large amounts of money passing from the SW corporate office in Vancouver to the mines through SW Cayman in one direction and money from silver sales flowing back through SW Cayman to the SW corporate office in Vancouver.

73.    FE1 state that SW Cayman kept a very small percentage of the revenue and income it earned in its bank accounts, passing most of it to the SW corporate office accounts.

74.    Beginning in March 2008 when the SW Cayman Islands office opened, FE1 began to wire transfer large sums of money from the SW Cayman office's revenue accounts to the Silver Wheaton corporate headquarters in Vancouver.

75.    Every week, FE1 wire transferred between $1.5 million and $4 million from the Cayman Islands' office to the SW corporate office's bank account in Vancouver in one or two wire transfers.  She said the amount transferred fluctuated each week.  Similar sized transfers were wired just as regularly to the Cayman Island accounts from the corporate office. Despite asking, FE1 was never told the purpose of the transfers. She was instructed by Carpenter and Tatarkin to simply make notations in the accounting system of the debits from the revenue accounts.  She added that no notes or descriptions of what the transfers represented were made on the bank documents recording the transfers, which is typically done when making business transactions. She said the paper trail from the bank would not reveal any information about why the transfers were made.

76.    FE1 also reviewed the Cayman Island's bank statements every day and kept track of wire transfers coming in from the corporate office on a regular basis. She noticed that the amounts seemed to be similar to the amounts going out in the wire transfers to the corporate office.

Consolidated Amended Class Action Complaint

77.   FE1 was instructed by Carpenter to record the transfers in and out as payables and receivables in the accounting books.

78.   FE1 asked Carpenter and Tatarkin about the purposed of the wire transfers, but they declined FE1's requests for explanations about the purpose of the transactions.  FE1 thought their refusal to provide details of the wire transfers was suspicious.

79.   FE1 said she accidently picked up a file from Carpenter's desk which documented some transactions at the office.

80.   The files, which she saw in 2013, documented that Silver Wheaton's corporate office sent money to the Cayman office for investments in silver mines. She understood from discussions with Carpenter that the investments gave Silver Wheaton a contract to buy silver at a set price.

81.   Once the silver was mined, the SW corporate office would send more money to SW Cayman for the purchase of the silver. The silver was then sold at a higher price and that revenue flowed back into the Silver Wheaton Cayman revenue accounts.  The SW Cayman office then transferred the bulk of the revenue back to the SW corporate offices, FE1 said.

82.   FE1 said the information in the file she accidently saw illuminated the transactions she was seeing on the bank account records.

83.   "You would see money come in from corporate," FE1 said. "Then two-to-three days later, that money's going out to pay for new silver. Then shortly after that, we'd get the silver sales (revenue), and then you'd see the money going back to corporate."

84.   From the bank accounts, FE1 could glean that the SW Cayman office was sending the bulk of the revenue coming in from silver sales back to the corporate office accounts.

- 20 -

Consolidated Amended Class Action Complaint

85.     FE1 said of the estimated $7 billion in annual revenue, the SW Cayman accounts kept about $2 billion of that throughout the year, sending the rest to the corporate office.  "They did not hold the majority of their money here," she said.

86.     She said the revenue transferred to SW corporate in Vancouver was not done as a lump sum of the total coming in from silver sales revenue, but rather the amounts were broken up into smaller amounts over time.  "They wouldn't do it all in one time," she said of the revenue transfers. "They would do it in smaller amounts per week so it wouldn't seem suspicious."

87.     FE1 stated that all material funding and capitalization of SW Cayman appeared to be derived, directly or indirectly, from SW Canada, and, to the knowledge of FE1, no material independent funding or resources were derived by SW Cayman from a third party without guarantee or support from SW Canada.  In this regard, FE1 stated that substantially all capital funding of future supply agreements with third parties was provided or facilitated by SW Canada. Accordingly, any economic loss on a default of such agreements by the counterparties to those agreements would be borne by SW Canada.

88.     SW Canada also guaranteed certain obligations of SW Cayman, such as the Silver Purchase Agreement among SW Canada, SW Cayman, Barrick International Bank Corp., and Barrick Gold Corporation, dated September 8, 2009. In the absence of any independent assets, any default by SW Cayman in respect of such guaranteed obligations would also be borne by SW Canada.

89.     SW Cayman was not regarded by SW Canada and SW Cayman employees as an entity or enterprise separate and distinct from SW Canada.  FE1 reports that SW Cayman was simply viewed as a branch of SW Canada by employees of SW Canada and SW Caymans.  FE1 states that staff at Silver Wheaton "always referred to the Cayman office as a branch office to [SW Canada]".  The content of the Tartarkin Resume similarly refers to SW Cayman as "the Cayman Islands office for

1  Silver Wheaton Corp." and as "the Cayman Islands based operating arm of Silver

2  Wheaton".

3         90.    The website of Silver Wheaton (www.silverwheaton.com) also referred

4  to the premises of SW Cayman as the "Cayman Islands office" during the Period.

5  Both the Annual Reports and the AIFs issued by SW Canada during the Period

6  consistently reported the operations of the Silver Wheaton group of companies on a

7  consolidated basis and did not distinguish SW Cayman as conducting a free-standing

8  enterprise.

9         91.    Ultimately, no third party would have contracted independently with SW

10 Cayman, absent its wholly-owned relationship with SW Canada.  Absent the efforts

11 and involvement of SW Canada in securing and funding streaming agreements and

12 managing and directing the activities that were undertaken in the name of SW

13 Cayman, SW Cayman would have had no revenue during the Period.

14

15     *(b)*    ***The Obligations of SW Canada under the Transfer Pricing Rules***
       ***during the Period***

16     92.    Throughout the Period:

17         (i)     the Transfer Pricing Rules were well established,

18         (ii)    by virtue of (A) the detailed publications issued by the CRA prior

19     to, and during, the Period, including the CRA Circular, ten separate CRA

20     Transfer Pricing Memoranda, and additional materials posted on the

21     CRA's website, and (B) frequent seminars and publications on transfer

22     pricing issues released by leading industry groups in Canada, including

23     the Canadian Tax Foundation, the interpretation and assessment

24     practices of the CRA with respect to the application of the Transfer

25     Pricing Rules were well-known to all commercial enterprises in Canada,

26     including Defendants and

27

28

Consolidated Amended Class Action Complaint

(iii)   the T106 transfer pricing information returns that Canadian corporations were obligated to file with the CRA in respect of any transaction with a Related Non-Resident (as described in more detail below) clearly demanded the provision of detailed transfer pricing information in respect of the transaction.

93.   Section 247 of the Tax Act and the published administrative policies of the CRA clearly dictated that SW Canada was obligated to analyze all of the property, services, advantages, and other rights it provided to SW Cayman in respect of each taxation year during the Period, and assess whether the amounts charged for such Property were equivalent to the amounts that would have been agreed to by parties dealing with one another at arm's length.

94.   In assessing the transfer prices that were required to be charged by SW Canada to SW Cayman for all of the property, services, and opportunities provided to SW Cayman during the Period, all material facts were required to be considered by SW Canada, including the relative functions performed, assets employed, and risks assumed by each of SW Canada and SW Cayman in respect of their dealings.

95.   Even a cursory examination of the activities of each of the two companies would have revealed that property, services and opportunities of significant value were being transferred by SW Canada to SW Cayman during the Period.  The Transfer Pricing Rules required SW Canada to recognize consideration for such Property provided, determined on the basis of arm's length transfer prices, when computing its income for Canadian tax purposes.

96.   Throughout the Period, SW Canada was, at best, willfully blind to its reporting and compliance obligations under the Transfer Pricing Rules, and, at worst, knowingly contravened the Transfer Pricing Rules in its reporting practices.

97.   The 2006 Annual Report of SW Canada lauded the "unique corporate structure" of the company as resulting in the company not having to pay tax in respect of any of its current silver sales.  The maintenance of the "Cayman Islands

Consolidated Amended Class Action Complaint

office" (in the words of Nik Tatarkin) was a material incremental expense and source of organizational inefficiency.

98.    The decision to situate a "conduit" (in the words of FE1) in the Cayman Islands through which the commercial activities of Silver Wheaton were to be conducted reflected a material organizational and structural decision that would have necessitated the understanding and approval of the President, Chief Executive Officer, and Chief Financial Officer of SW Canada.

99.    The only purpose for establishing and maintaining SW Cayman was to reduce and avoid Canadian taxation.  The tax analysis that underlay such structuring would have been brought to the attention of all senior management of SW Canada. At the outset when SW Cayman was created SW senior management would have had to analyze the tax position of SW Caymans.

100.   SW repeatedly told investors in its annual reports and in AIFs each year that the zero tax rate in for SW Cayman was highly beneficial to SW's business and lauded its value.  Each year senior SW officers would have had to assess whether there had been any legislative developments or changes.

101.   All Canadian companies with significant non-resident activities, were aware that OECD members had begun an initiative called BEPS to address multi-nationals' evading income tax by shifting taxable income to low tax jurisdictions. Beginning in about 2010 senior SW financial and tax employees would have known of the BEPS initiative and the increased likelihood that SW's tax position vis-a-vis SW Caymans would be audited by the CRA.

102.   The AIFs of SW Canada during the Period strongly demonstrate that the Company knowingly disregarded the Transfer Pricing Rules.  SW Canada's AIFs during the Period consistently stated that:

(i)     SW Canada's profit was derived from its subsidiary, SW Cayman, and

(ii)    since SW Cayman was incorporated and operated in the Cayman Islands, the profits of SW Canada would bear no tax.

103.   Similarly, the Annual Reports filed by SW Canada during the Period erroneously indicated that the "income earning activities" of Silver Wheaton, including the purchase of silver from third party mines, and the subsequent sales to various third party customers, were performed by SW Cayman, without reference to any of the functions performed, assets devoted, or risks assumed by SW Canada in respect of the enterprise.

104.   Each of the foregoing statements was premised on a false and misleading depiction of the manner in which the activities of the Silver Wheaton group of companies were conducted.

105.   The Transfer Pricing Rules required SW Canada to (i) separately identify the property, services, advantages, and other rights it provided to SW Cayman in respect of each taxation year during the Period, and (ii) assess whether the amounts charged for such Property were equivalent to the amounts that would have been agreed to by parties dealing with one another at arm's length.

106.   SW Canada provided (i) material strategic and operational guidance and oversight, (ii) commercial introductions and opportunities, (iii) commercial due diligence support, (iv) negotiation assistance and support, (v) legal documentation and execution support, (vi) reputational, brand and commercial intellectual property and know-how, (vii) financial support, capitalization, and guarantees, (viii) the assumption of commercial and financial risk, (ix) back office and administrative support, and (x) tax compliance support to SW Cayman during the Period.  The AIFs and Annual Reports of SW Canada indicate that SW Canada recognized no material revenue for tax purposes in respect of the provision of such Property in respect of any taxation year during the Period in express contravention of the Transfer Pricing Rules.  Had SW Canada properly identified the arm's length transfer prices that would have been paid in exchange for the Property described above, and included such amounts in computing its taxable income as required by the Transfer Pricing Rules, the taxable income of SW Canada in respect of each of the taxation years in

Consolidated Amended Class Action Complaint

1   the Period would have been materially higher ($715 million during the Period),

2   leading to a material increase in the current and/or future Canadian income tax

3   liabilities of SW Canada ($150 million during the Period).

4      107.   The press release that was issued by SW Canada on July 6, 2015

5   announcing the receipt of a proposal letter from the CRA to assess significant transfer

6   pricing adjustments and penalties (the "Press Release") underscores the fact that SW

7   Canada did not properly account for the Property provided to SW Cayman during the

8   Period in accordance with the Transfer Pricing Rules.  In particular, the Press Release

9   continued to erroneously state that income earned in respect of streaming contracts to

10   which SW Cayman was a party was not subject to Canadian income tax, apparently

11   on the basis that SW Cayman was the nominal signatory to such operative

12   agreements (and later sale agreements), again without regard to the actual property,

13   services, advantages, and other rights provided, and risks assumed, by SW Canada in

14   connection with such activities, and the resulting application of the Transfer Pricing

15   Rules thereto.

16          *(c)*   ***Clear Awareness of Obligations under the Transfer Pricing Rules***

17      108.   SW Canada was repeatedly made aware of its reporting and compliance

18   obligations under the Transfer Pricing Rules in the course of completing its annual

19   tax filings.  The second page of the general corporation income tax return that SW

20   Canada was required to file each year posed the express question whether SW

21   Canada "had any non-arm's length transactions with a non-resident" during the year.

22   If the answer was "yes", SW Canada was directed to file a special T106 Transfer

23   Pricing Information Return (a "T106 Return") with the CRA.

24      109.   The circumstances under which a taxpayer is required to file a T106

25   Return are set out in section 233.1 of the Tax Act.  Subsection 233.1(2) of the Tax

26   Act provides that a person who is resident in Canada (a "Reporting Person") is

27   required to file an information return (i.e., a T106 Return) in respect of each non-

28   resident person with whom the Reporting Person does not deal at arm's length in

Consolidated Amended Class Action Complaint

respect of all "reportable transactions" with the non-resident in a year.  Subsection 233.1(1) of the Tax Act generally defines a "reportable transaction" as a transaction or series of transactions that relate in any manner whatever to a business carried on by a Reporting Person in a taxation year.[27]  Except for a de minimis exception that applies where the total fair market value of all property or services relating to all "reportable transactions" of a Reporting Person (and certain other non-arm's length persons) for a particular taxation year does not exceed CDN\$1 million, the obligation to file a T106 Return is generally absolute.

110.  The T106 Return expressly requires a Canadian taxpayer to report arrangements involving the provision of all types of Property, including intangible property, to a Related Non-Resident, regardless of whether consideration is payable by the non-resident for such property.  The T106 Return also requires taxpayers to indicate whether they have prepared or obtained contemporaneous documentation in respect of all transactions with a Related Non-Resident in respect of each year.

111.  A knowledgeable authorized officer of SW Canada was required to review, ensure the accuracy of, and sign the T106 Return.

112.  The CRA's Audit Manual underscores the significance that the CRA placed on the T106 Return during the Period.  The Audit Manual indicated that the T106 Return "was introduced in 1988 to combat abuses in transfer pricing and provide the CRA with information on non-arm's length transactions with non-residents".  The Audit Manual also contained a special "grid" of "tax havens",[28] and the Audit Manual expressly stipulated that "the T106 return, as well as its related database, are key audit screening and planning tools for tax haven issues".

### (d)  Likelihood of a Successful Canadian Transfer Pricing Reassessment

---

[27]  For these purposes, a "transaction" is defined expansively as including an arrangement or event.

[28]  Although protected from disclosure, the "grid" is widely believed to have included the Cayman Islands.

113.   If the commercial activities of SW Canada in respect of the Period were audited by the CRA as they related to the interactions between SW Canada and SW Cayman, there was no reasonable basis to believe that the CRA would not seek to (i) ascribe arm's length transfer prices to the Property provided by SW Canada to SW Cayman during the Period, (ii) include such additional revenue amounts in the computation of the taxable income of SW Canada in respect of the relevant taxation years, and (iii) reassess SW Canada for additional income tax payable, computed on the basis of the increased taxable income of SW Canada.

114.   In proceedings before the Tax Court of Canada, the taxpayer generally bears the burden of "demolishing" each of the factual assumptions made by the Minister of National Revenue (Canada) in support of a reassessment.[29] There is no material basis upon which SW Canada could successfully establish that a person dealing at arm's length with SW Cayman would have been willing to provide the Property provided by SW Canada to SW Cayman during the Period for nominal consideration.

115.   Accordingly, it was readily apparent at all material times that it was clearly more likely than not, and indeed nearly certain, that, if SW Canada was subject to a comprehensive tax audit by the CRA, (i) the income tax payable by SW Canada would be reassessed on the basis of an increased level of taxable income that included additional revenue from the provision of the Property to SW Cayman, computed on the basis of arm's length transfer prices, and (ii) any attempt to appeal any such reassessments to the Canadian courts would not be entirely successful.

116.   There was information in the market in Canada and obvious and known to SW senior officers beginning in 2009, with public announcement of the well-known tax transfer pricing case involving Cameco Corporation ("Cameco") that the CRA was prioritizing audits of Canadian companies with large foreign income in low

---

[29]   See, for example, *Hickman Motors Ltd. v. The Queen*, [1997] 2 S.C.R. 336, 97 D.T.C. 5363.

Consolidated Amended Class Action Complaint

tax jurisdictions, particularly in the natural resources industry.  That SW was an extremely large and profitable entity and the vast majority of its profits were shifted to SW Caymans which was subject to zero income tax this would have been a red flag for the CRA to initiate a transfer pricing audit.  Thus it was known to Defendants that it was probable that SW Canada would be subject to a transfer pricing audit.

### (e)   CRA Assessment Practices During the Period

117.   The assessment practices of the CRA during the Period and during the Class Period were consistent with the statements made by the agency in its external publications.  For instance, the CRA issued a sizeable transfer pricing reassessment of Cameco during the Period in a highly publicized case that was principally premised on the assertion that Cameco had failed to adhere to the Transfer Pricing Rules when transacting with a non-resident subsidiary in connection with the purchase and sale of uranium.

118.   In the Cameco case, the CRA undertook an extensive review of the functions performed by Cameco, the risks assumed by Cameco, and the assets used and deployed by Cameco in connection with the subject transactions relative to those of its Swiss subsidiary and asserted, among other things, that all of the material functions and risks associated with the transactions undertaken by the two parties were performed or borne by Cameco.  Accordingly, the CRA asserted that all of the profits derived from the activities of Cameco and its Swiss subsidiary should accrue to Cameco and be included in Cameco's income.   The CRA founded its reassessments on both the application of the Transfer Pricing Rules, as well as the application of the sham doctrine and subsection 56(2) of the Tax Act.

119.   The circumstances of the Cameco case and SW Cayman bear broad similarities.   In each case, the Canadian corporate parent (i.e., Cameco and SW) provided significant Property to a Related Non-Resident subsidiary (SW Cayman) at prices that were materially less than the transfer prices that would have been mutually agreeable to parties dealing with one another at arm's length.   In each case, the

Consolidated Amended Class Action Complaint

Canadian corporate parent wished to divert business opportunities and expected future profits to an entity situated outside of Canada that would not be directly subject to Canadian income tax filing and payment obligations.  In each case, substantive commercial functions of value were performed by the corporate parent for the benefit of the Related Non-Resident subsidiary without material compensation.

120.   Thus, Defendants knew that SW Canada's tax position vis-à-vis SW Cayman was indefensible and without any reasonable basis and was highly likely to result in a future tax assessment for past due income taxes, penalties and interest in material amounts.

**Violations of GAAP Render Financial Statements False and Misleading**

121.   Generally accepted accounting principles ("GAAP") constitutes those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.

122.   GAAP are the common set of accounting principles, standards, and procedures that companies in the United States and Canada use to compile their financial statements.

123.   SEC and NYSE rules and regulations require that publicly traded companies such as SW include financial statements that comply with GAAP in their annual and quarterly reports filed with the SEC.  See Sections 12 and 13 of the Exchange Act; Rule 10-01(d) of Regulation SX.

124.   SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1) (emphasis added).

**Accounting Principles Imposed a Duty to Disclose SW's Tax Liabilities**

125.   As a Canadian corporation for fiscal years ended December 31, 2005 through 2010, SW prepared its financial statements according to Canadian GAAP.

- 30 -

Consolidated Amended Class Action Complaint

126. During the Class Period, SEC regulations required that all financial statements that SW files with the SEC if prepared under Canadian GAAP, must provide footnotes that reconcile any material differences between Canadian and US GAAP.

127. For fiscal years ended December 31, 2011 through 2014, SW prepared its financial statements was required to filed them with the SEC according to International Financial Reporting Standards ("IFRS"). IFRS are accounting principles that are substantially similar to U.S. and Canadian GAAP.

128. Under U.S. and Canadian GAAP, as well as IFRS, an uncertain tax position liability is generally defined as a present or possible obligation that arises from past events in which there is uncertainty as to the probability that the obligation will result in an outflow of resources or uncertainty as to the amount of the outflow.

129. As of March 31, 2011, U.S. GAAP (and Canadian GAAP) required that an issuer record in the financial statements the existence of an uncertain tax position liability if that liability was "more likely than not" to be incurred. ASC 740.  Indeed, SW stated in its 2010 Annual Report at page 71, that it adopted ASC 740 in regard to accounting for uncertainty in income taxes.

130. Under ASC 740, SW in determining whether a liability must be recorded for its tax position under Transfer Pricing Rules concerning profits earned by SW Caymans, SW was required to assume that the CRA would audit its transfer pricing position and make a determination whether it was "more likely than not" (i.e. 51% or higher likelihood") that SW's transfer pricing tax position violated CRA Transfer Pricing Rules and would assess SW additional income taxes, penalties and interest for the years 2005-2010.

131. IFRS, IAS 37 and IAS 12, the applicable accounting principle for uncertain tax positions for SW from fiscal 2011 through 2015, is quite similar to ASC 740.  Under IFRS 37 and 12, SW was required to recognize a tax liability for income taxes based on its transfer pricing tax position for shifting income from SW Canada

- 31 -
Consolidated Amended Class Action Complaint

to SW Caymans, if it was "more likely than not" (i.e. 51% or higher likelihood") that SW's transfer pricing tax position violated CRA Transfer Pricing Rules and assess SW additional income taxes for the years 2005-2010.

132.   Even if SW truly was not required to recognize and record an uncertain tax position liability as detailed above (and it was), IFRS 12 and IFRS 37¶86, still mandated that SW disclose in the notes to its financial statements the existence of the uncertain tax position liability resulting from its dealings with SW Cayman because the chance of being assessed the income tax was not "remote".  Under 37 ¶86, SW was therefore required to disclose (a) an estimate of the dollar amount of the uncertain tax position liability, (b) an indication of the uncertainties relating to the amount or timing of any outflow; and (c) the possibility of any reimbursement.

133.   The egregiousness of SW's tax position, and the probability the CRA would assess additional income taxes when SW was audited, is exemplified by the CRA's determination that "the transfer pricing provisions of the Act relating to income earned by the Company's foreign subsidiaries outside of Canada should apply such that the income of Silver Wheaton subject to tax in Canada should be increased by an amount equal to ***substantially all of the income earned outside of Canada by the Company's foreign subsidiaries.*** [emphasis added].

134.   Thus, CRA determined that SW didn't just make a small mistake in its transfer pricing tax position.  The CRA found the entirety of the tax position that SW maintained to be wholly unjustified and unlawful.

135.   The lack of any reasonable basis for SW's transfer pricing tax position is further evidenced by the fact that CRA assessed SW a penalty equal to 10% of the income that was unlawfully not declared.  This penalty is required to be assessed where the tax payer has not complied with its obligation to file with its tax returns the necessary documentation that the transactions between the Canadian entity and the offshore entity are on arms length or fair market value terms.

**Materially False And Misleading Statements Issued During the Class Period**

136.   The Class Period starts on March 30, 2011, when the Company filed a Form 40-F for the fiscal year ended December 31, 2010 (the "2010 40-F") with the SEC, which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting was effective as of December 31, 2010. The 2010 40-F was signed by Defendant Barnes. The 2010 40-F contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Barnes and Brown, which stated that the financial information contained in the 2010 40-F was accurate and disclosed any material changes to the Company's internal control over financial reporting.

137.   The 2010 40-F stated that "The Company prepares its financial statements in accordance with Canadian generally accepted accounting principles which are reconciled to United States generally accepted accounting principles in Note 14 of the audited consolidated financial statements of the Company as of December 31, 2010 and 2009 and for each of the years in the three year period ended December 31, 2010, including the reports of the Independent Registered Chartered Accountants with respect thereto, included as Exhibit 99.2 of this annual report on Form 40-F (the "Audited Financial Statements")."

138.   Exhibit 99.2 of the 2010 40-F contained SW's financial statements beginning on page 36 with a statement by CEO Barnes and CFO Brown  that the financial statements "were prepared by management, which is responsible for the integrity and fairness of the information presented, including the many amounts that must of necessity be based on estimates and judgments. These consolidated financial statements were prepared in accordance with Canadian generally accepted accounting principles ("Canadian GAAP") and include a footnote providing a reconciliation from Canadian GAAP to accounting principles generally accepted in the United States ("US GAAP").

139.    The financial statements contained balance sheets for fiscal years ended December 31, 2009 and 2010.

140.    The balance sheets for 2009 and 2010 were false and misleading for omitting to include a then present tax position liability of $207 million (consisting of $150 million of unpaid income tax and $57 million of mandatory penalties, but not including interest). which arose by SW's violating the CRA Transfer Pricing Rules to avoid paying Canadian corporate income tax on $567 million of income by unlawfully shifting SW's income to its subsidiary, SW Caymans for which no income tax is payable in the Cayman Islands.

141.    Under then operative U.S. GAAP, ASC 740, SW was required to recognize and record a tax position liability of $207 million if it was more likely than not that its transfer pricing tax position with respect to SW's transactions with SW Cayman, specifically SW's provision of property, services, advantages, and other rights to SW, did not conform to CRA Transfer Pricing Rules and would therefore result in the assessment of additional taxes.

142.    In addition, the 2010 Form 40-F and exhibits thereto, were misleading for failing to disclose the existence of the CRA audit of SW's transfer pricing transactions with SW Caymans and SW's transfer pricing tax position as of the date the Form 40-F was filed with the SEC on March 30, 2011.

143.    According to FE1, in May 2011, the CRA visited the Caymans and began its audit of its transactions with SW to determine if transfer pricing rules were violated and income tax payable. Prior to arrival of CRA auditors, Silver Wheaton sent a team of internal accountants and auditors to SW Cayman Islands to prepare the staff and office for the audit.

144.    Defendants were aware of the CRA audit as of March 30, 2011 because consistent with its standard procedures, the CRA would have commenced the audit of SW by making a firm request for SW to provide copies of all of its contemporaneous documentation concerning the transactions between SW Canada and SW Caymans

within 3 months.  Subsection 247(4) of the Tax Act effectively deems a taxpayer not to have made or obtained contemporaneous documentation if they do not deliver it within 3 months of receiving a proper written request from the CRA.  The visit by CRA auditors would therefore have occurred only after the 90 day period elapsed for SW to provide the requested documentation and only after some period of time (several weeks) in which CRA auditors would have reviewed SW's documentation before visiting SW Caymans and initiating the formal audit.   Since the CRA audit team arrived at SW Cayman's office in May 2011, SW and the Individual Defendants were aware of the CRA tax audit no later than February 2011.

145.   On May 9, August 8, and November 9, 2011, the Company filed Form 6-Ks with the SEC attaching its first, second and third quarter results for the periods ending March 31, June 30, and September 30, 2011 respectively (the "2011 Qs") each of which was signed by Defendant Smallwood. The 2011 Qs each also contained signed certifications on FORM 52-109F2 by Defendants Smallwood and Brown, who both certified that:

> 2.  No misrepresentations: Based on my knowledge, having exercised reasonable diligence, the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, with respect to the period covered by the interim filings.
>
> 3. Fair presentation: Based on my knowledge, having exercised reasonable diligence, the interim financial report together with the other financial information included in the interim filings fairly present in all material respects the financial condition, financial performance and cash flows of the issuer, as of the date of and for the periods presented in the interim filings.

146.   The 2011 Qs were false and misleading for the same reasons that the 2010 40-F and exhibits thereto were false and misleading as described above, i.e., for failing to recognize and record $207 million of income tax position liabilities.

147.   On March 27, 2012, the Company filed a Form 40-F for the fiscal year ended December 31, 2011 (the "2011 40-F") with the SEC, which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting was effective as of December 31, 2011. The 2011 40-F was signed by Defendant Smallwood. The 2011 40-F contained signed SOX certifications by Defendants Smallwood and Brown, which stated that the financial information contained in the 2011 40-F was accurate and disclosed any material changes to the Company's internal control over financial reporting.

148.   The 2011 40-F stated that "On January 1, 2011, the Company adopted International Financial Reporting Standards ("IFRS") for financial reporting purposes, using a transition date of January 1, 2010. The Company's audited annual Consolidated Financial Statements for the year ended December 31, 2011, including 2010 required comparative information (the "Audited Financial Statements"), have been prepared in accordance with IFRS, as issued by the International Accounting Standards Board ("IASB")".

149.   Exhibit 99.2 of the 2011 40-F contained an annual report with SW's audited financial statements beginning on page 37 with a statement by CEO Smallwood and CFO Brown that: "The accompanying consolidated financial statements of Silver Wheaton Corp. ("Silver Wheaton") were prepared by management, which is responsible for the integrity and fairness of the information presented, including the many amounts that must of necessity be based on estimates and judgments. These consolidated financial statements were prepared in accordance with International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board."

150.    The financial statements contained balance sheets for fiscal years ended December 31, 2011 and 2010.

151.    The balance sheets for 2011 and 2010 were false and misleading for omitting to include a then present tax position liability of $207 million (consisting of $150 million of unpaid income tax and $57 million of mandatory penalties, but not including interest). which arose by SW's violating the CRA Transfer Pricing Rules, to avoid paying Canadian corporate income tax on $567 million of income by unlawfully shifting SW's income to its subsidiary, SW Caymans for which no income tax is payable in the Cayman Islands.

152.    Under IFRS 12 and 37, SW was required to recognize and record a tax position liability of $207 million if it was more likely than not that its transfer pricing tax position with respect to SW's transactions with SW Cayman, specifically SW's provision of property, services, advantages, and other rights to SW, did not conform to CRA Transfer Pricing Rules and would therefore result in the assessment of additional taxes.

153.    In the alternative, if the tax position liability was not properly considered to be "more likely than not" under IFRS 12 and 37, and recording a tax position liability was not required (and it was required), SW was still obligated to disclose in the footnotes to its 2011 40-F financial statements the existence of a contingent tax position liability in the amount of approximately $207 million for unpaid income tax and penalties.  SW did not include any disclosure of the $207 million contingent tax position liability and therefore its financial statements violated IFRS 12 and 37 and were false and misleading.

154.    On April 2, 2013, the Company filed a Form 40-F for the fiscal year ended December 31, 2012 (the "2012 40-F") with the SEC, which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting was effective as of December 31, 2012. The 2012 40-F was signed by Defendant Smallwood. The 2012 40-F contained signed

SOX certifications by Defendants Smallwood and Brown, which stated that the financial information contained in the 2012 40-F was accurate and disclosed any material changes to the Company's internal control over financial reporting.

155.  The 2012 40-F stated that the Company's audited annual consolidated financial statements for the year ended December 31, 2012, and related notes thereto, have been prepared in accordance with IFRS, as issued by the International Accounting Standards Board.

156.  Exhibit 99.2 of the 2012 40-F contained an annual report with SW's audited financial statements beginning on page 45 with a statement by CEO Smallwood and CFO Brown that: "The accompanying consolidated financial statements of Silver Wheaton Corp. ("Silver Wheaton") were prepared by management, which is responsible for the integrity and fairness of the information presented, including the many amounts that must of necessity be based on estimates and judgments. These consolidated financial statements were prepared in accordance with International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board."

157.  The financial statements contained balance sheets for fiscal years ended December 31, 2012 and 2011.

158.  The balance sheets for 2012 and 2011 were false and misleading for omitting to include a then present tax position liability of $207 million (consisting of $150 million of unpaid income tax and $57 million of mandatory penalties, but not including interest). which arose by SW's violating the CRA Transfer Pricing Rules, to avoid paying Canadian corporate income tax on $567 million of income by unlawfully shifting SW's income to its subsidiary, SW Caymans for which no income tax is payable in the Cayman Islands.

159.  Under IFRS 12 and 37, SW was required to recognize and record a tax position liability of $207 million if it was more likely than not that its transfer pricing tax position with respect to SW's transactions with SW Cayman, specifically SW's

Consolidated Amended Class Action Complaint

1  provision of property, services, advantages, and other rights to SW, did not conform

2  to CRA Transfer Pricing Rules and would therefore result in the assessment of

3  additional taxes.

4      160.   In the alternative, if the tax position liability was not properly considered

5  to be "more likely than not" under IFRS 12 and 37, and recording a tax position

6  liability was not required (and it was required), SW was still obligated to disclose in

7  the footnotes to its 2012 40-F financial statements the existence of a contingent tax

8  position liability in the amount of approximately $207 million for unpaid income tax

9  and penalties.  SW did not include any disclosure of the $207 million contingent tax

10 position liability and therefore its financial statements violated IFRS 12 and 37 and

11 were false and misleading.

12     161.   On March 31, 2014, the Company filed a Form 40-F for the fiscal year

13 ended December 31, 2013 (the "2013 40-F") with the SEC, which provided the

14 Company's year-end financial results and position and stated that the Company's

15 internal control over financial reporting was effective as of December 31, 2013. The

16 2013 40-F was signed by Defendant Smallwood. The 2013 40-F contained signed

17 SOX certifications by Defendants Smallwood and Brown, which stated that the

18 financial information contained in the 2013 40-F was accurate and disclosed any

19 material changes to the Company's internal control over financial reporting.

20     162.   The 2013 40-F stated that the Company's audited annual consolidated

21 financial statements for the year ended December 31, 2013, have been prepared in

22 accordance with IFRS, as issued by the International Accounting Standards Board.

23     163.   Exhibit 99.2 of the 2013 40-F contained an annual report with SW's

24 audited financial statements beginning on page 47 with a statement by CEO

25 Smallwood and CFO Brown that: "The accompanying consolidated financial

26 statements of Silver Wheaton Corp. ("Silver Wheaton") were prepared by

27 management, which is responsible for the integrity and fairness of the information

28 presented, including the many amounts that must of necessity be based on estimates

- 39 -

Consolidated Amended Class Action Complaint

and judgments. These consolidated financial statements were prepared in accordance with International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board."

164.    The financial statements contained balance sheets for fiscal years ended December 31, 2013 and 2012.

165.    The balance sheets for 2013 and 2012 were false and misleading for omitting to include a then present tax position liability of $207 million (consisting of $150 million of unpaid income tax and $57 million of mandatory penalties, but not including interest). which arose by SW's violating the CRA Transfer Pricing Rules, to avoid paying Canadian corporate income tax on $567 million of income by unlawfully shifting SW's income to its subsidiary, SW Caymans for which no income tax is payable in the Cayman Islands.

166.    Under IFRS 12 and 37, SW was required to recognize and record a tax position liability of $207 million if it was more likely than not that its transfer pricing tax position with respect to SW's transactions with SW Cayman, specifically SW's provision of property, services, advantages, and other rights to SW, did not conform to CRA Transfer Pricing Rules and would therefore result in the assessment of additional taxes.

167.    In the alternative, if the tax position liability was not properly considered to be "more likely than not" under IFRS 12 and 37, and recording a tax position liability was not required (and it was required), SW was still obligated to disclose in the footnotes to its 2013 40-F financial statements the existence of a contingent tax position liability in the amount of approximately $207 million for unpaid income tax and penalties.  SW did not include any disclosure of the $207 million contingent tax position liability and therefore its financial statements violated IFRS 12 and 37 and were false and misleading.

168.    On March 31, 2015, the Company filed a Form 40-F for the fiscal year ended December 31, 2014 (the "2014 40-F") with the SEC, which provided the

Consolidated Amended Class Action Complaint

Company's year-end financial results and position and stated that the Company's internal control over financial reporting was effective as of December 31, 2014. The 2014 40-F was signed by Defendant Smallwood. The 2014 40-F contained signed SOX certifications by Defendants Smallwood and Brown, which stated that the financial information contained in the 2014 40-F was accurate and disclosed any material changes to the Company's internal control over financial reporting.

169.   The 2014 40-F stated that the Company's audited annual consolidated financial statements for the year ended December 31, 2014, have been prepared in accordance with IFRS, as issued by the International Accounting Standards Board.

170.   Exhibit 99.2 of the 2014 40-F contained an annual report with SW's audited financial statements beginning on page 51 with a statement by CEO Smallwood and CFO Brown that: "The accompanying consolidated financial statements of Silver Wheaton Corp. ("Silver Wheaton") were prepared by management, which is responsible for the integrity and fairness of the information presented, including the many amounts that must of necessity be based on estimates and judgments. These consolidated financial statements were prepared in accordance with International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board."

171.   The financial statements contained balance sheets for fiscal years ended December 31, 2014 and 2013.

172.   The balance sheets for 2014 and 2013 were false and misleading for omitting to include a then present tax position liability of $207 million (consisting of $150 million of unpaid income tax and $57 million of mandatory penalties, but not including interest). which arose by SW's violating the CRA Transfer Pricing Rules, to avoid paying Canadian corporate income tax on $567 million of income by unlawfully shifting SW's income to its subsidiary, SW Caymans for which no income tax is payable in the Cayman Islands.

Consolidated Amended Class Action Complaint

173.   Under IFRS 12 and 37, SW was required to recognize and record a tax position liability of $207 million if it was more likely than not that its transfer pricing tax position with respect to SW's transactions with SW Cayman, specifically SW's provision of property, services, advantages, and other rights to SW, did not conform to CRA Transfer Pricing Rules and would therefore result in the assessment of additional taxes.

174.   In the alternative, if the tax position liability was not properly considered to be "more likely than not" under IFRS 12 and 37, and recording a tax position liability was not required (and it was required), SW was still obligated to disclose in the footnotes to its 2014 40-F financial statements the existence of a contingent tax position liability in the amount of approximately $207 million for unpaid income tax and penalties.  SW did not include any disclosure of the $207 million contingent tax position liability and therefore its financial statements violated IFRS 12 and 37 and were false and misleading.

## **The Truth Emerges**

175.   On July 6, 2015, after market close, the Company issued a press release announcing that the CRA is proposing to reassess SW under various rules under the Income Tax Act (Canada). CRA takes the position that SW owes $567 million of taxes from the taxation years of 2005 to 2010 from income generated by SW's foreign subsidies. The press release states  in relevant part:

> VANCOUVER, July 6, 2015 /PRNewswire/ - Silver Wheaton Corp. ("Silver Wheaton" or the "Company") (SW) (SW) *announces that it has received a proposal letter dated July 6, 2015 (the "Proposal") from the Canada Revenue Agency (the "CRA") in which the CRA is proposing to reassess Silver Wheaton under various rules contained in the Income Tax Act (Canada).*

*The Proposal outlines CRA's position that the transfer pricing provisions of the Income Tax Act (Canada) relating to income earned by our foreign subsidiaries outside of Canada should apply such that the income of Silver Wheaton subject to tax in Canada should be increased for the 2005 to 2010 taxation years (the "Relevant Taxation Years") by approximately Cdn$715 million (US$567 million).* The issuance of the Proposal does not require the Company to pay any amount to the CRA at this time.

Management believes that the Company has filed its tax returns and paid applicable taxes in compliance with Canadian tax law. Silver Wheaton intends to vigorously defend its tax filing positions and is now in the process of preparing its response to the Proposal.

"We remain confident in our business structure which we believe is consistent with that typically used by Canadian companies, including Canadian streaming companies, that have international operations," said Randy Smallwood, President and Chief Executive Officer of Silver Wheaton.

"Generally a company is taxable in Canada on its income earned in Canada, while non-Canadian income earned by foreign subsidiaries is not subject to Canadian income tax. However, with this Proposal, the CRA is seeking to tax, within Canada, streaming income earned outside of Canada by our foreign subsidiaries related to mines located outside of Canada," added Smallwood.

Failing a resolution at the Proposal stage, the CRA may proceed to issue notices of reassessment for one or more of the Relevant Taxation Years. If the CRA reassesses Silver Wheaton on the basis outlined in the Proposal, and assuming that Silver Wheaton would be assessed taxes on the foreign subsidiaries' income on the same basis as its Canadian income, Silver Wheaton currently estimates on a preliminary basis that it would be subject to federal and provincial tax of approximately US$150 million in respect of the Relevant Taxation Years. The Proposal also indicates that the CRA is seeking to apply transfer pricing penalties of approximately Cdn$72 million (US$57 million) in respect of the Relevant Taxation Years. The Proposal does not indicate the amount of interest or other penalties in respect of the

Relevant Taxation Years. Further, taxation years subsequent to 2010 remain open to audit by the CRA.

Should Silver Wheaton receive a notice of reassessment from the CRA based upon the Proposal, we intend to file a notice of objection within the required 90 day period provided under the *Income Tax Act (Canada)*. In such a circumstance, Silver Wheaton would be required to pay 50% of the reassessed amount of tax, interest and penalties. This amount, plus interest, would be refunded if the Company were ultimately successful in challenging a reassessment. Any notice of objection would be reviewed by the CRA's Appeals Division. Silver Wheaton also has the right to appeal directly to the Tax Court of Canada 91 days after the date of filing of any notice of objection.

The timing for the Proposal process, the CRA appeals process and/or court process (if necessary following the issuance by CRA of any notices of reassessment), is uncertain. Regardless of the timing, Silver Wheaton intends to vigorously defend its tax filing positions.

(Emphasis added).

176. The next morning, on this news, the Company's share price opened $0.90 lower and continued falling. On July 7, 2015, SW's share price fell $2.08 per share or approximately 12% to close at $15.46 per share on July 7, 2015, as a result of the disclosure that SW had been concealing a Canadian tax liability in excess of $207 million.

177. In a July 8, 2015 analyst report titled "Coping With 'Guilty Until Proven Innocent'", Dundee Capital Markets estimated that the CRA tax audit could reduce Net Asset Value of SW by 40%, and reduced its target price from CDN $33/share to CDN $28/share.

178. In an August 12, 2015 analyst report titled "Q2/15 Results; All Eyes Still On CRA Audit", CIBC reduced its estimate of Net Asset Value of, and price target for, Silver Wheaton by 30% in response to the CRA audit.

179. An August 13, 2015 JP Morgan analyst report noted that "CRA Tax Audit Likely to Overhang the Stock."

Consolidated Amended Class Action Complaint

180.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities Plaintiffs and other Class members have suffered significant losses and damages.

### ADDITIONAL EVIDENCE OF DELIBERATE MISCONDUCT

#### (a)  *Tatarkin and Carpenter hid financial records from SW's auditors*

181.   FE1 kept a hardcopy file in her office file cabinet of all the wire transfers to and from the SW Vancouver corporate office from SW Cayman Islands.

182.   When FE1 sent wire transfers of money to the SW Vancouver corporate office, she kept hardcopies of the transfer confirmations in a file in her office. The file also contained the records about the transfers coming in from Vancouver corporate office.

183.   The file was kept with all of her other files with the Cayman Islands office's financial records. She was instructed to keep the files organized so that when outside auditors visited, they could easily find information or documentation they needed.

184.   FE1 noticed, however, that each time outside third party auditors arrived for the annual audit in 2009, 2010, 2011, 2012 and 2013, the file with the records of wire transfers to and from the SW corporate office was taken from her office without her knowledge.

185.   She believed that the file was hidden from the auditors and was kept in Tatarkin's office.

186.   FE1 said she realized the file went missing during the auditors' visits after she noticed the file would always show up on her office "in" tray to be re-filed after the auditors left. She did not know anyone had taken it from her file cabinet.

187.   She recalled at least one year, she looked for the file to file a wire transfer confirmation and it was not there. When she went to Carpenter to ask about it, he told her that the file was in Tatarkin's office and that he would get it for her.

1   "Sometimes he (Tatarkin) didn't bring it back, and I'd have a transfer action to do,"

2   she said. "Brad would say, 'Oh, that's in Nik's office.'"

3      188.   FE1 recalled the file went missing during auditors' visits in 2009, 2010,

4   2011, 2012 and 2013.

5      189.   When asked if the auditors could have looked at the accounting system

6   notes about the wire transfers, she said the outside auditors are "not going to look at

7   the accounting system itself. They're only going to look at the file of what is

8   transferred for year. They only ask for certain files."

9      *(b) Quarterly reports completed in the Cayman Islands did not include a*

10     *Canadian tax report*

11     190.   According to FE1, Quarterly financial reports completed in the Cayman

12  Islands did not include a Canadian tax report

13     191.   FE1 did not compile the quarterly reports for the Cayman Islands

14  operation, but she would see parts of it when Carpenter gave it to her to file.

15     192.   When reviewing the documents, she noticed there was never a Canadian

16  tax report. She thought this was strange because the other foreign companies she

17  worked for always had a tax report for the home country.

18     193.   When she asked Carpenter and Tatarkin why there was no Canadian tax

19  report, she was told it was not her concern.

20     *(c) Suspicious behavior when Canadian government officials visited*

21     *Cayman Islands office in May 2011 to determine its status and review its*

22     *tax filings*

23     194.   Officials from the Canadian government visited the Cayman Islands

24  office in May 2011 to determine if the operation was a separate entity than the

25  corporate operation in Vancouver. The Canadian officials were also there to

26  determine if the company filed the correct amount of taxes.

27

28

195.   FE1 suspected that Silver Wheaton might have been dodging Canadian taxes because of how her bosses behaved prior to the visit from Canadian government officials.

196.   In May 2011, officials from the Canadian government (CRA) visited the SW Cayman office for a review of its operations and financial records.

197.   Prior to the CRA officials' visit, SW sent down a team of internal accountants and auditors to the SW Cayman office to prep the SW Cayman employees about what to say to the CRA officials.

198.   FE1 recalled that the SW Canada team and Tatarkin gave her a pamphlet to study in preparation for her interview with the government officials. The pamphlet listed what she might be asked and what her answers should be.

199.   She was instructed to answer as briefly as possible and "not go into detail."

200.   For example, if she was asked what her job was, she was to say, "I'm an accountant," and not say anything more, she said.

201.   Bettina Charpentier, Vice President, Tax, at Silver Wheaton Corp., led the corporate contingent that went to the Caymans.

202.   With Tatarkin, Charpentier "grilled" FE1 and other employees in practice sessions to make sure they were answering questions professionally and in a way that would not raise suspicion.

203.   "From my experience with other companies, that was not the first time being questioned (by officials), but it was the first time a company had me practice what to say and they told you what they wanted you to say," FE1 said.

204.   She recalled that four Canadian government officials set up in the office boardroom and each employee went in for a private interview. After each interview, the Canadian officials met with Charpentier and Tatarkin to discuss the employee's answers.

205.   FE1 said the government officials were there to determine if the Cayman Islands office was a separate entity from the Vancouver corporate headquarters and also to review the taxes the company filed.

206.   "They wanted to confirm that these two companies, Silver Wheaton in Cayman and Silver Wheaton (corporate) was not one operation, that they were two separate entities," she said. "And that the income they were making was applied correctly on their taxes. That the amount they declared on their taxes was correct."

207.   The officials asked FE1 a series of questions.

208.   They told her, "We're here because we feel Silver Wheaton had not been paying their taxes, and we want to see if you know or you saw anything to help us to confirm this."

209.   When the officials asked her directly if she had seen anything that raised red flags in her mind, she said no. But she noted that Tatarkin and Charpentier later expressed displeasure with her that her facial expression had not assured the officials that she was being fully truthful.

210.   FE1 suspected that Silver Wheaton might have been dodging Canadian taxes.

211.   FE1 suspects the company might have been hiding something from Canadian tax officials when they visited the Cayman Islands office in May 2011.

212.   Carpenter and Tatarkin told the Cayman office employees that the company passed the review (tax audit). She never heard about any problems discovered by Canadian officials.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

213.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired SW securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at

all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

214.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, SW securities were actively traded on the New York Stock Exchange ("NYSE"). While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by SW or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

215.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

216.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

217.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of SW;

1      •     whether the Individual Defendants caused SW to issue false and
2              misleading financial statements during the Class Period;
3      •     whether Defendants acted knowingly or recklessly in issuing false and
4              misleading financial statements;
5      •     whether the prices of SW securities during the Class Period were
6              artificially inflated because of the Defendants' conduct complained of
7              herein; and
8      •     whether the members of the Class have sustained damages and, if so,
9              what is the proper measure of damages.

218.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

219.  Plaintiffs may rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

     •     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

     •     the omissions and misrepresentations were material;

     •     SW securities are traded in an efficient market;

     •     Over 8 billion of the Company's shares were traded with moderate to heavy volume on the NYSE during the Class Period;

     •     the Company was covered by multiple analysts;

     •     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold SW securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

220. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

221. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information, namely the $207 million tax position liability and, in their financial statements issued during the Class Period in violation of a duty to disclose such information, as detailed above.

## ALTERNATIVE BASES FOR REASSESSMENT

222. Past CRA assessment practices strongly indicate that the CRA will also found its transfer pricing reassessments of SW Canada on at least two additional bases that are also well supported by the facts described above.

(a)    The Sham Doctrine

223. The CRA has frequently challenged purported transactions where the terms of the transactions are not consistent with the commercial effect or actual operation of the relevant dealings.

224. The Canadian courts have consistently stated that where a set of dealings are found to be a "sham", the courts will consider the "real transaction" and disregard the one that was represented as being the real one when assessing the tax consequences of the applicable arrangements.[30]

225. The Supreme Court of Canada has defined a "sham" as "acts done or documents executed by the parties to the "sham" which are intended by them to give

---

[30] *Faraggi v. The Queen*, 2008 FCA 398, 2009 D.T.C. 5023 at para. 59, leave to appeal to S.C.C. refused, 398 N.R. 385 (note).

Consolidated Amended Class Action Complaint

to third parties or to the court the appearance of creating between the parties legal rights and obligations different from the actual legal rights and obligations (if any) which the parties intend to create".[31]

226.  The Supreme Court of Canada has further stated that a "sham" is to be taken to mean "a transaction conducted with an element of deceit so as to create an illusion calculated to lead the tax collector away from the taxpayer or the true nature of the transaction; or, simple deception whereby the taxpayer creates a facade of reality quite different from the disguised reality".[32]

227.  However, in setting the parameters of a "sham", the courts have cautioned that the "required intent or state of mind is not equivalent to *mens rea* and need not go so far as to give rise to what is known at common law as the tort of deceit… It suffices that parties to a transaction present it as being different from what they know it to be".[33]

228.  It is expected that the CRA will argue that the inter-position of SW Cayman between SW Canada and those third parties with which the Silver Wheaton corporate group entered into streaming and sale agreements was undertaken solely to mislead or misdirect the CRA into believing that the revenue from the sale of property acquired under the streaming and sale agreements accrued to SW Cayman, rather than SW Canada.  An analysis of the actual arrangements, including the burden of the risks, functions and assets deployed by the entities in the Silver Wheaton corporate group, illustrates that SW Cayman served as no more than a bare agent for SW Canada in executing streaming contracts and disposing of commodities acquired under such contracts.  The CRA is likely to assert that the agreements and arrangements among SW Canada, SW Cayman, and the streaming arrangement

---

[31] *The Queen v. Cameron*, [1974] S.C.R. 1062, 72 D.T.C. 6325 at para. 17.
[32] *Stubart Investments Ltd. v. The Queen*, [1984] 1 S.C.R. 536, 84 D.T.C. 6305 at para. 14.
[33] *Antle v. The Queen*, 2010 FCA 280, 2010 D.T.C. 5172 at para.20, leave to appeal to the S.C.C. refused, 423 N.R. 397 (note).

Consolidated Amended Class Action Complaint

1  counterparties were shams designed to deceive the government into believing that the
2  income and profit from those arrangements did not belong to SW Canada, despite SW
3  Canada being ultimately responsible for the performance of those arrangements and
4  undertaking all functions in respect of those arrangements other than signing certain
5  of the contracts thereunder.

6      (b)  <u>Indirect Benefits – Subsection 56(2) of the Tax Act</u>

7      229.  Where it is apparent that a return on property or a commercial
8  opportunity has been directed to be paid to a person other than the person that
9  possessed the property or opportunity (the "**Owner**"), the CRA has been inclined to
10 apply subsection 56(2) of the Tax Act to include the income derived from such
11 property or opportunities in the income of the Owner.  Specifically, subsection 56(2)
12 provides that an amount will be included in the income of a taxpayer who has not
13 received the income directly when the following four conditions are satisfied:

14          (i)    there is a payment or transfer of property to a person other than
15                 the taxpayer;
16          (ii)   the payment or transfer is pursuant to the direction of or with the
17                 concurrence of the taxpayer;
18          (iii)  the payment or transfer is for the taxpayer's own benefit or for the
19                 benefit of some other person on whom the taxpayer desires to
20                 have the benefit conferred; and
21          (iv)   the payment or transfer would have been included in computing
22                 the taxpayer's income if it had received it directly.

23     230.  Under comparable circumstances, the CRA has sought to reassess
24 taxpayers on the basis that payments made to an intermediary party (like SW
25 Cayman) pursuant to the direction, or with the concurrence, of the principal party that
26 would otherwise have been entitled to the payment (like SW Canada) should be
27 included in the income of the principal.

28

231.   It is expected that the CRA may cite subsection 56(2) as an alternative ground to reassess SW Canada on the basis that all amounts that were paid to SW Cayman were made at the direction, or with the concurrence, of SW Canada.  Absent the directions made by SW Canada, all payments made to SW Cayman would have accrued to SW Canada as the party that originated and secured the contractual rights that gave rise to the supply of silver that was nominally sold by SW Cayman at a profit.

## COUNT I

### Violations of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

232.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

233.   This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

234.  During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of SW securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire SW securities at artificially

1    inflated prices. In furtherance of this unlawful scheme, plan and course of conduct,

2    Defendants, and each of them, took the actions set forth herein.

3         235.   Pursuant to the above plan, scheme, conspiracy and course of conduct,

4    each of the Defendants participated directly or indirectly in the preparation and/or

5    issuance of the annual reports, SEC filings, press releases and other statements and

6    documents described above, including statements made to securities analysts and the

7    media that were designed to influence the market for SW securities. Such reports,

8    filings, releases and statements were materially false and misleading in that they

9    failed to disclose material adverse information and misrepresented the truth about

10    SW's business and financial statements.

11         236.   By virtue of their positions at SW, Defendants had actual knowledge of

12    the materially false and misleading statements and material omissions alleged herein

13    and intended thereby to deceive Plaintiffs and the other members of the Class, or, in

14    the alternative, Defendants acted with reckless disregard for the truth in that they

15    failed or refused to ascertain and disclose such facts as would reveal the materially

16    false and misleading nature of the statements made, although such facts were readily

17    available to Defendants. Said acts and omissions of Defendants were committed

18    willfully or with reckless disregard for the truth. In addition, each defendant knew or

19    recklessly disregarded that material facts were being misrepresented or omitted as

20    described above.

21         237.   Information showing that Defendants acted knowingly or with reckless

22    disregard for the truth is peculiarly within Defendants' knowledge and control. As the

23    senior officers of SW, the Individual Defendants had knowledge of the details of

24    SW's internal affairs, including its untenable transfer pricing tax position.

25         238.   The Individual Defendants are liable both directly and indirectly for the

26    wrongs complained of herein. Because of their positions of control and authority, the

27    Individual Defendants were able to and did, directly or indirectly, control the content

28    of the statements of SW. As officers and/or directors of a publicly-held company, the

Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to SW's businesses, operations, and financial condition.

239.  During the Class Period, SW securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of SW securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of SW securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of SW securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

240.  By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

241.  This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's and the Class's purchases of securities giving rise to the cause of action.

242.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

### COUNT II

### Violations of Section 20(a) of The Exchange Act
### <u>Against The Individual Defendants</u>

243.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

244.   During the Class Period, the Individual Defendants participated in the operation and management of SW, and conducted and participated, directly and indirectly, in the conduct of SW's business affairs. Because of their senior positions, they knew the adverse non-public information about SW's current financial position and future business prospects.

245.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to SW's business practices, and to correct promptly any public statements issued by SW which had become materially false or misleading.

246.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which SW disseminated in the marketplace during the Class Period concerning the Company's business, operational and accounting policies. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause SW to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of SW within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of SW securities.

247.   Each of the Individual Defendants, therefore, acted as a controlling person of SW. By reason of their senior management positions and/or being directors of SW, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, SW to engage in the unlawful acts and conduct

complained of herein. Each of the Individual Defendants exercised control over the general operations of SW and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

248. This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's and the Class's purchases of securities giving rise to the cause of action.

249. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by SW.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as her reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

Dated: December 18, 2015          Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Laurence M. Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiffs and Class*

Consolidated Amended Class Action Complaint

# Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against Silver Wheaton. The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis and will advance all costs and expenses. The Silver Wheaton. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by The Rosen Law Firm P.A.

| | |
|---|---|
| **First name:** | thomas |
| **Middle initial:** | s |
| **Last name:** | Bartsch |
| **Address:** | REDACTED |
| **City:** | |
| **State:** | |
| **Zip:** | |
| **Country:** | |
| **Facsimile:** | |
| **Phone:** | |
| **Email:** | |

Plaintiff certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.

5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

Acquisitions:

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 2/15/13 | 165 | 35.20 |
| Common Stock | 8/28/12 | 291 | 33.84 |
| Common Stock | 5/14/12 | 477 | 24.86 |
| Common Stock | 4/24/12 | 72 | 28.46 |
| Common Stock | 4/4/12 | 160 | 31.79 |
| Common Stock | 11/7/13 | 500 | 21.85 |
| Common Stock | 4/18/13 | 200 | 22.46 |
| Common Stock | 4/16/13 | 163 | 23.75 |
| Common Stock | 4/15/13 | 637 | 23.75 |
| Common Stock | 4/15/13 | 200 | 24.27 |
| Common Stock | 4/3/13 | 700 | 28.75 |
| Common Stock | 10/30/14 | 200 | 17.92 |

**Certification for thomas Bartsch (cont.)**

| | | |
|---|---|---|
| Common Stock3/11/15 | 250 | 18.25 |
| Common Stock10/9/14 | 1500 | 19.34 |
| Common Stock4/28/14 | 100 | 22.50 |
| Common Stock8/27/12 | 1193 | 34.25 |
| Common Stock4/18/12 | 94 | 29.80 |
| Common Stock3/9/12 | 267 | 35.80 |
| Common Stock12/28/11 | 294 | 27.56 |
| Common Stock9/29/11 | 333 | 30.00 |
| Common Stock5/12/11 | 58 | 34.10 |
| Common Stock1/20/11 | 62 | 30.97 |
| Common Stock12/22/10 | 108 | 36.75 |
| Common Stock12/13/10 | 220 | 39.33 |

Sales:

| Type of Security | Sale Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock7/3/12 | 1446.23 | 28.25 | |
| Common Stock10/8/14 | 1326.20 | 19.58 | |

7.  I have not served as a representative party on behalf of a class under the federal security laws
    during the last three years, except if detailed below. [ ]

I declare under penalty of perjury under the laws of the
United States, that the information entered is accurate:          **YES**

By clicking on the button below, I intend to sign and execute
this agreement and retain the Rosen Law Firm, P.A. to
proceed on Plaintiff's behalf, on a contingent fee basis.          **YES**

Signed pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform Electronic
Transactions Act as adopted by the various states and territories of the United States.

Date of signing: 07/11/2015

## Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against Silver Wheaton. The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis and will advance all costs and expenses. The Silver Wheaton. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by The Rosen Law Firm P.A.

**First name:** Jedrzej
**Middle initial:** A
**Last name:** Borowczyk
**Address:**
**City:**
**State:**
**Zip:**
**Country:**
**Facsimile:**
**Phone:**
**Email:**



Plaintiff certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.

5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

Acquisitions:

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 06/24/2015 | 1000 | 17.9458 |

Sales:

| Type of Security | Sale Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 07/10/2015 | 1000 | 15.0349 |

**Certification for Jedrzej Borowczyk (cont.)**

7.  I have not served as a representative party on behalf of a class under the federal security laws during the last three years, except if detailed below. [ ]

I declare under penalty of perjury, under the laws of the
United States, that the information entered is accurate:          **YES**

By clicking on the button below, I intend to sign and execute
this agreement and retain the Rosen Law Firm, P.A. to
proceed on Plaintiff's behalf, on a contingent fee basis.          **YES**

Signed pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform Electronic
Transactions Act as adopted by the various states and territories of the United States.

Date of signing: 07/10/2015

# Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against Silver Wheaton. The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis and will advance all costs and expenses. The Silver Wheaton. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by The Rosen Law Firm P.A.

| | |
|---|---|
| **First name:** | Larry |
| **Middle initial:** | D |
| **Last name:** | Brandow |
| **Address:** | |
| **City:** | REDACTED |
| **State:** | |
| **Zip:** | |
| **Country:** | |
| **Facsimile:** | |
| **Phone:** | |
| **Email:** | |

Plaintiff certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.

5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

Acquisitions:

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| | | | |

Sales:

| Type of Security | Sale Date | # of Shares | Price per Share |
|---|---|---|---|
| | See Below | | |

**Certification for Larry Brandow (cont.)**

7. I have not served as a representative party on behalf of a class under the federal security laws during the last three years, except if detailed below.

Settlement Date: 06/03/2015
07/17/2015 YOU SOLD
SLW SILVER WHEATON CORPORATION COM NPV ISIN
Cash Shares: -100.000 Price: $13.682 Amount: $1,368.17
Fees: $0.03
Settlement Date: 07/22/2015
07/17/2015 YOU SOLD
SLW SILVER WHEATON CORPORATION COM NPV ISIN
Cash Shares: -9,900.000 Price: $13.6801 Amount: $135,422.54
Comm: $7.95
Fees: $2.50
Settlement Date: 07/22/2015
07/08/2015 YOU BOUGHT
SLW SILVER WHEATON CORPORATION COM NPV ISIN
Cash Shares: +1,000.000 Price: $15.174 Amount: -$15,181.95
Comm: $7.95

Settlement Date: 07/13/2015
07/07/2015 YOU BOUGHT
SLW SILVER WHEATON CORPORATION COM NPV ISIN
Cash Shares: +2,000.000 Price: $16.0846 Amount: -$32,177.15
Comm: $7.95

Settlement Date: 07/10/2015
06/22/2015 YOU BOUGHT
SLW SILVER WHEATON CORPORATION COM NPV ISIN
Cash Shares: +1,000.000 Price: $18.1999 Amount: -$18,207.85
Comm: $7.95

Settlement Date: 06/25/2015
06/19/2015 YOU BOUGHT
SLW SILVER WHEATON CORPORATION COM NPV ISIN
Cash Shares: +900.000 Price: $18.2788 Amount: -$16,458.87
Comm: $7.95

Settlement Date: 06/24/2015
06/19/2015 YOU BOUGHT
SLW SILVER WHEATON CORPORATION COM NPV ISIN
Cash Shares: +100.000 Price: $18.275 Amount: -$1,827.50
Settlement Date: 06/24/2015
06/08/2015 YOU BOUGHT
SLW SILVER WHEATON CORPORATION COM NPV ISIN
Cash Shares: +1,000.000 Price: $18.3638 Amount: -$18,371.75
Comm: $7.95

Settlement Date: 06/11/2015
06/04/2015 YOU BOUGHT
SLW SILVER WHEATON CORPORATION COM NPV ISIN
Cash Shares: +1,000.000 Price: $18.779 Amount: -$18,786.95

**Certification for Larry Brandow (cont.)**

Comm: $7.95

Settlement Date: 06/09/2015
06/02/2015 DIVIDEND RECEIVED
SLW SILVER WHEATON CORPORATION COM NPV ISIN
Cash Amount: $50.00
05/26/2015 YOU BOUGHT
SLW SILVER WHEATON CORPORATION COM NPV ISIN
Cash Shares: +1,000.000 Price: $18.89 Amount: -$18,897.95
Comm: $7.95

Settlement Date: 05/29/2015
05/19/2015 YOU BOUGHT
SLW SILVER WHEATON CORPORATION COM NPV ISIN
Cash Shares: +1,000.000 Price: $19.7199 Amount: -$19,727.85
Comm: $7.95

Settlement Date: 05/22/2015
04/30/2015 YOU BOUGHT
SLW SILVER WHEATON CORPORATION COM NPV ISIN
Cash Shares: +1,000.000 Price: $19.90 Amount: -$19,907.95
Comm: $7.95

I declare under penalty of perjury, under the laws of the
United States, that the information entered is accurate:          **YES**

By clicking on the button below, I intend to sign and execute
this agreement and retain the Rosen Law Firm, P.A. to
proceed on Plaintiff's behalf on a contingent fee basis.          **YES**

Signed pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform Electronic
Transactions Act as adopted by the various states and territories of the United States.

Date of signing: 07/22/2015

# Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against Silver Wheaton. The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis and will advance all costs and expenses. The Silver Wheaton. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by The Rosen Law Firm P.A.

| | |
|---|---|
| **First name:** | Diana |
| **Middle initial:** | K |
| **Last name:** | Choi |
| **Address:** | |
| **City:** | |
| **State:** | |
| **Zip:** | |
| **Country:** | |
| **Facsimile:** | |
| **Phone:** | |
| **Email:** | |



Plaintiff certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.

5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

Acquisitions:

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 03/18/2015 | 1000 | 18.35 |

7. I have not served as a representative party on behalf of a class under the federal security laws during the last three years, except if detailed below. [ ]

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate:       **YES**

**Certification for Diana Choi (cont.)**

By clicking on the button below, I intend to sign and execute
this agreement and retain the Rosen Law Firm, P.A. to
proceed on Plaintiff's behalf, on a contingent fee basis.          **YES**

Signed pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform Electronic
Transactions Act as adopted by the various states and territories of the United States.

Date of signing: 07/09/2015

## Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against Silver Wheaton. The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis and will advance all costs and expenses. The Silver Wheaton. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by The Rosen Law Firm P.A.

| | |
|---|---|
| **First name:** | Jeffrey |
| **Middle initial:** | R |
| **Last name:** | Frohwerk |
| **Address:** | |
| **City:** | |
| **State:** | |
| **Zip:** | |
| **Country:** | |
| **Facsimile:** | |
| **Phone:** | |
| **Email:** | |



Plaintiff certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.

5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

Acquisitions:

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 10/2014 | 4234 | 22.06 |

7. I have not served as a representative party on behalf of a class under the federal security laws during the last three years, except if detailed below. [ ]

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate:                **YES**

**Certification for Jeffrey Frohwerk (cont.)**

By clicking on the button below, I intend to sign and execute
this agreement and retain the Rosen Law Firm, P.A. to
proceed on Plaintiff's behalf, on a contingent fee basis.          **YES**

Signed pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform Electronic
Transactions Act as adopted by the various states and territories of the United States.

Date of signing: 07/07/2015

# Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against Silver Wheaton. The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis and will advance all costs and expenses. The Silver Wheaton. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by The Rosen Law Firm P.A.

| | |
|---|---|
| **First name:** | Charles |
| **Middle initial:** | B. |
| **Last name:** | Montgomery |
| **Address:** | |
| **City:** | |
| **State:** | |
| **Zip:** | |
| **Country:** | |
| **Facsimile:** | |
| **Phone:** | |
| **Email:** | |



Plaintiff certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.

5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

Acquisitions:

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 9/13/2013 | 1000 | 25.95 |

7. I have not served as a representative party on behalf of a class under the federal security laws during the last three years, except if detailed below. [ ]

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate:                    **YES**

**Certification for Charles Montgomery (cont.)**

By clicking on the button below, I intend to sign and execute
this agreement and retain the Rosen Law Firm, P.A. to
proceed on Plaintiff's behalf, on a contingent fee basis.          **YES**

Signed pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform Electronic
Transactions Act as adopted by the various states and territories of the United States.

Date of signing: 08/10/2015

## Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against Silver Wheaton. The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis and will advance all costs and expenses. The Silver Wheaton. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by The Rosen Law Firm P.A.

| | |
|---|---|
| **First name:** | Ben |
| **Middle initial:** | J |
| **Last name:** | Potaracke |
| **Address:** | |
| **City:** | |
| **State:** | |
| **Zip:** | |
| **Country:** | |
| **Facsimile:** | |
| **Phone:** | |
| **Email:** | |



Plaintiff certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.

5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

Acquisitions:

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 4/25/2011 | 702 | 42.57 |
| Common Stock | 4/25/2011 | 504 | 42.64 |

7. I have not served as a representative party on behalf of a class under the federal security laws during the last three years, except if detailed below. [ ]

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate:          **YES**

**Certification for Ben Potaracke (cont.)**

By clicking on the button below, I intend to sign and execute
this agreement and retain the Rosen Law Firm, P.A. to
proceed on Plaintiff's behalf, on a contingent fee basis.          **YES**

Signed pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform Electronic
Transactions Act as adopted by the various states and territories of the United States.

Date of signing: 07/13/2015

# Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against Silver Wheaton. The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis and will advance all costs and expenses. The Silver Wheaton. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by The Rosen Law Firm P.A.

**First name:** Charles
**Middle initial:** Kent
**Last name:** Remmel
**Address:**
**City:**
**State:**
**Zip:**
**Country:**
**Facsimile:**
**Phone:**
**Email:**

REDACTED

Plaintiff certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.

5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

Acquisitions:

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| | 4-23-2014 | 5100 | 26.00 |
| Common Stock4-2-2014 | 4900 | 26.00 | |

7. I have not served as a representative party on behalf of a class under the federal security laws during the last three years, except if detailed below. [ ]

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate:          **YES**

**Certification for Charles Remmel (cont.)**

By clicking on the button below, I intend to sign and execute
this agreement and retain the Rosen Law Firm, P.A. to
proceed on Plaintiff's behalf, on a contingent fee basis.          **YES**

Signed pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform Electronic
Transactions Act as adopted by the various states and territories of the United States.

Date of signing: 07/20/2015

# **CERTIFICATE OF SERVICE**

I, Laurence Rosen, hereby declare under penalty of perjury as follows:

I am attorney with the Rosen Law Firm, P.A., with offices at 355 South Grand Avenue, Suite 2450, Los Angeles, CA, 90071. I am over the age of eighteen.

On December 15, 2015, I electronically filed the foregoing CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to counsel of record.

Executed on December 18, 2015

/s/ Laurence Rosen
Laurence Rosen