1  Laurence M. Rosen, Esq. (SBN 219683)
2  THE ROSEN LAW FIRM, P.A.
   355 South Grand Avenue, Suite 2450
3  Los Angeles, CA 90071
   Telephone: (213) 785-2610
4  Facsimile: (213) 226-4684
5  Email: lrosen@rosenlegal.com

6  *Counsel for Plaintiffs and the Class*
7

8              UNITED STATES DISTRICT COURT
9             CENTRAL DISTRICT OF CALIFORNIA

10 ┌─────────────────────────────────┐  Master  File  No.  2:15-cv-05146-
11 │                                 │  CAS-JEM
   │ In re Silver Wheaton Corp.      │
12 │ Securities Litigation           │   CLASS ACTION
13 │                                 │
14 │                                 │  **PLAINTIFFS' OPPOSITION TO**
   │                                 │  **MOTION TO DISMISS**
15 │                                 │  **AMENDED COMPLAINT**
16 │                                 │
   │                                 │  JUDGE: Hon. Christina A. Snyder
17 │                                 │  Date:    May 16, 2016
18 │                                 │  Time:    10:00 a.m.
   │                                 │  Courtroom:   5 – 2nd Floor
19 │                                 │  Before:  Hon. Christina A. Snyder
20 │                                 │
21 │                                 │  Complaint Filed:  July 8, 2015
22 └─────────────────────────────────┘
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

STATEMENT OF FACTS.....................................................................................2

    I.     Canadian Tax Laws Mandate Arm's Length Pricing .........................2

    II.    SW Claims That Its Operations Are Conducted By SW Cayman ...................3

    III.   SW Cayman Is A Mere Conduit For SW Canada...........................................4

    IV.  The CRA Audits SW's Tax Filings ................................................................5

    V.   The CRA Reassesses SW's Tax Liability ......................................................6

    VI.  Defendants' Admissions Against Interest In The Notice Of Appeal.................7

ARGUMENT ...........................................................................................................7

    I.     The CAC Plausibly Alleges that Defendants Omitted Material Facts ..............7

        A.   GAAP and IFRS Mandated Disclosure of SW's Tax Position Liability.......7

           1.   GAAP/IFRS Required SW to Record a Tax Position Liability Because It Was Probable The CRA Audit Would Result in a Reassessment ...................10

           2.   At Minimum, GAAP/IFRS Required Disclosure of a Potential Tax Position Liability because Reassessment was Possible .................................13

        B.   SW's Meager Disclosures Concerning The Audit in its 2011-2014 Annual Reports Were Inadequate and Misleading...........................................................14

        C.   Defendants' Russian cases are Inapplicable ................................................15

    II.   Defendants Knowingly or Recklessly Omitted to Disclose an Estimate of SW's Tax Position Liabilities in its 2011-2014 Financial Statements..............................16

        A.   The Core Operations Inference Supports Scienter. ....................................16

        B.   Defendants ignored information they had a duty to consider.....................18

C.   Plaintiffs Plead Facts Tying Defendants to Knowledge That Their Statements Were False and Misleading. ...................................................19

D.   Defendants Engaged In Deliberate Misconduct ...........................................19

E.   The Court Should Credit the Allegations From FE1 ...................................21

III.   The Auditor Sign Off And Absence Of A Restatement Do Not Undermine The Complaint's Allegations. ........................................23

IV.   The Statute of Limitations Did Not Begin to Run Until the Notice of Reassessment in July 2015. ...................................................24

**CONCLUSION ........................................25**

Plaintiffs' Opposition to Motion to Dismiss Amended Complaint; No. 2:15-cv-05146-CAS-JEM

# TABLE OF AUTHORITIES

**Cases**

*Aldridge v. A.T. Cross Corp.*
  284 F.3d 72 (1st Cir. 2002)..................................................................23

*Animal Sci. Products, Inc. v. China Nat. Metals & Minerals Imp. & Exp. Corp.*
  702 F. Supp. 2d 320 (D.N.J. 2010)
  *rev'd on other grounds Animal Sci. Products, Inc. v. China Minmetals Corp.*
  654 F.3d 462 (3d Cir. 2011) ..................................................................13

*Bd. of Trustees of City of Ft. Lauderdale Gen. Employees' Ret. Sys. v. Mechel OAO*
  811 F. Supp. 2d 853 (S.D.N.Y. 2011) ..................................................10, 13, 15, 16

*Berson v. Applied Signal Technology, Inc.*
  527 F.3d  (9th Cir. 2008) ..........................................................16, 17, 21

*Betz v. Trainer Wortham & Co.*
  829 F. Supp. 2d 860 (N.D. Cal. 2011)..................................................25

*Brodsky v. Yahoo! Inc.*
  630 F. Supp. 2d 1104 (N.D. Cal. 2009)................................................22

*Callejo v. Bancomer*, S.A.
  764 F.2d 1101 (5th Cir. 1985) ..............................................................13

*Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*
  964 F. Supp. 2d 1128 (N.D. Cal. 2013)................................................20

*City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*
  399 F.3d 651 (6th Cir. 2005) ..................................................................9

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*
  794 F.3d 297 (2d Cir. 2015) ..................................................................20

*Epstein v. Washington Energy Co.*
  83 F.3d 1136 (9th Cir. 1996) ................................................................10

*Harris v. AmTrust Fin. Servs., Inc.*
  No. 14-CV-736 VEC, 2015 WL 5707235 (S.D.N.Y. Sept. 29, 2015)....................23

*In re Accuray, Inc. Sec. Litig.*

   757 F. Supp. 2d 936 (N.D. Cal. 2010) ....................................................... 21

*In re BioScrip, Inc. Sec. Litig.*

   95 F. Supp. 3d 711 (S.D.N.Y. 2015) ....................................................... 15

*In re Countrywide Fin. Corp. Derivative Litig.*

   554 F. Supp. 2d 1044 (C.D. Cal. 2008) ................................................... 22

*In re Daou Sys., Inc.*

   411 F.3d 1006 (9th Cir. 2005) ................................................... 10, 21, 22

*In re Ebix, Inc. Securities Litigation*

   898 F. Supp. 2d (N.D. Ga. 2012) ........................................................ 9, 19

*In re Hansen Nat. Corp. Sec. Litig.*

   527 F. Supp. 2d 1142 (C.D. Cal. 2007) ................................................... 24

*In re LDK Solar Sec. Litig.*

   584 F. Supp. 2d 1230 (N.D. Cal. 2008) ................................................... 23

*In re Open Joint Stock Co. Vimpel-Communications*

   No. 04 CIV. 9742 (NRB), 2006 WL 647981 (S.D.N.Y., Mar. 14, 2006) ......... 13, 15

*In re Scottish Re Grp. Sec. Litig.*

   524 F. Supp. 2d 370 (S.D.N.Y. 2007) ...................................................... 9

*In re Spiegel, Inc. Sec. Litig.*

   382 F. Supp. 2d 989 (N.D. Ill. 2004) ...................................................... 24

*In re Yukos Oil Co. Sec. Litig.*

   No. 04 CIV. 5243 (WHP), 2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006) . 10, 13, 15, 16

*Institutional Inv'rs Grp. v. Avaya, Inc.*

   564 F.3d 242 (3d Cir. 2009) .............................................................. 19

*Lloyd v. CVB Fin. Corp.*

   No. 13-56838, 811  F.3d 1200, 2016 WL 384773 (9th Cir. Feb. 1, 2016) ............ 22

*McCasland v. FormFactor Inc.*
   No. C 07-5545 SI 2009 WL 2086168 (N.D. Cal., July 14, 2009)...................17, 21

*Menaldi v. Och-Ziff Capital Management Group LLC*
   2016 WL 634079 (S.D.N.Y., Feb. 17, 2016) ..........................................15

*Merck & Co. v. Reynolds*
   559 U.S. 633 (2010)...........................................................................25

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*
   540 F.3d 1049 (9th Cir. 2008) ..........................................................24

*Mulligan v. Impax Labs., Inc.*
   36 F. Supp. 3d 942 (N.D. Cal. 2014)..................................................21

*New Mexico State Inv. Council v. Ernst & Young LLP*
   641 F.3d 1089 (9th Cir. 2011) ..........................................................16

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*
   380 F.3d 1226 (9th Cir. 2004) ..........................................................16

*Oaktree Capital Mgmt., L.P. v. KPMG*
   963 F. Supp. 2d 1064 (D. Nev. 2013)..................................................25

*Pace v. Quintanilla*
   No. SA CV 14-2067-DOC, 2015 WL 652719 (C.D. Cal. Feb. 13, 2015) ..............25

*Patel v. Axesstel, Inc.*
   No. 3:14-CV-1037-CAB-BGS, 2015 WL 631525 (S.D. Cal. Feb. 13, 2015).........19

*Podraza v. Whiting*
   790 F.3d 828, 834 (8th Cir. 2015) ......................................................24

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*
   759 F.3d 1051 (9th Cir. 2014) ..........................................................21

*Provenz v. Miller*
   102 F.3d 1478 (9th Cir. 1996) ..........................................................24

*Pub. Pension Fund Grp. v. KV Pharm. Co.*
   679 F.3d 972 (8th Cir. 2012) ............................................................9

*Reese v. Malone*
   747 F.3d 557 (9th Cir. 2014) ...................................................................16, 18

*Resnik v. Woertz*
   774 F. Supp. 2d 614 (D. Del. 2011).....................................................................9

*Rieckborn v. Jefferies LLC*
   81 F. Supp. 3d 902 (N.D. Cal. 2015) ...................................................................25

*S.E.C. v. Fehn*
   97 F.3d 1276 (9th Cir. 1996) ...........................................................................9, 14

*Shaev v. Saper*
   320 F.3d 373 (3d Cir. 2003) ..................................................................................9

*Strategic Diversity, Inc. v. Alchemix Corp.*
   666 F.3d 1197 (9th Cir. 2012) ............................................................................25

*United States v. Perkins*
   937 F.2d 1397 (9th Cir. 1991) ............................................................................21

*United States v. Reyes*
   660 F.3d 454 (9th Cir. 2011) ..............................................................................21

*Zucco Partners, LLC v. Digimarc Corp.*
   552 F.3d 981 (9th Cir. 2009) ..............................................................................22

**Statutes**

28 U.S.C. § 1658(b) ...............................................................................................24

**Rules**

17 C.F.R. § 210.4 ...................................................................................................10

**Foreign cases**

*Marzen Artistic Aluminum Ltd. v. The Queen*
   [2016] FCA 34 [Can. B.C.] ................................................................................11

**INTRODUCTION**

Silver Wheaton Corp. ("SW"),[1] a Canadian company that chose to list its stock on the NYSE, earned nearly all of its 2005-2010 (the "Relevant Period") income from buying and selling silver and gold through its Cayman subsidiary. Because of its corporate structure, SW claimed not to owe any taxes on income earned by this subsidiary. In fact, though, SW had merely routed its profits through SW Cayman – thus evading more than $150 million in taxes.[2]

Unbeknownst to investors, during the Relevant Period, SW Cayman was a mere conduit for SW Canada. Until 2008, SW Cayman's entire Cayman operations consisted of one single desk in an unrelated firm's offices. But even after 2008, SW Canada continued to direct substantially all of SW Cayman's operations. SW Cayman's Head, who had a mere 7 years' experience, was not permitted to stray from the narrow authority pre-approved for him by SW Canada's management. SW Cayman merely signed its name on contracts drafted, approved, and guaranteed by SW Canada, received money from SW Canada, invested SW Canada's money, and received revenues and transferred them back to SW Canada. SW took the transfer pricing tax position that for its work as a shell, SW Cayman was entitled to profits of CDN $715 million during the Relevant Period – while SW claimed the value of SW Canada's work was a mere CDN $33 million.

Canada's transfer pricing rules prevent multi-nationals from evading income taxes through foreign subsidiaries in tax havens. Generally Accepted Accounting Principles ("GAAP") and International Financial Reporting Standards ("IFRS") required SW to record on its balance sheet the approximate tax liability it would face if Canadian authorities rejected its manipulative tax position, so long as the possibility that the

---

[1] Defendants are Silver Wheaton Corp. ("SW"), Randy V. J. Smallwood, SW's CEO after April 2011, Peter Barnes, its CEO before April 2011, and Gary Brown, its CFO at all relevant times. "SW Canada" refers to SW's parent company excluding subsidiaries, while "SW Cayman" refers to Silver Wheaton (Caymans) Ltd.
[2] Unless otherwise specified, all amounts herein are in U.S. Dollars.

liability would be incurred was not remote. Defendants never publicly disclosed that *all* of SW Cayman's purported profits were subject to Canadian taxes when the Canadian Revenue Agency ("CRA") discovered their wrongdoing.

In May 2011, the CRA visited SW Cayman as part of a tax audit. During the visit, the CRA told SW that it believed SW had violated transfer pricing tax laws. Then, on July 6, 2015, SW announced that the CRA had not only rejected its parking profits in SW Cayman, thereby evading Canadian taxes on income of $567 million, but had also assessed a $57 million penalty for the tax evasion scheme. On this news, Silver Wheaton's stock price fell 12%.

Defendants attempt to parry the Complaint's well pleaded allegations by seeking to have this Court withhold judgment until the CRA's Reassessment has been finally upheld on appeal – a process Defendants candidly admit will take years or decades. But the final resolution of the CRA's case is irrelevant to this case. Rather, Defendants are liable for failing to disclose in SW's financial statements SW's probable and estimable contingent tax position liability in violation of GAAP and IFRS. Because Defendants knew of the transfer pricing law, regulation and enforcement, knew that Cayman was a barely functioning shell, and knew how much income they had parked in SW Cayman, they were clearly reckless in not disclosing SW's material tax position liability. The Court should deny the motion to dismiss.

**STATEMENT OF FACTS**

I.    Canadian Tax Laws Mandate Arm's Length Pricing

As a resident Canadian corporation, Canada's "Tax Act" subjects SW to Canadian taxes on its worldwide income. ¶31. To prevent multinational companies like SW from parking income in subsidiaries in tax-free havens and avoiding taxes, the Canadian government enacted "transfer pricing" laws. ¶¶33, 44. These laws ensure that, for tax purposes, Canadian taxpayers report income from transactions with non-resident related parties based on pricing that would have been established if the transactions were at arm's length. ¶34. If a Canadian parent enters into transactions with subsidiaries

that are not at arm's length prices, the CRA may (i) recompute the taxable income of the taxpayer based on the adjusted prices, and (ii) reassess the income tax payable by applying the income tax rate to the adjusted income. ¶47. The CRA may also assess penalties to taxpayers who do not make contemporaneous records of reasonable efforts to establish arm's length prices. ¶¶49-51.[3]

Transfer pricing rules are set out in Section 247 of the Tax Act. ¶41. Since 1999, SW has had access to a "CRA Circular," assisting it in complying with Section 247 of the Tax Act. ¶54. If SW was unable to discover or discern comparable transactions among independent parties, the CRA Circular explains, Section 247 required that it delineate among it and Cayman the functions each performed, the assets each used or applied, and the risks each assumed. ¶55. The CRA Circular also incorporates by reference guidelines established by the Organization for Economic Co-operation and Development (the "OECD Guidelines") that instruct the taxpayer to consult the same factors in determining appropriate arm's length transfer prices. ¶56.

II.     SW Claims That Its Operations Are Conducted By SW Cayman

Pursuant to "streaming agreements," SW receives delivery of silver production from 21 operating and 6 developmental mines around the work, reselling the silver it receives for a profit. ¶19. During the Relevant Period, SW derived nearly 92% of its profits from streaming purchases it attributed to its subsidiary, SW Cayman, on which it paid no Cayman tax. ¶¶3, 100; Rosen Dec. Exs. A, 1-2. During the Relevant Period, SW did not pay any Canadian taxes on these profits, either, taking the tax position that it was SW Cayman not SW Canada that had earned them. ¶4.

---

[3] References to "¶_" are to Paragraphs of the Consolidated Amended Class Action Complaint for Violation of the Federal Securities Laws (the "CAC"), Dkt. # 60. Citations to "Def. Br. _" are to pages of the Memorandum of Points and Authorities In Support of Defendants' Motion to Dismiss Amended Complaint, Dkt. # 61-1. Citations to "Heale Dec. Ex. _"are to Exhibits to the Declaration of Amanda Heale, Dkt. # 61-18. Citations to "Walters Dec. _" are to Exhibits to the Declaration of Diane M. Walters In Support of Defendants' Motion to Dismiss Amended Complaint, dkt. # 61-2. References to "Rosen Dec. Ex. _" are to the Declaration of Laurence M. Rosen, filed herewith.

III.    SW Cayman Is A Mere Conduit For SW Canada

Unbeknownst to investors, almost every material activity SW attributed to SW Cayman was in fact conducted by SW Canada. SW Canada provided an extensive range of services, commercial opportunities, capital, know-how, intellectual property, strategic support, contractual support, back-office functions, and other taxable property to SW Cayman. ¶57. During the Relevant Period, SW Cayman had at most six employees, of which two were purely administrative staff. ¶58. But SW's total workforce was 18 as per the Annual Information Form ("AIF") for the period ending December 31, 2007, rising to 24 employees by the period ending December 31, 2010. ¶58. All senior SW staff were employed in Canada. ¶60.

SW Cayman's employees were incapable of performing the functions SW claimed they performed. During the Relevant Period, profits from SW Cayman amounted to at least $567 million. ¶6. To earn these staggering profits, SW Cayman would have had to identify commercial opportunities worldwide, and then negotiate and administer complex agreements in numerous different jurisdictions. ¶¶19, 61. There were at least 10 relevant agreements. Heale Dec. ¶23 and Appendix B. Five of the agreements were signed before 2008. Heale Dec. Appendix B. Yet until 2008, SW Cayman's entire operation was run from a single desk in the offices of another Cayman firm. ¶68. Even after SW Cayman opened an office in 2008, it did not have the financial sophistication to conduct SW's operations. Nik Tatarkin was SW Cayman's Executive Director from December 2008 until December 2012, and was its overall head. ¶29. Yet in December 2008, Tatarkin was seven years out of college, and aside from ten months as SW Canada's treasurer, had no training or experience in the natural resources industries. ¶62. Nor did SW Cayman have the fiscal resources to conduct SW's complex operations. SW Cayman never secured any independent funding or resources without a guarantee or support from SW Canada. ¶¶87, 88. No third party would have contracted independently with SW Cayman without guarantees from SW Canada. ¶91. Indeed, Smallwood himself signed many of SW Cayman's agreements. ¶63.

In fact, SW Canada conducted SW Cayman's business. Former Employee 1 ("FE1") was an Accountant in SW Cayman from December 2007 to November 2013. ¶25. Tatarkin explained to FE1 that Tatarkin "was not [his] own person". ¶64. Rather, SW Canada's CEO Defendant Smallwood pre-approved Tatarkin's authority, and Tatarkin could not stray from this authority without Smallwood's approval. ¶65. Indeed, on his resume, Tatarkin represents that he was the head of SW's Cayman Islands *office*. ¶91. And substantially all material agreements to which SW Cayman was a party were drafted by, and executed with the required approval of, officers and representatives of SW Canada. ¶59. And, moreover, SW Canada decided all material operational and accounting matters. ¶¶66, 67. According to FE 1, SW Cayman employees even referred to the company as a branch office of SW Canada, ¶89, as all reported to or accepted instructions from SW Canada officers or employees. ¶59.

In fact, SW Cayman was a mere conduit for SW Canada. FE 1 managed SW Cayman's books, made all wire transfers, and monitored its bank statements daily. ¶¶74, 76. FE1 personally made substantial multi-million dollar transfers weekly from SW Cayman to SW Canada's bank account. ¶75. SW Canada made similar-sized weekly transfers to SW Cayman. *Id.* The wire transfers did not state their purpose, and when FE1 asked her superiors for the transfers' purposes, she was rebuffed. ¶¶75, 78. Yet files FE1 picked up from her superior's desk establish that the business purpose of the payments from SW Canada was to fund SW Cayman's investments in and purchases from silver mines. ¶¶80, 81. Then, SW Cayman transferred any money from silver sales back to SW Canada. ¶81. And according to FE1, SW Cayman was a strawperson:

> You would see money come in from corporate. Then two-to-three days later, that money's going out to pay for new silver. Then shortly after that, we'd get the silver sales (revenue), and then you'd see the money going back to corporate. ¶83.

IV.   The CRA Audits SW's Tax Filings

In 2009, it was publicly disclosed that the CRA was targeting multinationals that

employed transfer pricing to evade Canadian tax obligations. ¶116. Just like SW, Cameco had established a subsidiary in a low tax jurisdiction. ¶118. Because the subsidiary's material functions were performed and material risks undertaken or guaranteed by the Canadian parent, the CRA reassessed Cameco's taxes to reflect that all of its profits were earned by the Canadian parent. *Id.* The reassessment increased Cameco's taxes by CDN$800 million. Rosen Dec. Ex. 10.

In February 2011, the CRA notified SW that it would audit its tax filings for 2005-2010 (the "Audit"). ¶144. In May 2011, as part of the Audit, the CRA visited SW Cayman. ¶143. As discussed below, SW Canada employees told SW Cayman employees what questions to anticipate from CRA employees and what answers to give in response. See 20, below. During the visit, the CRA told SW "[w]e're here because we feel Silver Wheaton had not been paying their taxes." ¶208

In March 2012, SW disclosed the Audit. Def. Br. 6. But SW repeatedly minimized the audit as a routine matter. For example, in May 2012, Defendant Brown claimed the audit was a "normal course audit and is completely expected." Rosen Dec. Ex. 5, at 5. Brown repeated the claim on the next two earnings calls, adding that SW hoped the CRA would "wrap it up by the end of [] 2012". Rosen Dec. Ex. 6, at 6; Ex. 7, at 5. Then, at the Scotiabank Mining Conference taking place in December 2013, Defendant Brown added that "***there is not significant risk associated with Canadian taxes being assessed on our international profits***." Rosen Dec. Ex. 15, at 6.

V.     The CRA Reassesses SW's Tax Liability

On July 6, 2015, after market close, SW issued a press release announcing that the CRA intended to reassess SW to raise its taxable income by $567 million (CDN $715 million) (the "Reassessment Release"). ¶175. SW also announced that it estimated its increased tax liability as $150 million (CDN $190 million) of back taxes and a 10% penalty of $56.7 million (CDN $71.5 million). *Id.* As a result, on July 7, 2015, SW's share price fell $2.08 per share, or about 12%, to close at $15.46 per share. ¶176. Two analysts covering SW quickly responded by decreasing valuations of the company by

40% and 30%, respectively, ¶¶177, 178, with another analyst reporting that the "CRA Tax Audit Likely to Overhang the Stock." ¶179.

VI.    Defendants' Admissions Against Interest In The Notice Of Appeal

In moving to dismiss, Defendants attach and rely on SW's Notice of Appeal of the CRA's Reassessment (the "Notice of Appeal"). Defendants cannot rely on their filing for the truth of its contents. Yet even if the Court accepts the facts stated there as true, they actually bolster Plaintiffs' case. SW admits that it was responsible for virtually all of Cayman's activities. For example, SW concedes that it identified Cayman's opportunities for and negotiated its streaming contracts, and evaluated and valued SW Cayman's mineral deposits. Heale Dec., Ex. I, ¶28. Further, SW was also responsible for "legal services in respect of streaming contracts entered into by [SW] Cayman." *Id.* Yet according to the Notice of Appeal, SW charged SW Cayman only CDN $33.6 million for all services it provided during the Relevant Period. *Id.* ¶¶27-29.

**ARGUMENT**[4]

I.    The CAC Plausibly Alleges that Defendants Omitted Material Facts

A.    GAAP and IFRS Mandated Disclosure of SW's Tax Position Liability.

GAAP are the common set of principles, standards, and procedures that companies use to present their financial statements. ¶122. For fiscal 2010, SW prepared its financial statements under Canadian GAAP which it reconciled to U.S. GAAP in its March 30, 2011 Form 40-F. ¶¶125-126. For fiscal 2011 through 2014, SW prepared its financial statements in accordance with IFRS that are substantially similar to GAAP. ¶127.

ASC 740 is the GAAP that applies to SW's tax position for fiscal 2010, and it required Defendants to determine and disclose whether it was more likely than not that the CRA would sustain SW's transfer pricing tax position (which was then under audit). ¶¶129-130; ASC 740-10-25-5 (Rosen Dec. Ex. 12). Canadian and U.S. GAAP

---

[4] The legal standards for pleading claims under Sections 10(b) and 20(a) are set forth in Def. Br. at 7-8.

for tax position liabilities are substantially the same. ¶129. To determine the likelihood of reassessment, ASC 740 required Defendants to evaluate the technical merits of SW's tax position by reference to sources of authority in the tax law, such as statutes, legislative intent, regulations, rulings and case law, as well as past administrative practices and precedents. ASC 740-10-25-7 b. (Rosen Dec. Ex. 12).

Under IFRS, for fiscal 2011-2014, SW was required to recognize a tax position liability on its balance sheet for its transfer pricing tax position if it was "probable" that the audit would result in a reassessment by the CRA. IAS 12, introduction; IAS 37 ¶14 (Rosen Dec. Exs. 13, 14). Probable means "more likely than not". IAS 37 ¶23. While IFRS doesn't specifically state that the issuer should consider relevant tax law and rulings and related precedent, the IFRS analysis is similar to the GAAP analysis. ¶127. Under ASC 740 and IAS 12 and 37, in each fiscal year's financial statements from 2010 through 2014, SW was required to recognize and record, or disclose, a material tax position liability on its balance sheet because it was probable, or at least possible, that the transfer pricing audit would result in a large tax reassessment. Yet SW neither recorded nor disclosed an uncertain tax position liability there.

In their briefs, Defendants claim the issue is whether the CRA was correct to reassess SW's taxes. Thus, Defendants argue, the Court should not even allow this case to get to discovery because, after all, Canadian courts do not always find in favor of the Queen.

But this is a red herring. The CAC alleges that Defendants made false statements by failing to either record a tax position liability or to disclose in SW's financial statements the full details of SW's potential tax liability, including the approximate amount of the liability, as required by accounting rules. Whether Canadian courts ultimately affirm that SW's tax strategies are unlawful is irrelevant to whether Defendants properly disclosed the probable or possible CRA reassessment. The Ninth Circuit's ruling in *Fehn* is directly on point. The *Fehn* court found a duty to disclose the "possibility" that an issuer's prior undisclosed securities violations might result in

subsequent litigation and liability. "Although [the issuer's] liabilities were not inevitable, but instead were contingent, they represented a potentially large financial loss for [the issuer]" and details of such contingent liabilities were required to be disclosed. *S.E.C. v. Fehn*, 97 F.3d 1276, 1291 (9th Cir. 1996); *see also City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 679 (6th Cir. 2005) (similar). Courts have applied this rule to failing to disclose uncertain tax liabilities, holding that issuers violated GAAP and made false and misleading statements by failing to record valuation allowances for deferred tax assets or liabilities even though the issuers never restated their financial statements. *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 390 (S.D.N.Y. 2007); *In re: Ebix, Inc. Sec. Litig.*, 898 F. Supp. 2d 1325, 1343 (N.D. Ga. 2012). Further, in *Ebix*, the auditor signed off on the company's financial statements, and the plaintiffs alleged no tax audit. *Id.* at 1330.

Nor need the Court await the Canadian courts' final determination on SW's tax liability to proceed. The CAC alleges that Defendants omitted to include in SW's financial statements or notes provisions for financial losses caused by the CRA audit, thereby representing that the risk of reassessment was "remote". *Bridgestone*, 399 F.3d at 678 (failure to disclose potential contingent loss was statement that contingent loss was not possible). Defendants' statements are misleading even if the Canadian court does not ultimately uphold the Reassessment on appeal. *See Resnik v. Woertz*, 774 F. Supp. 2d 614, 631 (D. Del. 2011) (failure to disclose risk of tax liability actionable whatever tax authority's ultimate determination) (*citing Shaev v. Saper*, 320 F.3d 373, 384 (3d Cir. 2003)); *see also Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 981 (8th Cir. 2012) (failure to disclose receipt of preliminary regulatory finding of violation actionable even if no regulatory action is guaranteed). Defendants are just conflating an obligation to disclose uncharged illegal conduct with an obligation to follow GAAP and IFRS in reporting financial statements. Moreover, Defendants' position conflicts with many of the cases Defendants cite in which U.S. courts faced with securities class action complaints attempted to determine whether companies

- 9 -

could have determined there was a risk they violated foreign tax laws.[5] Nor is *Epstein* relevant. In *Epstein*, the Ninth Circuit held that the defendants **had no duty** to handicap their chances of succeeding in a regulatory application. *Epstein v. Washington Energy Co.*, 83 F.3d 1136, 1142 (9th Cir. 1996).[6] Here, though, GAAP and IFRS **imposed a duty** on Defendants to provide an estimate of the contingency.

Because Defendants neither recorded a tax position liability nor disclosed in detail the nature of the tax position liability and an estimate of its amount as required by ASC 740 and IAS 37, SW's financial statements violated GAAP and IFRS and were false and misleading. *See In re Daou Sys., Inc.*, 411 F.3d 1006, 1016 (9th Cir. 2005) (Financial statements filed with the SEC that do not comply with GAAP are presumptively misleading.); 17 C.F.R. § 210.4-01(a)(1).

           1. GAAP/IFRS Required SW to Record a Tax Position Liability Because It Was Probable The CRA Audit Would Result in a Reassessment

All of the facts and circumstances surrounding SW's transfer pricing tax position, along with the statutory and regulatory precedent available to Defendants demonstrated it was, pursuant to ASC 740 and IAS 12 and 37, more likely than not that the CRA audit would result in a tax reassessment. The very purpose of Section 247 of the Tax Act is to prevent companies from shifting profits from Canada to subsidiaries in low tax jurisdictions. ¶¶41-44. And in 2010, before the beginning of the Class Period, OECD Members (including Canada) began a well-publicized initiative to address

---

[5] *In re Yukos Oil Co. Sec. Litig.*, No. 04 CIV. 5243 (WHP), 2006 WL 3026024, at *10 (S.D.N.Y. Oct. 25, 2006) (stating court's obligation to determine whether company violated tax law); *Bd. of Trustees of City of Ft. Lauderdale Gen. Employees' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 876 (S.D.N.Y. 2011) (determining whether company violated Russian tax law).

[6] Moreover, in *Epstein*, because the regulatory proceeding was public, any investor could obtain relevant information. *Epstein*, 83 F.3d at 1139. Here, not only was the audit non-public, Defendants made false statements about their operations which materially understated investors' assessment of SW's chances of receiving a reassessment.

multinationals evading income tax by shifting income to low tax jurisdictions. ¶101.[7]

Canada adopted OECD international transfer pricing standards in 1999. ¶39.  In, September 1999, the CRA issued a detailed Information Circular that set out its views on the application of section 247 and related transfer pricing compliance obligations for Canadian tax payers. ¶54. The CRA Circular incorporates by reference the OECD Guidelines, which specifically pointed SW to the functions performed by the entities – here, all of which were performed by SW Canada – and the risks borne – again, all by SW Canada. ¶56.

The CAC details a host of well-publicized tax regulations and CRA rulings and precedents prohibiting companies from successfully shifting its profits to low tax jurisdictions and making it probable that SW's transfer pricing tax position would not be sustained by the CRA. In a broadly similar case that was highly publicized in 2009, the CRA reassessed Cameco Corporation over CDN$800 million of taxes for transfer pricing tax violations, alerting Defendants that CRA was prioritizing audits of companies shifting income to low tax jurisdictions. ¶¶116-119; Rosen Dec. Ex. 10. The issue in Cameco was the same as here. A Canadian-resident parent diverted business opportunities and expected future profits to a foreign entity, while ignoring that the parent performed most of the substantive commercial functions without receiving material     compensation. ¶¶117-119.

In addition, and critically, the SW-specific facts, indicating that its CRA was highly likely to reassess SW were obvious and known to Defendants prior to the start of the Class Period. First, SW Cayman was not regarded by SW and SW Cayman employees as an entity or enterprise separate and distinct from SW. Second, SW Cayman had neither the authority nor capacity to run SW Cayman's purported several hundred million dollar operations. And third, SW Cayman' counterparties would not have

---

[7] Contrary to Defendants' claim, "Canadian courts have relied on the OECD Guidelines [] as being of assistance." *Marzen Artistic Aluminum Ltd. v. The Queen*, [2016] FCA 34 [Can. B.C.], ¶17 (Rosen Dec. Ex. 11).

1    contracted with it unless SW stood behind the agreements. *See* 4-5, above.

2       The Tax Act disregards the taxpayer's transfer pricing tax position if (a) the terms

3 of the transactions differ from those that would have been made between persons at

4 arm's length or (b) the transactions (i) would not have been entered into between

5 persons dealing at arms length and (ii) can reasonably be considered *not* to have been

6 entered into for purposes other than to obtain a tax benefit. ¶45. SW took the position

7 that SW Canada gave SW Cayman its entire highly profitable silver trading business,

8 which generated profits to SW Cayman of CDN $715.3 million in 2005-2010, in return

9 for total annual management fees payable to SW Canada of only CDN $33.6 million

10 during that time period. ¶106; Heale Dec. Ex. I, ¶29, App. A. This is not an arm's length

11 transaction. Rather, SW Canada gave away profitable business to SW Cayman because

12 SW Canada owned 100% of SW Cayman and SW Canada could thereby avoid

13 Canadian income taxes. Indeed, the CRA did not merely find that a small portion of

14 SW's tax position was incorrect; instead, it found that **all** of SW's foreign income was

15 subject to Canadian taxes. ¶133. SW's tax position was no technical mistake, but was

16 instead wholly unjustified. ¶134.

17       The CRA will also assess taxpayers, like SW, who do not make reasonable efforts

18 to determine and employ arm's length transfer prices will be assessed an additional

19 penalty of 10% of (i) the relevant transfer pricing adjustments ***minus (ii) the total of***

20 ***all transfer pricing adjustments that relate to transactions for which the taxpayer has***

21 ***made "reasonable efforts to determine [and use] arm's length transfer prices."*** ¶49.

22 The CRA reassessed SW penalties of $56.7 million (CDN $71.5 million) – 10 % of

23 SW's increased taxable income. ¶¶175-176.  Thus, documentation that SW created to

24 support its transfer price tax position – including the PWC report – utterly failed to

25 show that SW had made any reasonable efforts to determine and use arm's length

26 transfer prices in any of its Cayman transactions. ¶135.[8] The Court should treat the

27

28 [8]As defendants observe, the CAC misstates at ¶135 that the documentation must be filed with the tax returns. But the rule is correctly stated in great detail in ¶¶48-51. The

CRA's determination that SW's transfer pricing position violated the Act and that SW made no reasonable effort to determine and use arm's length prices as persuasive authority as to the application of Canadian tax law.[9]

Thus, GAAP and IFRS required SW to recognize a tax position liability because it was more likely than not that the CRA audit would result in a material reassessment.

2.   At Minimum, GAAP/IFRS Required Disclosure of a Potential Tax Position Liability because Reassessment was Possible

Even if SW had not been obligated to recognize and record on its balance sheet a tax position liability (i.e. if a successful challenge to its tax position was not probable), GAAP and IFRS would still have required detailed disclosure in the financial statements of SW's potential tax position liability. A contingent liability is "a possible

_____

documentation is not filed with the tax return. Instead it must provided to the CRA within 90 days of CRA's notification to the taxpayer of the audit. The documentation must be prepared by the taxpayer no later than the date the tax return is filed. This is a date 6 months from the end of the tax year. *See* Rosen Dec. Ex. 9. The Notice of Appeal claims that the transfer studies for SW's 2006 study was not conducted contemporaneously. Rather, it was conducted on or about June 20, 2008. Healy Dec., Ex. I, Appendix C. Further SW concededly never conducted transfer studies for its 2005 tax filings.

[9]   Courts commonly treat as persuasive authority the findings of foreign governments and agencies regarding the law they must administer. *Callejo v. Bancomer*, S.A., 764 F.2d 1101, 1119-20 (5th Cir. 1985) (analogizing deference to *Chevron* deference); *Animal Sci. Products, Inc. v. China Nat. Metals & Minerals Imp. & Exp. Corp.*, 702 F. Supp. 2d 320, 429 (D.N.J. 2010) *rev'd on other grounds Animal Sci. Products, Inc. v. China Minmetals Corp.*, 654 F.3d 462 (3d Cir. 2011) (taking foreign government agency's interpretation as "final authority unless the Court detects a [] legal provision or an alternative [] statement that clearly and correctly establishes [their] incorrectness"). Courts award deference even if the foreign agencies express their determinations as conclusions without reasoning. *Callejo*, 764 F.2d at 1119 (deferring to International Monetary Fund's bottom-line conclusion that provision did not violate Fund rules). Here, the CRA evaluated SW's arguments, including the claims it makes in the Notice of Appeal, and found not only that SW was wrong but that it had made no reasonable efforts to determine and apply arm's length prices on any transactions funneled through SW Cayman. The Court should treat its determination as persuasive. And though SW relies on *Yukos, VimpelCom,* and *Mechel*, it is worth noting that all the cases SW cites concerned securities class actions filed in the SDNY alleging that companies violated Russian law, suggesting that the companies were faced with arbitrary decisions. *See* 14-15, below.

- 13 -

obligation that arises from past events and whose existence will be confirmed only by the occurrence or non-occurrence of one or more uncertain future events not wholly within the control of the entity[]" IAS 37 ¶10.   And under GAAP, "FASB 5 requires that 'disclosure of the contingency shall be made when there is at least a reasonable possibility that a loss ... may have been incurred.'" *Fehn*, 97 F.3d at 1291. The relevant IFRS requires disclosure unless the risk is "remote". ¶132. Because a tax reassessment was probable, *a fortiori*, a reassessment was possible (i.e., not remote.) Thus, SW was required to disclose (but did not) (a) an estimate of the dollar amount of the uncertain tax position, (b) an indication of the uncertainties relating to the amount or timing of any outflow; and (c) the possibility of any reimbursement. *Id.* (*citing* IAS 37¶86).

B.    SW's Meager Disclosures Concerning The Audit in its 2011-2014 Annual
        Reports Were Inadequate and Misleading

SW disclosed the existence of the CRA audit for the first time in its fiscal 2011 annual report on March 27, 2012, and the disclosure was repeated in each SW annual report thereafter. SW added one sentence to the disclosure about its tax liabilities, related to deriving its operating profits primarily through Caymans and another foreign subsidiary, stating, "[d]ue to the size, complexity and nature of the Company's operations, various legal and tax matters are outstanding from time to time, including an audit by the Canada Revenue Agency of the Company's international transactions covering the 2005 to 2010 taxation years." Defendants concluded, "[n]o assurance can be given that new tax laws or regulations will not be enacted or that existing tax laws or regulations will not be changed, interpreted or applied in a manner which could have a material adverse effect on the Company." Walters Dec. Ex. 7, at 11, 24.  SW did not thereby adequately apprise investors that the CRA was ***auditing the entirety of SW's transfer pricing tax position***, challenging its entire nil tax rate and potentially calling for an enormous tax reassessment.

Further, Defendants repeatedly claimed that the audit was "normal course" and "completely expected," would be "wrap[ped] up" soon, and did not present

"significant" risk. See 6, above. Given the Cameco reassessment and the stark similarities between SW and Cameco, Defendants' minimization of the CRA audit is actionable, and was misleading for not disclosing the existence, nature and possible consequences of the tax audit. *Menaldi v. Och-Ziff Capital Management Group LLC*, 2016 WL 634079, at *11, (S.D.N.Y., Feb. 17, 2016) (company "misled investors by suggesting that the company was not facing an investigation that could have a material impact on its business, when, in fact, it was facing such an investigation") (*citing In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 727 (S.D.N.Y. 2015)).

C.    Defendants' Russian cases are Inapplicable

Defendants cite three cases finding that Russian companies did not commit securities fraud for not disclosing the possibility of adverse Russian government actions under tax and anti-monopoly laws. These cases, all from the Southern District of New York, reflect that Russian authorities are notoriously arbitrary and unlawful in their enforcement proceedings and in essence, establish a special rule for Russia. *Mechel*, 811 F. Supp. 2d at 874 (discussing heightened scrutiny applied to Russian cases). Canada, plainly, is no Russia.

In *Vimpel*, the company warned investors that Russian tax laws were "subject to frequent change, varying interpretations and inconsistent enforcement", and were "unconstitutionally enforced," "unclear", and at times "arbitrary or onerous." *In re Open Joint Stock Co. Vimpel-Communications*, No. 04 CIV 9742 (NRB), 2006 WL 647981, at *1 (S.D.N.Y., Mar. 14, 2006). The company thus sufficiently warned of the possibility of the audit and penalties that eventually transpired. *Id.* at *3.

In *Yukos*, Russian President Vladimir Putin prosecuted a personal vendetta against Yukos President Mihail Khodorovsky, a political opponent, by concocting a tax fraud case to confiscate the company. *Yukos*, 2006 WL 3026024, at *1, *5. **Plaintiffs** showed as much by alleging that Yukos should have disclosed that "Khodorkovsky's political activity exposed the Company to retribution from the current Russian government". *Id.* The court dismissed the tax fraud allegations because plaintiffs did not plausibly allege

that Yukos's tax position violated Russian law. *Id.* at *15. And *Mechel* was another case where the only thing the company had done wrong was offend Putin and thereby suffer threatened tax reassessments. *Mechel*, 811 F. Supp. 2d at 859. Indeed, one of the corrective disclosures was Putin's publicly threatening the CEO, who had suddenly fallen ill, that if he did not get well soon "we'll need to send him a doctor and clean up all these problems." *Id.* at 860, 877.

II.     Defendants Knowingly or Recklessly Omitted to Disclose an Estimate of SW's Tax Position Liabilities in its 2011-2014 Financial Statements

A complaint must plead a "strong inference of scienter" – i.e., one that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014). It suffices to show that a defendant made false or misleading statements intentionally or with deliberate recklessness. *Id.* The court considers the complaint – and documents incorporated by reference and matters of which a court may take judicial notice – holistically. *Id.* at 568-69. Scienter is adequately alleged where, among other cases, (1) it would be absurd to suggest that the defendants did not know of the facts rendering their statements misleading, *Berson v. Applied Signal Technology, Inc.*, 527 F.3d at 988 (9th Cir. 2008); (2) defendants failed to review information they had a duty to consider, *New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1098 (9th Cir. 2011); or (3) the plaintiff pleads facts connecting the defendants to information showing their statements were false. *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004).

A. The Core Operations Inference Supports Scienter.

In *Berson*, the plaintiffs claimed that the defendants, a company's CEO and CFO, must have known that the company had received stop-work orders. *Berson*, 527 F.3d at 987. The stop work orders initially affected only $12 million of the company's $143 million in backlog. *Id.* at 986. The Ninth Circuit nonetheless found it "absurd to suggest" that the defendants would be unaware of the stop work order. *Id.* at 989.

- 16 -

1    Here, the CRA audit covered substantially all of SW's foreign operations,
2 accounting for some CDN $715 million in profits (nearly 92% of SW's profits). Yet in
3 the course of the audit, the CRA told FE1 point blank that "[w]e're here because we
4 feel Silver Wheaton had not been paying their taxes." ¶208.[10] Tatarkin and Bettina
5 Charpentier, SW's VP of Tax – both physically present, ¶209 – would plainly have
6 conveyed the CRA's position to Defendants Smallwood and Brown, their immediate
7 supervisors. ¶65. Indeed, Charpentier and a team of other SW Canada employees had
8 been sent specifically to coach SW Cayman employees in responding to the CRA's
9 questions. ¶197. And the impact on SW's operations vastly exceeds that in *Berson* –
10 here, an analyst ultimately concluded that the Reassessment reduced SW's NAV by
11 40%.[11] Thus, it is "absurd to suggest" Defendants didn't know that Reassessment was
12 reasonably possible and that it would have a devastating impact on SW.

13    Trying to negate scienter, Defendants claim "the mere fact of the CRA audit cannot
14 show that Defendants knew years earlier the CRA would ultimately issue
15 reassessments, much less the amount of any proposed tax liability." Def. Br. at 19.  But
16 GAAP/IFRS doesn't require that Defendants know for certain the tax would be
17 reassessed. It requires only that reassessment be possible. See 10-13, above. Given
18 SW's failure to make *any* reasonable effort to use arm length transfer prices, the
19 reassessment of Cameco in 2010 in a substantially similar situation,[12] and CRA's frank
20 statements to SW employees during the audit site visit, it is absurd to suggest the

21

22 [10] Defendants ask the Court to evaluate their state of mind when their tax returns were
23 filed in 2005 through 2010 – prior to the CRA audit. But what governs here is their
   state of mind after the CRA commenced its audit, at the time SW issued each
24 misleading annual report from fiscal 2010 through 2014 and failed to adequately
   disclose and estimate SW's transfer pricing tax liability. Thus, the information
25 Defendants learned from the CRA in the audit demonstrates Defendants' scienter.
26 [11] In *FormFactor*, the court *first* found the core operations inference inapplicable and
   therefore required "additional detailed allegations about the defendants' actual
27 exposure to information." *McCasland v. FormFactor Inc.*, No. C 07-5545 SI 2009 WL
   2086168, at *6 (N.D. Cal., July 14, 2009).
28 [12] Cameco's situation need not be identical to SW's to provide notice to Defendants
   that the transfer pricing audit posed a material threat of an enormous tax liability.

1   Defendants did not know and were not reckless in not knowing that a reassessment was

2   possible.

3       B.      Defendants ignored information they had a duty to consider

4       Courts infer scienter if (a) an event occurs that would have drawn a defendant's

5   attention, and (b) the defendant would then have reviewed information showing their

6   statement was false. *Reese*, 747 F.3d at 571 (inferring scienter because first oil leak

7   *would have* made executive review other oil pipelines, and executive *would have*

8   discovered information showing that other pipelines were also vulnerable to leaks). As

9   further set out above, the transfer pricing rules were well established and widely

10  publicized. *See* 11, above. But an authorized SW officer was required to prepare and

11  sign a T106 transfer pricing tax return and consider whether transactions were at arm's

12  length. ¶111. The officer was required to certify that "the information [] is, to the best

13  of my knowledge, correct and complete." Rosen Dec. Ex. 9, at 2. The T106 Return

14  includes a box to check claiming that SW had prepared contemporaneous

15  documentation showing it had used arm's length pricing. ¶108; Rosen Dec. Ex. 9, at 1.

16  Yet for 2005 and 2006, SW had not prepared contemporaneous documentation by the

17  time of filing. See n. 8, above.  As if that weren't enough, the CRA further drew

18  Defendants' attention by reassessing Cameco and then auditing SW. The CRA audit,

19  which unfolded over five years, also provided SW much longer to evaluate and respond

20  to than the crisis in *Reese*, which occurred two weeks before the first false statement.

21  *Reese*, 747 F.3d at 571. This is thus a much easier case than *Reese*.

22      Defendants rely on certain purported transfer pricing studies, described in the

23  Notice of Appeal. But they ignore the details of the purported management agreements

24  referenced there. No reasonable person bargaining at arm's length would exchange

25  CDN $715 million of profits in return for CDN $33 million of management fees.

26  Defendants suggest that the management fee provided SW with a 20% return on

27  investment which is reasonable and approximates an arm's length transaction. But the

28  CRA found that the PWC Report did not show that Defendants had made a reasonable

effort to determine or use arms length transfer prices. Among other things, SW retained all of the risk and financial obligations associated with that income it gave away, and it would be foolish to incur the obligations of a principal in order to obtain a small mark-up on the fees of an agent. The only purpose of this arrangement was to evade taxes.

Thus, Defendants ignored information they had a duty to consider.

### C.   Plaintiffs Plead Facts Tying Defendants to Knowledge That Their Statements Were False and Misleading.

There were a plethora of facts and reports that Defendants were aware of showing there was a risk the CRA would reject SW's tax position *in toto*:

- Defendant Smallwood himself set Tatarkin's authority. Tatarkin reported directly to Defendant Smallwood. And Tatarkin was plainly unqualified to manage a company generating hundred-million-dollar annual profits.
- SW was a very small company, with only about twenty-four employees at the time of the CRA audit visit. ¶58; *see Patel v. Axesstel, Inc.*, No. 3:14-CV-1037-CAB-BGS, 2015 WL 631525, at *9 (S.D. Cal. Feb. 13, 2015) (inferring scienter because company only had 35 employees).
- Defendants repeatedly reassured investors that they had nothing to worry about. *See* 6, above. Unqualified denials made to reassure analysts support scienter. *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 270 (3d Cir. 2009).
- Defendant Smallwood personally signed several of SW Cayman's contracts.

These facts show Defendants knew or were reckless in not knowing they had an obligation to disclose SW's uncertain tax position. *Ebix*, 898 F. Supp. 2d at 1346 (statements about tax position misleading given CEO's knowledge that company's reporting of transactions with foreign subsidiaries did not adhere to GAAP).[13]

### D.   Defendants Engaged In Deliberate Misconduct

Facts suggesting that Defendants took steps to cover up misconduct are especially

---

[13] SW states in its annual financial statements for fiscal 2011-2014 that it must apply IAS 12 and 37 to its accounting for income taxes. ¶129. The Individual Defendants acknowledged their responsibility for all judgments and estimates included in financial statements. ¶¶138, 149, 156, 163, 170. Thus, ignorance is not exculpatory. *Avaya*, 564 F.3d at 270.

probative of scienter. *Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*, 964 F. Supp. 2d 1128, 1143 (N.D. Cal. 2013); *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 308 (2d Cir. 2015) (lying to auditors probative of scienter).

FE1 kept wire confirmations in a file in her office. ¶182. The file went missing before every auditor visit. ¶184. Defendants suggest a non-culpable inference – that the file went missing because someone else from the office took the file and gave it to the auditor. But that explanation is not plausible since Tatarkin knew nothing of the entries in the financial records. The auditors and SW Cayman would both have wanted to ensure that they got the file directly from the custodian – FE1. Otherwise, SW Cayman and the auditors could not know that they got the right file, that the file was complete and accurate, that it was up to date, and that it had not been tampered with. But SW Cayman did not obtain the file from FE1 and, in fact, no one even asked FE1 any questions about the file. Thus, the CAC shows that SW Cayman took the file from FE1 and hid it from the auditors.

Similarly, Defendants claim that the high level SW team's visit prior to the CRA's May 2011 visit amounted to mere witness preparation. ¶¶196-97. But telling a witness "what her answers should be" is not preparation, but rather witness *tampering*. Lawyers would know the difference between preparing and coaching a witness, and would have a professional obligation not to coach a witness.[14] But instead of sending lawyers to prepare witnesses, SW sent accountants and auditors, and a SW Canada tax executive with no law degree or law practice experience. Rosen Dec. Ex. 8. And because FE1 was coached, of course she uneasily reported that there were "no red flags." ¶209. She did not wholly believe it; Tatarkin and Charpentier later berated her for her facial expression when she made the statement. *Id.* Further, Carpenter and Tatarkin falsely

---

[14] For example, British Columbia attorneys must "take care not to subvert or suppress any evidence or procure the witness to stay out of the way." Rule 5.3 of the Code of Professional Conduct, Law Society of British Columbia.

1  told the SW Cayman office employees that SW passed the CRA tax audit. ¶212. Such

2  false exculpatory statements are evidence of consciousness of guilt. *United States v.*

3  *Reyes*, 660 F.3d 454, 467 (9th Cir. 2011) (*citing United States v. Perkins*, 937 F.2d

4  1397, 1402 (9th Cir. 1991)).

5  **E.    The Court Should Credit the Allegations From FE1**

6  Courts credit allegations attributed to unnamed witnesses if the complaint pleads

7  facts sufficient to show the witnesses would "be in a position to infer" the facts

8  attributed to them. *Berson*, 527 F.3d at 985; *Mulligan v. Impax Labs., Inc.*, 36 F. Supp.

9  3d 942, 963 (N.D. Cal. 2014) (question is whether witnesses have enough knowledge

10  regarding facts attributed to them). Where a plaintiff relies on the core operations

11  inference (i.e., the inference that the facts showing the defendants' false statements

12  were so prominent it would be absurd to suggest the defendant did not know them), an

13  unnamed witness who has no insight into what information was conveyed to the

14  individual defendants can establish that the condition exists. *Berson*, 527 F.3d at 985

15  (work stoppages); *Mulligan*, 36 F. Supp. 3d at 963, 969-70 (failed remediation

16  efforts).[15]

17  There is no bright-line test requiring that unnamed witnesses occupy specific

18  positions or avoid hearsay. *See Berson*, 527 F.3d at 985 (non-managerial employees

19  qualified to report on stop work order despite lack of direct knowledge because would

20  be able to see its effects); *Daou*, 411 F.3d at 1017 (field technical personnel qualified

21  to speak to revenue recognition process). While Defendants nonetheless advance

22  several bright-line tests, they misread the cases they cite. For example, Defendants

23  incorrectly cite *Zucco* as holding that witness statements based on hearsay are stricken.

24  [15] Defendants cite three cases requiring direct contact with individual defendants, but

25  there, plaintiffs did not advance a serious core operations inference argument. *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014); *In*

26  *re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 949, 951 (N.D. Cal. 2010);

27  *FormFactor*, 2009 WL 2086168, at *6 (N.D. Cal. July 14, 2009). So plaintiffs had to show that the information known to the unnamed witnesses made it to the defendants'

28  attention, which they could not do. Further, here, the facts FE1 cite show shed light on the information available to Defendants.

- 21 -

Def. Br. at 22 (*citing Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009). In fact, *Zucco* holds the opposite. *Lloyd v. CVB Fin. Corp.*, No. 13-56838, 811 F.3d 1200, 2016 WL 384773, at *6-*7 (9th Cir. Feb. 1, 2016) (reversible error to discount hearsay statements, citing *Zucco*). Instead, courts focus on whether the confidential witnesses' hearsay reports are "sufficiently reliable, plausible, or coherent." *Id.*[16] Here, FE1 recalls the precise words of some of Tatarkin's statements and numerous other details, and an officer's repeated statements about the scope of his authority are plainly important enough to be reliable. *See id.* (drawing indicia of reliability from specificity and importance of report). Moreover, FE1's statements are consistent with other facts Defendants concede are adequately alleged, including Tatarkin's experience and his own claims on his resume, *see* 5, above. *See In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1059 (C.D. Cal. 2008) (allegations provide strong inference of scienter by providing "the same story [] from markedly different angles.")

Instead of addressing these allegations head on, Defendants argue that FE1 is not reliable, citing two purported errors in her report. Defendants assert FE1 is wrong to say that SW opened its Cayman office in 2008, the date asserted in the CAC (¶¶26, 68), rather than 2004, the date asserted in SW's SEC filings. Wrong. Until April 2008 – halfway through the Relevant Period – SW Cayman did not have an office, and instead ran its operations from a single desk in the offices of Endeavor Mining Corporation. ¶68. Thus, FE1 correctly reports that SW set up an office in 2008 – it is SW's SEC filings that are misleading. And even if the CAC quotes FE1 as incorrectly reporting that SW's annual revenues were $7 billion instead of $700 million,[17] Defendants have

---

[16] And Defendants cite a manifestly unreliable decision that declares that in an accounting case, the witness must have personal knowledge of the accounting process, but relies on a Ninth Circuit case holding precisely the opposite. *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1115 (N.D. Cal. 2009) (*citing Daou*, 411 F.3d at 1016 (VP sales and field personnel had sufficient knowledge in accounting case)).

[17] In fact, SW's annual revenues were about $700-850 million for the last three years of FE1's tenure. Rosen Dec. Exs. 3, 4.

1  not explained how this innocent misstatement undermines the CAC's report of FE1's

2  much more specific recollections of her own experiences.

3      Defendants also mischaracterize some of the specific statements made by FE1. FE1

4  was instructed to record all wires between SW Canada and SW Cayman. The

5  substantial cash flows were broken up into million-dollar weekly wires, and these wires

6  did not list any purpose. Defendants claim the transactions were not suspicious,

7  because CW was told to record all incoming and outgoing wires. But there never was

8  a notation of why any individual or the collective transfers were made – thereby

9  concealing that the wire transfers were just SW Canada's way of routing its investments

10 through SW Caymans to evade Canadian taxes. And the wire transfers similarly were

11 not mere "cash management" unrelated to the CRA Reassessment, but evidence that

12 SW was evading Canadian taxes by using SW Cayman as a conduit.

13      Thus, facts attributed to FE1 are both reliable and relevant.

14      **III.   The Auditor Sign Off And Absence Of A Restatement Do Not**

15               **Undermine The Complaint's Allegations.**

16      Defendants cite SW's auditor's sign-off, coupled with the lack of restatement, as

17 evidence that they did not make false statements and that the statements were not made

18 with scienter. In general, though, "the fact that the financial statements for the year in

19 question were not restated does not end [plaintiff's] case when [plaintiff] has otherwise

20 met the pleading requirements of the PSLRA." *Aldridge v. A.T. Cross Corp.*, 284 F.3d

21 72, 83 (1st Cir. 2002) (upholding complaint alleging securities fraud even in light of

22 auditor's subsequent clean audit opinion on allegedly misstated financial results);

23 *accord In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1246 (N.D. Cal. 2008)

24 (same).[18] *Metzler* in no way suggests that an auditor's opinion *negates* scienter, but

---

25 [18] In *AmTrust*, an out-of-circuit case, the plaintiffs pointed to neither objective facts

26 suggesting that the defendants' accounting position was incorrect, nor to any

27 government action calling the accounting position into question. *Harris v. AmTrust

   Fin. Servs., Inc.*, No. 14-CV-736 VEC, 2015 WL 5707235, at *10 and n.29 (S.D.N.Y.

28 Sept. 29, 2015). Here, Plaintiffs point to objective facts showing that SW Cayman was

   a mere conduit, and the CRA agrees with Plaintiffs that SW's tax position is untenable

rather holds that an auditor's concerns are *one way to plead* scienter. *Compare Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1069 (9th Cir. 2008) *with Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996) (denying motion for summary judgment though defendant presented evidence it had worked with auditor to ensure financial statements accurately presented).

It is particularly inappropriate to rely on the lack of a restatement in this case. Here, SW allegedly both withheld documents from its auditors and tampered with witnesses in a CRA investigation. *See* 20-21, above. The Court can draw no inference from an auditor's sign-off that SW procured by deception. *In re Spiegel, Inc. Sec. Litig.*, 382 F. Supp. 2d 989, 1027 n. 28 (N.D. Ill. 2004) (fact that officers did not disclose all relevant facts to accountants "provides a further basis for denying [officers'] motion" despite argument that auditors' sign off immunized company). And here, even if Defendants did not lie to their auditor, the Court cannot assume Defendants ***did*** tell their auditor ***the CRA had told SW it believed SW violated tax laws***. In contrast, Defendants cite cases in which auditors knew everything because the plaintiffs only relied on publicly-disclosed facts. *Podraza v. Whiting*, 790 F.3d 828, 834, 838-39 (8th Cir. 2015) (dialogue about accounting treatment between SEC and company is public; in addition, case involved mere classification of fully disclosed costs); *In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1155 (C.D. Cal. 2007) (plaintiffs' only facts came from contemporaneous publicly-disclosed documents).

## IV. The Statute of Limitations Did Not Begin to Run Until the Notice of Reassessment in July 2015.

Citing the mere fact of the CRA audit, Defendants assert that the statute of limitations bars recovery. The statute of limitations, however, is only triggered when the plaintiffs discovered, or a reasonably diligent plaintiff would have discovered, the facts constituting the violation. 28 U.S.C. § 1658(b). These include facts showing that defendants made false statements with scienter. *Merck & Co. v. Reynolds*, 559 U.S.

and indeed unreasonable.

633, 648-49 (2010). And the facts must be sufficient to state a claim. *City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 174 (2d Cir. 2011) (*Merck* holds statute of limitations runs when plaintiff has enough facts to survive motion to dismiss). Yet determining "discovery" "is fact intensive and is usually not appropriate at the pleadings stage." *Rieckborn v. Jefferies LLC*, 81 F. Supp. 3d 902, 915 (N.D. Cal. 2015) (internal quotations omitted).

*Defendants* must demonstrate how a reasonably diligent plaintiff would have discovered the facts constituting the violations. *Strategic Diversity, Inc. v. Alchemix Corp.*, 666 F.3d 1197, 1206 (9th Cir. 2012). Here, Defendants point to the mere fact of the CRA audit. But Plaintiffs rely on information provided by FE1 showing among other things that Tatarkin reported to SW Canada, and that SW hid documents from its auditor. Defendants make no effort to explain how a reasonably diligent investor could have uncovered these facts prior to the CRA's assessment. Since it is "not clear [] what a reasonably diligent [] investor could or should have done", the Court should deny the motion to dismiss for statute of limitations grounds. *Pace v. Quintanilla*, No. SA CV 14-2067-DOC, 2015 WL 652719, at *6 (C.D. Cal. Feb. 13, 2015).

Further, the statute of limitations will not begin to run if defendants reliably "purposefully downplayed and/or understated" the risks. *Merck*, 559 U.S. at 654. See *Betz v. Trainer Wortham & Co.*, 829 F. Supp. 2d 860, 866-67 (N.D. Cal. 2011) (defendants' reassurances that issue would be "taken care of" prevented running of statute of limitations); *Oaktree Capital Mgmt., L.P. v. KPMG*, 963 F. Supp. 2d 1064, 1084 (D. Nev. 2013) (reassurances that financials were accurately stated prevented running of statute of limitations from fact that internal controls were inadequate). Here, Defendants' false reassuring statements, see 6, above, prevented the statute of limitations from running.

**CONCLUSION**

For all of the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety.

Dated: March 4, 2016

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Laurence M. Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiffs and the Class*

## __CERTIFICATE OF SERVICE__

I, Laurence Rosen, hereby declare under penalty of perjury as follows:

I am attorney with the Rosen Law Firm, P.A., with offices at 355 South Grand Avenue, Suite 2450, Los Angeles, CA, 90071. I am over the age of eighteen.

On March 4, 2016, I electronically filed the foregoing PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS AMENDED COMPLAINT with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to counsel of record.

Executed on March 4, 2016

/s/ Laurence Rosen
Laurence Rosen