UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL   'O'

| Case No. | CV15-5146-CAS(JEMx) C/W: CV15-5173-CAS(JEMx) | Date | June 6, 2016 |
|---|---|---|---|
| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

| Present: The Honorable | CHRISTINA A. SNYDER, U.S. DISTRICT JUDGE | |
|---|---|---|
| Connie Lee | Laura Elias | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys Present for Plaintiffs:

Laurence Rosen

Attorneys Present for Defendants:

Barry Kaplan
Jerome Birn, Jr.

**Proceedings:**   DEFENDANTS' MOTION TO DISMISS AMENDED
COMPLAINT (Dkt. 61, filed January 29, 2016)

## I.   INTRODUCTION

On July 8, 2015, plaintiff Chris Masilionis commenced this putative class action alleging violations of the Securities Exchange Act of 1934, 15 U.S.C. § 78(a), *et seq.* ("the Exchange Act"), against defendants Silver Wheaton Corp. ("Silver Wheaton"), Randy V. J. Smallwood ("Smallwood"), Peter Barnes ("Barnes"), and Gary Brown ("Brown") (collectively, "defendants"). Dkt. 1. On October 19, 2015, the Court consolidated this action with a related action, Steve Klein, et al. v. Silver Wheaton Corp., et al., Case No: 2:15-cv-5173-CAS-JEM, and appointed Joe Elek as lead plaintiff in the consolidated action. Dkt. 55. The plaintiffs in the consolidated action filed an amended complaint ("CAC") on December 18, 2016. Dkt. 60. The CAC asserts two claims for relief: (1) violation of Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder (17 C.F.R. § 240) against all defendants, and (2) violation of Section 20(a) of the Exchange Act against all individual defendants. Id. Plaintiffs allege that the class period runs from March 30, 2011 to July 6, 2015, inclusive ("the Class Period"). Id. ¶ 1.

On January 29, 2016, defendants filed a motion to dismiss the CAC. Dkt. 61. On March 4, 2016, plaintiffs filed an opposition, Dkt. 66, and on April 1, 2016, defendants filed a reply, Dkt. 73. Having carefully considered the parties' arguments, the Court finds and concludes as follows.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                            'O'

| Case No. | CV15-5146-CAS(JEMx)<br>C/W: CV15-5173-CAS(JEMx) | Date | June 6, 2016 |
|----------|--------------------------------|------|--------------|
| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

## II.   BACKGROUND

### A.   Silver Wheaton Corporation

Defendant Silver Wheaton is a Canadian Company, headquartered in Vancouver, British Columbia whose shares are traded on the NYSE under the ticker symbol "SLW". CAC ¶ 18.  Silver Wheaton and its subsidiaries purchase and sell of gold and silver worldwide.  Id. ¶¶ 2-3.  Silver Wheaton enters into so-called "streaming agreements," whereby it obtains the rights to a portion of precious metals produced by mines located in politically stable regions around the world such as Canada, Mexico, Portugal, Brazil, Peru, and Sweden.  Id. ¶ 19.  According to Silver Wheaton, under the terms of a typical streaming agreement, Silver Wheaton or its subsidiaries would agree to purchase a specified percentage of the future production of silver or gold from a mine operator for an upfront payment plus, on delivery, an amount equal to the lesser of an agreed upon price or the then-current market price.  Mot., at 3.  Silver Wheaton and its subsidiaries allegedly earn profits by selling the silver and gold purchased pursuant to these streaming agreements.  Id. at 4.

Plaintiffs allege that Silver Wheaton derives revenues principally from streaming agreements entered into by one of its subsidiaries located in the Cayman Islands ("SW Cayman").  CAC ¶ 3.  Plaintiffs further allege that, pursuant to the laws of the Cayman Islands, SW Cayman paid no income tax in the Cayman Islands on its profits derived from these agreements.  Id. ¶ 4.  Nor did Silver Wheaton pay any income tax in Canada on the profits earned by SW Cayman because Silver Wheaton took the position that SW Cayman was a separate entity and that no income tax on SW Cayman's profits was owed to Canada.  Id.

The individually named defendants are all current and former executives of Silver Wheaton.  Specifically, defendant Smallwood has served as Silver Wheaton's President since January 2010 and as the company's Chief Executive Officer ("CEO") since April 11, 2011.  Id. ¶ 20.  Defendant Barnes served as Silver Wheaton's CEO and as a member of the company's board of directors from 2006 until April 11, 2011.  Id. ¶ 21.  And

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                    'O'

| Case No. | CV15-5146-CAS(JEMx)<br>C/W: CV15-5173-CAS(JEMx) | Date | June 6, 2016 |
|---|---|---|---|
| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

defendant Brown joined Silver Wheaton in 2008 and has served as the company's Chief Financial Office ("CFO") throughout the Class Period.  Id. ¶ 22.

**B.     Canada's Transfer Pricing Rules**

This case turns, in large part, on defendants' interpretation and application of Canada's corporate income tax laws.  Accordingly, the Court begins with a brief overview of several pertinent provisions of the Canadian Income Tax Act.

Pursuant to the Canadian Income Tax Act, when a person or corporation sells something of value, such as property, services, commercial opportunities, or any other right or advantage, they are generally required to include the amount they received from the purchaser when computing their taxable income.  See generally R.S.C. 1985, c. 1. (5th Supp.) (The "Canadian Income Tax Act").  In addition, Canadian corporations are subject to Canada's transfer pricing rules.  See generally R.S.C. 1985, c. 1. (5th Supp.) § 247.  Transfer pricing refers to the prices at which services, tangible property, and intangible property are traded across international borders between related entities and the transfer pricing rules govern the amount a corporation must report as taxable income based on such transactions.  M.N.R., Canadian Revenue Agency Information Circular 87-2R "International Transfer Pricing" (27 September, 1999) ("CRA Circular"), ¶¶ 2, 5.  In general, Canada's transfer pricing rules require that when a taxpayer engages in a non-arm's length transaction they must report their income from that transaction in such a manner so as to approximate the amount of income the taxpayer would have received had the transaction been negotiated at arm's length.  Id. ¶ 7.  These rules are premised on the "arm's length principle," which Canada's tax authority, the Canada Revenue Agency ("CRA"), summarizes as follows:

> Where . . . conditions are made or imposed between . . . two [non-arm's length] enterprises in their commercial or financial relations which differ from those which would be made between [arm's legnth] enterprises, then any profits which would, but for those conditions, have accrued to one of the enterprises but, by reason of those conditions, have not so accrued, may be included in the profits of that enterprise and taxed accordingly

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                                    **'O'**

| Case No. | CV15-5146-CAS(JEMx) C/W: CV15-5173-CAS(JEMx) | Date | June 6, 2016 |
|---|---|---|---|
| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

Id. ¶ 29 (quoting Organisation for Economic Co-operation and Development ("OECD"), *Model Tax Convention*, Art. 9, ¶1).

Canada's transfer pricing rules are principally set forth in section 247 of the Canadian Income Tax Act. CRA Circular ¶ 11. The rules apply to transactions between a Canadian taxpayer and a non-resident person or entity with whom the taxpayer does not deal at arm's length. Id. ¶ 12.[1] According to the CRA, Canadian courts consider the following criteria in assessing whether parties to a transaction are not dealing at arms' length: (1) was there a common mind which directs the bargaining for both parties to a transaction; (2) were the parties to a transaction acting in concert without separate interests; and (3) was there "de facto" control. M.N.R. Interpretation Bulletin IT-419R2 "Meaning of Arm's Length" (8 June 2004), ¶ 23.[2]

For tax purposes, section 247 requires Canadian corporations to report their income from non-arm's length transactions with non-residents based on the pricing that would have been established had the transaction been at arm's length. See also CRA Circular ¶ 7 ("[Transfer pricing] ensures that taxpayers, who are non-arm's length members of a group and engage in transactions with other members of the group, report substantially the same amount of income as they would if they had been dealing with each other at arm's length."). If a Canadian corporation enters into a non-arm's length transaction with a non-resident and does not use arm's length pricing, the CRA may (a) recompute the taxable income of the corporation to reflect arm's length pricing, and (b) reassess the income tax payable by applying the income tax rate to the adjusted income. See R.S.C. 1985, c. 1. (5th Supp.), § 247(2); CRA Circular, at ¶ 13. In addition, the CRA may also assess penalties to corporations who fail to report income using arm's length pricing and fail to make contemporaneous records documenting their reasonable efforts to

---

[1] The transfer pricing rules also apply to non-arm's length transactions involving partnerships, see CRA Circular ¶ 12; however, these provisions are not relevant to the instant motion.

[2] Interpretation Bulletin IT-419R2, which was in effect during the Class Period, was subsequently canceled by the CRA and replaced with Income Tax Folio S1-F5-C1, "Related Persons and Dealing at Arm's Length." Nonetheless, Income Tax Folio S1-F5-C1 incorporates the same three criteria as Interpretation Bulletin IT-419R2.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL                    'O'

| Case No. | CV15-5146-CAS(JEMx)<br>C/W: CV15-5173-CAS(JEMx) | Date | June 6, 2016 |
|----------|--------------------------------------------------|------|--------------|
| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

establish arm's length prices.  R.S.C. 1985, c. 1. (5th Supp.), §§ 247(3)-(4); CRA Circular ¶ 14-18.

### C.    Silver Wheaton's Tax Position With Regard to SW Cayman

According to plaintiffs, during the Class Period, Silver Wheaton derived its profits principally from streaming agreements Silver Wheaton attributed to its subsidiary, SW Cayman.  CAC ¶ 3.  Silver Wheaton paid no Cayman Islands or Canadian taxes on these profits.  Id. ¶ 4.  This is so because Silver Wheaton took the position that SW Cayman was a separate entity and that it was SW Cayman and not Silver Wheaton that had earned these profits.  Id.  Nevertheless, plaintiffs contend that Silver Wheaton provided an extensive range of services, commercial opportunities, capital, know-how, intellectual property, strategic support, contractual support, and other property to SW Cayman that were critical to generating the revenue purportedly earned by SW Cayman.  Id. ¶ 57.  Indeed, plaintiff goes so far as to assert that SW Cayman was a mere "conduit" for Silver Wheaton's business operations, id. ¶¶ 72, 98, and that all substantive strategic, managerial, and operational direction relating to the activities of SW Cayman was provided by Silver Wheaton, id. ¶ 58.

A former employee of SW Cayman—referred to in the CAC only as Former Employee 1 ("FE1")—states that she observed and/or was informed by her SW Cayman superiors that all material operational and strategic decisions in respect of SW Cayman were subject to the direction and approval of officers or employees of Silver Wheaton.  Id. ¶ 59.  In addition, FE1 states that all material agreements to which SW Cayman was a party were drafted and executed by officers or representatives of Silver Wheaton, and that all employees of SW Cayman reported to or accepted instruction from officers or employees of Silver Wheaton.  Id.  FE1 further states that the executive director of SW Cayman, Nik Tatarkin ("Tatarkin") told her that he was not his own boss and that he "had to report to [Silver Wheaton CEO] Randy [Smallwood]" regarding any financial decisions that were outside Tatarkin's pre-approved authority.  Id. ¶¶ 64-65.  According to FE1, all of SW Cayman's accounting functions were guided by Silver Wheaton, all material operations matters were subject to the oversight and/or approval of Silver

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                               'O'

| Case No. | CV15-5146-CAS(JEMx) C/W: CV15-5173-CAS(JEMx) | Date | June 6, 2016 |
|----------|----------------------------------------------|------|--------------|
| Title    | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION |  |  |

Wheaton, and all material back-office responsibilities of SW Cayman were provided by Silver Wheaton.  Id. ¶¶ 66-67.[3]

---

[3] Plaintiff states that FE1 was an accountant at Silver Wheaton's Cayman Islands office from December 2007 to November 2013.  CAC ¶ 25.  In this capacity, FE1 performed bookkeeping tasks, such as reconciliation, data entry and making sure the company was receiving payments it was expecting.  Id. ¶ 26.  FE1 reported to Tatarkin and Brad Carpenter, the controller and later director of contract compliance at SW Cayman.  Id. ¶¶ 27-29.  Defendants contend that the Court should discredit the allegations made by FE1.  In particular they contend that FE1 was merely a bookkeeper at SW Cayman and has no knowledge of Silver Wheaton's company-wide financial practices or of Silver Wheaton's operations at its headquarters in Canada.  A court may credit the allegations of confidential witnesses, such as FE1, where "[p]laintiffs have properly alleged facts suggesting that the confidential witnesses have personal knowledge about the incidents they address."  Mulligan v. Impax Labs., Inc., 36 F. Supp. 3d 942, 936 (N.D. Cal. 2014); see also Berson v. Applied Signal Tech., Inc., 52 F.3d 982, 985 (9th Cir. 2008) (court permitted to credit allegations of confidential witnesses where witnesses "would be in a position to infer" the facts to which they testified).  Here, plaintiff alleges that FE1 was an accountant at SW Cayman and reported directly to two senior executives at SW Cayman.  Accepting these allegations as true, it is reasonable to infer for pleading purposes that FE1 has knowledge regarding the manner in which decisions were made at SW Cayman, the financial dealings of SW Cayman, and how SW Cayman interacted with and related to the broader business of Silver Wheaton.  At a minimum, based on her familiarity with SW Cayman's bookkeeping and executives, it is plausible that FE1 "would be in a position to infer" information about these topics.  See Berson, 52 F.3d at 985.  In addition, defendants contend that the Court should discount FE1's allegations because they rely on hearsay statements.  However, in the context of pleading a securities law violation, the Ninth Circuit has expressly stated that "the fact that a confidential witness reports hearsay does not automatically disqualify [her] statement from consideration . . . ."  Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 997 n. 4 (9th Cir. 2009).  Rather, court's are instructed to "examine a confidential witness's hearsay report to determine if it is 'sufficiently reliable, plausible, or coherent.' " Lloyd v. CVB Fin. Corp., 811 F.3d 1200, 1208 (9th Cir. 2016) (quoting Zucco Partners, 552 F.3d at 997 n.4).  Here, the hearsay statements FE1 relies upon were largely made by Tatarkin, to whom FE1 directly reported, and are consistent with her other statements

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                                    **'O'**

| Case No. | CV15-5146-CAS(JEMx)<br>C/W: CV15-5173-CAS(JEMx) | Date | June 6, 2016 |
|----------|--------------------------------------------------|------|--------------|
| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

Plaintiffs contend that the employees of SW Cayman lacked the requisite professional experience and training to perform all of the activities Silver Wheaton attributes to SW Cayman during the Class Period.  Id. ¶ 61.  For example, plaintiffs note that prior to becoming the executive director of SW Cayman, Tatarkin had little experience with the natural resources industry and, in fact, had only six years of work experience in any capacity since graduating from university.  Id. ¶ 62.  In addition, Silver Wheaton assumed all material financial and contractual risks on behalf of SW Cayman during the Class Period, id. ¶ 72, and FE1 states that during negotiations of SW Cayman's streaming agreements and other material agreements Tatarkin would represent that he entered such agreements "on behalf of [Silver Wheaton] as a whole and not just SW Cayman," id. ¶ 63.  In sum, plaintiffs contend that SW Cayman was incapable of generating the substantial revenues it purportedly earned without the substantial assistance and involvement of Silver Wheaton.  See, e.g., Id. ¶ 68 ("FE1 made clear that SW Cayman was simply not institutionally oriented toward operating on an autonomous basis during the [Class] Period."); Id. ¶ 91 ("Absent the efforts and involvement of [Silver Wheaton] in securing and funding streaming agreements and managing and directing the activities that were undertaken in the name of SW Cayman, SW Cayman would have had no revenue during the [Class] Period.").

Notwithstanding the substantial services Silver Wheaton provided to SW Cayman, plaintiff alleges that during the Class Period Silver Wheaton "recognized no material revenue for tax purposes" with respect to the provision of these services.  CAC ¶ 106.[4]  By contrast, SW Cayman reportedly earned profits of CDN$715 million during the Class Period.  Id.  Plaintiffs aver that the manner in which Silver Wheaton reported its income from these services was in "express contravention" of Canada's transfer pricing rules.  Id.

---

regarding Silver Wheaton's control over its subsidiary SW Cayman.  Accordingly, for purposes of ruling on the instant motion, the Court considers the testimony of FE1 and relies on her testimony to the extent it concerns topics of which she is reasonably likely to posses personal knowledge.

[4] In their papers, the parties appear to agree that Silver Wheaton reported income of CDN$33 million for the services it provided to SW Cayman.  See Mot., at 4-5; Opp'n., at 1.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**     **'O'**

| Case No. | CV15-5146-CAS(JEMx)<br>C/W: CV15-5173-CAS(JEMx) | Date | June 6, 2016 |
|---|---|---|---|
| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

### D.    The CRA Audits Silver Wheaton

According to plaintiffs, beginning in 2009 there was information in Canadian business sectors that the CRA was prioritizing audits of Canadian companies with large foreign income in low-tax jurisdictions, particularly in the natural resources industry. Id. ¶ 116. FE1 states that, in May of 2011, CRA officials visited SW Cayman to begin an audit of SW Cayman's transactions with Silver Wheaton to determine if Silver Wheaton had violated transfer pricing rules. Id. ¶ 143. Plaintiff contends that, pursuant to the CRA's internal procedures, Silver Wheaton would have been informed of the CRA's intention to conduct this audit no later than February of 2011. Id. ¶ 144. In the course of conducting the audit, employees of the CRA told FE1: "We're here because we feel Silver Wheaton [has] not been paying their taxes." Id. ¶ 208.

On July 6, 2015, Silver Wheaton issued a press release announcing that the CRA was proposing to reassess Silver Wheaton's tax liability. Id. ¶ 175. The press released stated, in pertinent part:

> Silver Wheaton Corp. . . . announces that it has received a proposal letter dated July 6, 2015 (the "Proposal") from the Canada Revenue Agency (the "CRA") in which CRA is proposing to reassess Silver Wheaton under various rules contained in the Income Tax Act (Canada).

> The Proposal outlines CRA's position that the transfer pricing provisions of the Income Tax Act (Canada) relating to income earned by our foreign subsidiaries outside of Canada should apply such that the income of Silver Wheaton subject to tax in Canada should be increased for the 2005 to 2010 taxation years (the "Relevant Taxation Years") by approximately Cdn$715 million (US$567 million).

> \* \* \*

> If the CRA reassesses Silver Wheaton on the basis outlined in the Proposal, and assuming that Silver Wheaton would be assessed taxes on the foreign subsidiaries' income on the same basis as its Canadian income, Silver Wheaton currently estimates on a preliminary basis

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                    'O'

| Case No. | CV15-5146-CAS(JEMx)<br>C/W: CV15-5173-CAS(JEMx) | Date | June 6, 2016 |
| --- | --- | --- | --- |
| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

> that it would be subject to federal and provincial tax of approximately
> US$150 million in respect of the Relevant Taxation Years.  The
> Proposal also indicates that the CRA is seeking to apply transfer
> pricing penalties of approximately Cdn$72 million (US$57 million) in
> respect of the Relevant Taxation Years. . . .

Id.  The press release also stated that "Management believes that [Silver Wheaton] has filed its tax returns and paid applicable taxes in compliance with Canadian tax law."  Id. The press release also quoted defendant Smallwood who stated: "We remain confident in our business structure which we believe is consistent with that typically used by Canadian companies, including Canadian streaming companies, that have international operations."  Id.  And the press release concluded by noting that "Silver Wheaton intends to vigorously defend its tax filing positions."  Id.

On July 7, 2015, the day after Silver Wheaton issued the press release, Silver Wheaton's share price fell $2.08 or approximately 12% to close at $15.46 per share.  Id. ¶ 176.  Shortly thereafter, two analysts covering Silver Wheaton issued reports estimating that the CRA tax audit could reduce Silver Wheaton's value by 40% and 30% respectively.  Id. ¶¶ 177, 178.

### E.    Defendants Alleged Misrepresentation and Omissions

During the Class Period, defendants submitted a number of annual and quarterly reports to the SEC detailing Silver Wheaton's financial position.[5]  Defendants appended consolidated financial statements for Silver Wheaton and its subsidiaries to their annual

---

[5] The CAC identifies six distinct sets of reports defendants submitted to the SEC: (1) on March 30, 2011, a Form 40-F annual report; (2) on May 9, August 8, and November 9, 2011, Form 6-K quarterly reports; (3) on March 27, 2012, a Form 40-F annual report; (4) on April 2, 2013, a Form 40-F annual report; (5) on March 31, 2014, a Form 40-F annual report; and (6) on March 31, 2015, a Form 40-F annual report.  CAC ¶¶ 136, 145, 147, 154, 161, 168.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                       'O'

| Case No. | CV15-5146-CAS(JEMx)<br>C/W: CV15-5173-CAS(JEMx) | Date | June 6, 2016 |
|----------|--------------------------------------------------|------|--------------|
| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

and quarterly reports, and these financial statements included balance sheets for fiscal years 2009 through 2014. See, e.g., id. ¶¶ 139, 150, 157. Defendants represented that their consolidated financial statements were prepared in accordance with either Generally Accepted Accounting Principles ("GAAP") or International Financial Reporting Standards ("IFRS"). See, e.g., id. ¶¶ 138, 148, 156. As required by federal law, the individual defendants signed and certified that the financial information contained in these reports was accurate. See, e.g., id. ¶¶ 136, 147, 154.

Plaintiffs contend that each of the balance sheets included in defendants' annual and quarterly reports was false and misleading because they failed to disclose a tax liability of USD$207 million (USD$150 million for unpaid income tax plus USD$57 million in mandatory penalties) for violating Canada's transfer pricing rules. See, e.g., id. ¶¶ 140, 146, 151. According to plaintiffs, under applicable provisions of GAAP and IFRS, defendants were required to recognize and record any tax liability that Silver Wheaton was "more likely than not" to incur. Id. ¶¶ 141, 152. In this case, plaintiffs contend that it was more likely than not that the CRA would reject Silver Wheaton's interpretation of transfer pricing rules and thus require Silver Wheaton to pay unpaid income tax plus appropriate penalties. Id. Accordingly, in plaintiffs' view, it was a violation of GAAP and IFRS for defendants not to recognize and record a tax liability of USD$207 million on Silver Wheaton's balance sheets. Id. Alternatively, even if Silver Wheaton was not more likely than not to incur a tax liability of USD$207 million, plaintiffs contend that, pursuant to other provisions of GAAP and IFRS, plaintiffs contend that defendants were still required to disclose a "contingent" tax liability of USD$207 million. Id. ¶ 153. By failing to either record or disclose an actual or contingent tax liability of USD$207 million, plaintiffs contend that the balance sheets incorporated into defendants annual and quarterly reports to the SEC contained false and misleading financial information regarding Silver Wheaton. See, e.g., id. ¶¶ 140, 146, 151.

Plaintiffs contend that the price of Silver Wheaton's securities was artificially inflated by defendants purportedly wrongful conduct. Id. ¶ 239. Accordingly, plaintiffs allege that they and other members of the putative Class in this action, all of whom purchased Silver Wheaton securities, suffered damages when it was disclosed that

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL      'O'

| Case No. | CV15-5146-CAS(JEMx)<br>C/W: CV15-5173-CAS(JEMx) | Date | June 6, 2016 |
|---|---|---|---|
| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

defendants had been disseminating inaccurate financial statements to the investing public. Id. ¶ 242.

## III. LEGAL STANDARD

The basic elements of a Rule 10b-5 claim are (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance or "transaction causation"; (5) economic loss; and (6) loss causation or a causal connection between the material misrepresentation and the loss. Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005).

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in a complaint. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1964-65 (2007). "[F]actual allegations must be enough to raise a right to relief above the speculative level." Id. at 1965.

A federal securities fraud suit is also subject to the demanding pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"). Enacted by Congress in 1995 to provide "protections to discourage frivolous [securities] litigation," H.R. Conf. Rep. No. 104-369, 104th Cong., 1st Sess. at 32 (Nov. 28, 1995), the PSLRA strengthened the already-heightened pleading requirements of Fed. R. Civ. P. 9(b). Under the PSLRA, private actions based on allegations of material misstatements or omissions must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). In addition, the PSLRA imposes strict requirements for pleading scienter in actions brought pursuant to Section 10(b) and Rule 10b-5, requiring that the complaint "state with particularity facts giving

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                                    **'O'**

| Case No. | CV15-5146-CAS(JEMx) | Date | June 6, 2016 |
| | C/W: CV15-5173-CAS(JEMx) | | |

| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION |

rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).

The Ninth Circuit, in interpreting the PSLRA, has held that "a private securities plaintiff proceeding under the [PSLRA] must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct."  In re Silicon Graphics, Inc., 183 F.3d 970, 974 (9th Cir. 1999).  In determining whether a plaintiff has sufficiently pled scienter, a court must consider "whether the totality of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness."  Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1230 (9th Cir. 2004) (quoting No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp., 320 F.3d 920, 938 (9th Cir. 2003)).  Moreover, "[i]n determining whether a strong inference of scienter exists, [a court] must consider all reasonable inferences, whether or not favorable to the plaintiff."  Id.

## IV.   ANALYSIS

As stated above, the basic elements of a Rule 10b-5 claim are (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance or "transaction causation"; (5) economic loss; and (6) loss causation or a causal connection between the material misrepresentation and the loss. Dura Pharms., 544 U.S. at 341-42 (2005).  In their motion, defendants only challenge the first two of these elements, i.e., whether plaintiffs have sufficiently alleged a material misrepresentation or omission and whether plaintiffs have sufficiently alleged scienter. In addition, defendants argue that several of plaintiffs' claims are time-barred.  The Court addresses each of these arguments in turn.

### A.     Material Misrepresentation or Omission

Defendants first contend that plaintiffs have failed to allege facts demonstrating that defendants made any false or misleading statements.  In their papers, defendants

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                                                                      'O'

| Case No. | CV15-5146-CAS(JEMx)<br>C/W: CV15-5173-CAS(JEMx) | Date | June 6, 2016 |
|----------|--------------------------------------------------|------|--------------|
| Title    | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION |      |              |

argue at great length that they are currently disputing the CRA's reassessment of Silver Wheaton's tax obligations and believe that the Canadian tax courts will ultimately vindicate their tax position and reject the CRA's proposed reassessment of Silver Wheaton's tax liability.

However, this argument is misplaced.  The CAC alleges that defendants made false or misleading statements by either (a) failing to record and recognize a tax liability on Silver Wheaton's balance sheets or (b) failing to disclose a contingent tax liability in Silver Wheaton's financial statements.  Whether defendants were required to record or disclose a tax liability depends, not on whether the Canadian tax courts will ultimately affirm the CRA's reassessment, but rather on whether it is *probable* that Silver Wheaton will eventually be required to pay unpaid income taxes and applicable penalties.  Indeed, some courts have even found that a failure to disclose a risk of enhanced tax liability is actionable *regardless* of the tax authority's ultimate determination on the matter.  See, e.g., Resnik v. Woertz, 774 F. Supp. 2d 614, 631 (D. Del. 2011) ("[T]he risk that a bonus might not be tax deductible and the information necessary to determine whether it is deductible are material to the average investor . . . regardless of the IRS's ultimate determination on the matter.") (citing Shaev v. Saper, 320 F.3d 373, 384 (3d Cir. 2003)); see also U.S. S.E.C. v. Fehn, 97 F.3d 1276, 1291 (9th Cir. 1996) (requiring disclosure of contingent liabilities where, "[a]lthough [the issuer's] liabilities were not inevitable, but instead were contingent, they represented a potentially large financial loss for [the issuer]."").  Accordingly, even if the Canadian tax courts were ultimately to reverse the CRA's reassessment of Silver Wheaton's tax liability, plaintiffs could still prevail on their claims by demonstrating that it was false or misleading for defendants to fail to disclose, at a minimum, the potential that Silver Wheaton would be subject to an enhanced tax liability.

Here, the Court finds that plaintiffs have stated at least a plausible claim that, pursuant to the requirements of both GAAP and IFRS, defendants were required to record or disclose a tax liability of approximately USD$ 207 million on Silver Wheaton's balance sheets.  For fiscal year 2010, Silver Wheaton represented that it had prepared its financial statements in accordance with GAAP and for fiscal years 2011 through 2014,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                              'O'

| Case No. | CV15-5146-CAS(JEMx) C/W: CV15-5173-CAS(JEMx) | Date | June 6, 2016 |
|----------|---------------------------------------------|------|--------------|
| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

Silver Wheaton represented that it had prepared its financial statements in accordance with IFRS. Pursuant to GAAP Accounting Standards Codification ("ASC") 740, an entity must recognize in its financial statements the "effects of a tax position when it is more likely than not, based on the technical merits, that the position will be sustained upon examination" by the relevant tax authority. GAAP ASC 740-10-25-6. "More likely than not" mean a likelihood of more than 50 percent. Id. Applying this provision, in determining whether a tax liability must be recorded, defendants were required to assume that the CRA would audit Silver Wheaton's transfer pricing position and then determine whether it was more likely than not (i.e. more than 50% likely), that the CRA would find that Silver Wheaton owed additional income taxes and penalties. See id. 740-25-7. If it was more likely than not that the CRA would find that Silver Wheaton had violated Canada's transfer pricing rules, defendants were required by GAAP to record a tax liability position on Silver Wheaton's balance sheets in the amount of any unpaid taxes and applicable penalties.

Likewise, pursuant to IFRS, defendants were required to recognize a tax liability on Silver Wheaton's balance sheets if it was "probable" that an audit by the CRA would result in a reassessment of Silver Wheaton's tax liability. See IFRS International Accounting Standard ("IAS") 12, Introduction; IFRS IAS 37, ¶ 14. "Probable" means more likely than not. IFRS IAS 37, ¶ 23. Accordingly, under either GAAP or IFRS defendants were required to record and recognize on Silver Wheaton's balance sheets a tax liability if it was more likely than not that the CRA would reject Silver Wheaton's tax position and impose a greater tax obligation.

As stated above, with respect to SW Cayman, Silver Wheaton took the position that it was entitled to CDN$33 million for the services it provided on SW Cayman's behalf. Thus, the operative question is whether it was more likely than not that the CRA would sustain this tax position. In the CAC, plaintiffs allege that SW Cayman served as merely a "conduit" for Silver Wheaton's business operations. According to plaintiffs, Silver Wheaton provided services, commercial opportunities, capital, know-how, intellectual property, strategic support, contractual support, and other property to SW Cayman. CAC ¶ 57. In addition, plaintiffs allege that Silver Wheaton directed all of SW

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                                              'O'

| Case No. | CV15-5146-CAS(JEMx)<br>C/W: CV15-5173-CAS(JEMx) | Date | June 6, 2016 |
|----------|-----|------|-----|
| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

Cayman's material strategic and operational decisions, id. ¶ 59, and assumed all material financial and contractual risks on behalf of SW Cayman, id. ¶ 72.  In short, plaintiffs contend that SW Cayman lacked the institutional infrastructure to operate on an autonomous basis and that, absent the efforts and involvement of Silver Wheaton, SW Cayman would have had no revenues.  Id. ¶¶ 68, 91.  Nevertheless, Silver Wheaton took the position, for tax purposes, that, despite SW Cayman's substantial dependence on the resources and guidance of its parent, SW Cayman was entitled to profits of CDN$715 million while Silver Wheaton was entitled to income of only CDN$33 million.

If all of these allegations are taken as true, it would appear, based on the extensive resources Silver Wheaton provided to SW Cayman and the significant disparity between SW Cayman's profits and Silver Wheaton's reported income, that there was a significant likelihood that the CRA would find that Silver Wheaton had under-reported its income.  In fact, when the CRA reassessed Silver Wheaton's tax liability, it did not simply recompute Silver Wheaton's taxable income from its SW Cayman transactions; rather, the CRA found that Silver Wheaton should have recognized additional income of CDN$715 million based on its transactions with SW Cayman—in other words, *all* of SW Cayman's purported profits.[6]

_____

[6] Defendants contend that it is improper to rely on the CRA's reassessment as evidence of the falsity of Silver Wheaton's financial statements because that decision is "hotly contested and will ultimately be decided by the Canadian courts."  Mot., at 9.  Defendants are correct to note that the CRA's reassessment is not a final decision and is appealable to the Canadian tax courts.  Nevertheless, the fact that the CRA, the agency charged with interpreting and enforcing Canada's income tax laws, has determined to reassess Silver Wheaton's tax liability is, at a minimum, relevant to assessing whether plaintiffs have stated a plausible claim that defendants misrepresented Silver Wheaton's potential tax liability.  This is particularly true given the significant extent of the CRA's reassessment—virtually all of SW Cayman's profits.  Accordingly, the Court considers the CRA's reassessment in evaluating whether plaintiffs have stated a plausible claim for violations of the Exchange Act.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                    'O'

| Case No. | CV15-5146-CAS(JEMx)<br>C/W: CV15-5173-CAS(JEMx) | Date | June 6, 2016 |
|---|---|---|---|
| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

In addition, even if defendants were not required to record and recognize a tax liability of CDN$207 million—i.e., if it was not more likely than not that the CRA would reassess Silver Wheaton's tax liability—plaintiffs could still state a claim by demonstrating that defendants should have disclosed a "contingent" tax liability. GAAP Financial Accounting Standard Number 5 ("FAS 5") "requires that disclosure of [a] contingency shall be made when there is at least a *reasonable possibility* that a loss . . . may have been incurred." Fehn, 97 F.3d at 1291 (emphasis in original) (quoting FAS 5 ¶ 10). According to FAS 5, an event is "reasonably possible" if "the chance of the future events or events occurring is more than remote but less than likely." FAS 5 ¶ 3. If there is a reasonable possibility that an entity will incur a contingent liability, FAS 5 mandates that the entity disclose: (a) the nature of the contingency and (b) give an estimate of the possible loss or range of loss or state that such an estimate cannot be made. Id. ¶ 10. Similarly, IFRS IAS 37 states that a contingent liability must be disclosed unless the possiblity that such a liability will occur is "remote." IFRS IAS 37 ¶ 28. Where the possibility of a contingent liability is not remote, IFRS requires that an entity disclose: (a) an estimate of the financial effect of the liability; (b) an indication of the uncertainties relating to the amount or timing of the liability; and (c) the possibility of any reimbursement. Id. ¶ 86.

Again, accepting all of the allegations in the CAC as true, it seems probable that the possibility that the CRA would reassess Silver Wheaton's tax liability was, at a minimum, more than remote. And, if the probability of a tax reassessment was more than remote, defendants were required, in accordance with both GAAP and IFRS, to disclose a contingent liability and provide an estimate of their potential tax liability. Accordingly, the Court finds that plaintiffs have plausibly demonstrated that defendants annual and quarterly reports to the SEC did not comply with either GAAP or IFRS and, as such, contained false and misleading information about Silver Wheaton's financial position. See 17 C.F.R. § 210.4-01(a)(1) ("Financial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate"); See also Penn. Public Sch. Employees' Ret. Sys. v. Bank of Am. Corp., 874 F. Supp. 2d 341, 356 (S.D.N.Y. 2012) ("SEC regulations dictate that where financial statements are not prepared in compliance with GAAP, they

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                                    'O'

| Case No. | CV15-5146-CAS(JEMx)<br>C/W: CV15-5173-CAS(JEMx) | Date | June 6, 2016 |
|----------|------|------|------|
| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

are presumed to be misleading.") (citing 17 C.F.R. § 210.4-01(a)(1)); S.E.C. v. Yuen, 2006 WL 1390828, at *41 (C.D. Cal. Mar. 16, 2006) (Pfaelzer, J.) ("a financial statement that is not prepared in accordance with GAAP is presumptively misleading or inaccurate.") (citing 17 C.F.R. § 210.4-01(a)(1)).

Defendants contend that, contrary to plaintiffs assertions, they did issue disclosures regarding Silver Wheaton's potential tax liability. Specifically, defendants note that, in each of Silver Wheaton's annual reports since 2011, defendants have disclosed that Silver Wheaton was being audited by the CRA. In one such disclosure, defendants cautioned investors that: "Due to the size, complexity and nature of [Silver Wheaton's] operations, various legal and tax matters are outstanding from time to time, *including an audit by the [CRA] of [Silver Wheaton's] international transactions covering the 2005 to 2010 taxation years*." Mot., Ex. 7, at 343 (emphasis added). This disclosure also noted that "[i]f [Silver Wheaton] was unable to resolve any of these matters favorably there may be a material adverse impact on [Silver Wheaton's] financial performance, cash flows or results of operations." Id. And with each of Silver Wheaton's annual reports, defendants included the following statement expressly warning investors that differing interpretations of Canadian tax law may result in a higher tax liability for Silver Wheaton:

> [D]iffering interpretations of existing tax laws or regulations in Canada . . . could result in an increase in the Company's taxes, or other governmental charges, duties or impositions . . . . [There can be] [n]o assurance . . . existing tax laws or regulations will not be . . . interpreted or applied in a manner which could have a material adverse effect on [Silver Wheaton].

Mot., Ex. 6, at 99. Defendants argue that, in light of these disclosures, plaintiffs cannot establish that defendants falsely represented Silver Wheaton's tax position or the associated risks of that position.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL                                        'O'

| Case No. | CV15-5146-CAS(JEMx)<br>C/W: CV15-5173-CAS(JEMx) | Date | June 6, 2016 |
|----------|---------------------------------------------|------|--------------|
| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

However, plaintiffs respond that, while defendants disclosed the existence of the CRA's audit, they consistently downplayed its significance in earnings calls with investors and financial analysts. For example, on an earnings call in May of 2012, defendant Brown stated that the audit "is a normal course audit and is completely expected." Rosen Decl., Ex. 5, at5. Similarly, on an earnings call in August of 2012, Brown stated that Silver Wheaton was "hopeful that [the CRA] would wrap [the audit] up by the end of [] 2012." Id., Ex. 6, at 6. And, in December 2013 at the Scotiabank Mining Conference, Brown stated that it was Silver Wheaton's view that "there is not a significant risk associated with Canadian taxes being assessed on [Silver Wheaton's] international profits." Id. Ex. 15, at 6.

Morever, as stated above, both GAAP and IFRS set forth detailed requirements regarding the disclosure of contingent liabilities. Among other things, both GAAP and IFRS require an entity, where possible, to provide a reasonable estimation of the amount of any potential liability. See FAS 5 ¶ 10; IFRS IAS 87 ¶ 86. In none of the disclosures on which defendants rely, did they make any effort to provide an estimate of Silver Wheaton's potential liability in the event of a reassessment by the CRA. Accordingly, notwithstanding defendants' disclosures, plaintiffs have plausibly demonstrated that defendants failed to adequately apprise investors of Silver Wheaton's potential tax liability.

For the foregoing reasons, the Court finds that plaintiffs have adequately alleged that defendants made false or misleading statements in their annual and quarterly reports to the SEC.

### B.    Scienter

In a securities fraud action, "the term 'scienter' refers to a mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Scienter can be established by a showing that the defendant acted knowingly or with deliberate recklessness with regard to the truth of their representations. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                                    'O'

| Case No. | CV15-5146-CAS(JEMx)<br>C/W: CV15-5173-CAS(JEMx) | Date | June 6, 2016 |
|----------|---|---|---|
| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

U.S. 308, 319 n.3 (2007) ("Every Court of Appeals that has considered the issue has held that a plaintiff may meet the scienter requirement by showing that the defendant acted intentionally or recklessly").  To plead scienter, plaintiffs must allege "with particularity facts that give rise to a 'strong'—i.e., a powerful or cogent—inference" that defendants acted knowingly or with deliberate indifference.  Id. at 323.  For the following reasons, the Court finds that plaintiffs have sufficiently pleaded facts giving rise to a "strong" inference of scienter.

In particular, plaintiffs have alleged that, beginning in 2009, there was information in Canadian business sectors that the CRA was prioritizing audits of Canadian companies with large foreign income in low-tax jurisdictions, particularly in the natural resources industry.  CAC ¶ 116.  Given Silver Wheaton's business and corporate structure it would seem to be a prime target for such an audit—its business is the purchase and sale of silver and gold (i.e., it is in the natural resources industry) and it has a Cayman Islands subsidiary that reported profits of CDN$715 million between 2005 and 2010 (i.e., it has large foreign income in a low-tax jurisdiction).  Moreover, plaintiffs note that in 2009 in a "broadly similar" case that was highly publicized, the CRA reassessed another corporation, Cameco Corporation ("Cameco"), for transfer pricing violations.  CAC ¶ 116.  Like Silver Wheaton, Cameco was a large corporation in the natural resources industry—Cameco earned profits through the purchase and sale of uranium.  Id. ¶ 117.  And, like Silver Wheaton, Cameco had established a foreign subsidiary in a low-tax jurisdiction, Switzerland.  Id. ¶ 118.  According to plaintiffs, the CRA undertook an extensive review of the functions performed by Cameco, the risks assumed by Cameco, and the assets used and deployed by Cameco in connection with the transactions of its foreign subsidiary.  Id. The CRA found, among other things, that all of the material functions and risks associated with the transactions of Cameco's foreign subsidiary were performed or borne by Cameco.  Id.  Accordingly, the CRA determined that all of the profits derived from the activities of Cameco's foreign subsidiary should accrue to Cameco and reassessed Cameco's taxes by CDN$800 million.  Id.  In light of the stark similarities between this case and the Cameco case, defendants were arguably on notice that they too could be subject to a significant reassessment based on their transactions

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                                    'O'

| Case No. | CV15-5146-CAS(JEMx)<br>C/W: CV15-5173-CAS(JEMx) | Date | June 6, 2016 |
|---|---|---|---|
| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

with Silver Wheaton's foreign subsidiary, SW Cayman.[7]  And, even more to the point, plaintiffs allege that as of February 2011—one month before defendants filed their 2011 Form 40-F with the SEC—defendants would have been aware that the CRA intended to audit Silver Wheaton for possible transfer pricing violations.

Significantly, plaintiffs also allege that, during the course of this audit, the CRA candidly informed FE1: "We're here because we feel Silver Wheaton ha[s] not been paying its taxes."  CAC ¶ 208.  According to FE1, two senior Silver Wheaton executives were present during this meeting—Tatarkin, the executive director of SW Cayman, and Bettina Charpentier, Silver Wheaton's vice president of tax.  It seems highly unlikely that these executives would not have informed their superiors at Silver Wheaton of the CRA's frank assessment that it believed Silver Wheaton had not been paying taxes it owed.  Moreover, Silver Wheaton executives were heavily involved, not just in the day-to-day operations of SW Cayman, but also in preparing SW Cayman's response to the CRA audit.  FE1 states that, prior to the CRA officials' visit to SW Cayman, Silver Wheaton sent down a team of internal accountants and auditors to the SW Cayman office to coach SW Cayman employess in responding to the CRA's questions.  Id. ¶ 197.  FE1 further states that she was instructed to answer questions as briefly as possible and to "not go into detail," and she states that she was given a pamphlet which listed what the CRA might ask her and what her answers should be in response.  Id. ¶¶ 198-199.  Accordingly, Silver Wheaton and its executives were likely well-informed regarding the progress of the CRA audit.  These allegations support a "strong" inference that defendants knew or had reason to suspect that a CRA reassessment was possible, if not probable, and yet took no efforts to incorporate that fact into Silver Wheaton's financial statements.

---

[7] Defendants contend that plaintiffs have failed to allege facts showing that the Cameco dispute was obvious or known to senior Silver Wheaton officials.  However, plaintiffs allege that the Cameco case was highly publicized and, in any event, it is plausible to infer that Silver Wheaton's senior executives knew that a fellow Canadian corporation, in the same industry, and with a substantially similar corporate structure had been accused by the CRA of underpaying its taxes in the amount of CDN$800 million.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                    'O'

| Case No. | CV15-5146-CAS(JEMx)<br>C/W: CV15-5173-CAS(JEMx) | Date | June 6, 2016 |
|---|---|---|---|
| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

Finally, the Ninth Circuit has noted that "[v]iolations of GAAP standards can also provide evidence of scienter." In re Daou Sys., Inc., 411 F.3d at 1016; see also In re McKesson HBOC, Inc. Sec. Litig., 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000) ("when significant GAAP violations are described with particularity in the complaint, they may provide powerful indirect evidence of scienter. After all, books do not cook themselves."). Here, as stated in greater detail *supra*, the Court has found that plaintiffs have plausibly alleged that defendants failure to either record or recognize a tax liability or, alternatively, to disclose a contingent tax liability, constituted a violation of both GAAP and IFRS. And, while the Ninth Circuit has distinguished GAAP violations that are "minor or technical in nature," it has found that "significant violations" of GAAP standards are probative of scienter. In re Daou Sys., Inc., 411 F.3d at 1020, 1022. Here, plaintiffs have alleged that defendants failed to record or disclose a potential tax liability of USD$207 million. An omission of this magnitude cannot be considered merely a "minor or techincal" violation. See also id. ("Certainly, prematurely recognizing millions of dollars in revenue is not minor or technical in nature."). Accordingly, this too provides strong circumstantial evidence of scienter.

Defendants resist this conclusion. In particular, defendants note that Silver Wheaton's outside auditors and accountants—Deloitte and Pricewaterhouse Coopers—reviewed Silver Wheatons financial statements, were aware of the CRA audit, and yet did not require defendants to either record a tax liability or disclose a contingent tax liability. And defendants note that, to date, Silver Wheaton has not restated its financial statements for the years in question. In general, though, "the fact that the financial statements for the year in question were not restated does not end [a plaintiff's] case when [the plaintiff] has otherwise met the pleading requirements of the PSLRA." Aldridge v. A.T. Cross Corp., 248 F.3d 72, 83 (1st Cir. 2002). Moreover, while courts have found the opinions of independent auditors to be "highly probative of an absence of scienter," In re Hansen Natural Corp. Sec. Litig., 527 F. Supp. 2d 1142, 1157-58 (C.D. Cal. 2007), many courts have found adequate allegations of scienter even when the defendants had obtained "clean" audit opinions from their independent auditors and had never restated their financial statements, see, e.g., Aldridge, 284 F.3d at 83 (upholding complaint alleging securities fraud even in light of auditor's subsequent clean audit

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                                    'O'

| Case No. | CV15-5146-CAS(JEMx)<br>C/W: CV15-5173-CAS(JEMx) | Date | June 6, 2016 |
|----------|---|---|---|
| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

opinion on allegedly misstated financial results); <u>In re LDK Solar Sec. Litig.</u>, 584 F. Supp. 2d 1230, 1246 (N.D. Cal. 2008) (same); <u>In re Scottish Re Grp. Sec. Litig.</u>, 524 F. Supp. 2d 370, 390 (S.D.N.Y. 2007) (Sheindlin, J.) (finding failure to disclose uncertain tax liability in financial statements made these statements false and misleading even though defendants never restated their financial statements); <u>see also</u> <u>Provenz v. Miller</u>, 102 F.3d 1478, 1490 (9th Cir. 1996) (reversing grant of summary judgment even though defendant presented evidence it had worked with auditor to ensure financial statements were accurate).

Moreover, in this case, plaintiffs have made at least some allegations that defendants may have withheld documents or information from their independent auditors. For example, FE1 states that, during the relevant period, SW Cayman sent numerous wire transfers of money to Silver Wheaton and that she kept hard copies of the transfer confirmations in her office file cabinet.  CAC ¶¶ 181-182.  FE1 states that she was told to keep these files organized so that when the independent auditors visited they could easily find the information or documentation they required.  <u>Id.</u> ¶ 183.  FE1 noticed, however, that every time the independent auditors would visit SW Cayman for its annual audit, the file with the records of wire transfers to and from Silver Wheaton's corporate offices was removed from her office without her knowledge.  <u>Id.</u> ¶ 184.  FE1 believes that the file was hidden from the independent auditors and kept in Tatarkin's office for the duration of the audits.  <u>Id.</u> ¶ 185.[8]  To the extent defendants were not forthcoming with their independent auditors, the opinions of those auditors cannot immunize Silver Wheaton's financial statements from liability.  And, in fact, evidence that defendants hid information from their independent auditors provides further proof of scienter.  <u>See also</u> <u>In re Spigel, Inc. Sec. Litig.</u>, 382 F. Supp. 2d 989, 1027 n.28 (N.D. Ill. 2004) (fact that defendants did not disclose all relevant facts to accountants "arguably provides a further basis for

---

[8] Defendants contend that there is a plausible explanation for why these files were removed from FE1's office—namely, they were taken from her office and given to the independent auditors.  However, it is, at a minimum, suspicious that these files were taken from FE1's office without her knowledge after she was expressly instructed to keep the files organized for the benefit of the independent auditors.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                    '**O**'

| Case No. | CV15-5146-CAS(JEMx)<br>C/W: CV15-5173-CAS(JEMx) | Date | June 6, 2016 |
|---|---|---|---|
| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

denying [defendants'] motion" despite argument that auditors' sign off immunized company).

Defendants also argue that the CAC does not set forth specific allegations from which it can be inferred that the individual defendants knowingly or recklessly certified false financial statements. However, defendants are mistaken. The CAC is replete with allegations that the individual defendants—all high level Silver Wheaton executives—were heavily involved in the management and direction of SW Cayman. See, e.g., CAC ¶ 67 ("FE1 states that all material operational matters were subject to the oversight and/or approval of senior officers or employees of SW Canada, principally Peter Barnes and Randy Smallwood"); id. ¶ 66 ("FE1 reports that all accounting functions were ultimately guided by [Silver Wheaton] staff in Canada, principally by . . . CFO Gary Brown"). In this capacity, the individual defendants would have been aware of the full extent of Silver Wheaton's services on behalf of SW Cayman and could have appreciated the risk that the CDN$33 million Silver Wheaton reported as income significantly understated the value of these services. Moreover, given their involvement with SW Cayman, the individual defendants were almost certainly aware of the CRA audit and were likely informed that the CRA had represented to SW Cayman employees that it believed Silver Wheaton was not paying adequate taxes. See also Berson v. Applied Signal Tech., Inc., 527 F.3d 982, 988 (9th Cir. 2008) (finding scienter when it would be "absurd to suggest" defendants did not have knowledge of the facts rendering their statements misleading). Finally, the individual defendants certified that the financial statements they submitted to the SEC were accurate and not false and misleading. In accordance with the provisions of the Sarbane-Oxley Act, before certifying these documents, the individual defendants should have assured themselves that such documents were, in fact, accurate and not misleading. See generally, 15 U.S.C. § 7241.[9]

---

[9] The Ninth Circuit, and many other circuits have held that "Sarbanes–Oxley certifications are not sufficient, without more, to raise a strong inference of scienter." Glazer Capital Mgmt., LP v. Magistri, 549 F.3d 736, 747–48 (9th Cir. 2008). However, here, the Court does not rely merely on the individual defendants Sarbanes-Oxley certifications; rather the Court finds that, when viewed holistically with the other

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                                           'O'

| Case No. | CV15-5146-CAS(JEMx)<br>C/W: CV15-5173-CAS(JEMx) | Date | June 6, 2016 |
|----------|--------------------------------------------------|------|--------------|
| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

Based on these allegations the Court finds that the CAC alleges sufficient facts to infer that, at a minimum, the individual defendants acted with deliberate recklessness regarding the accuracy of Silver Wheaton's financial statements.

Accordingly, the Court finds that plaintiffs have sufficiently alleged facts raising a "strong" inference of scienter.

## C.     The Statute of Limitations

Lastly, defendants briefly argue that at least some of plaintiffs' claims are time-barred.  Claims for alleged violations of Section 10(b) must be brought within the earlier of "(1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation."  28 U.S.C. § 1658(b).  Defendants argue that, because they disclosed the CRA audit in every annual report to the SEC since March 27, 2012, plaintiffs had knowledge of the falsity of defendants' statements and should have initiated this lawsuit within two years of each challenged statement.  Accordingly, defendants

---

allegations in the CAC, the individual defendants Sarbanes-Oxley certifications support an inference of scienter.  Specifically, under the provisions of the Sarbanes-Oxley Act, "[a] signing officer must certify that he has reviewed [a financial] report, that based on his knowledge the report 'does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made . . . not misleading,' and that the report and any information included within the report 'fairly present in all material respects the financial condition and results of operations of the issuer . . . .' " Zucco Partners, 552 F.3d at 1003) (citing 15 U.S.C. § 7241(a)(1), (2), (3)).  Here, for reasons stated *supra*, plaintiffs have plausibly alleged that defendants had reason to believe that the CRA would reassess Silver Wheaton's tax liability to a significant degree.  Nonetheless, the individual defendants still certified that Silver Wheaton's reports to the SEC did not omit any material facts necessary in order to make the reports not misleading.  This, together with the other facts alleged in the CAC, supports an inference that the individual defendants acted with deliberate recklessness in preparing and certifying Silver Wheaton's annual and quarterly reports to the SEC.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                    **'O'**

| Case No. | CV15-5146-CAS(JEMx)<br>C/W: CV15-5173-CAS(JEMx) | Date | June 6, 2016 |
|----------|---|---|---|
| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

contend that the court should dismiss as time-barred plaintiffs' claims relating to the Forms 40-F filed March 30, 2011, March 27, 2012, and April 2, 2013 as well as the Forms 6-K filed in 2011.

However, as already stated, plaintiffs have alleged facts demonstrating that, while defendants disclosed the CRA audit, they did not disclose adequate information regarding the scope of Silver Wheaton's potential tax liability.  Moreover, the fact that defendants may have "purposefully downplayed and/or understated" the risks associated with the CRA audit prevents the statute of limitations from running on plaintiffs' claims.  Merck & Co. v. Reynolds, 559 U.S. 633, 648-49 (2010); see also  Betz v. Trainer Wortham & Co., 829 F. Supp. 2d 860, 866-67 (N.D. Cal. 2011) (defendants' reassurances that they would "take care" of the situation prevented running of statute of limitations); Oaktree Capital Mgmt., L.P. v. KPMG, 963 F. Supp. 2d 1064, 1084 (D. Nev. 2013) (reassurances that financials were accurately stated prevented running of statute of limitations).  Accordingly, the Court finds, based on the allegations in the complaint, that the earliest the statue of limitations began to run on plaintiffs claims was July 6, 2015, when defendants issued a press release detailing the CRA's proposed reassessment of Silver Wheatons' tax liability.  Because plaintiffs initiated these actions on July 8 and 9, 2015, only a few days thereafter, the Court finds that defendants have failed to show that plaintiffs' claims are time-barred.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                              'O'

| Case No. | CV15-5146-CAS(JEMx)<br>C/W: CV15-5173-CAS(JEMx) | Date | June 6, 2016 |
|----------|--------------------------------------------------|------|--------------|
| Title    | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION |      |              |

## V.   CONCLUSION

In accordance with the foregoing, the Court **DENIES** defendants motion to dismiss the CAC.[10]

IT IS SO ORDERED

|       | 00 | : | 26 |
|-------|----|---|----|
| Initials of Preparer | | CL | |

_____

[10] Because the Court finds that plaintiffs have adequately pleaded a claim against defendants for violations of section 10(b), the Court also denies defendants motion to dismiss plaintiffs claims under section 20(a) against the individual defendants.  In order to prove a prima facie case under section 20(a), a plaintiff must prove: (1) a primary violation of federal securities laws, and (2) that the defendant exercised "actual power or control" over the primary violator.  <u>Howard v. Everex Sys., Inc.</u>, 228 F.3d 1057, 1065 (9th Cir. 2000).  In the instant motion, defendants only argue that plaintiffs have failed to establish a primary violation of federal securities law.  Because the Court finds that plaintiffs have plausibly alleged that all defendants, including the individual defendants, violated section 10(b) of the Securities Exchange Act the Court also finds that plaintiffs have plausibly alleged a claim for liability under section 20(a).