BARRY M. KAPLAN, *Pro Hac Vice*
Email:  bkaplan@wsgr.com
GREGORY L. WATTS, State Bar No. 197126
Email:  gwatts@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
701 Fifth Avenue, Suite 5100
Seattle, WA  98104
Telephone:  (206) 883-2500
Facsimile:   (206) 883-2699

JEROME F. BIRN JR., State Bar No. 128561
Email:  jbirn@wsgr.com
DIANE M. WALTERS, State Bar No. 148136
Email:  dwalters@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA  94304-1050
Telephone:  (650) 493-9300
Facsimile:   (650) 565-5100

Attorneys for Defendants Silver Wheaton
Corp., Randy V. J. Smallwood, Peter Barnes
and Gary Brown

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| In re Silver Wheaton Corp. Securities Litigation | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Master File No. 2:15-cv-05146-CAS (JEMx) c/w: 2:15-cv-05173-CAS (JEMx) **DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** JUDGE:  Hon. Christina A. Snyder Date:           April 17, 2017 Time:           12:00 p.m. Courtroom    8D Before:        Hon. Christina A. Snyder Trial Date:    None Set Complaint Filed: July 8, 2015 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................. 1

ARGUMENT ..................................................................................................... 2

I.  THE PROPOSED CLASS REPRESENTATIVES DO NOT MEET
    THE ADEQUACY REQUIREMENTS OF RULE 23(a) .............................. 3

    A.  The Proposed Representatives Have No Actual, Credible
        Evidence of Adequacy ............................................................ 3

    B.  False Certifications Disqualify Four of the Seven Proposed
        Representatives ......................................................................... 5

    C.  The Proposed Representatives Have Failed To Take Discovery
        Seriously ................................................................................... 7

    D.  Many Other Failings Render the Proposed Representatives
        Inadequate ................................................................................ 8

II. PLAINTIFFS DO NOT SATISFY RULE 23(b)(3) PREDOMINANCE
    BECAUSE THEY FAIL TO PROFFER A DAMAGES
    METHODOLOGY THAT COMPLIES WITH *COMCAST* ...................... 10

    A.  Plaintiffs Do Not Even Proffer a Damages Methodology ................ 10

    B.  Plaintiffs Have Not Shown a Model for Calculating Damages on
        a Classwide Basis That Is Consistent With Their Different
        Theories of Liability and Allegations About Class Members ........... 14

        1.  Plaintiffs' Sub-Classes and Alternate Liability Theories ........ 14

        2.  Those Who Would Not Have Purchased (Sub-Class A)
            Cannot Be Certified Because Individual Issues of Reliance
            Predominate. ................................................................... 16

        3.  Plaintiffs' Damages Methodology Cannot Be Applied
            Classwide and Is Inconsistent With Their Various Liability
            Theories. ......................................................................... 17

            a.  Feinstein Does Not Address Alternative Liability
                Theories or Sub-Classes ............................................. 17

     b.  Feinstein's Backcasting Model Cannot Measure Classwide Damages and Is Inconsistent with Plaintiffs' Liability Theories. .............................................18

     c.  Feinstein's "Valuation" Model Is Not Tethered to the Facts or Liability Theories .......................................21

III. PLAINTIFFS' CLAIMS ARE NOT PURE OMISSIONS CLAIMS AND ARE NOT ENTITLED TO THE *AFFILIATED UTE* PRESUMPTION OF RELIANCE ...............................................................23

CONCLUSION....................................................................................................25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

### CASES

4

*Affiliated Ute Citizens of Utah v. United States,*
  406 U.S. 128 (1972) ........................................................ 16, 23, 24,

5

25

6

*Alakozai v. Chase Inv. Servs. Corp.,*
  2014 WL 5660697 (C.D. Cal. Oct. 6, 2014) ................................. 21

7

8

*Basic, Inc. v. Levinson,*
  485 U.S. 224 (1988) ..................................................... 15, 16, 17,

9

23

10

*Berger v. Compaq Comp. Corp.,*
  257 F.3d 475 (5th Cir. 2001) ...................................................... 4

11

12

*Betts v. Reliable Collection Agency, Ltd.,*
  659 F.2d 1000 (9th Cir. 1981) ..................................................... 16

13

*Binder v. Gillespie,*
  184 F.3d 1059 (9th Cir. 1999) ..................................................... 24

14

15

*Blackie v. Barrack,*
  524 F.2d 891 (9th Cir. 1975) (Mot. ) ............................................ 3

16

17

*Bodner v. Oreck Direct, LLC,*
  2007 WL 1223777 (N.D. Cal. Apr. 25, 2007) ................................. 9

18

19

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC,*
  310 F.R.D. 69 (S.D.N.Y. 2015) ................................................... 25

20

*Carr v. Int'l Game Tech.,*
  2012 U.S. Dist. LEXIS 35688 (D. Nev. Mar. 16, 2012) ................. 24

21

22

*Carrera v. Bayer Corp.,*
  727 F.3d 300 (3d Cir. 2013) ........................................................ 13

23

24

*Clausen v. M/V New Carissa,*
  339 F.3d 1049 (9th Cir. 2003) ..................................................... 22

25

*Comcast Corp. v. Behrend,*
  133 S. Ct. 1426 (2013) ........................................................ *Passim*

26

27

*Darvin v. Int'l Harvester Co.,*
  610 F. Supp. 255 (S.D.N.Y. 1985) ............................................... 5

28

*Del Campo v. Am. Corrective Counseling Servs.*,
  2008 WL 2038047 (N.D. Cal. May 12, 2008) ..................................................3

*Dias v. Res. Credit Sols., Inc.*,
  297 F.R.D. 42 (E.D.N.Y. 2014) ..........................................................................4

*Doyle v. Chrysler Grp., LLC*,
  2016 U.S. App. LEXIS 19159 (9th Cir. Oct. 24, 2016)..................................20

*Dubin v. Miller*,
  132 F.R.D. 269 (D. Colo. 1990) ..........................................................................5

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) ..............................................................................2

*Forrand v. Fed. Express Corp.*,
  2013 WL 1793951 (C.D. Cal. Apr. 25, 2013).................................10, 11, 21

*Fox Test Prep v. Facebook, Inc.*,
  588 F. App'x 733 (9th Cir. 2014).......................................................................20

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) ...........................................................................................14

*Gen. Tel. Co. v. Falcon*,
  457 U.S. 147 (1982) .............................................................................................2

*George v. Cal. Infrastructure & Econ. Dev. Bank*,
  2010 U.S. Dist. LEXIS 57401 (E.D. Cal. June 10, 2010)..............................24

*Goodman v. Genworth Fin. Wealth Mgmt., Inc.*,
  300 F.R.D. 90 (E.D.N.Y. 2014) ........................................................................24

*Greebel v. FTP Software, Inc.*,
  939 F. Supp. 57 (D. Mass. 1996) ........................................................................5

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  134 S. Ct. 2398 (2014) .......................................................................................16

*Hawkins v. Comparet-Cassani*,
  251 F.3d 1230 (9th Cir. 2001)............................................................................16

*Hayes v. Wal-Mart Stores, Inc.*,
  725 F.3d 349 (3d Cir. 2013) ..............................................................................14

*In re Baan Co. Sec. Litig.*,
  186 F.R.D. 214 (D.D.C. 1999) ............................................................................9

*In re BP p.l.c. Sec. Litig.*,
  2014 U.S. Dist. LEXIS 69900 (S.D. Tex. May 20, 2014) .......................11, 13

*In re BP PLC Sec. Litig.*,
   2013 U.S. Dist. LEXIS 173303 (S.D. Tex. Dec. 6, 2013) .............................. 20

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   2016 U.S. Dist. LEXIS 24951 (N.D. Cal. Jan. 28, 2016) ................................ 2

*In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*,
   934 F. Supp. 2d 1219 (C.D. Cal. 2013) ............................................................ 5

*In re InterBank Funding Corp. Sec. Litig.*,
   629 F.3d 213 (D.C. Cir. 2010) ........................................................................ 25

*In re Kosmos Energy Ltd. Sec. Litig.*,
   299 F.R.D. 133 (N.D. Tex. 2014) ........................................................... 3, 4, 5

*In re Lehman Bros. Sec. & ERISA Litig.*,
   2013 WL 5730020 (S.D.N.Y. Oct. 22, 2013) ................................................ 25

*In re Metropolitan Securities*,
   532 F. Supp. 2d 1260 (E.D. Wash. 2007) ...................................................... 24

*In re Network Assocs. Sec. Litig.*,
   76 F. Supp. 2d 1017(N.D. Cal. 1999) ....................................................... 9, 10

*In re Nice Sys. Sec. Litig.*,
   188 F.R.D. 206 (D. N.J. 1999) ......................................................................... 9

*In re NYSE Specialists Sec. Litig.*,
   240 F.R.D. 128 (S.D.N.Y. 2007) ..................................................................... 7

*In re POM Wonderful LLC*,
   2014 WL 1225184 (C.D. Cal. Mar. 25, 2014) .............................................. 20

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   725 F.3d 244 (D.C. Cir. 2013) ......................................................... 2, 14, 18,
   20

*In re THQ, Inc. Sec. Litig.*,
   2002 WL 1832145 (C.D. Cal. Mar. 22, 2002) ........................................... 2, 3

*Kaplan v. Pomerantz*,
   132 F.R.D. 504 (N.D. Ill. 1990) ...................................................................... 7

*Kline v. Wolf*,
   88 F.R.D. 696 (S.D.N.Y. 1981) ................................................................... 3, 7

*Labou v. Cellco P'ship*,
   2014 U.S. Dist. LEXIS 26974 (E.D. Cal. Mar. 3, 2014) ............................... 4

*Leyva v. Medline Indus. Inc.*,
   716 F.3d 510 (9th Cir. 2013) ................................................................... 10, 22

*Little v. First Cal. Co.*,
    532 F.2d 1302 (9th Cir. 1976) ................................................................. 25

*Loritz v. Exide Techs.*,
    2015 U.S. Dist. LEXIS 100471 (C.D. Cal. July 21, 2015) ................ 10, 22, 24

*Ludlow v. BP, P.L.C.*,
    800 F.3d 674 (5th Cir. 2015) ........................................................ 16, 17, 21

*Ludlow v. BP, P.L.C.*,
    136 S. Ct. 1824 (2016) ............................................................................ 16

*Markette v. Xoma Corp.*,
    2016 U.S. Dist. LEXIS 63701 (N.D. Cal. May 13, 2016) .......................... 4

*Norman v. Arcs Equities Corp.*,
    72 F.R.D. 502 (S.D.N.Y. 1976) ................................................................. 7

*Paper Sys. v. Mitsubishi Corp.*,
    193 F.R.D. 601 (E.D. Wis. 2000) .............................................................. 7

*Prism Techs. LLC v. AT&T Mobility, LLC*,
    2014 U.S. Dist. LEXIS 132619 (D. Neb. Sept. 22, 2014) ....................... 22

*Rahman v. Mott's LLP*,
    2014 WL 6815779 (N.D. Cal. Dec. 3, 2014) ............................................ 2

*Rocco v. Nam Tai Elecs., Inc.*,
    245 F.R.D. 131 (S.D.N.Y. 2007) ............................................................... 7

*Rodriguez v. West Publ'g Corp.*,
    563 F.3d 948 (9th Cir. 2009) ..................................................................... 5

*Schriver v. Impac Mortg. Holdings, Inc.*,
    2006 U.S. Dist. LEXIS 40607 (C.D. Cal. May 2, 2006) ........................... 9

*Shakur v. Schriro*,
    514 F.3d 878 (9th Cir. 2008) ..................................................................... 4

*Shiring v. Tier Techs., Inc.*,
    244 F.R.D. 307 (E.D. Va. 2007) ............................................................ 7, 9

*Simon v. Ashworth, Inc.*,
    2007 WL 4811932 (C.D. Cal. Sept. 28, 2007) ....................................... 7, 9

*Stockwell v. City & Cty. of S.F.*,
    749 F.3d 1107 (9th Cir. 2014) ................................................................ 3, 4

*Turnbow v. Life Partners, Inc.*,
    2013 WL 3479884 (N.D. Tex. July 9, 2013) ..................................... 17, 22, 23

*Vaccarino v. Midland Nat'l Life Ins. Co.*,
    2013 WL 3200500 (C.D. Cal. June 17, 2013) ........................................ *Passim*

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) .................................................................................. 2, 3

*Werdebaugh v. Blue Diamond Growers*,
    2014 WL 7148923 (N.D. Cal. Dec. 15, 2014) .................................. 14, 20, 22

**STATUTES**

15 U.S.C. § 77z-1(a)(2)(A)(iv) ...................................................................... 5

**RULES**

Fed. R. Civ. P. 23 ............................................................................... *Passim*

1        Silver Wheaton Corporation ("Silver Wheaton" or the "Company"), and

2   Randy V.J. Smallwood, Peter Barnes, and Gary Brown (the "Individual

3   Defendants"), collectively "Defendants," submit this memorandum in opposition

4   to Plaintiffs' Motion for Class Certification, ECF No. 91 ("Motion" or "Mot.").

5                               **INTRODUCTION**

6        Class certification in securities litigation is often a routine matter. That is not

7   the case here. This is the unusual putative securities class action in which the Court

8   should deny class certification. Plaintiffs have clearly failed to demonstrate that

9   they are adequate class representatives as required by Rule 23(a). In addition, in

10  complete disregard of the teachings of the Supreme Court's decision in *Comcast*

11  *Corp. v. Behrend*, 133 S. Ct. 1426 (2013), and the requirements of Rule 23(b),

12  Plaintiffs have utterly failed to offer a theory of damages that can be applied on a

13  classwide basis and that is consistent with their several liability theories.

14       Plaintiffs' lack of demonstrated adequacy stems not just from their failure to

15  show they are anything other than figureheads with no knowledge about, desire, or

16  ability to actively participate in this lawsuit. Shockingly, a majority of the proposed

17  representatives filed false sworn statements about their Silver Wheaton stock

18  trading. Equally disqualifying is Plaintiffs' cavalier disregard of their discovery

19  obligations. These actions demonstrate that these Plaintiffs are inadequate.

20        Equally important is Plaintiffs' disregard of their Rule 23(b) obligations

21  under *Comcast*. First, Plaintiffs in reality have alleged two sub-classes—

22  membership in which is impossible to determine without specific inquiry of each

23  proposed class member. Second, the members of one sub-class cannot avail

24  themselves of the "fraud on the market" doctrine since they are not alleged to have

25  relied on the integrity of the stock price. Finally, Plaintiffs have failed to offer any

26  damages methodology that ties classwide damages to the various liability theories

27  they have alleged.

28       The Motion should be denied.

## ARGUMENT

To certify a class pursuant to Rule 23, a plaintiff must demonstrate that the prerequisites set forth in Rule 23(a) are satisfied and that an appropriate class may be certified under one of the subdivisions of Rule 23(b).  *See* Fed. R. Civ. P. 23. Rule 23(a) requires that the representative parties fairly and adequately protect the interests of the class and imposes four requirements—numerosity, commonality, typicality, and adequacy.  As is typical in securities cases, Plaintiffs propose to certify this class under Rule 23(b)(3), which requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members."  Plaintiffs fail under both Rules 23(a) and (b).

"Class certification is far from automatic," *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 249 (D.C. Cir. 2013), and constitutes a "severe hurdle." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 U.S. Dist. LEXIS 24951, at *284 (N.D. Cal. Jan. 28, 2016).  There are no presumptions in favor of certification: "actual, not presumed, conformance" is "indispensable." *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 160 (1982).  The burden of proof rests squarely on the Plaintiffs.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979-80 (9th Cir. 2011). This is not a mere pleading burden.  *Dukes*, 564 U.S. at 350-51; *Rahman v. Mott's LLP*, 2014 WL 6815779, at *2 (N.D. Cal. Dec. 3, 2014) (plaintiffs "must actually prove—not simply plead—that their proposed class satisfies each requirement of Rule 23").  Rather, a class may be certified only if, after a "rigorous" and "demanding" analysis that often entails "'overlap with the merits'" of the underlying claim, the court is convinced that the plaintiff has met the requirements of Rule 23 by a "'preponderance of the evidence.'"  *Comcast*, 133 S. Ct. at 1432 (quoting *Dukes*, 564 U.S. at 351, 352 n.7).[1]

---

[1] Plaintiffs mistakenly rely on *In re THQ, Inc. Sec. Litig.*, 2002 WL 1832145 (C.D. Cal. Mar. 22, 2002), for the proposition that Rule 23 is "liberally construed" in favor of certification (Mot. at 2, 5), but *THQ* relies on pre-*Falcon* cases and is

## I.     THE PROPOSED CLASS REPRESENTATIVES DO NOT MEET THE ADEQUACY REQUIREMENTS OF RULE 23(a)

"[A]dequacy of representation is perhaps the most significant of the prerequisites to a determination of class certification." *Del Campo v. Am. Corrective Counseling Servs.*, 2008 WL 2038047, at *4 (N.D. Cal. May 12, 2008). A class representative "serves as a fiduciary to advance and protect the interests of those whom he purports to represent." *Kline v. Wolf*, 88 F.R.D. 696, 700 (S.D.N.Y. 1981).  In assessing adequacy, courts look to "the proposed representative's personal attributes, including evidence of the representative's character, honesty, and conscientiousness." *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 145 (N.D. Tex. 2014).  Here the proposed representatives have not satisfied *their burden* of proving by a preponderance of evidence that the adequacy requirement of Rule 23(a) has been satisfied.

### A.     The Proposed Representatives Have No Actual, Credible Evidence of Adequacy

Plaintiffs have failed to put forward actual, credible evidence of adequacy; instead, they wrongly assume they are entitled to a presumption of adequacy.  The Motion devotes a mere 24 lines to adequacy, and the sole factual support provided is the resume of The Rosen Law Firm and a series of cookie-cutter declarations by the proposed class representatives.  Mot. at 8-9.  But it is not Defendants' burden to disprove adequacy.  Plaintiffs "must produce actual, credible evidence that the proposed class representatives are informed, able individuals, who are themselves—not the lawyers—actually directing the litigation." *Kosmos*, 299 F.R.D. at 145; *see also Stockwell v. City & Cty. of S.F.*, 749 F.3d 1107, 1111 (9th

---

no longer good law after *Dukes* and *Comcast*.  Plaintiffs claim that "uncertainty" should be resolved in their favor (Mot. at 5), but this also runs afoul of *Dukes* and *Comcast*.  In *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975) (Mot. at 5), the court held that uncertainty as to the merits would not defeat certification, not that uncertainties about a plaintiff's satisfaction of Rule 23 requirements are resolved in plaintiff's favor.

1  Cir. 2014) (requiring "affirmative evidence").  The failure to do so justifies the

2  denial of class certification.  *Kosmos*, 299 F.R.D. at 146 (generalized detail "falls

3  far short of satisfying the more stringent requirements for assessing [] adequacy").[2]

4  Here Plaintiffs' "evidence" of adequacy falls far short of the requisite showing.

5      *First*, The Rosen Law Firm's resume does nothing to prove the adequacy *of*

6  *the proposed class representatives*.  *Kosmos*, 299 F.R.D. at 141-42 (denying

7  motion for class certification despite submission of eighty-eight-page firm resume).

8  A class representative's duty to protect the class is non-delegable: "it is not enough

9  that plaintiff's counsel are competent if the plaintiffs themselves almost totally lack

10  familiarity with the facts of the case." *Berger v. Compaq Comp. Corp.*, 257 F.3d

11  475, 483 n.18 (5th Cir. 2001).  "Class action lawsuits are intended to serve as a

12  vehicle for capable, committed advocates to pursue the goals of the class members

13  through counsel, not for capable, committed counsel to pursue their own goals

14  through those class members." *Id*. at 484.

15      *Second*, Plaintiffs' cookie-cutter declarations are not credible evidence of

16  adequacy.  Not only are they obviously lawyer-created documents untailored to

17  each plaintiff, the statements contained therein are conclusory and merely parrot

18  legal requirements.  Horne Decl., Dkt. 93, Exs. 3-10.  They provide no facts about

19  how the Plaintiffs have "communicated" or "work[ed]" with counsel, or

20  "monitor[ed]" the litigation.  *Id*.  Such conclusory declarations are entitled to little

21  or no evidentiary weight.  *See Shakur v. Schriro*, 514 F.3d 878, 890 (9th Cir. 2008)

22  (disregarding "'[c]onclusory affidavits that do not affirmatively show personal

23  knowledge of specific facts'") (citation omitted); *Markette v. Xoma Corp.*, 2016

24  U.S. Dist. LEXIS 63701, at *28-29 (N.D. Cal. May 13, 2016) (finding inadequate a

25

26

27
     [2] *See Labou v. Cellco P'ship*, 2014 U.S. Dist. LEXIS 26974, at *15-17 (E.D. Cal. Mar. 3, 2014) (denying certification; rejecting boilerplate assertions because plaintiff bears burden of showing she is adequate representative); *Dias v. Res. Credit Sols., Inc.*, 297 F.R.D. 42, 52 (E.D.N.Y. 2014) (denying certification; plaintiff failed to proffer proof suggesting she will adequately represent class).

28

lawyer-created group of unrelated individuals bound only by declaration stating they would participate in litigation).  Indeed, Plaintiffs' declarations are indistinguishable from those found in *Kosmos* to be "little more than formulaic, boiler-plate assertions."  299 F.R.D. at 146.  *Kosmos* is persuasive here.

## B.     False Certifications Disqualify Four of the Seven Proposed Representatives

The Motion also fails because the proposed representatives' own inexcusable conduct shows they are inadequate.  The Reform Act requires every plaintiff seeking to serve in a representative capacity to provide a sworn certification setting forth "all of the transactions of the plaintiff in the security that is the subject of the complaint during the class period."[3]  15 U.S.C. § 77z-1(a)(2)(A)(iv).  This is not a mere suggestion; it is a legal requirement.  Here, four of the seven proposed representatives submitted false certifications to the Court, a fact that raises significant concerns and should preclude them from serving as class representatives.  *See Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 959 (9th Cir. 2009).  A lack of credibility can be a basis for finding inadequacy.  *Dubin v. Miller*, 132 F.R.D. 269, 272 (D. Colo. 1990) ("A plaintiff's lack of credibility . . . can render him an 'inadequate' class representative."); *Darvin v. Int'l Harvester Co.*, 610 F. Supp. 255, 257-58 (S.D.N.Y. 1985) (credibility problems provided basis for denying motion to be named class representative).

Borowczyk's certification stated that he made only two trades in Silver Wheaton stock during the four-year class period (AC at 62-63); after discovery, we now know he traded at least 120 times.  Ex. A at 15-19 (Borowczyk Tr. 142:12-

---

[3] These certifications, made under penalty of perjury, are fundamental to class representation.  Numerous courts have held that a plaintiff's failure to comply with the Reform Act's certification requirement precludes them from serving as a class representative. *See In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*, 934 F. Supp. 2d 1219, 1231 (C.D. Cal. 2013) (failure of a named plaintiff to file certification "fatal" to maintenance of class action) (citation omitted); *Greebel v. FTP Software, Inc.*, 939 F. Supp. 57, 60 (D. Mass. 1996) (same).

146:8)[4]; Ex. B at 25-40.  Brandow's certification stated that he made only eight class-period trades (AC at 64-66); after discovery, we now know he engaged in at least 50 trades.  Ex. C at 52-59 (Brandow Tr. 145:16-152:9); Ex. D at 67-132. Remmel's certification stated that he made only two class-period trades (AC at 75-76); after discovery, we now know he traded at least nine times.  Ex. E at 133-80. Potaracke's certification stated he made two class-period trades (for 504 shares and 702 shares) (AC at 73-74); after discovery, we now know Potaracke misrepresented a trade made by his wife as his own, an error that was obscured because instead of producing real documents for his wife's account, the only "documentation" produced prior to his deposition was a line item on a lawyer-created summary.  Ex. F at 181-84.  Frohwerk, a fifth Plaintiff, submitted the most egregiously false certification, stating that he traded only once during the class period (AC at 69-70); after discovery, we now know he traded 187 times.  Ex. G at 185-209.  It is hardly surprising that Plaintiffs' counsel withdrew Frohwerk as a proposed representative.  *See* Ex. H at 210-12; Joint Stipulation, Dkt. 108.  These are serious misrepresentations made under oath, particularly, as discussed below, where the plaintiff has multiple theories of liability as to what should have been disclosed at various times in the proposed class period.[5]

The reasons for the false certifications are immaterial—at best, they show "indifference" to details and "a lack of diligence and candor" weighing against

---

[4] Cites to "Ex.__" are to Exhibits to the Declaration of Gregory L. Watts, submitted herewith.

[5] In letters dated January 17 and 27, 2017, Defendants' counsel noted the curious and widespread filing of false certifications, stated that these false certifications disqualified the plaintiffs in question from serving as class representatives, and requested that Plaintiffs' counsel rectify the erroneous record before the Court.  *See* Ex. I at 213-14; Ex. J at 215-16. Plaintiffs' counsel served corrected certifications for some Plaintiffs and a *post hoc* assignment of Mrs. Potaracke's interest to Mr. Potaracke (Ex. K at 217), but the "corrected" certification for Mr. Borowczyk is still false, and Plaintiffs have still done nothing to correct *the Court's record* with regard to any of the false certifications.

1   adequacy.  *Shiring v. Tier Techs., Inc.*, 244 F.R.D. 307, 317 (E.D. Va. 2007).[6]  And

2   regardless of whether these false certifications can or will be cured, their

3   submission to the Court demonstrates a genuine lack of credibility and a lack of

4   concern for the obligation imposed upon a litigant in making sworn statements.

5   *See Kaplan v. Pomerantz*, 132 F.R.D. 504, 510 (N.D. Ill. 1990) (false testimony

6   warranted decertification of the class); *In re NYSE Specialists Sec. Litig.*, 240

7   F.R.D. 128, 144-45 (S.D.N.Y. 2007) (finding adequacy "sufficiently in doubt" to

8   deny lead plaintiff status in light of submissions containing questionable

9   statements).  Indeed, the whole justice system in large part depends upon parties

10  taking seriously the obligation of making truthful sworn statements.

11          **C.    The Proposed Representatives Have Failed To Take Discovery**

12                  **Seriously**

13          Plaintiffs' cavalier failure to comply with discovery obligations militates

14  against a finding of adequacy.  *See Rocco v. Nam Tai Elecs., Inc.*, 245 F.R.D. 131,

15  136-37 (S.D.N.Y. 2007) (class representative's failure to make timely responses to

16  discovery requests rendered him inadequate).[7]  Beyond the four false certifications,

17  several proposed representatives testified they had never seen "their" document

18  request responses—apparently, they were never asked to review them.  *See* Ex. L

19  at 229-30 (Choi Tr. 81:6-82:1); Ex. M at 247-48 (Potaracke Tr. 102:22-103:7); Ex.

20

21          [6] *See Kline*, 702 F.2d at 402-03 (false testimony subjects credibility "to serious
    question" even if "product of an innocent mistake"); *Simon v. Ashworth, Inc.*, 2007
22  WL 4811932, at *3 (C.D. Cal. Sept. 28, 2007) (plaintiff inadequate where
    "cavalier about signing statements under penalty of perjury"); *NYSE Specialists*,
23  240 F.R.D. at 144-45 (even "inadvertent error" and "innocent mistakes" warrant
    disqualification); *Paper Sys. v. Mitsubishi Corp.*, 193 F.R.D. 601, 611 n.5 (E.D.
24  Wis. 2000) (cavalier attitude towards verified court documents reflects less than
    diligent effort to advance and protect interests of absent class members).
25          [7] *See also Norman v. Arcs Equities Corp.*, 72 F.R.D. 502, 506 (S.D.N.Y. 1976)
26  ("One who will not comply wholeheartedly and fully with the discovery
    requirements of modern federal practice, is not to be regarded by this Court as one
27  to whom the important fiduciary obligation of acting as a class representative
    should be entrusted."); *Kline*, 88 F.R.D. at 700 (Plaintiff's "failure to comply with
28  proper discovery inquiry may be considered on the issue as to whether a class
    representative lives up to his fiduciary obligation.").

N at 265 (Elek Tr. 160:4-12).  Six failed to catch obvious factual inaccuracies regarding their trading histories in their responses to Defendants' document requests—inaccuracies created when one representative's responses were simply copied to create responses for the others.  *Compare* Ex. O at 275; Ex. P at 295; Ex.Q at 315; Ex. R at 335; Ex. S at 355; Ex. T at 375.

The proposed representatives also took a lackadaisical approach to their searches for responsive documents.  Ex. M at 243-44 (Potaracke Tr. 63:14-64:1).  Some stated that they did not search their email for responsive documents.  Ex. U at 393-95 (Remmel Tr. 53:11-21, 54:13-16, 55:10-20).  Others stated that they did not search their computers for responsive documents.  Ex. A at 20-21 (Borowczyk Tr. 157:11-158:25); Ex. N at 266-67 (Elek Tr. 161:24-162:8).  Although Borowczyk testified he kept paper files for his investments, he did not bother to search those files before his deposition.  Ex. A at 14, 22-23 (Borowczyk Tr. 114:7-13, 162:20-163:2).  Many of the proposed representatives were content to produce missing documents after their depositions or, in one case, the night before.  Lead Plaintiff Elek summed it up best:  he paid little attention to Defendants' document requests because "*it didn't affect me*."  Ex. N at 253-54 (Elek Tr. 22:25-23:14) (emphasis added).  The discovery obligations were hardly onerous.  The proposed representatives were required to comply in good faith.  Their efforts stand in stark contrast to the multi-million dollar burden they have imposed upon Defendants.

### D.    Many Other Failings Render the Proposed Representatives Inadequate

The proposed representatives did not initiate this lawsuit—their lawyers found them *after the fact*.[8]  Courts deny class certification where the proposed

---

[8] *See* Ex. A at 10 (Borowczyk Tr. 48:10-15); Ex. U at 396 (Remmel Tr. 98:16-23); Ex. L at 226 (Choi Tr. 43:7-15); Ex. V at 404 (Bartsch 34:14-17); Ex. C at 49 (Brandow Tr. 39:12-18); Ex. M at 240-41 (Potaracke Tr. 47:25-48:22).  They did not consider litigation before coming across news of this lawsuit.  *See* Ex. N at 259-60 (Elek Tr. 63:21-64:4); Ex. V at 401-03 (Bartsch Tr. 27:3-7, 30:24-31:1); Ex.

representatives were recruited as figureheads.[9]  The proposed representative lack

basic knowledge of the case: none could explain what transfer pricing is,[10] and they

have not monitored developments,[11] which renders them inadequate.[12]  The

proposed representatives have played no role in strategic decisions and may not

understand they have a role to play.[13]  *See Simon*, 2007 WL 4811932, at *2-3.

Finally, the proposed representatives do not function as a group; indeed, they have

had no contact with each other whatsoever.[14]  Larger groups struggle to act

collectively, raising even more questions as to their adequacy.[15]

---

C at 50 (Brandow Tr. 40:15-18); Ex. L at 224 (Choi Tr. 39:20-22); Ex. M at 242
(Potaracke Tr. 49:12-25); Ex. A at 9 (Borowczyk Tr. 47:10-13).

[9] *See Shiring*, 244 F.R.D. at 316 (plaintiff pursued litigation only after
responding to lawyers' press release); *In re Nice Sys. Sec. Litig.*, 188 F.R.D. 206,
223 (D. N.J. 1999) (selection of counsel should be independent decision); *In re
Network Assocs. Sec. Litig.*, 76 F. Supp. 2d 1017, 1023 (N.D. Cal. 1999)
("Congress hoped that the lead plaintiff would seek the lawyers, rather than having
the lawyers seek lead plaintiff").

[10] *See* Ex. N at 255-58 (Elek Tr. 24:18-20, 28:2-29:5, 33:12-14); Ex. A at 7-8
(Borowczyk Tr. 26:3-27:11); Ex. M at 236-39 (Potaracke Tr. 23:22-26:19); Ex. C
at 45 (Brandow Tr. 17:11-20:7); Ex. L at 220-23 (Choi Tr. 15:24-18:12); Ex. V at
400 (Bartsch Tr. 13:9-16).

[11] Bartsch and Potaracke were not aware of the motion for class certification.
Ex. V at 405 (Bartsch Tr. 36:14-15); Ex. M at 246 (Potaracke Tr. 96:13-20).
Brandow believed class certification had been granted and that he, not Elek, was
lead plaintiff.  Ex. C at 64-65 (Brandow Tr. 191:15-192:5).

[12] *See Simon*, 2007 WL 4811932, at *2-5; *Bodner v. Oreck Direct, LLC*, 2007
WL 1223777, at *2 (N.D. Cal. Apr. 25, 2007).

[13] *See* Ex. C at 51 (Brandow Tr. 48:7-12); Ex. A at 11 (Borowczyk Tr. 61:7-10);
Ex. L at 225 (Choi Tr. 40:14-16); Ex. V at 410 (Bartsch Tr. 103:14-17); Ex. M at
245 (Potaracke 88:1-4).  Elek, Lead Plaintiff, stated that the most important
decision that he made during the entire litigation was to "[a]ttend this deposition."
Ex. N at 261-62 (Elek Tr. 78:25-79:2).

[14] *See* Ex. U at 391-92 (Remmel Tr. 19:5-20:12); Ex. C at 44, 60-63 (Brandow
Tr. 13:2-17, 159:15-162:19); Ex. L at 231-32 (Choi Tr. 92:25-93:18); Ex. V at
408-10 (Bartsch Tr. 101:9-20, 102:6-103:5).

[15] *See Schriver v. Impac Mortg. Holdings, Inc.*, 2006 U.S. Dist. LEXIS 40607,
at *25-28 (C.D. Cal. May 2, 2006) (Carney, J.) (group with no relationship except
through counsel had no plan to manage litigation); *In re Baan Co. Sec. Litig.*, 186
F.R.D. 214, 224 (D.D.C. 1999) (danger of appointing group of unaffiliated persons
with modest losses); *Network Assocs.*, 76 F. Supp. 2d at 1025-26 (when previously

## II.   PLAINTIFFS DO NOT SATISFY RULE 23(b)(3) PREDOMINANCE BECAUSE THEY FAIL TO PROFFER A DAMAGES METHODOLOGY THAT COMPLIES WITH *COMCAST*

In *Comcast*, the Supreme Court emphasized that Rule 23(b)(3) requires plaintiffs, as part of predominance, to "establish[] that damages are capable of measurement on a classwide basis." 133 S. Ct. at 1433.  This burden requires plaintiffs to put forward a damages methodology that is both "sound" and "produce[s] [a] commonality of damages." *Id*. at 1434.  Without such a showing, "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." *Id*. at 1433.  Importantly, "a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to [the] theory" of liability underlying the class claims.  *Id*.  In other words, at the class-certification stage, a plaintiff must proffer a damages model that is *both* capable of measuring damages on a classwide basis *and* "'consistent with [plaintiff's] liability case.'"  *Id*. (citation omitted); *Forrand v. Fed. Express Corp.*, 2013 WL 1793951, at *3 (C.D. Cal. Apr. 25, 2013) (Fischer, J.) ("for Rule 23(b)(3)'s predominance requirement to be satisfied, a plaintiff must bring forth a measurement method that can be applied classwide *and* that ties the plaintiff's legal theory to the impact of the defendant's allegedly illegal conduct").

### A.   Plaintiffs Do Not Even Proffer a Damages Methodology

Plaintiffs must *actually proffer* a methodology for calculating damages. *Comcast*, 133 S. Ct. at 1433-34 (requiring damages methodology that is "sound"); *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (plaintiffs must prove "damages stemmed from the defendant's actions that created the legal liability"); *Loritz v. Exide Techs.*, 2015 U.S. Dist. LEXIS 100471, at *70-71 (C.D. Cal. July 21, 2015) (Wilson, J.) (denying certification of damages class; plaintiffs

unaffiliated shareholders are bundled into group, "'lawyers will dominate the decisionmaking.'") (citation omitted).

1   failed to provide damages methodology in connection with opening brief); *In re*
2   *BP p.l.c. Sec. Litig.*, 2014 U.S. Dist. LEXIS 69900, at *90 (S.D. Tex. May 20,
3   2014) (denying certification of subclass due to lack of damages methodology
4   attributable to subclass) ("*BP II*"); *Vaccarino v. Midland Nat'l Life Ins. Co.*, 2013
5   WL 3200500, at *15 (C.D. Cal. June 17, 2013) (Snyder, J.) (requiring damages
6   methodology tailored to particular case); *Forrand*, 2013 WL 1793951, at *3
7   (requiring damages model tied to liability theory).

8         Here, Plaintiffs' expert, Dr. Steven Feinstein, did not proffer a damages
9   methodology—indeed, he did not even believe he had been asked to be a damages
10   expert.  Ex. W at 434 (Feinstein Tr. 66:1-5).  Feinstein is "not sure which valuation
11   technique [he] would use …."  *Id*. at 430  (51:9-10).  He initially testified he
12   "know[s] what tools [he] would use."  *Id*. at 433 (61:4-5).  But he later admitted:
13   "I don't know for sure until I study the facts more carefully which ... tools I would
14   use."  *Id*. at 435 (80:11-14).  The only thing he could say was that he "would take
15   into account all tools that apply in the profession to valuate stock on an as-needed
16   basis," *id*. at 437 (88:19-21), and "would apply whatever I found to be most
17   appropriate ...."  *Id*. at 429 (50:10-11).

18         Feinstein stated in his report that he would use an event study to create an
19   inflation ribbon by "working chronologically backwards from the final corrective
20   disclosure to the start of the Class Period."  Horne Decl., Dkt. 93, Ex. 1 ("Feinstein
21   Report"), ¶ 177.  As Defendants' expert, Dr. Allan Kleidon, stated, this is
22   frequently referred to as "backcasting."  Ex. X at 461-62, 463-64 (Kleidon Report,
23   ¶¶ 32, 36); Ex. W at 438-41 (Feinstein Tr. 89:19-92:16).  At his deposition,
24   however, Feinstein testified he was not sure he would even backcast:

25       Q. And isn't it the case that a standard way is backcasting from the
26       corrective disclosure?
27       A. Sometimes people backcast, and sometimes it's appropriate.  And
28       sometimes it's not.  And if I determine that it's not, there are other tools

1    that are available.

2        Q. Is it appropriate in this case, in your view?

3        A. I'm not sure yet.

4    Ex. W at 438-39, 432 (Feinstein Tr. 89:19-90:3, 60:9-12) ("Q. So how would you

5    actually try to [calculate inflation], starting with the final corrective disclosure and

6    working back through the class period? A. Well, I'm not sure."). Feinstein clearly

7    has no specific idea what valuation technique he would use.

8        Feinstein's report and deposition testimony also fail to provide an

9    economically sound damages methodology. When Feinstein states that he would

10   ascertain the "inflation" in Silver Wheaton stock by calculating the difference

11   between the actual price and the real value (Feinstein Report, ¶ 177; Ex. W at 427-

12   29 (Feinstein Tr. 48:13-50:3)), he is simply reciting the legal definition of inflation,

13   not a methodology for calculating it. Ex. X at 458 (Kleidon Report, ¶ 25). The

14   same is true of his reference to "out-of-pocket" damages. *Id*. at 459-60 (¶ 29);

15   Feinstein Report, ¶ 176; Ex. W at 426 (Feinstein Tr. 46:2-24). Feinstein's

16   statement that he would use valuation tools to calculate the "but for" price of Silver

17   Wheaton stock "has no economic content, unless [he] identifies the underlying

18   assumptions and inputs specific to this matter and specifies the way in which such

19   specific tools can be applied in this current matter to calculate a sound measure of

20   damages." Ex. X at 473-74 (Kleidon Report, ¶ 56).

21       Feinstein was asked directly if he has opined as to whether damages in this

22   case can be calculated using a common, classwide methodology. He testified that

23   all he had done was "assess[] whether the facts of this case are similar enough to

24   the facts of other cases that I've calculated damages for or other people have

25   calculated damages for and cases that the court has accepted damage computations

26   for, and determined that they were similar enough." Ex. W at 415-16 (Feinstein

27   Tr. 9:23-10:3). Neither Feinstein's report nor his testimony identify the supposed

28   factual similarities or the "similar enough" cases he would use for the damages

1    methodology in this case.  Even if such information had been provided, "[s]uch

2    assurances . . . are insufficient to satisfy Rule 23." *Carrera v. Bayer Corp.*, 727

3    F.3d 300, 311 (3d Cir. 2013); *Vaccarino*, 2013 WL 3200500, at *15 (requiring

4    plaintiffs to "present a damages theory tailored to this particular case").

5         Feinstein summarized his explanation of a damages methodology by using a

6    treehouse analogy:

7        [I]f you're asking me to build a treehouse and ask me what tools I

8        would use to build the treehouse, I would tell you, I haven't built the

9        treehouse yet, but I would bring a saw, I'd bring a hammer, I'd bring

10       some nails, I'd bring wood.  I don't know exactly until I get further into

11       the project what the treehouse is going to look like and whether I'm

12       going to need a level and a plane as well.  But I know that I have it at

13       my disposal and I know that people build treehouses every day, so I

14       know I can do it.

15   Ex. W at 436 (Feinstein Tr. 81:3-14).  Feinstein's analogy is that he knows he can

16   build a treehouse (damages methodology) because tools are available and other

17   people build treehouses every day.  However, this "in no way ensures that

18   Feinstein can build a particular type of treehouse [damages methodology] on some

19   particular tree [this case's liability theories]."  Ex. X at 477 (Kleidon Report, ¶ 62).

20   In short, Feinstein is saying:  "I can't tell you what tools I would use or what

21   methods I would employ—but **Believe Me!**  I can do it!"

22         Feinstein has failed to show that he can create a classwide damages

23   methodology that it is feasible, non-arbitrary, and consistent with Plaintiffs'

24   liability theories. Ex. X at 477 (Kleidon Report, ¶ 63).  Feinstein provides little

25   more than basic definitions of simple economic principles, a toolkit for calculating

26   damages (without identifying which tools he would use), and tautologies.  *Id*. at

27   472-73 (¶ 54).  But Plaintiffs' "burden is not met by asking the Court simply to

28   trust them."  *BP II*, 2014 U.S. Dist. LEXIS 69900, at *90.  "Certification may not

1   be granted because the plaintiff promises the class will be able to fulfill Rule 23's

2   requirements…." *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 358 (3d Cir.

3   2013); *see Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing" in

4   Federal Rules of Evidence "requires a district court to admit opinion evidence that

5   is connected to existing data only by the *ipse dixit* of the expert.").

6       Plaintiffs appear to hope this Court will blithely rubber-stamp their Motion

7   even though they fail to proffer a sound, classwide damages methodology.  But the

8   Court is required to conduct a rigorous *a priori* analysis and conclude that

9   Plaintiffs' damages methodology is tied to their liability theories and is capable of

10  measuring damages on a classwide basis.  *See In re Rail Freight*, 725 F.3d at 254

11  ("[i]t is not enough to submit a questionable model whose unsubstantiated claims

12  cannot be refuted through *a priori* analysis."); *Werdebaugh v. Blue Diamond*

13  *Growers*, 2014 WL 7148923, at *14 (N.D. Cal. Dec. 15, 2014) (must do more than

14  "rubberstamp a proposed damages class"); *Comcast*, 133 S. Ct. at 1433-34.

15      **B.**    **Plaintiffs Have Not Shown a Model for Calculating Damages**

16              **on a Classwide Basis That Is Consistent With Their Different**

17              **Theories of Liability and Allegations About Class Members**

18          **1.**    **Plaintiffs' Sub-Classes and Alternate Liability Theories**

19      The Complaint alleges that "[h]ad Plaintiffs and the other members of the

20  Class known the truth,[16] they would not have purchased [Silver Wheaton stock], *or*

21  would not have purchased [the stock] at the inflated prices that were paid."  AC ¶

22  239 (emphasis added).  The Complaint, therefore, alleges two sub-classes of

23  purchasers.  **Sub-Class A** consists of investors who would not have bought Silver

24  Wheaton stock had they known the allegedly undisclosed risks.  These investors

25  did not rely on the integrity of the market price of Silver Wheaton stock but instead

26

27       [16] Plaintiffs have been ambiguous and confusing about their liability theories.

28  They assert accounting claims based upon the risk of ultimate tax liability, but confusingly also speak of it in terms of the risk of reassessment, which is different. Defendants do not believe they have liability under any theory.

1   upon their individual preferences and investment philosophies concerning the risk

2   of reassessment.  *Id*. (identifying two groups of plaintiffs:  those "relying on the

3   materially false and misleading statements" and those "relying upon the integrity

4   of the market"); Ex. X at 449-50, 452, 454 (Kleidon Report ¶¶ 11, 14, 19).  **Sub-**

5   **Class B** consists of investors who still would have bought Silver Wheaton stock

6   had they known the allegedly undisclosed risks, but at a lower price.  AC ¶ 239.[17]

7       This distinction between Sub-Class A and B is not merely theoretical.

8   Plaintiffs' depositions show they fall into one of these two sub-classes.[18]  And, it is

9   impossible to determine which proposed class member falls into which category

10  without individual testimony.

11      The Complaint also alleges a number of alternative liability theories. One

12  theory is that the probability of significantly increased taxes at various times

13  during the proposed class period was "more likely than not" (a "51% or higher

14  likelihood") and Silver Wheaton, therefore, should have recorded a tax liability on

15  its balance sheets.  AC ¶¶ 129-131, 140-141, 151-152, 158-159, 165-166, 172-173.

16  Another is that the probability of liability for significantly increased taxes was "not

17  remote" and Silver Wheaton, therefore, should have added more footnote

18  disclosure to its financial statements about a contingent tax liability.  *Id*. ¶¶ 132,

19  

20      [17] The proposed class definition also includes those who purchased Silver
    Wheaton stock in off-exchange transactions.  *See* ECF No. 91 (class includes

21  purchasers on exchanges "or . . . in a transaction in the United States").  This group
    is also a distinct subclass; it cannot be certified because no plaintiff is a member of

22  it and there is no evidence to support certifying it; indeed, off-exchange purchasers
    cannot invoke the fraud-on-the-market presumption.  *Basic, Inc. v. Levinson*, 485

23  U.S. 224, 244-45 (1988).

24      [18] Choi and Borowczyk would not have purchased had they known the
    Company faced a risk of a tax reassessment.  Ex. L at 227-28 (Choi Tr. 76:19-

25  77:22); Ex. A at 12-13 (Borowczyk Tr. 109:20-110:10).  Elek and Bartsch still
    would have purchased with knowledge of the risk of reassessment, albeit at a lower

26  price.  Ex. N at 263-64 (Elek Tr. 114:22-115:23); Ex. V at 406-07 (Bartsch Tr.
    91:21-92:2).  Moreover, Bartsch, Brandow and Frohwerk actually purchased stock

27  after disclosure of the reassessment, after the end of the proposed class period,
    showing their willingness to purchase despite knowledge of the reassessment.  *Id*.;

28  AC at 65; Ex. G at 201-09.

1  153, 160, 167, 174.  Yet another appears to be that Defendants misrepresented the

2  likelihood of a reassessment regardless of whether Silver Wheaton is ultimately

3  liable for increased taxes.  *See* ECF No. 65, at 1, 8-9.

4         Plaintiffs fail to proffer a damages methodology that applies to either of

5  these sub-classes or to any of these alternative liability theories, as required by

6  Rule 23(b)(3) and *Comcast*.

7         **2.      Those Who Would Not Have Purchased (Sub-Class A)**

8                   **Cannot Be Certified Because Individual Issues of Reliance**

9                   **Predominate.**

10        Members of Sub-Class A would not have purchased if they had known of

11  the allegedly undisclosed risks.  Thus, they made their investment decision based

12  upon their individual preferences concerning risk, not price and cannot rely on the

13  fraud-on-the-market presumption of reliance because the price-to-decision link is

14  severed and the presumption rebutted.  *Basic*, 485 U.S. at 248; Ex. X at 449-50,

15  452, 454 (Kleidon Report ¶¶ 11, 14, 19).  Accordingly, Sub-Class A cannot be

16  certified because, with no *Basic* presumption, individual issues of reliance would

17  predominate.[19]  *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398,

18  2407-08 (2014) ("'requiring proof of individualized reliance' from every securities

19  fraud plaintiff" prevents class action in Rule 10b-5 suits.) (citation omitted).[20]

20        This very situation was analyzed by the Fifth Circuit in denying class

21  certification in *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 689-91 (5th Cir. 2015), *cert.*

22  *denied*, 136 S. Ct. 1824 (2016), a securities class action stemming from the

23

24        [19] Section III, *infra.* explains why no *Affiliated Ute* presumption is available.

25        [20] "[E]ach subclass must independently meet the requirements of Rule 23" or
   face "dismissal of the action with respect to the subclass or force the action to
26  proceed with regard to the members of the subclass on an individual basis."  *Betts*
   *v. Reliable Collection Agency, Ltd.*, 659 F.2d 1000, 1005 (9th Cir. 1981).  Neither
27  Defendants nor the Court should "'bear the burden of constructing subclasses' or
   otherwise correcting Rule 23[] problems; rather, the burden is on Plaintiffs to
28  submit proposals to the court."  *Hawkins v. Comparet-Cassani*, 251 F.3d 1230,
   1238 (9th Cir. 2001) (citation omitted).

1   catastrophic Deepwater Horizon oil spill.  In *Ludlow*, plaintiffs put forward a

2   subclass comprised of BP stockholders who would have sold their stock had they

3   known the true risk of an oil spill.  *Id*.  The court concluded:

4      By claiming that class members may have divested themselves of BP

5      stock if they had known about the true risk of an accident in the Gulf—

6      as distinguished from that risk's impact on BP's stock *price*—the

7      plaintiffs are arguing that their investment decisions were based

8      substantially upon factors other than price.  The plaintiff's argument

9      thus undercuts one of the rationales for the *Basic* presumption of

10     reliance.

11  *Id*. at 691; *see Turnbow v. Life Partners, Inc.*, 2013 WL 3479884, at *19 (N.D.

12  Tex. July 9, 2013) (denying certification because case required discovery into

13  individual issue of whether purchasers would have bought policies had they known

14  actual facts).  This Court should likewise refuse to certify Sub-Class A or appoint

15  Choi and Borowczyk as representatives.  Determining which remaining class

16  members fit into this Sub-Class also would have to be determined on an

17  individualized basis; thus, individual issues predominate.

18      **3.      Plaintiffs' Damages Methodology Cannot Be Applied**

19              **Classwide and Is Inconsistent With Their Various Liability**

20              **Theories**

21      Plaintiffs fail to even proffer a damages methodology.  Section II.A, *supra*.

22  This of course fails to satisfy their burden.  *Comcast*, 133 S. Ct. at 1433.  Even the

23  scant information Feinstein provides as to two possible methodologies reveals their

24  gross insufficiency.

25          **a.  Feinstein Does Not Address Alternative Liability**

26              **Theories or Sub-Classes**

27      Plaintiffs assert several alternative liability theories.  Feinstein was aware of

28  alternative liability theories (Ex. W at 420-21 (Feinstein Tr. 14:25-15:22)), but his

1   report does not mention them or demonstrate why either of his two damages

2   methodologies is consistent with them.  Feinstein Report ¶¶ 1-49.  In fact,

3   Feinstein testified that the liability theories were "not something [he] felt that [he]

4   needed to give a great deal of thought to" and not something he thought "matters

5   that much."  Ex. W at 419, 421-22 (Feinstein Tr. 13:2-13, 15:23-16:3).

6        Feinstein also failed to recognize that the Complaint also asserts the two

7   primary subclasses discussed above.  Feinstein's report and testimony fails to

8   mention these two classes of purchasers—let alone the impossibility of telling

9   which class members fall into which subclass without individual testimony (*see*

10  Section II.B.1).

11       Feinstein's failure to address the several liability theories as applied to the

12  sub-classes precludes class certification.  It demonstrates that his methodologies

13  are arbitrary and untethered to Plaintiffs' allegations and liability theories.  Ex. X

14  at 457-58, 460, 469-70 (Kleidon Report ¶¶ 23-24, 30, 49); *Comcast*, 133 S. Ct. at

15  1433 (model cannot be "arbitrary"); *In re Rail Freight*, 725 F.3d at 253 ("model

16  divorced from the plaintiffs' theory of liability" fails "rigorous analysis");

17  *Vaccarino*, 2013 WL 3200500, at *15 (methodology must be "tethered" to liability

18  theory).  Indeed, Feinstein's methodologies suffer from the same problem as in

19  *Comcast*—they do not "attribute damages to any one particular theory" of liability.

20  *Id*. at 1434.

21               **b.  Feinstein's Backcasting Model Cannot Measure**

22                    **Classwide Damages and Is Inconsistent with Plaintiffs'**

23                    **Liability Theories**

24       Feinstein proposes a backcasting damages methodology that would calculate

25  inflation throughout the class period based upon the price decline of Silver

26  Wheaton stock at the end of the class period after disclosure of the proposed CRA

27  reassessments.  Ex. X at 462 (Kleidon Report ¶ 33); Feinstein Report ¶¶ 26, 151-

28  54, 177; Ex. W at 422 (Feinstein Tr. 16:9-18) (one corrective disclosure, July 6,

2015 press release); 26:14-20 (single corrective disclosure).[21]  Feinstein admits that this methodology is not tied to Plaintiffs' sub-classes or liability theories.  Ex. W at 417, 419, 423-24, 431 (Feinstein Tr. 11:1-6, 13:2-13, 22:4-23:11; 53:8-22).

With respect to Sub-Class B (those who would have bought but at a lower price, and assuming the members could be determined), the single corrective disclosure backcasting methodology is inconsistent with any liability theory.  Take, for example, the accounting claim that, from the outset of the class period, the probability of liability for substantially higher taxes was "more likely than not" (at least 51%) and so the Company should have recorded a tax liability on its balance sheet.  Sub-Class B purchasers allegedly bought stock at an inflated price that reflected a lower or zero probability.  Feinstein relies on the price decline at the end of the class period, which merely reflects the difference between a near 100% risk of a proposed reassessment (which would then be followed by years of litigation seeking to determine the actual liability) and the market's prior belief about that risk.  Feinstein presumes purchasers should get 100% of that price decline.  But, the accounting claim is not based on the risk of reassessment, but rather on the risk of actual tax liability.  Thus, Feinstein's damages methodology is not tied to the accounting liability claim.

Another problem with Feinstein's methodology is that he ignores both the actual risk of liability under any of Plaintiffs' theories and the market's perception of those risks at any time during the class period.  By backcasting and anchoring his damages "analysis" to 100% of the price decline upon an announcement of a proposal to reassess, he is presuming that the actual risk under any theory was always 100% and that the market's perception of that risk was always 0%.  But there is no basis for this presumption and it is inconsistent with Plaintiffs' liability theories.  For example, Plaintiffs alternatively claim that the risk of substantially

---

[21] Feinstein later waffled on whether and how he would use the July 6th disclosure and price decline and even whether he would use backcasting at all.  Ex. W at 430, 432, 438-39 (Feinstein Tr. 51:14-19, 60:9-12, 89:19-90:3).

higher taxes was "more likely than not" (at least 51%) or at least "not remote." Feinstein Report, ¶¶ 21, 41.  As explained *In re BP PLC Sec. Litig.*, 2013 U.S. Dist. LEXIS 173303 (S.D. Tex. Dec. 6, 2013) ("*BP I*"), such a simplistic methodology fails to consider the difference between actual and perceived risk and cannot support class certification.[22]  Ex. X at 464-65 (Kleidon Report, ¶¶ 38-40); *see In re Rail Freight*, 725 F.3d at 253 (model divorced from liability theory precludes certification); *Werdebaugh*, 2014 WL 7148923, at *13 (decertifying class; damages model "incapable of providing a damages figure that is consistent with Plaintiff's liability case"); *In re POM Wonderful LLC*, 2014 WL 1225184, at *5 (C.D. Cal. Mar. 25, 2014) (Pregerson, J.) (decertifying class; damages model did "not comport with *Comcast's* requirements that classwide damages be tied to a legal theory"); *see Doyle v. Chrysler Grp., LLC*, 2016 U.S. App. LEXIS 19159, at *3 (9th Cir. Oct. 24, 2016) (reversing certification; no way to determine whether proffered model measured damages solely attributable to theory of liability).

While Feinstein's approach conceivably might work for Sub-Class A investors, those who would not have bought Silver Wheaton stock at any price if they had known the actual risks, this simply highlights the critical importance of distinguishing between shareholders belonging to one sub-class or the other.  *Fox Test Prep v. Facebook, Inc.*, 588 F. App'x 733, 733-34 (9th Cir. 2014) (denying

---

[22] *Id.* at *71-72 n.15:  "Imagine that a company announced that it was going to draw a marble from an urn of 100 marbles, of which 99 were black and one was red.  If the company drew a red marble, it would have to pay $1 million.  Prior to finding out the outcome, the company's market value would reflect the expected loss from this lottery of 1% of $1 million, or $10,000.  If the company subsequently drew a red marble, the market value would have fallen $990,000 to reflect the new information—the certainty of a $1 million loss.  If, however, contrary to the company's statement, there were two red marbles (increasing the probability of drawing a red marble), the share price would *still* have fallen when the company drew a red marble.  In order to understand the value implication of the company's misstatement that there was only one red marble, the relevant issue is what the market value would have been, prior to the drawing, had the company told the truth.  In this case, the market value would have reflected an expected loss of $20,000, only $10,000 lower than the actual market value, *not* the $990,000 less that would be implied by looking at the reaction to the drawing of a red marble."

1    certification because plaintiff's expert did not provide "actual method for

2    distinguishing between valid and invalid clicks"); *Forrand*, 2013 WL 1793951, at

3    *3-5 (damages methodology using time cards not reliable because policies for

4    employees varied from facility to facility).

5        Plaintiffs, however, provide no method of distinguishing between the sub-

6    classes.  This precise problem is well-described in the Fifth Circuit's decision in

7    *Ludlow*, 800 F.3d at 690, and led the court to deny certification of a pre-spill sub-

8    class of BP investors because the proposed damages methodology had no

9    mechanism to separate those who would have purchased at a reduced price from

10   those who would not have purchased at all.  Ex. X at 454-56 (Kleidon Report, ¶¶

11   20-21).  The only possible method of distinguishing between these sub-classes

12   would be to conduct investor-by-investor examinations (*id.* at 454, 456-67 ¶¶ 19,

13   22), which, of course, also results in individual issues predominating in

14   contravention of Rule 23(b)(3).  *Alakozai v. Chase Inv. Servs. Corp.*, 2014 WL

15   5660697, at *18 (C.D. Cal. Oct. 6, 2014) (denying certification; plaintiffs

16   "offer[ed] no methodology for avoiding a burdensome and 'fact intensive,

17   individual analysis' with regard to damages.").

18              **c.  Feinstein's "Valuation" Model Is Not Tethered to the**

19                    **Facts or Liability Theories**

20        Although it is hardly Defendants' burden to tease out a method, at his

21   deposition Feinstein came up with a new damages methodology very different

22   from the backcasting method in his report.  Feinstein Report, ¶ 177.  He testified he

23   would use "valuation techniques" to calculate the "but-for price" of Silver

24   Wheaton stock on each day of the class period.  Ex. W at 427-28, 435, 437

25   (Feinstein Tr. 48:13-49:14, 80:3-10; 88:19-23).  While unsure about which

26   techniques he would use (*id.* at 429, 430 (50:10-23, 51:9-13)), he identified

27   discounted cash flow ("DCF"), valuation multiples, and an event study as possible

28   techniques.  *Id.* at 437 (88:7-13).  Merely listing potential techniques lacks any

1   economic content, and does not constitute "one model explaining how he would

2   use these techniques in concert to calculate damages in this case." *Loritz*, 2015

3   U.S. Dist. LEXIS 100471, at \*71.  Feinstein does not identify what assumptions or

4   inputs he would use or how he would tie them to the facts and liability theories.

5   Ex. X at 471-76 (Kleidon Report, ¶¶ 51-59).  In short, Feinstein's new method is

6   so lacking in specifics that it is impossible for the Court to analyze whether it is

7   sound, capable of calculating damages on a classwide basis, or tethered to

8   Plaintiffs' liability theories.  *Comcast*, 133 S. Ct. at 1433; *Turnbow*, 2013 WL

9   3479884, at \*17.

10      Feinstein's claim that these valuation techniques are used every day by Wall

11   Street professionals is highly misleading.  These techniques are rarely, if ever, used

12   to calculate daily stock price inflation because they generally use assumptions and

13   inputs that do not correspond to market consensus beliefs.  Ex. X at 476 (Kleidon

14   Report, ¶ 60).  It is not surprising, therefore, that Feinstein could not recall a single

15   instance where he had used these techniques in a securities fraud case.  *Id*. ¶ 46.

16   Legions of cases hold that a damages model that is untested or fails to adequately

17   explain why or how it reached its conclusions cannot support class certification.

18   *See, e.g.*, *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1056 (9th Cir. 2003); *Prism*

19   *Techs. LLC v. AT&T Mobility, LLC*, 2014 U.S. Dist. LEXIS 132619, at \*22 (D.

20   Neb. Sept. 22, 2014).

21      Plaintiffs may argue on reply they are not required to calculate damages at

22   this stage, and the problems of any particular methodology need not be resolved to

23   certify a liability-only class.[23]  But Defendants are not arguing that Plaintiffs must

24   

---

25   [23] In *Leyva*, the court found that "damages could be calculated on a classwide basis, based on the defendant's own admissions[.]" *Vaccarino*, 2013 WL 3200500,

26   at \*14.  Here, Plaintiffs' liability theories and their expert's report and testimony show the proposed damages methodologies cannot calculate damages on a

27   classwide basis consistent with the liability theories. *Comcast*, 133 S. Ct. at 1433; *Werdebaugh*, 2014 WL 7148923, at \*14. Unlike *Leyva*, "it is not facially apparent

28   from plaintiff's theory of liability . . . that damages will be readily ascertainable classwide. . . ." *Vaccarino*, 2013 WL 3200500, at \*14.

1  provide precise damages calculations at this stage.  As this Court stated in

2  *Vaccarino*, Plaintiffs "must still offer a method that tethers their theory of liability

3  to a methodology for determining the damages suffered by the class."  2013 WL

4  3200500, at *14; *see Turnbow*, 2013 WL 3479884, at *15 (at class certification (as

5  at trial) "any model supporting a 'plaintiff's damages case must be consistent with

6  its liability case'") (quoting *Comcast*, 133 S. Ct. at 1433).

7  **III.   PLAINTIFFS' CLAIMS ARE NOT PURE OMISSIONS CLAIMS**

8  **AND ARE NOT ENTITLED TO THE *AFFILIATED UTE***

9  **PRESUMPTION OF RELIANCE**

10       In the alternative, Plaintiffs argue they are entitled to a presumption of

11  reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-

12  54 (1972), because they "allege[] no affirmative misstatement" (Mot. at 11) and

13  the case is "entirely based on omissions."  *Id*. at 12; *id*. at 11 ("Plaintiffs never

14  alleged an affirmative misstatement in the Complaint.").  Plaintiffs are wrong.[24]

15       This is not a pure omissions case.  The Complaint repeatedly refers to

16  alleged "misrepresentations."  Paragraph 219, for example, refers three times to

17  "misrepresentations."  AC ¶ 219 ("Defendants made public misrepresentations or

18  failed to disclose material facts during the Class Period"; the "omissions and

19  misrepresentations were material"; and, the "misrepresentations and omissions

20  alleged").  There are numerous other examples of alleged "materially false and

21  misleading statements" (*id*. ¶¶ 236, 239), "untrue statements of material facts" (*id*.

22  ¶ 234), and "misrepresented financial statements."  *Id*. ¶ 242.  Indeed, the header to

23  the section identifying the allegedly wrongful conduct is "Materially False and

24

25  [24] Plaintiffs incorrectly claim that Defendants do not oppose the fraud-on-the-market presumption of reliance.  Mot. at 13 n.4.  Defendants stated *for purposes of*
26  *class certification* they "w[ould] not oppose the efficiency of the market in Silver Wheaton common stock on U.S. exchanges."  Horne Decl., Ex. 11.  Defendants
27  reserve their right to challenge market efficiency and the fraud-on-the-market presumption, which is rebuttable, at summary judgment or trial.  *Basic*, 485 U.S. at
28  243, 248.  Defendants also remain free to oppose market efficiency for U.S. purchasers *not on a U.S. exchange* (Mot. at 1).

1   Misleading Statements Issued During the Class Period." *Id*. at 33.  And, three of

2   the complaint's six "common questions of law and fact" supporting class

3   certification are:  (1) "whether statements made by Defendants to the investing

4   public during the Class Period misrepresented material facts about the business,

5   operations and management of SW"; (2) "whether the Individual Defendants

6   caused SW to issue false and misleading financial statements during the Class

7   Period;" and (3) "whether Defendants acted knowingly or recklessly in issuing

8   false and misleading financial statements." *Id*. ¶ 217.

9        Plaintiffs' own expert certainly considers the Complaint to allege

10  misrepresentations.  His report repeatedly refers to alleged "misrepresentations and

11  omissions."  Feinstein Report ¶¶ 176 ("various alleged misrepresentations and

12  omissions"), 177(i) ("alleged misrepresentations and omissions"), 177(ii) (same).

13  When questioned whether the "theories of this case" involve "affirmative

14  misrepresentations as well as omissions," Feinstein testified: "Well, yes. Yes.

15  There are certainly alleged affirmative misrepresentations." Ex. W at 418

16  (Feinstein Tr. 12:7-19); *see also* 417 (11:21-22) ("misrepresentations and

17  omissions" by company).

18       Plaintiffs argue that even if the complaint alleges both misstatements and

19  omissions, they are nonetheless entitled to the *Affiliated Ute* presumption because

20  their case is "primarily" an omissions case.  Mot. at 12.  But "*Affiliated Ute* should

21  be confined to cases that primarily allege omissions," *Binder v. Gillespie*, 184 F.3d

22  1059, 1064 (9th Cir. 1999), and this is not such a Complaint.[25]

23       There are many examples.  Plaintiffs' primary allegation is that the class

24

25       ───────────────────
        [25] Courts refuse to apply *Affiliated Ute* to "mixed cases."  *See, e.g.*, *Loritz*, 2015
26  U.S. Dist. LEXIS 100471, at *65-69; *Goodman v. Genworth Fin. Wealth Mgmt.,
    Inc.*, 300 F.R.D. 90, 104 (E.D.N.Y. 2014) (no presumption where positive
27  statements central to alleged fraud); *Carr v. Int'l Game Tech.*, 2012 U.S. Dist.
    LEXIS 35688, at *16-17 (D. Nev. Mar. 16, 2012); *George v. Calif. Infrastructure
28  & Econ. Dev. Bank*, 2010 U.S. Dist. LEXIS 57401, at *4-6 (E.D. Cal. June 10,
    2010); *In re Metropolitan Sec.*, 532 F. Supp. 2d 1260 (E.D. Wash. 2007).

period financial statements were affirmatively misleading because they either contained a false balance sheet by failing to include a provision for a tax liability that was "more likely than not" (AC ¶¶ 7, 140-141, 151-152, 157-159, 164-166, 171-173), or failed to include additional footnote disclosures because there was a contingent tax liability that was "not remote." *Id.* ¶¶ 153, 160, 167, 174.  Plaintiffs allege that the line item for taxable income was "underreported." *Id.* ¶ 6.  Further, Plaintiffs allege that each Form 40-F filed during the Class Period contained affirmative misrepresentations that the financial statements were prepared in accordance with Canadian GAAP or IFRS. *Id.* ¶¶ 137-138, 148-149, 155-156, 162-163, 169-170.  Finally, Plaintiffs allege that the CEO and CFO Sarbanes-Oxley certifications made misrepresentations and that Canadian Annual Information Forms gave "a false and misleading depiction." *Id.* ¶¶ 58-60, 90, 100, 102-104, 136, 145, 147, 154, 161, 168.  These allegations are similar to those in *In re InterBank Funding Corp. Sec. Litig.*, 629 F.3d 213, 220-21 (D.C. Cir. 2010), where the *Affiliated Ute* presumption was unavailable. *Id.* at 215, 220-21 (alleged misstatements in balance sheets and certifications not omissions).

Plaintiffs cannot re-characterize the Complaint's allegations of affirmative misrepresentations as omissions.  Where a case involves a "representation from which material facts are omitted," the *Affiliated Ute* presumption does not apply. *Little v. First Cal. Co.*, 532 F.2d 1302, 1304-05 & n.4 (9th Cir. 1976); *see Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 98 (S.D.N.Y. 2015) ("[t]he 'omissions' in this case are simply the truth" as opposed to omission of extrinsic "additional fact"); *In re Lehman Bros. Sec. & ERISA Litig.*, 2013 WL 5730020, at *3 (S.D.N.Y. Oct. 22, 2013) (same)

## CONCLUSION

For these reasons, the Motion for Class Certification should be denied.

Dated:  February 24, 2017          WILSON SONSINI GOODRICH & ROSATI, P.C.

By:  /s/ Jerome F. Birn, Jr.

1

Jerome F. Birn Jr., State Bar No. 128561
Wilson Sonsini Goodrich & Rosati, P.C.

2

650 Page Mill Road
Palo Alto, CA 94304-1050

3

Telephone:  (650) 493-9300
Facsimile:  (650) 565-5100

4

Email:  jbirn@wsgr.com

5

Barry M. Kaplan, *Pro Hac Vice*
Gregory L. Watts, State Bar No. 197126

6

Wilson Sonsini Goodrich & Rosati, P.C.
701 Fifth Avenue, Suite 5100

7

Seattle, WA  98104
Telephone:  (206) 883-2500

8

Facsimile:  (206) 883-2699
Email:  gwatts@wsgr.com

9

Email:  bkaplan@wsgr.com

10

Attorneys for Defendants
Silver Wheaton Corp., Randy V. J.

11

Smallwood, Peter Barnes and Gary Brown

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28