# EXHIBIT W

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

Master File No. 2:15-cv-05146CAS(JEMx)

c/w: 2:15-cv-05173-CAS(JEMx)

_____

                                    )

In re Silver Wheaton Corp. )

Securities Litigation      )   CLASS ACTION

                           )   JUDGE: Hon. Christina

_____)          Snyder


VIDEOTAPED DEPOSITION OF STEVEN P. FEINSTEIN, Ph.D.

Tuesday, January 31, 2017 9:14 a.m.

Wilson Sonsini Goodrich & Rosati

28 State Street, Boston, MA 02109


Reported by:

Janet Sambataro, RMR, CRR, CLR

JOB NO. SF-111630

STEVEN P. FEINSTEIN, Ph.D. - 1/31/2017

Page 2

```
 1

 2

 3                         January 31, 2017

 4                         9:14 a.m.

 5

 6

 7       Videotaped deposition of STEVEN P. FEINSTEIN,

 8    Ph.D., held at the offices of Wilson Sonsini

 9    Goodrich & Rosati , 28 State Street, Boston,

10    Massachusetts, pursuant to Agreement before

11    Janet Sambataro, a Registered Merit Reporter,

12    Certified Realtime Reporter, Certified LiveNote

13    Reporter, and a Notary Public within and for the

14    Commonwealth of Massachusetts.

15

16

17

18

19

20

21

22

23

24

25
```

**Exhibit W**

**Page 414**

Case 2:15-cv-05146-CAS-PJW   Document 122-25   Filed 02/24/17   Page 4 of 31   Page ID #:4234
STEVEN P. FEINSTEIN, Ph.D. - 1/31/2017

Page 9

| | |
|---|---|
| 1 | believe both issues are adequately addressed. | 09:18:37 |
| 2 | Q.   Okay.  And with respect to the issue of | 09:18:39 |
| 3 | whether one can compute a common class-wide | 09:18:41 |
| 4 | methodology for all class members in connection | 09:18:47 |
| 5 | with claims under Section 10b, you have about | 09:18:49 |
| 6 | four pages here.  Is that correct? | 09:18:53 |
| 7 | A.   That sounds about right.  Yes. | 09:18:55 |
| 8 | Q.   By the way, with respect to the scope | 09:18:57 |
| 9 | of the project, Paragraph 1 says that you were | 09:19:01 |
| 10 | asked "to determine whether the common stock of | 09:19:05 |
| 11 | Silver Wheaton traded in an efficient market." | 09:19:11 |
| 12 | And so did you do an analysis to determine | 09:19:14 |
| 13 | whether or not Silver Wheaton's stock traded in | 09:19:17 |
| 14 | an efficient market? | 09:19:20 |
| 15 | A.   Yes. | 09:19:22 |
| 16 | Q.   And Paragraph 2 says, however, you were | 09:19:22 |
| 17 | "asked to opine on whether damages in this matter | 09:19:26 |
| 18 | can be computed using a common class-wide | 09:19:29 |
| 19 | methodology." | 09:19:32 |
| 20 | Do I take it from that, that you didn't do | 09:19:33 |
| 21 | an analysis.  You just gave an opinion? | 09:19:35 |
| 22 | A.   Well, I don't think that's an accurate | 09:19:40 |
| 23 | portrayal.  I assessed whether the facts of this | 09:19:44 |
| 24 | case are similar enough to the facts of other | 09:19:49 |
| 25 | cases that I've calculated damages for or other | 09:19:53 |

STEVEN P. FEINSTEIN, Ph.D. - 1/31/2017

Page 10

```
 1    people have calculated damages for and cases that      09:19:56

 2    the Court has accepted damage computations for,         09:20:02

 3    and determined that they were similar enough.  So       09:20:06

 4    I did that analysis, that this case was similar         09:20:08

 5    enough to other cases where a standard 10b-5            09:20:12

 6    damage model would, therefore, apply.                   09:20:16

 7         So I did an assessment.  I did a                    09:20:17

 8    determination.  And then the opinion offered here       09:20:19

 9    is the result of that.                                  09:20:21

10         Q.   In connection with your work on damages       09:20:24

11    in this report, you haven't conducted a loss            09:20:27

12    causation analysis, have you?                           09:20:30

13         A.   That's correct.  I have not.                  09:20:32

14         Q.   And you haven't done a computation of         09:20:32

15    damages.  Is that correct?                              09:20:35

16         A.   Correct.                                      09:20:38

17         Q.   So do you know what the claims are in         09:20:39

18    this particular class action?                           09:20:42

19         A.   Yes.                                           09:20:44

20         Q.   All right.  And what did you do to            09:20:45

21    learn what the claims were?                             09:20:47

22         A.   I read the Complaint, an earlier              09:20:49

23    version, and then the current active version.  I        09:20:54

24    read the motion to certify.  I read the judge's         09:20:57

25    determination on the motion to dismiss.                 09:21:03
```

Exhibit W

Page 416

| | |
|---|---|
| 1    Q.   Okay.  Do you know what the liability | 09:21:08 |
| 2  theories are in this case? | 09:21:12 |
| 3    A.   Well, to the extent that "liability | 09:21:15 |
| 4  theory" has a specific legal meaning, I'm not | 09:21:17 |
| 5  here to offer legal conclusions or legal | 09:21:21 |
| 6  opinions. | 09:21:24 |
| 7    But, in general vernacular, if you mean why | 09:21:24 |
| 8  are plaintiffs seeking redress for harm, I can | 09:21:28 |
| 9  tell you what their allegations are and why they | 09:21:32 |
| 10  believe they're entitled to some redress. | 09:21:35 |
| 11    Q.   If you can, tell us what your | 09:21:38 |
| 12  understanding is of the allegations. | 09:21:39 |
| 13    A.   The allegations are that the company | 09:21:41 |
| 14  misrepresented and omitted information about the | 09:21:43 |
| 15  nature of their business in the Cayman Islands, | 09:21:49 |
| 16  such that they were ultimately -- such that they | 09:21:51 |
| 17  were not in compliance with Canadian tax law over | 09:21:55 |
| 18  a several-year period. | 09:21:58 |
| 19    And, ultimately, there was an ongoing audit | 09:22:01 |
| 20  about which they were also misled, allegedly, | 09:22:05 |
| 21  because of misrepresentations and omissions by | 09:22:08 |
| 22  the company, such that they were surprised when | 09:22:10 |
| 23  there was a $207 million levy for back taxes and | 09:22:14 |
| 24  penalties at the end of the class period. | 09:22:19 |
| 25    Q.   And when you say "they were surprised," | 09:22:21 |

Case 2:15-cv-05146-CAS-PJW  Document 122-25  Filed 02/24/17  Page 7 of 31  Page ID #:4237
STEVEN P. FEINSTEIN, Ph.D. - 1/31/2017

Page 12

| | |
|---|---|
| 1 | do you mean -- | 09:22:23 |
| 2 | A.   Investors.  In fact, analysts, as well. | 09:22:24 |
| 3 | I mean, the plaintiffs, but all, I think, | 09:22:27 |
| 4 | investors and the analysts as well. | 09:22:29 |
| 5 | Q.   You mentioned that there were | 09:22:31 |
| 6 | misrepresentations and omissions. | 09:22:32 |
| 7 | Is it your understanding that the theories | 09:22:34 |
| 8 | of this case involve affirmative | 09:22:36 |
| 9 | misrepresentations as well as omissions? | 09:22:38 |
| 10 | MR. ROSEN:  Objection.  Calls for a | 09:22:41 |
| 11 | legal conclusion. | 09:22:42 |
| 12 | A.   Well, yes, yes.  There are certainly | 09:22:44 |
| 13 | alleged affirmative misrepresentations. | 09:22:57 |
| 14 | Specifically, the Sarbanes-Oxley certifications | 09:22:59 |
| 15 | and comments in the filings about the likelihood | 09:23:04 |
| 16 | of there being a tax penalty and that they would | 09:23:11 |
| 17 | be found noncompliant with tax laws. | 09:23:17 |
| 18 | There -- I understand there are affirmative | 09:23:21 |
| 19 | misrepresentations about the -- the accounting | 09:23:24 |
| 20 | itself, that the accounting was -- I'm not an | 09:23:25 |
| 21 | accountant, but I understand the allegations are | 09:23:32 |
| 22 | that, you know, given the nature of the business | 09:23:34 |
| 23 | and what the company knew about the nature of the | 09:23:38 |
| 24 | business, that there should have been different | 09:23:40 |
| 25 | accounting that would have recognized contingent | 09:23:46 |

STEVEN P. FEINSTEIN, Ph.D. - 1/31/2017

Page 13

| | | |
|---|---|---|
| 1 | liabilities for taxes. | 09:23:50 |
| 2 | Q.   Are you aware of whether or not, in | 09:23:52 |
| 3 | this case, the allegations are made in the | 09:23:57 |
| 4 | alternative, that there were alternative things | 09:24:01 |
| 5 | that the company should or shouldn't have done in | 09:24:04 |
| 6 | connection with its accounting? | 09:24:06 |
| 7 | A.   Frankly, I'm not sure exactly what you | 09:24:11 |
| 8 | mean by that question, but I can tell you that | 09:24:16 |
| 9 | it's not something I felt that I needed to give a | 09:24:18 |
| 10 | great deal of thought to, as I was determining | 09:24:21 |
| 11 | whether or not the stock traded in an efficient | 09:24:24 |
| 12 | market and whether damages can be computed the | 09:24:26 |
| 13 | way I described. | 09:24:28 |
| 14 | Q.   Okay.  So you're not aware of whether | 09:24:30 |
| 15 | or not the allegations are phrased or framed in | 09:24:31 |
| 16 | the alternative about the accounting obligations | 09:24:36 |
| 17 | of the company? | 09:24:41 |
| 18 | A.   Do you mean by that -- let me clarify. | 09:24:41 |
| 19 | Do you mean -- I mean, I did read the Complaint. | 09:24:43 |
| 20 | I believe I understand the Complaint well.  And | 09:24:45 |
| 21 | I -- but does your question mean that the | 09:24:48 |
| 22 | Complaint alleges that there should have been | 09:24:50 |
| 23 | specific other things in the accounting? | 09:24:53 |
| 24 | Q.   So let me ask you this.  Let me ask you | 09:24:55 |
| 25 | this to make it clear:  Are you aware that | 09:24:58 |

STEVEN P. FEINSTEIN, Ph.D. - 1/31/2017

Page 14

| | | |
|---|---|---|
| 1 | there's an allegation that the company should | 09:25:00 |
| 2 | have recorded in its financial statements tax | 09:25:02 |
| 3 | liabilities that it didn't record? | 09:25:05 |
| 4 | A.   Tax liabilities or contingent tax | 09:25:07 |
| 5 | liabilities or a footnote to describe that there | 09:25:09 |
| 6 | was a potential of additional tax liabilities. | 09:25:14 |
| 7 | That's my understanding. | 09:25:16 |
| 8 | Q.   And are you aware of the standards that | 09:25:17 |
| 9 | would have -- by the way, you just did, by your | 09:25:20 |
| 10 | answer, express alternatives.  You used "this" or | 09:25:23 |
| 11 | "that" or "this."  So that's the alternatives | 09:25:27 |
| 12 | that we're focusing on. | 09:25:31 |
| 13 | Are you aware of what the different | 09:25:32 |
| 14 | standards are in the accounting literature? | 09:25:36 |
| 15 | A.   Only through -- I'm not an accountant. | 09:25:38 |
| 16 | I'm not an expert in accounting.  I'm a consumer | 09:25:41 |
| 17 | of accounting.  As a financial analyst, I use | 09:25:43 |
| 18 | accounting and understand accounting from that | 09:25:46 |
| 19 | perspective. | 09:25:48 |
| 20 | I'm also not a lawyer, but I do understand | 09:25:50 |
| 21 | that the Complaint alleges that their -- that the | 09:25:53 |
| 22 | accounting was improper.  And how to make it | 09:25:56 |
| 23 | proper, you'd have to go to a different expert to | 09:25:58 |
| 24 | explain that. | 09:26:01 |
| 25 | Q.   Are you aware that there's an | 09:26:02 |

STEVEN P. FEINSTEIN, Ph.D. - 1/31/2017

Page 15

| | | |
|---|---|---|
| 1 | allegation that if it was more likely than not | 09:26:04 |
| 2 | that the company would face additional tax | 09:26:06 |
| 3 | liabilities, that they needed to record those | 09:26:10 |
| 4 | liabilities in their financial statements? | 09:26:12 |
| 5 | A.   I'm familiar with language like that in | 09:26:15 |
| 6 | the Complaint, but I would be -- I'm accepting as | 09:26:18 |
| 7 | an assumption that there are other experts in | 09:26:24 |
| 8 | accounting -- there are other experts with more | 09:26:26 |
| 9 | expertise in accounting than me on which | 09:26:29 |
| 10 | plaintiffs are relying. | 09:26:31 |
| 11 | And the extent of what I needed to know to | 09:26:32 |
| 12 | do my work is that the allegation was that the | 09:26:34 |
| 13 | accounting was improper with respect to recording | 09:26:36 |
| 14 | and reporting and announcing potential of greater | 09:26:39 |
| 15 | taxes. | 09:26:44 |
| 16 | Q.   Are you aware that there's also an | 09:26:45 |
| 17 | allegation that, in the alternative, even if it | 09:26:47 |
| 18 | was not more likely than not that the company | 09:26:49 |
| 19 | would incur those tax liabilities if it was not | 09:26:52 |
| 20 | remote, the company should footnote those | 09:26:56 |
| 21 | potential tax contingencies? | 09:26:58 |
| 22 | A.   Yeah.  I know that's in the Complaint. | 09:27:03 |
| 23 | Q.   Are you aware of the fact that those | 09:27:04 |
| 24 | are alternative possible theories of liability? | 09:27:05 |
| 25 | A.   Well, again, I think that's -- that's a | 09:27:17 |

**Exhibit W**

**Page 421**

| | |
|---|---|
| 1 | legal distinction.  From the economic analytic | 09:27:21 |
| 2 | point of view, I don't think it matters that | 09:27:25 |
| 3 | much. | 09:27:27 |
| 4 |     Whatever -- in order to opine that there's a | 09:27:27 |
| 5 | common damage methodology, what I need to know is | 09:27:33 |
| 6 | that at some point it will be determined what the | 09:27:37 |
| 7 | "but for" world would have -- should have looked | 09:27:42 |
| 8 | like. | 09:27:44 |
| 9 |     Q.   How many corrective disclosures are | 09:27:46 |
| 10 | alleged in this Complaint? | 09:27:47 |
| 11 |     A.   One. | 09:27:50 |
| 12 |     Q.   And what is that disclosure? | 09:27:51 |
| 13 |     A.   It's the press release on July 6th, | 09:27:53 |
| 14 | 2015, that announces that the CRA determined that | 09:27:59 |
| 15 | the company was not previously in compliance with | 09:28:06 |
| 16 | the tax laws and that there would be a | 09:28:09 |
| 17 | $150 million back tax assessed and a $57 million | 09:28:14 |
| 18 | penalty. | 09:28:17 |
| 19 |     Q.   And what is your understanding of what | 09:28:18 |
| 20 | that single corrective disclosure corrected in | 09:28:20 |
| 21 | terms of past misdisclosure or nondisclosure? | 09:28:23 |
| 22 |     A.   Well, previously the company had said | 09:28:30 |
| 23 | that -- well, because of their accounting, they | 09:28:32 |
| 24 | certainly implied to the marketplace that the | 09:28:39 |
| 25 | likelihood of that was remote, the likelihood of | 09:28:43 |

STEVEN P. FEINSTEIN, Ph.D. - 1/31/2017

Page 22

| | |
|---|---|
| 1 | you're asking was that word used in the | 09:34:42 |
| 2 | allegations, I would want to look at the | 09:34:44 |
| 3 | Complaint and check. | 09:34:45 |
| 4 | Q.   Okay.  And I can give you the | 09:34:46 |
| 5 | Complaint.  But let me ask you a question and see | 09:34:48 |
| 6 | if you think you need it.  And I'm happy to give | 09:34:49 |
| 7 | you the Complaint. | 09:34:53 |
| 8 | Do you know whether the allegation is either | 09:34:54 |
| 9 | that the company should have put in its financial | 09:34:58 |
| 10 | statement footnotes a contingency for tax | 09:35:01 |
| 11 | liability or should have actually recorded the | 09:35:04 |
| 12 | tax liability in its financial statements? | 09:35:08 |
| 13 | A.   With that level of specificity, I would | 09:35:13 |
| 14 | want to refer back to the source document.  But | 09:35:15 |
| 15 | for my purposes, to determine whether a 10b-5 | 09:35:18 |
| 16 | damage model applies to this case and whether or | 09:35:24 |
| 17 | not the company stock traded in an efficient | 09:35:25 |
| 18 | market, it was not necessary to be that specific | 09:35:27 |
| 19 | about the allegation. | 09:35:29 |
| 20 | What was necessary was to understand that | 09:35:31 |
| 21 | the allegation essentially was that not enough | 09:35:33 |
| 22 | information and some misinformation was provided | 09:35:37 |
| 23 | to investors about the relationship between the | 09:35:41 |
| 24 | company and its subsidiary and the likelihood of | 09:35:45 |
| 25 | a tax penalty.  And some of that misinformation | 09:35:47 |

STEVEN P. FEINSTEIN, Ph.D. - 1/31/2017

Page 23

| | | |
|---|---|---|
| 1 | in the Complaint was in the form of improper | 09:35:52 |
| 2 | accounting, which could have been made proper | 09:35:55 |
| 3 | based on alternative accounting that I'm not an | 09:35:58 |
| 4 | expert in. | 09:36:01 |
| 5 | But I am an expert in knowing the effect on | 09:36:02 |
| 6 | the stock price of the generality that it had to | 09:36:05 |
| 7 | do with better accounting that would have | 09:36:07 |
| 8 | better -- that would better have informed | 09:36:10 |
| 9 | investors about the true relationship between the | 09:36:12 |
| 10 | company, its subsidiary, and the likelihood of a | 09:36:14 |
| 11 | tax assessment. | 09:36:16 |
| 12 | Q.   So in doing your -- | 09:36:17 |
| 13 | MR. ROSEN:  Before you ask a question, | 09:36:19 |
| 14 | I'm going to use the men's room.  And why don't | 09:36:20 |
| 15 | you give him the Complaint so that he could | 09:36:23 |
| 16 | answer your next questions, rather than giving | 09:36:25 |
| 17 | him sort of a spot quiz of what he remembers from | 09:36:29 |
| 18 | the 100-some-odd-page Complaint.  It's up to you, | 09:36:31 |
| 19 | but -- | 09:36:35 |
| 20 | MR. KAPLAN:  I'm happy to do that. | 09:36:36 |
| 21 | THE WITNESS:  Are we taking a break? | 09:36:39 |
| 22 | MR. ROSEN:  Yeah.  I'm just going to | 09:36:40 |
| 23 | use the men's room. | 09:36:42 |
| 24 | MR. KAPLAN:  Hold on.  We need to | 09:36:43 |
| 25 | formally go off the record. | 09:36:45 |

**Exhibit W**

**Page 424**

Case 2:15-cv-05146-CAS-PJW   Document 122-25   Filed 02/24/17   Page 14 of 31   Page ID #:4244
STEVEN P. FEINSTEIN, Ph.D. - 1/31/2017

Page 26

| | |
|---|---|
| 1 | corrective disclosures.  As such, classified | 09:45:25 |
| 2 | damages in response to the specific | 09:45:28 |
| 3 | misrepresentations and omissions ultimately | 09:45:30 |
| 4 | established by the plaintiff can be calculated in | 09:45:33 |
| 5 | a straightforward manner common to all class | 09:45:35 |
| 6 | members." | 09:45:39 |
| 7 | So this methodology of damages that I've | 09:45:39 |
| 8 | proposed here is flexible and accommodates | 09:45:41 |
| 9 | whether it's ultimately determined that there | 09:45:47 |
| 10 | were misrepresentations and omissions or | 09:45:49 |
| 11 | omissions without misrepresentations.  It's a | 09:45:51 |
| 12 | methodology that accommodates a wide variety of | 09:45:56 |
| 13 | facts and allegations. | 09:45:59 |
| 14 | Q.   Okay.  Thank you.  And we'll come back. | 09:46:01 |
| 15 | I want to come back, obviously, in detail to the | 09:46:03 |
| 16 | portion of your analysis which deals with this. | 09:46:05 |
| 17 | But as far as you understand, there's a | 09:46:08 |
| 18 | single corrective disclosure alleged in this | 09:46:10 |
| 19 | case? | 09:46:14 |
| 20 | A.   Yes. | 09:46:14 |
| 21 | Q.   And I think you -- is it fair to say | 09:46:15 |
| 22 | that you did not feel the need to thoroughly | 09:46:19 |
| 23 | understand the potential alternative liability | 09:46:22 |
| 24 | theories in this case in order to render your | 09:46:26 |
| 25 | opinion? | 09:46:28 |

STEVEN P. FEINSTEIN, Ph.D. - 1/31/2017

Page 46

```
 1        A.   Yes.                                          10:21:46

 2        Q.   Is it your understanding that the             10:21:47

 3   "out-of-pocket" damages is the appropriate way to       10:21:51

 4   measure damages under Section 10b?                      10:21:55

 5        A.   My understanding is that's the                10:21:58

 6   terminology used to describe the damage                 10:22:01

 7   methodology, as I later more fully describe it to       10:22:04

 8   be.                                                     10:22:07

 9        Q.   And --                                        10:22:09

10        A.   Why they use the term "out-of-pocket,"        10:22:10

11   I'm really not 100 percent sure, but that's -- my       10:22:11

12   understanding is that's how the 10b-5 damage            10:22:14

13   formula is described by attorneys and the courts.       10:22:18

14        Q.   And what does that mean to you when you       10:22:20

15   use that term?  What did it mean to you in this         10:22:22

16   report?                                                 10:22:24

17        A.   That the damages -- that an                   10:22:26

18   individual's damages would be the difference            10:22:29

19   between the artificial inflation when they bought       10:22:36

20   the stock and the artificial inflation when they        10:22:40

21   disposed of the stock, if they disposed of the          10:22:42

22   stock.  So the amount of money that they actually       10:22:44

23   lost on account of the stock being artificially         10:22:47

24   inflated.                                               10:22:50

25        Q.   And that would require that there be a        10:22:51
```

| | | |
|---|---|---|
| 1 | this point, my assumption is that there is one. | 10:24:14 |
| 2 | I can imagine that with more discovery, there -- | 10:24:18 |
| 3 | you know, there's already been at least two -- | 10:24:23 |
| 4 | you know, there's two Complaints.  I mean, it | 10:24:25 |
| 5 | could change, but as of right now, it seems that | 10:24:27 |
| 6 | there's one alleged corrective disclosure. | 10:24:30 |
| 7 | Q.   All right.  Based upon this one -- I | 10:24:32 |
| 8 | want you to just tell me generally, based upon | 10:24:34 |
| 9 | this currently-framed Complaint which said that | 10:24:38 |
| 10 | there was this corrective disclosure on July 6, | 10:24:42 |
| 11 | 2015 -- | 10:24:45 |
| 12 | A.   Okay. | 10:24:48 |
| 13 | Q.   -- how would you generally find the | 10:24:48 |
| 14 | damages could be calculated for all class members | 10:24:53 |
| 15 | on a class-wide basis? | 10:24:56 |
| 16 | A.   Okay.  I would need to, first, know | 10:24:58 |
| 17 | what omissions or misrepresentations were found | 10:25:03 |
| 18 | by the trier of fact to be, in fact, actionable | 10:25:08 |
| 19 | and having actually occurred, misrepresentations | 10:25:17 |
| 20 | or omissions.  Or I could do the analysis on a | 10:25:21 |
| 21 | contingent basis on the assumption that they | 10:25:23 |
| 22 | would -- a certain set would be found to be | 10:25:26 |
| 23 | actionable and truly misrepresentations and | 10:25:29 |
| 24 | omissions. | 10:25:32 |
| 25 | With that set of information, about -- now, | 10:25:34 |

STEVEN P. FEINSTEIN, Ph.D. - 1/31/2017

Page 49

```
1    that establishes what, in a "but for" world,          10:25:36

2    could have and should have been disclosed.            10:25:41

3         I would apply valuation techniques the same      10:25:44

4    way investors, analysts, Wall Street                  10:25:48

5    professionals do every day, apply valuation           10:25:51

6    techniques to value the security under an             10:25:54

7    alternative set of facts.  And that would -- the      10:25:56

8    difference between this "but for" price on each       10:26:01

9    day in the class period and the actual price is       10:26:06

10   the inflation ribbon.                                 10:26:09

11        That would tell you how much the stock was       10:26:10

12   inflated because of the surviving alleged             10:26:11

13   misrepresentations and omissions.  So that's the      10:26:15

14   construction of the inflation ribbon.                 10:26:19

15        And then, as I just said moments ago, for        10:26:21

16   each indi- -- investor, the damage calculation        10:26:24

17   would be the difference between the inflation         10:26:26

18   when they bought the stock and the inflation, I       10:26:34

19   guess, since there was only one -- if there was       10:26:41

20   only one corrective disclosure, after the end of      10:26:42

21   the class period, that would be the per-share         10:26:44

22   damages.                                              10:26:48

23        And then you multiply that by the number of      10:26:48

24   shares at issue that were purchased and sustained     10:26:51

25   losses on account of that change in inflation,        10:26:53
```

STEVEN P. FEINSTEIN, Ph.D. - 1/31/2017

Page 50

```
 1    subtracting from the change of inflation any        10:26:54
 2    inflation change that may have occurred on          10:26:58
 3    account of a nondisclosure or some other factor.    10:27:00
 4         Q.   You talked about applying various         10:27:03
 5    valuation techniques.  Can you describe more        10:27:06
 6    fully what you mean by that?                         10:27:08
 7         A.   Sure.  There are textbooks on             10:27:10
 8    valuation.  There is courses taught.  There's       10:27:13
 9    multiple courses taught on how to value a stock.    10:27:16
10         I would value the stock.  I would apply        10:27:19
11    whatever I found to be most appropriate and to      10:27:22
12    some extent guided by what analysts were doing at   10:27:27
13    the time, value the stock under an alternative      10:27:29
14    set of facts.  I mean, there's -- there's           10:27:34
15    discounted cash flow methodologies.  There are      10:27:37
16    valuation multiple methodologies.                   10:27:39
17         In this case, we have the empirics of seeing   10:27:42
18    how the stock price changed when new information    10:27:45
19    entered the marketplace.  I would use all of        10:27:48
20    these methodologies in concert, the same way        10:27:50
21    financial analysts do every day to determine what   10:27:53
22    the stock would have been worth under an            10:27:56
23    alternative set of facts.                           10:27:58
24         Q.   Okay.  So let me see if I can ask you a   10:28:00
25    general question, without your counsel objecting.   10:28:02
```

| | | |
|---|---|---|
| 1 | I'm going to try to do it as simple as possible. | 10:28:04 |
| 2 | If you're trying to figure out what the | 10:28:10 |
| 3 | inflation is at any given point of time as a | 10:28:12 |
| 4 | result of an allegation of fraud -- | 10:28:15 |
| 5 | A.    Okay. | 10:28:20 |
| 6 | Q.    -- you would use a valuation technique | 10:28:20 |
| 7 | on that date to see what the impact of the fraud | 10:28:25 |
| 8 | was on that date? | 10:28:29 |
| 9 | A.    Well, I'm not sure which valuation | 10:28:33 |
| 10 | technique I would use, but essentially, yes, on | 10:28:35 |
| 11 | each day in the class period, I would assess what | 10:28:38 |
| 12 | the stock would have been worth had it not been | 10:28:40 |
| 13 | for the alleged fraud. | 10:28:42 |
| 14 | Q.    What would the relevance be of the drop | 10:28:43 |
| 15 | on the last day of the class period? | 10:28:47 |
| 16 | A.    I haven't done the analysis yet. | 10:28:50 |
| 17 | However, it's information I wouldn't discard. | 10:28:55 |
| 18 | It's probably information I'd rely on to some | 10:28:59 |
| 19 | extent, maybe a large extent.  It tells me | 10:29:02 |
| 20 | what -- how the market reassessed the value of | 10:29:10 |
| 21 | the company, when that new information, which | 10:29:13 |
| 22 | included the information of there being, you | 10:29:16 |
| 23 | know, a much more fulsome understanding of the | 10:29:20 |
| 24 | likelihood of the tax assessment and a penalty | 10:29:22 |
| 25 | and all the other information provided in the | 10:29:26 |

STEVEN P. FEINSTEIN, Ph.D. - 1/31/2017

Page 53

```
 1    speculation.                                        10:30:31
 2         A.   Potentially, but I have not done the      10:30:33
 3    analysis, so I can't tell you one way or the        10:30:35
 4    other.                                              10:30:37
 5         Q.   Okay.                                      10:30:38
 6         A.   It wasn't necessary for a market          10:30:38
 7    efficiency study.                                   10:30:40
 8         Q.   Okay.  And it's possible that inflation   10:30:42
 9    may have varied, in terms of its amount, during     10:30:44
10    the class period.  Correct?                         10:30:47
11         MR. ROSEN:  Objection.  Calls for              10:30:49
12    speculation.                                        10:30:50
13         A.   That is possible.  But we're talking      10:30:51
14    about the difference between a market price, as     10:30:53
15    observed, and a market price as it would have       10:30:56
16    been observed, had there been no alleged            10:30:57
17    misdeeds.                                           10:31:01
18         So this inflation ribbon applies to all        10:31:02
19    investors.  It's the same inflation ribbon you'd    10:31:04
20    apply to all investors, just picking different      10:31:07
21    points on the ribbon, depending on what their buy   10:31:11
22    and sell dates were.                                10:31:13
23         Q.   Okay.  So, again, I'm not asking you to   10:31:14
24    speculate.  We're just talking about the fact       10:31:17
25    that, as far as your analysis goes, you don't       10:31:19
```

STEVEN P. FEINSTEIN, Ph.D. - 1/31/2017

Page 60

```
 1          A.   I mean, there -- like I said, there are       10:39:43
 2     courses taught in stock valuation, and I               10:39:45
 3     described it in one sentence or two.                    10:39:48
 4          Q.   And then the next sentence says, "The         10:39:51
 5     inflation ribbon is often constructed by working       10:39:53
 6     chronologically backwards from the final               10:39:56
 7     corrective disclosure to the start of the class        10:39:59
 8     period."  And the sentence goes on.                     10:40:01
 9          So how would you actually try to do this,          10:40:06
10     starting with the final corrective disclosure and     10:40:11
11     working back through the class period?                  10:40:18
12          A.   Well, I'm not sure.                           10:40:20
13          MR. ROSEN:  Calls for speculation.                 10:40:21
14          A.   I'm not sure.  I haven't done it yet.         10:40:22
15     And there's more analysis that needs to be             10:40:24
16     undertaken in order to determine exactly how the       10:40:26
17     inflation ribbon would be constructed.                 10:40:28
18          But I wouldn't disregard that the stock           10:40:31
19     price fell a significant amount when there was a       10:40:33
20     corrective disclosure at the end.  That                10:40:36
21     corrective disclosure included the information         10:40:38
22     that plaintiffs are alleging should have been          10:40:39
23     disclosed earlier.                                      10:40:43
24          Q.   So you're -- you're testifying that          10:40:45
25     you -- you have an opinion that it could be done,      10:40:47
```

**Exhibit W**

**Page 432**

STEVEN P. FEINSTEIN, Ph.D. - 1/31/2017

Page 61

```
 1    but you don't really -- you aren't able to say        10:40:50
 2    how it would be done?                                  10:40:53
 3              MR. ROSEN:  Objection.                        10:40:54
 4         A.   No.  I know how it would be done.  I          10:40:54
 5    know what tools I would use.  I just don't know         10:40:56
 6    what the answer is that I would find.  I know           10:40:58
 7    what I would look at.                                   10:41:00
 8         I would look at the facts, the information,        10:41:02
 9    and try to value the stock, taking into account        10:41:04
10    everything that we know about the stock and how        10:41:07
11    it actually did behave, what would the value of        10:41:08
12    that stock have been on each day during the class      10:41:10
13    period under an alternative set of information.        10:41:14
14         And this is -- we know it's possible,             10:41:16
15    because valuation is a human endeavor.  It's what      10:41:18
16    a willing person is -- two willing parties agree       10:41:23
17    on as the price, given the information that they       10:41:26
18    have.  And we know that this is the valuation --       10:41:28
19    that valuation takes place in this way under           10:41:31
20    realistic and also hypothetical conditions by a        10:41:36
21    multitude of financial analysts every day in the       10:41:39
22    investments industry.  I would do what they do.        10:41:42
23         Q.   How would you use an event study?            10:41:44
24         A.   Well, the event study tells you -- an        10:41:47
25    event study is essentially controlled experiment.      10:41:49
```

**Exhibit W**

**Page 433**

Case 2:15-cv-05146-CAS-PJW   Document 122-25   Filed 02/24/17   Page 23 of 31   Page ID
#:4253
STEVEN P. FEINSTEIN, Ph.D. - 1/31/2017

Page 66

| | |
|---|---|
| 1 | Q.   Okay.  You don't have an opinion on | 10:48:25 |
| 2 | that now. | 10:48:26 |
| 3 | A.   Not yet.  But if I'm asked to be the | 10:48:27 |
| 4 | damage expert, I'll work one up.  I'll do that | 10:48:29 |
| 5 | research and analysis. | 10:48:32 |
| 6 | Q.   In fact, a disclosure that there is a | 10:48:33 |
| 7 | reassessment might still leave open the | 10:48:36 |
| 8 | possibility that ultimate tax liability is | 10:48:40 |
| 9 | neither more likely than not or maybe not even | 10:48:42 |
| 10 | more than remote? | 10:48:46 |
| 11 | A.   Well -- | 10:48:48 |
| 12 | Q.   Isn't that correct? | 10:48:49 |
| 13 | A.   Are you saying hypothetically that it's | 10:48:55 |
| 14 | possible that that's what the press release | 10:48:57 |
| 15 | conveyed or that's the information, that's the | 10:49:00 |
| 16 | understanding investors got from the press | 10:49:03 |
| 17 | release? | 10:49:04 |
| 18 | Q.   Yeah.  I'm trying to get your | 10:49:05 |
| 19 | understanding of this corrective disclosure. | 10:49:06 |
| 20 | Corrective disclosure says -- the alleged | 10:49:10 |
| 21 | corrective disclosure says that we're now being | 10:49:12 |
| 22 | reassessed X amount of taxes.  Correct? | 10:49:14 |
| 23 | A.   Yes.  I want to clarify one thing | 10:49:18 |
| 24 | before we go too far -- | 10:49:20 |
| 25 | Q.   Okay.  Fine. | 10:49:22 |

Exhibit W

Page 434

Case 2:15-cv-05146-CAS-PJW  Document 122-25  Filed 02/24/17  Page 24 of 31  Page ID
#:4254
STEVEN P. FEINSTEIN, Ph.D. - 1/31/2017

Page 80

| | | |
|---|---|---|
| 1 | healthcare financial analysts do every day, | 11:17:25 |
| 2 | thousands of them on hundreds of stocks. | 11:17:28 |
| 3 | I would do the same thing here. I would | 11:17:30 |
| 4 | apply -- I would apply the entire toolkit of | 11:17:32 |
| 5 | valuation tools to answer the question, what | 11:17:35 |
| 6 | would that stock -- what would Silver Wheaton's | 11:17:37 |
| 7 | stock have been worth on -- been worth, what | 11:17:41 |
| 8 | would it have traded at -- what is my estimate of | 11:17:42 |
| 9 | what it would have traded at in the marketplace | 11:17:44 |
| 10 | if there had been full disclosure on that day. | 11:17:46 |
| 11 | And I would use -- and I would -- I don't | 11:17:48 |
| 12 | know for sure until I study the facts more | 11:17:51 |
| 13 | carefully which of among the following tools I | 11:17:54 |
| 14 | would use. But I would consider discounted cash | 11:17:56 |
| 15 | flow analysis. I would consider valuation | 11:17:59 |
| 16 | multiples analysis. I would look at what various | 11:18:01 |
| 17 | models that equity analysts had published to see | 11:18:05 |
| 18 | what was most commonly used. And I would | 11:18:08 |
| 19 | certainly take into account the information | 11:18:11 |
| 20 | evident in the stock price drop at the end of the | 11:18:14 |
| 21 | class period. | 11:18:16 |
| 22 | Q. Now, okay. So basically you're | 11:18:17 |
| 23 | testifying that you can't really identify | 11:18:21 |
| 24 | specifically how you would determine the "but | 11:18:23 |
| 25 | for" price as you sit here today, but you will | 11:18:25 |

Case 2:15-cv-05146-CAS-PJW   Document 122-25   Filed 02/24/17   Page 25 of 31   Page ID
#:4255
STEVEN P. FEINSTEIN, Ph.D. - 1/31/2017

Page 81

| | | |
|---|---|---|
| 1 | figure that out later, if you are called upon to | 11:18:28 |
| 2 | do that? | 11:18:30 |
| 3 | A.   Well, I mean, you know, if you're | 11:18:32 |
| 4 | asking me to build a treehouse and ask me what | 11:18:33 |
| 5 | tools I would use to build the treehouse, I would | 11:18:36 |
| 6 | tell you, I haven't built the treehouse yet, but | 11:18:38 |
| 7 | I would bring a saw, I'd bring a hammer, I'd | 11:18:41 |
| 8 | bring some nails, I'd bring wood.  I don't know | 11:18:45 |
| 9 | exactly until I get further into the project what | 11:18:47 |
| 10 | the treehouse is going to look like and whether | 11:18:50 |
| 11 | I'm going to need a level and a plane as well. | 11:18:52 |
| 12 | But I know that I have it at my disposal and I | 11:18:54 |
| 13 | know that people build treehouses every day, so I | 11:18:57 |
| 14 | know I can do it. | 11:18:59 |
| 15 | Q.   So one thing you said was that you | 11:19:01 |
| 16 | would certainly take into account the information | 11:19:02 |
| 17 | evident in the stock price drop at the end of the | 11:19:06 |
| 18 | class period. | 11:19:09 |
| 19 | A.   Right. | 11:19:10 |
| 20 | Q.   How would you use that stock price drop | 11:19:11 |
| 21 | which related to the disclosure of an assessment | 11:19:16 |
| 22 | to try to construct the "but for" price on | 11:19:20 |
| 23 | April 1st, 2012? | 11:19:29 |
| 24 | A.   Well, I would -- I would make note of | 11:19:32 |
| 25 | the fact that I already know that it's a | 11:19:34 |

STEVEN P. FEINSTEIN, Ph.D. - 1/31/2017

Page 88

| | | |
|---|---|---|
| 1 | said, or maybe I should clarify. | 11:36:11 |
| 2 | Q.   Sure. | 11:36:13 |
| 3 | A.   I didn't say that I would necessarily | 11:36:17 |
| 4 | do a DCF on every single day -- a discounted cash | 11:36:20 |
| 5 | flow analysis for every single day in the class | 11:36:24 |
| 6 | period. | 11:36:27 |
| 7 | I said I would take into account discounted | 11:36:27 |
| 8 | cash flow analysis, in general, for assessing -- | 11:36:29 |
| 9 | for creating the "but for" price ribbon.  I would | 11:36:31 |
| 10 | also look at, if appropriate, when I dig into the | 11:36:35 |
| 11 | facts, other -- other fundamental valuation | 11:36:38 |
| 12 | tools, where appropriate.  And I would also | 11:36:43 |
| 13 | consider and use the event study results. | 11:36:48 |
| 14 | Q.   Now, the event study results, as I | 11:36:50 |
| 15 | understand your testimony, is the -- there's a | 11:36:52 |
| 16 | single event in your event study, which is the | 11:36:56 |
| 17 | final drop in stock on the last day of the class | 11:36:58 |
| 18 | period. | 11:37:01 |
| 19 | A.   Right.  I would take into account all | 11:37:02 |
| 20 | tools that apply in the profession to valuate | 11:37:04 |
| 21 | stock on an as-needed basis, which is fact | 11:37:10 |
| 22 | driven, to arrive at the "but for" price for each | 11:37:14 |
| 23 | day in the class period. | 11:37:17 |
| 24 | Q.   And -- | 11:37:18 |
| 25 | A.   It's not -- it doesn't necessarily mean | 11:37:19 |

Case 2:15-cv-05146-CAS-PJW  Document 122-25  Filed 02/24/17  Page 27 of 31  Page ID
#:4257
STEVEN P. FEINSTEIN, Ph.D. - 1/31/2017

Page 89

| | | |
|---|---|---|
| 1 | that I'm going to run a separate valuation for | 11:37:22 |
| 2 | each day, but I could if I had to. | 11:37:24 |
| 3 | Q.  And is it safe to assume that in a | 11:37:26 |
| 4 | class of stock that's -- a class relating to | 11:37:29 |
| 5 | stocks which is traded like Silver Wheaton that | 11:37:33 |
| 6 | you probably will have a purchaser on every day | 11:37:35 |
| 7 | of the class period? | 11:37:38 |
| 8 | A.  Sure.  And we have a market price, and | 11:37:40 |
| 9 | then what we need is an alternative "but for" | 11:37:42 |
| 10 | price. | 11:37:45 |
| 11 | Q.  And in order to establish that | 11:37:46 |
| 12 | alternative "but for" price, don't you need to do | 11:37:47 |
| 13 | an evaluation on every single day of the class | 11:37:52 |
| 14 | period? | 11:37:55 |
| 15 | A.  You need to assess what the value would | 11:37:56 |
| 16 | have been in the alternative "but for" world on | 11:37:58 |
| 17 | each day.  That's the standard way of doing 10b-5 | 11:38:00 |
| 18 | damages. | 11:38:03 |
| 19 | Q.  And isn't it the case that a standard | 11:38:03 |
| 20 | way is backcasting from the corrective | 11:38:06 |
| 21 | disclosure? | 11:38:09 |
| 22 | A.  Sometimes people backcast, and | 11:38:10 |
| 23 | sometimes it's appropriate.  And sometimes it's | 11:38:14 |
| 24 | not.  And if I determine that it's not, there are | 11:38:17 |
| 25 | other tools that are available. | 11:38:19 |

Exhibit W

Page 438

STEVEN P. FEINSTEIN, Ph.D. - 1/31/2017

Page 90

| | |
|---|---|
| 1       Q.   Is it appropriate in this case, in your | 11:38:21 |
| 2    view? | 11:38:22 |
| 3       A.   I'm not sure yet. | 11:38:23 |
| 4       Q.   What would you need to know to make -- | 11:38:27 |
| 5    to be sure about whether it's appropriate or not? | 11:38:29 |
| 6       A.   A little more fulsome development of | 11:38:33 |
| 7    the record about what the misrepresentations and | 11:38:35 |
| 8    omissions ultimately are determined to have been | 11:38:39 |
| 9    or if I have to do it on a hypothetical basis, | 11:38:47 |
| 10   then, you know, which ones to include. | 11:38:48 |
| 11      Essentially, just, you know, sitting down | 11:38:57 |
| 12   with the -- with the data and the tools and doing | 11:38:58 |
| 13   the valuation and seeing how it turns out, | 11:39:00 |
| 14   seeing -- seeing what tools are most appropriate | 11:39:03 |
| 15   for the job.  But I can -- I'm confident that | 11:39:08 |
| 16   valuation of this stock in an alternative -- with | 11:39:13 |
| 17   an alternative set of facts is possible, just as | 11:39:16 |
| 18   people value other stocks every day with | 11:39:19 |
| 19   alternative sets of facts. | 11:39:21 |
| 20      Q.   Can you give me a better sense of how | 11:39:34 |
| 21   often you've done an analysis of damages | 11:39:35 |
| 22   yourself, using other than a backcasting | 11:39:39 |
| 23   technique? | 11:39:42 |
| 24      A.   I've used backcasting, but I usually | 11:39:44 |
| 25   accompany backcasting with other valuation tools | 11:39:47 |

Exhibit W
Page 439

STEVEN P. FEINSTEIN, Ph.D. - 1/31/2017

Page 91

| | | |
|---|---|---|
| 1 | and models.  And as I sit here now, I couldn't | 11:39:49 |
| 2 | tell you which and how often. | 11:39:51 |
| 3 | Q.   And as you sit here now, you can't say | 11:39:53 |
| 4 | that the typical backcasting method is or is not | 11:39:55 |
| 5 | applicable in this case? | 11:39:58 |
| 6 | A.   To the extent -- I mean, I'm quite | 11:40:04 |
| 7 | confident that there's information in that event | 11:40:09 |
| 8 | and the stock price reaction to that event, and I | 11:40:14 |
| 9 | would use that somehow. | 11:40:16 |
| 10 | Financial theory, as well as the literature, | 11:40:20 |
| 11 | the literature on empirical finance, has accepted | 11:40:26 |
| 12 | as an acceptable methodology the proposition | 11:40:32 |
| 13 | that -- that investors, on average, are correct | 11:40:41 |
| 14 | in their assessments. | 11:40:45 |
| 15 | Investors don't systematically, in an | 11:40:48 |
| 16 | efficient market, get valuation wrong.  And so we | 11:40:50 |
| 17 | can derive some information about what the "but | 11:40:56 |
| 18 | for" price would have been by looking at what the | 11:40:58 |
| 19 | price ultimately turned out to be.  And that's | 11:41:01 |
| 20 | essentially the theoretical foundation of | 11:41:03 |
| 21 | backcasting. | 11:41:06 |
| 22 | There's a distribution not only around the | 11:41:08 |
| 23 | various probabilities that could be assigned to a | 11:41:14 |
| 24 | tax levy or a finding of the CRA or that | 11:41:18 |
| 25 | there's -- that there's liability, but there's | 11:41:22 |

Exhibit W

Page 440

STEVEN P. FEINSTEIN, Ph.D. - 1/31/2017

Page 92

```
 1     also a distribution around the magnitude of the        11:41:24

 2     assessment.                                             11:41:26

 3         I would have to do additional analysis to          11:41:28

 4     see what -- maybe what I would have predicted the       11:41:30

 5     magnitude of the assessment to be and what I            11:41:34

 6     believe, based on what they said analysts and           11:41:36

 7     investors thought that distribution to be.              11:41:39

 8         And it's that analysis that would inform me         11:41:43

 9     as to whether or not the final drop is a good           11:41:45

10     indicator of the inflation earlier in the class        11:41:50

11     period or whether the -- whether it overstates         11:41:52

12     the inflation or understates the inflation.  But       11:41:57

13     that's the analysis I would do.                        11:41:59

14         I would need to get a sense of the                 11:42:00

15     distribution around what ultimately turned out to      11:42:02

16     be the case in the estimation of analysts.             11:42:05

17             MR. KAPLAN:  Okay.  No further                 11:42:15

18     questions.                                              11:42:16

19             MR. ROSEN:  Give me one second.  Can I         11:42:22

20     speak to you outside?                                   11:42:28

21             THE VIDEOGRAPHER:  It is 11:42 a.m.            11:42:33

22     We're going off the record on Tape No. 2 [sic].        11:42:34

23             (A recess was taken.)                          11:42:38

24             THE VIDEOGRAPHER:  It is 11:43 a.m.            11:43:47

25     We're back on the record on Tape No. 2.                11:43:48
```

**Exhibit W**

**Page 441**

94

```
 1                C E R T I F I C A T E

 2      COMMONWEALTH OF MASSACHUSETTS

 3      SUFFOLK, SS.

 4              I, Janet M. Sambataro, a Registered

 5      Merit Reporter and a Notary Public within and for

 6      the Commonwealth of Massachusetts do hereby

 7      certify:

 8              THAT STEVEN P. FEINSTEIN, PH.D., the

 9      witness whose testimony is hereinbefore set

10      forth, was duly sworn by me and that such

11      testimony is a true and accurate record of my

12      stenotype notes taken in the foregoing matter, to

13      the best of my knowledge, skill and ability; that

14      review was not requested.

15              I further certify that I am not related

16      to any parties to this action by blood or

17      marriage; and that I am in no way interested in

18      the outcome of this matter.

19              IN WITNESS WHEREOF, I have hereunto set

20      my hand this 8th day of February, 2017.

21
                                    Janet M. Sambataro
22                                  _____

23                                  JANET M. SAMBATARO
                                    Notary Public

24      My Commission Expires:

25      July 16, 2021
```

**Exhibit W**

**Page 442**