# EXHIBIT X

**REPORT OF**
**ALLAN W. KLEIDON, Ph.D.**

**In re Silver Wheaton Corp.**
**Securities Litigation**

**February 10, 2017**

**Exhibit X**
**Page 443**

# Table of Contents

I.      Qualifications ....................................................................................................... 1

II.     Assignment ........................................................................................................... 1

III.    Summary of Background and Allegations ............................................................ 2

     A.      Background on Silver Wheaton and CRA Reassessment ....................................... 2

     B.      Summary of Allegations ...................................................................... 3

IV.     Summary of Opinions ......................................................................................... 6

V.      Analysis ............................................................................................................... 7

     A.      Plaintiffs' Theories Concerning Reliance and Damages Require Individualized Inquiry ............................................................................................................ 7

          1.      Reliance Cannot Be Established on a Class-Wide Basis, Absent Individualized Inquiry ............................................................................ 8

          2.      Plaintiffs Do Not Provide a Common Class-Wide Damages Measure, Absent Individualized Inquiry, That Comports With Their Liability and Damages Theories ................................................................................. 10

     B.      Feinstein's Proposed Methodology Cannot Establish a Class-Wide Non-Arbitrary Damages Calculation That Comports with Plaintiffs' Liability Theories ............ 13

          1.      The Proposed Damages Methodology in the Feinstein Report Does Not Comport with Plaintiffs' Liability Theories ............................................. 16

          2.      The New "Valuation" Damages Methodology Feinstein Proposed in His Deposition Is a Tautology Without Economic Content ............................ 24

**Exhibit X**

**Page 444**

## I.      Qualifications

1.      I am a Senior Vice President at Cornerstone Research, a financial and economic consulting firm, and an Honorary Professor in the School of Business at the University of Queensland in Australia.  Prior to joining Cornerstone Research, I was an Associate Professor of Finance at the Graduate School of Business, Stanford University, and I have taught in the Graduate School of Business and the School of Law at Stanford since joining Cornerstone Research.  I have also taught at the Haas School of Business at the University of California, Berkeley, and the University of Chicago, Graduate School of Business.  I received my doctorate in 1983 from the University of Chicago and my Master of Business Administration degree from that institution in 1981.  My academic work has been in the fields of econometrics (the application of statistical methods within an economic framework), security prices and markets, corporate finance, and management of financial institutions.  I have published numerous articles on economic and financial topics.  A copy of my curriculum vitae and a list of prior testimony over the past four years are attached hereto as Exhibit 1.

## II.     Assignment

2.      I have been asked by counsel for Silver Wheaton Corporation ("Silver Wheaton" or the "Company") to review and analyze issues raised in Plaintiffs' Consolidated Amended Class Action Complaint dated December 18, 2015 ("Complaint") and Motion for Class Certification filed November 1, 2016 ("Motion").  I have also been asked to evaluate issues with respect to class-wide damages raised in the Report on Market Efficiency of Professor Steven P.

Feinstein, Ph. D., CFA, dated November 1, 2016 ("Feinstein" or "Feinstein Report"), filed on behalf of Plaintiffs, and in Feinstein's deposition in this matter ("Feinstein Deposition").

3.      A list of the documents I have relied upon in forming my opinions is attached hereto as Exhibit 2.  Cornerstone Research is being compensated for my work in this matter at my hourly rate, which currently is $990.  My compensation is not affected by the outcome of this matter.

## III.    Summary of Background and Allegations

### A.    Background on Silver Wheaton and CRA Reassessment

4.      Silver Wheaton is a precious metals streaming company, with agreements to purchase silver and gold from mines around the world.[1]  Between 2005 and 2010, Silver Wheaton derived its operating profits primarily from subsidiaries in the Cayman Islands, such that its profits were subject to a minimal amount of income taxes.[2]  Silver Wheaton stock is listed on the New York Stock Exchange ("NYSE") and on the Toronto Stock Exchange ("TSX"), and trades under the symbol SLW (Silver Wheaton 2015 Annual Report, p. 15).

5.      On July 6, 2015, after the market closed, Silver Wheaton issued a press release announcing it had received a letter from the Canada Revenue Agency ("CRA") in which the CRA proposed to reassess Silver Wheaton's income taxes for the 2005 to 2010 taxation years.[3]  Although the reassessment proposal did not require Silver Wheaton to pay any amount

---

[1] "Company Profile," Silver Wheaton, available at: http://web.archive.org/web/20150401065128/http://www.silverwheaton.com/company/company-profile/default.aspx

[2] Silver Wheaton Corp. 2005 Annual Report, p. 11, Silver Wheaton Corp. 2006 Annual Report, p. 12, Silver Wheaton Corp. 2007 Annual Report, p. 19, Silver Wheaton Corp. 2008 Annual Report, p. 26, Silver Wheaton Corp. 2009 Annual Report, p. 35, and Silver Wheaton Corp. 2010 Annual Report, p. 35.

[3] Silver Wheaton Press Release, "Silver Wheaton Remains Confident in Business Structure Following Receipt of CRA Proposal Letter," July 6, 2015 ("July 6 Press Release"), and "Silver Wheaton Remains Confident in Business Structure Following Receipt of CRA Proposal Letter," *Bloomberg English CNS*, July 6, 2015, 11:50 PM.

immediately, Silver Wheaton would be required to pay 50% of the reassessed amount of tax,

interest and penalties should Silver Wheaton receive a notice of reassessment from the CRA

based upon the proposal and the remainder if the Company was unsuccessful in challenging the

reassessment (July 6 Press Release).

### B.   Summary of Allegations

6.      Plaintiffs allege that the financial statements Silver Wheaton filed with the SEC

during a period from March 30, 2011 to July 6, 2015 (the "putative class period") (Complaint,

¶ 1) were false and misleading for two different reasons, which rely on very different

probabilities of a reassessment by the CRA.

7.      First, Plaintiffs allege that the probability of a reassessment by the CRA was

"more likely than not" throughout the entire putative class period, and that Silver Wheaton

should have recorded a tax position liability in its balance sheets for fiscal years 2009 through

2014 to (Complaint, ¶¶ 140, 151, 158, 165, 172).[4]  Specifically, for example, the Complaint

states (¶¶ 140, 141):

> The balance sheets for 2009 and 2010 were false and misleading for omitting to
> include a then present tax position liability of $207 million (consisting of $150
> million of unpaid income tax and $57 million of mandatory penalties, but not
> including interest), which arose by SW's [Silver Wheaton's] violating the CRA
> Transfer Pricing Rules to avoid paying Canadian corporate income tax on $567
> million of income by unlawfully shifting SW's income to its subsidiary, SW
> Caymans for which no income tax is payable in the Cayman Islands.
>
> Under then operative U.S. GAAP, ASC 740, SW was required to recognize and
> record a tax position liability of $207 million if it was more likely than not that its
> transfer pricing tax position with respect to SW's transactions with SW Cayman,
> specifically SW's provision of property, services, advantages, and other rights to

---

[4] The Complaint defines "more likely than not" as "51% or higher likelihood" (Complaint, ¶ 130).

SW, did not conform to CRA Transfer Pricing Rules and would therefore result in the assessment of additional taxes.

Similarly, the Complaint states that, if Silver Wheaton was subject to a tax audit by the CRA, then a subsequent reassessment by the CRA was "clearly more likely than not, and indeed nearly certain" (Complaint, ¶ 115).

8.      This allegation implies that, according to Plaintiffs, on the first day of the putative class period, March 30, 2011, when Silver Wheaton filed its Form 40-F with the SEC for fiscal year 2010, the probability of a CRA reassessment was "more likely than not," and the Company allegedly should have changed its financial statements, which would have revealed this information.

9.      Second, Plaintiffs allege that even if the probability of a reassessment by the CRA was not "more likely than not," Silver Wheaton should have disclosed a potential tax position liability in the footnotes to its financial statements if the probability of a reassessment was "not 'remote'" (Complaint, ¶ 132).  Specifically, for example, the Complaint states (¶¶ 132, 152, 153):

> Even if SW truly was not required to recognize and record an uncertain tax position liability as detailed above (and it was), IFRS [International Financial Reporting Standards] 12 and IFRS 37¶86, still mandated that SW disclose in the notes to its financial statements the existence of the uncertain tax position liability resulting from its dealings with SW Cayman because the chance of being assessed the income tax was not "remote". Under 37 ¶86, SW was therefore required to disclose (a) an estimate of the dollar amount of the uncertain tax position liability, (b) an indication of the uncertainties relating to the amount or timing of any outflow; and (c) the possibility of any reimbursement.

> Under IFRS 12 and 37, SW was required to recognize and record a tax position liability of $207 million if it was more likely than not that its transfer pricing tax position with respect to SW's transactions with SW Cayman, specifically SW's provision of property, services, advantages, and other rights to SW, did not

conform to CRA Transfer Pricing Rules and would therefore result in the assessment of additional taxes.

In the alternative, if the tax position liability was not properly considered to be "more likely than not" under IFRS 12 and 37, and recording a tax position liability was not required (and it was required), SW was still obligated to disclose in the footnotes to its 2011 40-F financial statements the existence of a contingent tax position liability in the amount of approximately $207 million for unpaid income tax and penalties. SW did not include any disclosure of the $207 million contingent tax position liability and therefore its financial statements violated IFRS 12 and 37 and were false and misleading.

10.     Plaintiffs' second allegation implies that the probability of a reassessment on the first day of the putative class period is only "not 'remote,'" rather than "more likely than not," and the Company allegedly should have changed its financial statements, which would have revealed this information.[5]

11.     Thus, Plaintiffs have alternative liability theories concerning what the Company should have disclosed during the putative class period, corresponding to different probabilities of being assessed additional taxes.  Plaintiffs also make alternative claims concerning whether or not putative class members relied upon the integrity of the market, and concerning the class members' investment decisions had they known the alleged truth.  The Complaint (¶ 239) states that putative class members relied "on the materially false and misleading statements…which the Defendants made," *or* "upon the integrity of the market."  Further, the Complaint states that, had the alleged truth been known, class members either: (1) would not have purchased Silver Wheaton shares, or (2) would have purchased the shares, but at lower prices.  Specifically, the Complaint states (¶ 239):

---

[5] Plaintiffs also allege that the Company should have disclosed on March 30, 2011 the existence of the CRA audit of Silver Wheaton's transfer pricing transactions with its Cayman Islands subsidiary (Complaint, ¶ 142).

During the Class Period, SW securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of SW securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.

## IV.    Summary of Opinions

12.    Below is a brief summary of my preliminary findings in this matter.  The bases for each finding are detailed in the sections that follow.  My work in this matter is ongoing, and I reserve the right to supplement my current analysis if additional information becomes available.

- The Complaint does not claim that all members of the putative class relied on the integrity of the market in their decisions to purchase Silver Wheaton stock. Deposition testimony of named plaintiffs state that they would not have purchased Silver Wheaton stock had they known the alleged truth, regardless of the stock price. Therefore, Feinstein's conclusion that Silver Wheaton stock traded in an efficient market does not establish reliance for all members of the putative class, absent individualized inquiry.

- The Complaint explicitly alleges two sub-classes of putative class members, namely those that would not have invested in Silver Wheaton stock at all had they known the alleged truth, and those that would have invested at a lower price.  Given the differences across the two sub-classes in their reliance upon the integrity of the market price and the ensuing implications for damages, it is crucial to be able to identify and separate the sub-classes.  Plaintiffs and Feinstein provide no mechanism to identify to which sub-class each member of the putative class belongs.  Such identification inherently requires individualized inquiry concerning each individual's risk tolerance and investment strategy.

- Given the differences across the two sub-classes in their reliance and damages, the "back-casting" methodology proposed in the Feinstein Report cannot calculate class-wide damages for all members of the putative class.

- For the unidentified sub-class that relied on the integrity of the market and would have purchased Silver Wheaton shares at lower prices had they known the alleged truth, the "back-casting" methodology proposed in the Feinstein Report does not comport with Plaintiffs' alternative liability theories.

- The "valuation" damages methodology Feinstein proposed at his deposition amounts to using various valuation models to calculate the but-for price absent the alleged misrepresentations, and hence calculating damages as the difference between the actual price and the but-for price.

- Feinstein's "valuation" damages methodology is simply a tautology without economic content given the definition of inflation and damages.  Feinstein does not provide any indication as to what assumptions and inputs would be required in his "valuation" methodology given the specifics concerning the allegations, the company, and the security at issue, or how his "valuation" methodology would produce a sound calculation of class-wide damages that are consistent with the specific case facts and liability theories.

## V.       Analysis

### A.       Plaintiffs' Theories Concerning Reliance and Damages Require Individualized Inquiry

13.      As part of Plaintiffs' damages theory, Plaintiffs claim that "[h]ad Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid" (Complaint, ¶ 239).  Thus, according to Plaintiffs, there are two sub-classes under the putative class in this matter:  Sub-Class A consists of investors who would not have bought Silver Wheaton shares had they known the alleged truth, and Sub-Class B consists of investors who would have bought Silver Wheaton shares, but presumably at lower prices that reflected the alleged truth.  Further, as noted in ¶ 11 above, the Complaint (¶ 239) does not claim that all members of the putative class relied upon the integrity of the market.  Plaintiffs' claims raise individualized issues concerning both reliance and the appropriate measure of damages, discussed in turn.

### 1.   Reliance Cannot Be Established on a Class-Wide Basis, Absent Individualized Inquiry

14.   The Feinstein Report (¶ 17) concludes that the market for shares of Silver Wheaton stock was efficient.  However, the Complaint does not claim that all members of the putative class relied on the integrity of the market.  The Complaint states that putative class members purchased Silver Wheaton shares "relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, *or* relying upon the integrity of the market" (Complaint, ¶ 239, emphasis added).  This is consistent with Plaintiffs' claims regarding the differing purchase decisions of putative class members.  Plaintiffs claim some putative class members (members of Sub-Class B) would have purchased at a reduced price had they known the alleged truth concerning the risk of tax reassessment.  Plaintiffs also claim that some putative class members (members of Sub-Class A) would not have purchased at all had they known the alleged truth concerning the risk of tax reassessment.  For Sub-Class A putative class members, those who would not have bought at all, their investment decisions as described in the Complaint were not in reliance on the integrity of the market price, but rather on their individual preferences concerning reassessment risk.

15.   This is exactly the same situation as discussed in the Fifth Circuit Court of Appeals decision in *Ludlow v. BP, PLC*, 800 F.3d 674 (5th Cir. 2015) ("*BP II*").  There, the court pointed to putative class members who would have sold had they known the alleged true risk concerning the Deepwater Horizon oil spill, and stated (*BP II*, p. 691, emphasis in original):

> …But plaintiffs' own model asserts that they relied on something other than price: risk.  By claiming that class members may have divested themselves of BP stock if they had known about the true risk of an accident in the Gulf—as distinguished from that risk's impact on BP's stock *price*—the plaintiffs are arguing that their investment decisions were based substantially upon factors other than price.  The

plaintiff's argument thus undercuts one of the rationales for the *Basic* presumption of reliance.

16.     The discussion in *BP II* concerns putative class members who would have sold had they known the alleged true risk.  This is economically equivalent to distinguishing between putative class members in the current matter who would not have purchased had they known the alleged actual risk of tax reassessment, irrespective of price, versus those who would have bought but allegedly at a different price.  This is not an academic issue, since the Complaint specifically states that there are two different categories of putative class members, whose actions depend on their attitude to this risk.  Further, the deposition testimony of named plaintiffs confirms the differences across putative class members in their investment decisions had they known the alleged truth concerning the risk of tax reassessment.

17.     For example, Joe Elek, Lead Plaintiff in this matter, testified that he would have bought Silver Wheaton stock but allegedly at a lower price.  Specifically, Joe Elek testified that he would have bought Silver Wheaton stock even if it had disclosed the risk of a reassessment, "but not 50 cents or $2 lower price but maybe $5 lower price because of all the unknowns" (Deposition of Joe Elek dated January 19, 2017, 114:18–115:23).  Similarly, Thomas Bartsch, a named plaintiff, testified that he would, and in fact did, purchase Silver Wheaton stock knowing it would be reassessed, albeit at a lower price (Deposition of Thomas Bartsch dated January 10, 2017, 91:21–92:2). Therefore, Joe Elek's and Thomas Bartsch's descriptions of their purchasing decisions indicate that they would be members of Sub-Class B.

18.     In contrast, Diana Choi and Jedrzej Borowczyk, both named plaintiffs in this matter, testified that they would not have purchased Silver Wheaton stock had they known the Company faced a risk of having its taxes reassessed by the CRA (Deposition of Diana Choi

dated January 24, 2017, 76:19–77:22; Deposition of Jedrzej Borowczyk dated January 26, 2017, 109:20–110:3). Therefore, Diana Choi's and Jedrzej Borowczyk's descriptions of their purchasing decisions indicate that they would be members of Sub-Class A.

19.     Given the differences across the two sub-classes in their reliance upon the integrity of the market price as opposed to the amount of risk, Feinstein's conclusion that Silver Wheaton stock traded in an efficient market does not establish reliance for all members of the putative class, absent individualized inquiry. While the Complaint recognizes that some putative class members did not rely on the integrity of the market, Plaintiffs and Feinstein propose no mechanism to identify which members of the putative class did or did not make investment decisions based on the risk of tax reassessment. In other words, Plaintiffs and Feinstein propose no uniform method of distinguishing between members of Sub-Class A and Sub-Class B. Indeed they cannot, because such identification inherently requires knowledge of each individual's risk tolerance as well as investment strategy, which by their nature are individualized inquiries.

### 2.     Plaintiffs Do Not Provide a Common Class-Wide Damages Measure, Absent Individualized Inquiry, That Comports With Their Liability and Damages Theories

20.     Given the different potential investment decisions of putative class members in a but-for world in which the alleged truth had been disclosed, where one sub-class would not have purchased or held irrespective of price because of their attitude to a risk, the court in *BP II* stated that approaches to measuring damages also differ between the two sub-classes. The court in *BP II* discussed this specific issue in the context of evaluating whether plaintiffs had put forward a damages model based on their liability theory that is "'susceptible of measurement across the

entire class for purposes of Rule 23(b)(3),' as required by *Comcast*" (*BP II*, p. 690).

Specifically, the court states (*BP II*, p. 690, internal references omitted, emphasis added):

> Consider the following scenario: The true risk of a major spill was 2%, but BP's statements had improperly represented the risk as 0.5%. Further imagine two different plaintiff-investors. The first is a low-risk pension fund, whose investment policy forbids investing in companies for whom the risk of a catastrophic event is greater than 1%. The second is a high-risk fund whose risk threshold is higher than 2%. Both plaintiffs invested in BP based on BP's statements representing the risk as 0.5%. In this hypothetical, BP's misstatements caused the low risk pension fund to make an investment forbidden under its policy. It would not have bought BP stock at all had it known the true risk of a catastrophe. This is the type of plaintiff the materialization-of-the-risk theory is designed to compensate. By contrast, the high-risk fund still might have purchased the stock, even had it known the "true" risk, though presumably at a lower price that accounted for the increased risk. For the second type of plaintiff, full materialization-of-the-risk damages would prove a windfall.

> The loss causation element requires a clear causal link between the misrepresentation and the economic loss, ensuring in a Rule 10b-5 case ensures that investors are protected only "against those economic losses that misrepresentations actually cause." The securities laws do not provide "broad insurance against market losses." *For the first plaintiff*, who would not have purchased the stock absent the misrepresented risk, the decline in the stock's value when the risk actually materialized may well be causally linked to the misrepresentation, in which case that *full stock price decline following the materialization of the catastrophic event could constitute a valid economic loss. The second plaintiff*, by contrast, might have purchased the stock even assuming the true risk. Although she *would be entitled to damages based on the inflated price* she paid, she *cannot be compensated for the materialization of a risk she may have been willing to take.*

21.     As discussed in Section V.B.1 below, the methodology proposed in the Feinstein Report measures per-share damages as Silver Wheaton's stock price decline upon the announcement that the CRA proposed to reassess Silver Wheaton's taxes (after controlling for potential confounding information) (Feinstein Report, ¶ 177). As discussed by the *BP II* court, this measure might be appropriate to compensate investors in Sub-Class A who allegedly would not have bought Silver Wheaton stock at all had they known that the risk of a reassessment was

either "more likely than not" or "not 'remote'" (corresponding to Plaintiffs' two different liability theories).   However, this measure overcompensates investors in Sub-Class B because they would have bought Silver Wheaton stock at lower prices had they known that the risk of a reassessment was either "more likely than not" or "not 'remote,'" but the allegedly lower prices would not correspond to the certainty of a reassessment.[6]  Thus, the proper damages measure for these investors should be the difference between their purchase prices and the prices that would have prevailed had the alleged truth been known, that is, depending on Plaintiffs' different liability theory, the probability that a reassessment was either "more likely than not" or "not 'remote.'" However, the entire price decline following the reassessment announcement proposed under the damages methodology in the Feinstein Report measures the price decline when the reassessment was certain, which will overstate the "inflation" that would result if the market were to assess the probability as either "more likely than not" or "not 'remote,'" but not 100% certain.  Thus, in effect, the methodology in the Feinstein Report compensates investors in Sub-Class B for the occurrence of the reassessment, even though this was a risk that these investors ostensibly were willing to take.

22.     Given the differences in these damages measures across the two sub-classes, it is crucial to be able to identify and separate the sub-classes.  Plaintiffs and Feinstein provide no mechanism to identify to which sub-class each member of the putative class belongs.  Nor could they, because such identification inherently requires knowledge of each individual's risk tolerance as well as investment strategy, which by their nature are individualized inquiries.  Given the inability to distinguish the two sub-classes without individualized inquiry, Plaintiffs

---

[6] I understand that the Silver Wheaton press release on July 6, 2015, which Plaintiffs allege is the corrective disclosure ending the putative class period, announces a reassessment proposal, rather than an actual reassessment or the realization of a tax liability.  While the analyses in this report assume that the July 6, 2015 announcement represents a 100% certainty of a reassessment by the CRA, similar logic and arguments hold even if this certainty assumption is changed.

and Feinstein cannot provide a common class-wide damages measure, absent individualized

inquiry, that comports with their liability and damages theories.

> **B.**   **Feinstein's Proposed Methodology Cannot Establish a Class-Wide Non-Arbitrary Damages Calculation That Comports with Plaintiffs' Liability Theories**

23.     In this matter, Feinstein states that he was asked "to opine on whether per share

out-of-pocket damages could be measured for each Class member under Section 10(b) of the

Exchange Act using a common methodology for all Class members" (Feinstein Report, ¶ 174),

although he has not calculated damages because he has not conducted a loss causation analysis.

However, Feinstein does not provide a class-wide damages methodology that is tied to the facts

in this particular matter, or that comports with the particular liability theories that Plaintiffs

propose in this matter.  As discussed in Section V.A above, the Complaint explicitly

differentiates between putative class members as to whether they relied on the integrity of the

market and as to whether or not they would have bought shares of Silver Wheaton if the alleged

relevant truth had been disclosed.  It is crucial to address the particular claims in this case in

order to demonstrate that a common methodology of damages applies to all putative class

members.

24.     Feinstein does not examine the liability assumptions in this matter, as laid out in

Section III.B above, and does not demonstrate that his proposed methodology is consistent with

those liability assumptions.  He does not address whether his proposed damages methodology is

the right measure of damages for Sub-Class A that would not have purchased Silver Wheaton

shares had they known the alleged truth.  Instead, the Feinstein Report describes briefly a general

methodology without reference to the facts and Plaintiffs' theories in this case, and asserts that

this methodology "allows the calculation of individual and class-wide damages stemming from

various alleged misrepresentations and omissions and therefore will accommodate alternative potential determinations of liability" (Feinstein Report, ¶ 176).

25.     Out-of-pocket damages are typically defined as "the difference between the price paid and the 'real' value of the security, *i.e.,* the fair market value absent the misrepresentations [the 'but-for price'], at the time of the initial purchase by the defrauded buyer" (*Huddleston v. Herman & MacLean*, 640 F.2d 534, 556 (5th Cir. 1981)).  The difference between the actual price and the "real" value is often referred to as inflation, but this is a definition of inflation, not a methodology for calculating inflation.  I understand that the Supreme Court in *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) ("*Comcast*"), emphasized that Rule 23(b)(3) requires plaintiffs to "establish[] that damages are capable of measurement on a classwide basis" (*Comcast*, p. 1433), which requires plaintiffs to put forward a damages methodology that is both "sound" and "produce[s] a commonality of damages" (*Comcast*, p. 1434).

26.     Thus, if someone were to say, "My class-wide methodology for calculating inflation is to calculate the 'real' value absent the misrepresentations and subtract that 'real' value from the actual stock price," this is simply a tautology until the methodology proposed to calculate the "real" value is specified.  Such a tautology provides no economic content, and in particular does not comprise a demonstration of a sound damages methodology that produces a commonality of damages across all members of the putative class.  In effect, the devil is in the details of the proposed methodology to calculate inflation and damages.

27.     In the current matter, as discussed in Section V.B.1 below, the Feinstein Report does identify a general methodology for calculating inflation that is more than a tautology, namely a "back-casting" methodology that measures inflation throughout the putative class period as the price decline on July 7, 2015 (after accounting for market and industry effects, and

possible confounding information).  However, Feinstein's general "back-casting" methodology is not tied to Plaintiffs' liability theories and demonstrably does not measure damages correctly for Sub-Class B investors who would have purchased Silver Wheaton stock at lower prices absent the alleged misrepresentations.  It might measure damages for Sub-Class A of investors who would not have purchased Silver Wheaton stock absent the alleged misrepresentations, as discussed in *BP II*.  However, there is no way to know which members of the putative class fall into which sub-class, absent individualized inquiry.

28.     As discussed in Section V.B.2 below, Feinstein's deposition testimony also discussed proposed methodologies for calculating damages in this matter.  Feinstein's deposition testimony introduced a different methodology from that proposed in his Report, namely using various valuation models to calculate the "fair" value absent the alleged misrepresentations, and hence calculate damages (Feinstein's "valuation" methodology).  Feinstein testified that, depending on the particular circumstances of this case, a damages calculation using his proposed "valuation" methodology might or might not use the price decline on July 7, 2015.

29.     However, the "valuation" damages methodology proposed in Feinstein's deposition testimony is simply a tautology without economic content, since his proposed "methodology" is simply to calculate fair value using an appropriate valuation model and appropriate valuation tools, whatever they might happen to be.  Because the "fair value" in the but-for world of no alleged misrepresentations is hypothetical and hence unobservable, its estimation necessarily involves some valuation model and tools.  A statement that out-of-pocket damages or inflation can be estimated by using valuation models and tools to calculate the but-for price is simply repeating the definition of out-of-pocket damages.  The specifics concerning the allegations, the company, and the security at issue will determine whether a particular

valuation analysis will produce a sound calculation of class-wide damages that are consistent

with the specific case facts and liability theories, which I understand is required from Plaintiffs.

However, Feinstein's deposition testimony demonstrates that he does not know which specific

valuation tools would be appropriate to measure damages in this matter, let alone what

assumptions should be made in a particular valuation model given the specific allegations in this

case.  Feinstein simply states that his "valuation" methodology will be based on an appropriate

valuation methodology, using whichever valuation tools are appropriate.  This claim has no

economic content.

30.     The upshot is that Feinstein points to two general methodologies for assessing

damages in this matter.  The first "back-casting" methodology is defined with sufficient

specificity that it could be implemented by a financial economist, but it is not tied to Plaintiffs'

liability assumptions in this matter and does not address the complications arising from

Plaintiffs' specification of two different sub-classes of putative class members.  Feinstein's

second damages methodology, his "valuation" methodology, is nothing more than the statement

that appropriate valuation models and tools will be used to calculate the fair value absent the

alleged misrepresentations, which is simply a tautology given the definition of inflation and

damages.

### 1.     The Proposed Damages Methodology in the Feinstein Report Does Not Comport with Plaintiffs' Liability Theories

31.     Feinstein states that damages in this matter can be measured as follows (Feinstein

Report, ¶ 177, emphasis added):

> i.   First, valuation tools, which would include event study analysis
>      such as that described herein, and potentially other empirical

analyses if necessary, would be used to establish that the disclosure(s) correcting the alleged misrepresentations and omissions, caused the price of Silver Wheaton common stock to fall. *This analysis, after controlling for potentially confounding non-fraud-related information, would determine if the alleged misrepresentations and omissions had caused the stock price to be artificially inflated, and that the corrective disclosures caused the inflation to dissipate, in turn causing investor losses*. This analysis would be used to measure the effect of a disclosure(s) on the Company's stock and would apply on a class-wide basis.

ii.  *Second, an inflation ribbon would be constructed*, indicating how much artificial inflation caused by the alleged misrepresentations and omissions was in the price of Silver Wheaton common stock *on each day during the Class Period*. An inflation ribbon is a time series of the difference between the actual stock price observed in the marketplace, and the estimated price that the stock would have traded at each day had there been full disclosure from the outset of the Class Period. Construction of the inflation ribbon generally employs event study analysis, combined with widely used and generally accepted valuation tools and models. *The inflation ribbon is often constructed by working chronologically backwards from the final corrective disclosure to the start of the Class Period, accounting for the alleged fraud-related residual price declines as they occurred. Inflation prior to a corrective disclosure that dissipated inflation is greater than the inflation afterward by the amount of inflation that dissipated*. Should it be determined that a disclosure(s) is not corrective, the methodology described herein can accommodate such a change and adjust per share damages accordingly. This analysis would also apply on a class-wide basis.

32.     In a nutshell, the general methodology Feinstein describes in his report is a "back-casting" approach, under which per-share damages throughout the putative class period are measured as Silver Wheaton's stock price decline upon the announcement that the CRA proposed to reassess Silver Wheaton's taxes (after controlling for potential confounding information).  In particular, Feinstein's description of how the inflation ribbon "is often constructed" (which is the only place in which Feinstein lays out a specific proposal for how damages might actually be calculated) is sufficiently clear that it could be applied to the facts of

this case in which Plaintiffs allege only one corrective disclosure, i.e., the one ending the putative class period on July 6, 2015.

33.    First, Feinstein proposes to measure the amount by which the alleged corrective disclosure after close of trading on July 6, 2015 caused inflation to dissipate when the price fell on July 7, 2015 (accounting for potentially confounding information).  Second, Feinstein takes the inflation decline on July 7, 2015 as the measure of inflation on every day in the putative class period prior to this alleged corrective disclosure, on the principle that "[i]nflation prior to a corrective disclosure that dissipated inflation is greater than the inflation afterward by the amount of inflation that dissipated" (Feinstein Report, ¶ 177).  Since there is only one alleged corrective disclosure under this scenario, and since inflation is zero after that corrective disclosure, Feinstein's proposed "back-casting" measure of inflation for each day prior to July 7, 2015 is equal to the price decline on that day caused by the corrective disclosure the previous day.  This results in a constant inflation ribbon throughout the putative class period.

34.    It should be noted that the Feinstein Report (¶ 177) mentions "valuation tools" in two places, but neither of these changes the description in the previous paragraph of how the inflation ribbon in Feinstein's proposed "back-casting" methodology "is often constructed." First, Feinstein mentions "valuation tools" for a limited role, namely "to establish that the disclosure(s) correcting the alleged misrepresentations and omissions, caused the price of Silver Wheaton common stock to fall," and this use of valuation tools is tied to "controlling for potentially confounding non-fraud-related information" at the time of the alleged corrective disclosure (Feinstein Report, ¶ 177).  Thus, this proposed use of valuation tools focuses on measuring the price decline caused by the alleged corrective disclosure, which in turn is used to measure inflation throughout the putative class period.  Second, Feinstein states that

"[c]onstruction of the inflation ribbon generally employs event study analysis, combined with widely used and generally accepted valuation tools and models" (Feinstein Report, ¶ 177).  There is no indication in the Feinstein Report that the contemplated use of such "valuation tools" is for anything other than to control for confounding information in measuring the effect of some corrective disclosure.

35.     Feinstein's description of how the inflation ribbon "is often constructed" explicitly states that, once the inflation dissipation upon a corrective disclosure is calculated, "[i]nflation prior to a corrective disclosure that dissipated inflation is greater than the inflation afterward by the amount of inflation that dissipated" (Feinstein Report, ¶ 177).  In this case, this implies that inflation throughout the putative class period is equal to the full price decline on July 7, 2015 that was caused by the alleged corrective disclosure.  It should be noted that Feinstein does not address the possibility that inflation on every day prior to this single corrective disclosure might not be equal to the price decline caused by the single corrective disclosure on July 6, 2015, in which case his proposed "back-casting" method would not measure inflation properly.

36.     Feinstein (¶ 176) asserts that his proposed "back-casting" approach (with passing reference to general valuation tools) "allows the calculation of individual and class-wide damages stemming from various alleged misrepresentations and omissions and therefore will accommodate alternative potential determinations of liability."  The proposed "back-casting" methodology described in ¶ 177 of the Feinstein Report results in a constant inflation ribbon throughout the putative class period equal to the full price decline on July 7, 2015 caused by the disclosure of the proposed CRA tax reassessment.  As discussed in ¶¶ 21–22 above, Feinstein's proposed methodology might measure damages for Sub-Class A of investors who would not

have purchased Silver Wheaton stock had they known the alleged truth regarding the risk of tax

reassessment, as contemplated in the *BP* ruling (*BP II*, p. 690).  However, Feinstein's "back-

casting" approach cannot measure damages properly for Sub-Class B of investors who would

still have purchased had they known the alleged truth (albeit at a possibly different price).  This

is because the July 7, 2015 price decline corresponds to 100% certainty of a tax reassessment,

which is inconsistent with Plaintiffs' two liability theories as to what should have been disclosed

throughout the entire putative class period.

37.     With respect to investors in Sub-Class B, Feinstein's proposed methodology does

not comport with Plaintiffs' liability theories.  As noted in *BP II* (p. 690), these investors could

potentially claim as damages the amount of inflation in the stock when they purchased, and this

inflation is determined by the hypothetical stock price decline if there had been no alleged

misrepresentation, and the alleged misrepresentations are defined by Plaintiffs' liability theory.

38.     As discussed in Section III.B above, Plaintiffs' first liability theory implies that,

from the outset of the putative class period, Silver Wheaton should have revealed that the

probability of a reassessment was "more likely than not," that is, 51% probability or higher.

Suppose that, at the start of the putative class period, the market estimated the reassessment

probability to be zero.  Consider the following hypothetical scenario, in which the market would

have estimated that the reassessment probability was 51% had the Company changed its

financial statements as alleged under Plaintiffs' first liability theory.  Under this hypothetical

scenario, the alleged misrepresentations caused the unidentified investors in Sub-Class B to

purchase Silver Wheaton stock at an inflated price, that is, the purchase price reflected a zero

probability of a reassessment instead of the probability of 51%.  Thus, damages for these

investors, if they suffered the decline in price in Silver Wheaton stock on July 7, 2015 when the

probability of a proposed reassessment was 100%, should be the difference between the price based on the belief of a zero probability of a reassessment and the price based on the belief of a 51% probability of a reassessment.

39.     By proposing as a damages measure the full price decline upon the actual reassessment announcement, Feinstein's methodology gives as ostensible damages the difference between the price based on a zero probability of a reassessment and the price based on a 100% probability of a reassessment. Feinstein's methodology thus overstates damages by the stock price decline representing the difference between a probability of 51% (i.e., what Plaintiffs allege should and could have been disclosed in this hypothetical scenario) and 100% (when the Company received and announced the CRA's reassessment proposal at the end of the putative class period).

40.     This fundamental flaw in Feinstein's methodology is also present under the alternative theory of liability that Plaintiffs propose "if the tax position liability was not properly considered to be 'more likely than not'" (Complaint, ¶ 153). This alternative liability theory is that Silver Wheaton should have changed its financial statements (with respect to footnotes), which would have revealed from the outset of the putative class period that the probability of a reassessment was "not 'remote.'" Whatever "not 'remote'" means exactly, Plaintiffs propose this alternative theory if a tax assessment was not "more likely than not," that is, if the probability is less than 51%. Again, Feinstein's proposed damages measure of the price decline (adjusted for confounding information) when a proposed reassessment is 100% certain does not measure properly the share price inflation under a liability assumption that presumes the probability is less than 51%.

41.     Feinstein does not offer any method to calculate damages that is consistent with Plaintiffs' theories as to what could and should have been disclosed during the putative class period.  By using the full price decline when the reassessment was announced, Feinstein implicitly assumes that there was 100% chance at the start of the putative class period that the events at the end of the putative class period would occur.  Since this assumption is inconsistent with either of Plaintiffs' stated liability theories, Feinstein's proposed methodology does not allow class-wide computation of damages that comport with Plaintiffs' liability theories.

42.     Moreover, the "back-casting" approach also assumes that conditions relevant for market valuation when the reassessment was announced matched the conditions that prevailed at the earlier date during the putative class period.  However, Feinstein provides no information whatsoever as to why this implicit assumption might be valid in this matter.  One example is the market's belief regarding the likelihood of a reassessment.  Given that the Company announced that it was under audit by the CRA on March 27, 2012,[7] it is quite possible that the market's belief regarding the possibility of a reassessment changed during the putative class period.  In fact, the Complaint (¶ 115) states that "it was clearly more likely than not, and indeed nearly certain, that, if SW Canada was subject to a comprehensive tax audit by the CRA," the income tax payable by Silver Wheaton would be reassessed.  Feinstein, however, totally ignores this issue in reaching his assertion that the general methodology he proposes can measure class-wide damages.

43.     Feinstein further states that "[s]hould it be determined that a disclosure(s) is not corrective, the methodology described herein can accommodate such a change and adjust per share damages accordingly.  This analysis would also apply on a class-wide basis" (Feinstein

---

[7] Silver Wheaton Form 40-F filed on March 27, 2012, Exhibit 99.1, p. 11.

Report, ¶ 177).  However, this statement misses the point entirely.  The issue is not which

disclosures are corrective—in this matter, only the July 6, 2015 announcement is alleged to be a

corrective disclosure—but rather that his methodology intrinsically assumes a different liability

theory than Plaintiffs have alleged.  The issue is that the methodology Feinstein proposes does

not even mention the problems caused for his methodology if the probability of reassessment as

of the beginning of the putative class period is different from the 100% probability that his

methodology assumes, but Plaintiffs' theories contemplate precisely this difference in

probabilities.

44.     What is required for a damages methodology to have any chance of comporting

with Plaintiffs' liability theories is some method to evaluate what the market would believe about

the probabilities of a tax reassessment under Plaintiffs' alternative theories of changes in

accounting that result from a "more likely than not" or a "not 'remote'" probability.  Such an

evaluation would not be trivial, but the Feinstein Report does not even address the issue.

Instead, Feinstein simply ignores it by presenting a "back-casting" methodology that intrinsically

assumes that the probability is 100%.

45.     Thus, if the finder of fact in this matter were to conclude that, during the putative

class period, the probability of a reassessment was positive but not certain (which would be

consistent with either of Plaintiffs' alternative liability assumptions), the general "back-casting"

methodology proposed in the Feinstein Report is not adequate to provide a class-wide damages

measure that is consistent with such a finding.

### 2. The New "Valuation" Damages Methodology Feinstein Proposed in His Deposition Is a Tautology Without Economic Content

46.     Feinstein's deposition testimony regarding his proposed damages methodology initially affirmed the "back-casting" methodology proposed in his report.  As discussed in Section V.B.1 above, that "back-casting" methodology is not consistent with Plaintiffs' liability assumptions in this matter, and Feinstein's deposition testimony demonstrates that he did not attempt to reconcile his "back-casting" methodology with Plaintiffs' liability theories.  Feinstein subsequently introduced a new "valuation" damages methodology in his deposition that is very different from his "back-casting" methodology, and testified that this new methodology would be consistent with Plaintiffs' liability assumptions.  However, not only was Feinstein unable to recall a single instance when he had used this newly proposed methodology to calculate an inflation ribbon, his new "valuation" damages methodology comprises nothing more than the tautology that he would value the "fair" price that would hypothetically prevail on each day of the putative class period absent the alleged omissions by applying whatever valuation methods and tools were appropriate.  Such a tautology is without economic content, and does not provide any specific damages methodology, tied to the facts and liability theories of this case, that demonstrates that a sound measure of damages can be calculated on a class-wide basis in this matter.

### a) Feinstein lacks understanding of Plaintiffs' liability theories

47.     Consistent with his Report, Feinstein stated early in his deposition that "back-casting" could be used to calculate damages in this matter.  Specifically, when asked whether he performed any analysis to opine whether damages in this matter can be computed using a common class-wide methodology, Feinstein stated (Feinstein Deposition, 9:23–10:6):

I assessed whether the facts of this case are similar enough to the facts of other cases that I've calculated damages for or other people have calculated damages for and cases that the Court has accepted damage computations for, and determined that they were similar enough.  So I did that analysis, that this case was similar enough to other cases where a standard 10b-5 damage model [i.e., constructing an inflation ribbon using "back-casting"] would, therefore, apply.

48.     With respect to "a standard 10b-5 damage model," Feinstein explains in his Report (¶ 177):

The inflation ribbon is often constructed by working chronologically backwards from the final corrective disclosure to the start of the Class Period, accounting for the alleged fraud-related residual price declines as they occurred.  Inflation prior to a corrective disclosure that dissipated inflation is greater than the inflation afterward by the amount of inflation that dissipated.

As discussed in ¶¶ 31–35 above, Feinstein's description of how an inflation ribbon "is often constructed" amounts to a "back-casting" approach.  Therefore, by testifying, as his basis to conclude that damages can be computed using a common class-wide methodology, that the current matter is "similar enough to other cases where a standard 10b-5 damage model [i.e., constructing an inflation ribbon using 'back-casting'] would…apply," Feinstein in effect proposed the same "back-casting" method that he discussed in his Report.

49.     While Feinstein proposed a "back-casting" approach, he was unable to answer, when asked about Plaintiffs' alternative liability theories, what Silver Wheaton should have revealed, and apparently regarded it as not being relevant to his assignment (Feinstein Deposition, 13:2–13):

Q.  Are you aware of whether or not, in this case, the allegations are made in the alternative, that there were alternative things that the company should or shouldn't have done in connection with its accounting?

A.  Frankly, I'm not sure exactly what you mean by that question, but I can tell
you that it's not something I felt that I needed to give a great deal of thought to, as
I was determining…whether damages can be computed the way I described.

Feinstein dismissed the need to distinguish between alternative theories of liability as a legal

issue that did not matter "that much" "[f]rom the economic analytic point of view" (Feinstein

Deposition, 15:23–16:3).  Thus, while the "back-casting" approach that Feinstein proposed is

valid only if the alleged corrective disclosures match what allegedly could and should have been

disclosed earlier, Feinstein provided no analysis or justification on this issue.  In fact, Feinstein's

testimony appears to suggest that all one needs is a method capable of calculating damages

numbers that apply class-wide, no matter how arbitrary the numbers might be, since the liability

theories did not matter "that much."

50.      Feinstein's deposition testimony confirms that the simple "back-casting"

methodology is inconsistent with his description of Plaintiffs' theories of liability.  For example,

Feinstein stated that information about the relationship between "Silver Wheaton Canada and

Silver Wheaton Cayman" was disclosed over the putative class period (Feinstein Deposition,

42:22–43:10).  The arrival of new information over the putative class period that corrects alleged

misrepresentations suggests an inflation band that is changing through time.  Feinstein further

testified that the decline in Silver Wheaton's stock price on July 7, 2015 reflected a 100%

probability of a tax reassessment (Feinstein Deposition, 64:12–24), which is not the same as

saying that a tax reassessment was either "more likely than not" or that it was "not 'remote,'"

depending on the relevant accounting treatment.  Feinstein has provided no information that

would justify a "back-cast" inflation ribbon throughout the entire putative class period equal to

the observed price decline when there is a 100% probability of reassessment (which Feinstein

associates with the July 7, 2015 price decline), in contrast to the different and lower reassessment probabilities that Plaintiffs allege should have been disclosed.

### b) Feinstein's newly proposed "valuation" damages methodology amounts to nothing more than the definition of out-of-pocket damages

51.     When pressed, Feinstein retreated from his initial proposal that damages be calculated through "back-casting," and testified that if "back-casting" were determined to be inappropriate, he would use other tools (Feinstein Deposition, 89:19–90:3).  Specifically, Feinstein proposed a very different "valuation" damages methodology, by which he would use valuation tools to calculate the but-for price of Silver Wheaton stock, and then measure inflation as the difference between Silver Wheaton's actual price and the but-for price resulting from his valuation procedures (Feinstein Deposition, 48:13–49:14):

> Q. -- how would you generally find the damages could be calculated for all class members on a class-wide basis?
>
> A.  Okay.  I would need to, first, know what omissions or misrepresentations were found by the trier of fact to be, in fact, actionable and having actually occurred, misrepresentations or omissions.  Or I could do the analysis on a contingent basis on the assumption that they would -- a certain set would be found to be actionable and truly misrepresentations and omissions.  With that set of information, about -- now, that establishes what, in a "but for" world, could have and should have been disclosed.  I would apply valuation techniques the same way investors, analysts, Wall Street professionals do every day, apply valuation techniques to value the security under an alternative set of facts.  And that would -- the difference between this "but for" price on each day in the class period and the actual price is the inflation ribbon.  That would tell you how much the stock was inflated because of the surviving alleged misrepresentations and omissions.  So that's the construction of the inflation ribbon.

52.     Feinstein proposed to use "the entire tool kit of valuation tools to answer the question…what would Silver Wheaton's stock have been worth…if there had been full

disclosure on that day" (Feinstein Deposition, 80:3–10).  However, Feinstein offered no details as to how he would use "the entire tool kit of valuation tools" to calculate the but-for price, or what assumptions he would need to make to be consistent with the facts in this matter.  Indeed, the general methodology of using "the entire tool kit" Feinstein advanced in his deposition to value the but-for price, and then calculate inflation as the difference between the actual price and the but-for price, is simply the definition of inflation, which makes it a tautology.

53.     Feinstein explicitly testified that he was not saying how such a valuation should be done, just that it could be done since there exist various valuation techniques that are used in many circumstances.  For example, Feinstein testified, "I'm not sure which valuation technique I would use, but essentially, yes, on each day in the class period, I would assess what the stock would have been worth had it not been for the alleged fraud" (Feinstein Deposition, 51:9–13).  Thus, Feinstein's "valuation" damages methodology is no more than an assertion that he would calculate the but-for price, but he provided no testimony as to how such a valuation should be done in the current matter.

54.     Despite Feinstein's claim that his new damages methodology would enable him to calculate out-of-pocket damages consistent with Plaintiffs' liability assumptions in this matter, his proposed method for how such calculation could be done is just a description of what out-of-pocket damages are, not any indication of how they can be calculated or whether the results of any particular calculation produce a sound class-wide measure of damages.  Feinstein's "valuation" methodology has no content beyond the definition of inflation, namely the actual price minus the value of the but-for price.  Given the total lack of specifics for his proposed "valuation" damages methodology, or the adequacy of any particular valuation approach and assumptions, Feinstein appears to be asking the court to "just trust him" when he says he is

"confident that valuation of this stock…with an alternative set of facts is possible, just as people value other stocks every day with alternative sets of facts" (Feinstein Deposition, 90:15–19). However, he provides no details other than his own *ipse dixit*.

> c)   **Feinstein's assertion that valuation tools could be used to value the but-for price fails to provide any economic content for calculating class-wide damages specific to this matter**

55.   Feinstein claims he would do what was necessary to calculate the Silver Wheaton but-for price on each day during the putative class period.  Feinstein testified (Feinstein Deposition, 50:10–23):

> I would value the stock.  I would apply whatever I found to be most appropriate and to some extent guided by what analysts were doing at the time, value the stock under an alternative set of facts.  I mean, there's -- there's discounted cash flow methodologies.  There are valuation multiple methodologies.  In this case, we have the empirics of seeing how the stock price changed when new information entered the marketplace.  I would use all of these methodologies in concert, the same way financial analysts do every day to determine what the stock would have been worth under alternative set of facts.

56.   Feinstein referred to various methodologies, including the use of discounted cash flow ("DCF") methodologies, valuation multiples methodologies, the event study results (Feinstein Deposition, 88:7–13), and even a rational expectations model (Feinstein Deposition, 83:25–84:5).  Feinstein testified that, if necessary, he would calculate a different valuation for each day of the putative class period using all the tools at his disposal (Feinstein Deposition, 88:19–23).  While Feinstein cites the existence of valuation tools as a basis to conclude that damages in this matter can be computed using a common methodology, the mere recitation of various valuation tools does not make Feinstein's proposed "valuation" damages methodology any less of a tautology.  The statement that the value of the but-for price will be determined by

using a valuation tool to calculate the value of the but-for price has no economic content, unless it identifies the underlying assumptions and inputs specific to this matter and specifies the way in which such specific tools can be applied in this current matter to calculate a sound measure of damages.

57.     To illustrate, Feinstein states that "Silver Wheaton common stock traded in an efficient market over the course of the Class Period" (Feinstein Report, ¶ 17) and that "investors in an efficient market, on average, value stocks correctly" (Feinstein Deposition, 65:13–16).[8] Feinstein's statements amount to saying that the market price of Silver Wheaton stock on any date during the putative class period reflects investors' beliefs about the discounted value of Silver Wheaton's future cash flows, given all the information then publicly available.  To determine Silver Wheaton's but-for stock price on each date during the putative class period in a manner that is consistent with the price in the efficient market that Feinstein concludes exists, he must calculate the value of Silver Wheaton stock under the same set of beliefs and information as the market, changing only information concerning the alleged misrepresentations.  The price of Silver Wheaton stock is determined by market beliefs and information about a host of factors, including future changes in the price of gold and silver, Silver Wheaton's current and future investment opportunities, and the overall riskiness of its business and the corresponding required discount rate to be used to value future cash flows.  Therefore, using valuation tools to determine a but-for stock price that is consistent with the market's consensus beliefs on non-litigation related inputs, as reflected in the current actual stock price, requires some methodology to

---

[8] In defining an efficient market, Feinstein cites to Eugene Fama (Feinstein Report, ¶ 28), who stated that "[a] market in which prices always 'fully reflect' available information is called 'efficient'" (Fama, Eugene F. "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance* 25, no. 2 (1970): 383–417 at 383).

calculate the price impact of the alleged misrepresentations that does not alter the market's consensus beliefs on other dimensions.

58.     For example, Feinstein asserts that he could use a DCF model to calculate inflation for each day of the putative class period.  However, that would require first identifying market beliefs and information about all the factors affecting Silver Wheaton stock prices other than the alleged misrepresentations, and then translating those beliefs and information into DCF valuation model inputs such as growth rates and discount rates.  Those valuation model inputs might then be taken together with the allegedly misrepresented truth to calculate a but-for stock price.  However, Feinstein has given no indication as to *how* he would identify market beliefs and information about all factors affecting Silver Wheaton stock prices, and how to translate these into reliable inputs to any valuation model of his choice, such as a DCF model.  Thus, Feinstein's statement that damages in this matter can be measured using a class-wide "valuation" methodology based on ostensibly appropriate valuation tools is simply a vacuous assertion until specific details are given of how such an exercise would be performed.  Feinstein provides absolutely no such details.

59.     Another basis for Feinstein's claim that his "valuation" damages methodology would produce sound, class-wide damages numbers is that "valuation people," "financial analysts," or "portfolio managers" use valuation tools every day to calculate the value of stocks under different scenarios (Feinstein Deposition, 77:14–78:6).  However, such an assertion is highly misleading because, while it is true that valuation tools are commonly applied to value all sorts of things, they are *not* frequently applied to calculate daily stock price inflation defined as the actual stock price minus the price of a but-for price absent the alleged misrepresentations.  This is because, as discussed above, a but-for price is the value of the security absent the alleged

misrepresentations *holding all other value-relevant conditions unchanged.*  While it is true that valuation tools are regularly used to value stocks, it is exceedingly rare for the stock valuations proposed by financial analysts or portfolio managers to coincide with the actual stock market price, because they generally use inputs to their valuation models that do not correspond to market consensus beliefs given then available information.  Therefore, the common use of valuation tools to conduct valuation exercises in other contexts does not establish how damages in this matter would be measured using these tools.

60.     In fact, Feinstein did not cite any example (in his report or during his deposition) of inflation being calculated on a daily basis using valuation tools such as DCF, as opposed to his initially proposed "back-casting" methodology.  The only example Feinstein testified to in which he had used DCF analysis or some other valuation tool to calculate inflation was in the context of "back-casting."  Feinstein stated he had "used valuation models to figure out the value of confounding information and subtract that from a price change on an event date" (Feinstein Deposition, 87:1–6).

61.     The fallacy of Feinstein's claims that his proposed "valuation" methodology provides a sound basis for calculating class-wide damages is highlighted by his example of building a treehouse (Feinstein Deposition, 80:22–81:14):

> Q.  …So basically you're testifying that you can't really identify specifically how you would determine the "but for" price as you sit here today, but you will figure that out later, if you are called upon to do that?
>
> A. Well, I mean, you know, if you're asking me to build a treehouse and ask me what tools I would use to build the treehouse, I would tell you, I haven't built the treehouse yet, but I would bring a saw, I'd bring a hammer, I'd bring some nails, I'd bring wood. I don't know exactly until I get further into the project what the treehouse is going to look like and whether I'm going to need a level and a plane

as well. But I know that I have it at my disposal and I know that people build treehouses every day, so I know I can do it.

62.     Under Feinstein's analogy, the question of whether one could build a treehouse is equivalent to the question whether damages in this matter can be measured class-wide using a common methodology.  Feinstein's analogy is that he "know[s] he can" build a treehouse because tools are available and other people "build treehouses every day."  However, even if people build treehouses every day, and even if tools exist, that in no way ensures that Feinstein can build a particular type of treehouse on some particular tree.

63.     What Feinstein totally ignores is that, before people know if they can build a functional treehouse on a particular tree, they would at a minimum need to inspect the condition of the tree and make sure that the desired specifics of the treehouse (such as size and weight) are compatible with the tree.  These omitted steps are the equivalent of showing that the damages methodology Feinstein proposes is feasible, non-arbitrary, and consistent with Plaintiffs' liability theories in the current matter.  However, just like his treehouse analogy, Feinstein provides no information whatsoever as to these key issues.  His tautological "valuation" damages methodology simply states that he will value the but-for price using whatever valuation tools are appropriate to calculate the value of the but-for price.  This conclusory assertion has no economic content, and is not a credible basis for the claim that Feinstein has demonstrated a methodology that provides a sound measure of class-wide damages in this particular matter using a common methodology.

Executed this 10th day of February 2017, in Menlo Park.

_____

Allan W. Kleidon, Ph.D.

Exhibit 1

# ALLAN WILLIAM KLEIDON

**Cornerstone Research**
1000 El Camino Real, Suite 250 • Menlo Park, CA  94025
650.470.7112 • akleidon@cornerstone.com

### CURRENT POSITIONS

**Cornerstone Research**
Senior Vice President

**University of Queensland, School of Business, Australia**
Honorary Professor

### EDUCATION

**University of Queensland, Australia**
Bachelor of Commerce, 1973
Bachelor of Commerce (First Class Honours), 1976
Bachelor of Laws (Honours), 1978

**Graduate School of Business, University of Chicago**
Master of Business Administration, 1981
PhD, 1983
     Finance examination, 1979
     Economics examination, 1980

### ACADEMIC EXPERIENCE

**School of Law, Stanford University**
Consulting Professor of Law (in Finance), 1994 – 2000
Lecturer in Law (in Finance), 2001 – 2003

**Graduate School of Business, Stanford University**
Lecturer in Finance, 1993 – 1994; 1997 – 1999; 2005 – 2006
Associate Professor of Finance, 1986 – 1992
Assistant Professor of Finance, 1982 – 1986

| | |
|---|---|
| Doctoral | Econometrics |
| | Empirical Research in Finance |
| | Doctoral Seminar in Finance |
| Masters | Corporate Finance |
| | Management of Financial Institutions |
| | Derivatives |
| Executive | International Investment Management Program |
| | Financial Management Program |

**University of California, Berkeley**
Visiting Associate Professor of Finance, 1992
Lecturer (Finance), 2003

**Exhibit X**
**Page 479**

**University of Chicago**
Part-time teaching and tutoring, 1978 – 1982:
    Corporate Finance, Investments
Personal tutoring in finance, statistics, accounting, economics, and mathematics.

**University of Queensland, Australia**
Honorary Professor, School of Business, 2008 – present
Full-time faculty, 1974 – 1978:
    Finance (undergraduate, postgraduate), Business Economics (Honours), Scientific
    Method (Honours), Research Methods (M.B.A. level), Financial Accounting,
    Managerial Accounting

## HONORS

**Professional**
Business School Trust Faculty Fellow, 1990 – 1991
Batterymarch Fellowship, 1989 – 1990

**Graduate**
Dean's List all eligible quarters
1979 Finance Prize
1980 Center for Research in Security Prices Research Grant
1980 Beta Gamma Sigma

**Undergraduate**
1974 Institute of Chartered Accountants in Australia Prize in Finance
1976 Thomas Brown and Sons, Ltd. Prize in Commerce Honours

## RESEARCH

**Publications**

"Just How Much Damage Did Those Misrepresentations Actually Cause And To Whom?:
    Damages Measurement in 'Fraud on the Market' Securities Class Actions," joint with
    D. Lefler, *Securities Litigation & Enforcement Institute 2005,* 2005, pp. 285–325.

"The Stock Market Crashes of 1987 and 1989," joint with R. Mehra, *Business Cycles,*
    *Panics and Depressions,* D. Glassner, ed., Garland Press, New York, 1997.

"U.K. and U.S. Trading of British Cross-Listed Stocks:  An Intraday Analysis of Market
    Integration," joint with I. Werner, *The Review of Financial Studies*, Vol. 9 (2), 1996,
    pp. 619–664.

"Bid-Ask Spreads in Foreign Exchange Markets:  Implications for Models of Asymmetric
    Information," joint with D. A. Hsieh, in *Microstructure of Foreign Exchange Markets,*
    J. Frankel, G. Galli and A. Giovannini, eds., National Bureau of Economic Research,
    University of Chicago Press, 1996, pp. 41–65.

"Stock Market Crashes," in *Finance Handbook,* K. Jarrow, V. Maksimovic and W.T.
    Ziemba, eds., Elsevier Science B.V., North Holland, *Handbooks in OR & MS*, Vol. 9,
    1995, pp. 465–495.

**Exhibit X**

**Page 480**

Exhibit 1

"Price Volatility and Volume Spillovers between the Tokyo and New York Stock Markets: Comment," *The Internationalization of Equity Markets,* J. Frankel, ed., National Bureau of Economic Research, University of Chicago Press, 1994, pp. 333–338.

"Market Maker Activity on Nasdaq: Implications for Trading Volume," joint with J. Gould, *Stanford Journal of Law, Business and Finance,* Vol. 1 (1), 1994, pp. 11–27.

"'Windfall' Gains in Mutual-to-Stock Conversion of Thrift Institutions?," joint with J. Barth and R. D. Brumbaugh, *Challenge: The Magazine of Economic Affairs,* Vol. 37 (4), 1994, pp. 43–49.

"CEO Performance, Board Types and Board Performance:  A First Cut," joint with K.E. Scott, in *Institutional Investors and Corporate Governance,* T. Baums, R.M. Buxbaum, and K.J. Hobt, eds., de Gruyter, 1993, pp. 181–199.

"Market 2000," in *Modernizing U.S. Securities Regulation: Economic and Legal Perspectives,* K. Lehn and R.W. Kamphuis, Jr., eds., Business One Irwin, 1992, pp. 363–373.

"Arbitrage, Nontrading, and Stale Prices:  October 1987," *Journal of Business,* Vol. 65 (4), 1992, pp. 483–507.

"One Market?  Stocks, Futures and Options During October 1987," joint with R. Whaley, *Journal of Finance,* Vol. 47, 1992, pp. 851–877.

"Market and Environmental Uncertainty," *The New Palgrave Dictionary of Money and Finance,* The Macmillan Press, Vol. 2, 1992, pp. 651–653.

"Periodic Market Closure and Trading Volume:  A Model of Intraday Bids and Asks," joint with W. A. Brock, *Journal of Economic Dynamics and Control*, Vol. 16, 1992, pp. 451–489.

"Underestimation of Portfolio Insurance and the Crash of October 1987," joint with C.J. Jacklin and P. Pfleiderer, *The Review of Financial Studies,* Vol. 5 (1), 1992, pp. 35–63.

"Are Stock Prices Excessively Sensitive to Current Information? Comment," joint with J. Lynch Koski, *Journal of Economic Behavior and Organization,* Vol. 18, 1992, pp. 127–131.

"Market Volatility:  Review," *Journal of Economic Literature*, Vol. 29, December 1991, pp. 1760–1761.

"Tests de acotacion de la varianza Y modelos de valoracion del precio de las acciones," *Cuadernos Economicos De Ice,* Numero 38 (1), 1988, pp. 49–93. (Translation of "Variance Bounds Tests and Stock Price Valuation Models," *Journal of Political Economy,* Vol. 94 (5), 1986, pp. 953–1001.

"The Probability of Gross Violations of a Present Value Variance Inequality: Reply," *Journal of Political Economy,* Vol. 96 (5), 1988, pp. 1093–1096.

"Bubbles, Fads and Stock Price Volatility Tests, A Partial Evaluation:  Discussion," *Journal of Finance,* Vol. 43 (3), 1988, pp. 656–660.

**Exhibit X**

**Page 481**

Exhibit 1

"Anomalies in Financial Economics:  Blueprint for Change?," *Journal of Business,* Vol. 59, 1986, S469–S499.  Reprinted in *Rational Choice:  The Contrast Between Economics and Psychology,* R. G. Hogarth and M. W. Reder, eds., University of Chicago Press, 1987.

"Empirical Assessment of Present Value Relations:  Comment," *Econometric Reviews,* Vol. 5 (2), 1986, pp. 261–265.

"Variance Bounds Tests and Stock Price Valuation Models," *Journal of Political Economy,* Vol. 94, 1986, pp. 953–1001. (Reprinted in *The International Library of Financial Econometrics*, Andrew W. Lo, ed., Cheltenham: Edward Elgar, 2007, pp. 953–1001.)

"Bias in Small Sample Tests of Stock Price Rationality," *Journal of Business,* Vol. 59, 1986, pp. 237–261.

"New Evidence on the Nature of Size Related Anomalies in Stock Prices," joint with P. Brown and T. A. Marsh, *Journal of Financial Economics,* Vol. 12, 1983, pp. 33–56.

"Stock Return Seasonalities and the 'Tax-loss Selling' Hypothesis:  Analysis of the Arguments and Australian Evidence," joint with P. Brown, D. B. Keim, and T. A. Marsh, *Journal of Financial Economics,* Vol. 12, 1983, pp. 105–127. (Reprinted in *Share Markets and Portfolio Theory: Readings and Australian Evidence,* 2nd ed., R. Ball, P. Brown, F. Finn, and R. Officer, eds., University of Queensland Press, 1987.)

"International Arbitrage Pricing Theory:  Discussion," joint with P. Pfleiderer, *Journal of Finance,* Vol. 38 (2), 1983, pp. 470–472.

"Stock Prices as Rational Forecasters of Future Cash Flows," Proceedings, *Seminar on the Analysis of Security Prices,* Vol. 27 (1), 1982, pp. 157–189.

"Mergers and the Trade Practices Act, 1974," joint with L. E. Bracker, Proceedings, *Tenth Students Congress of the Institute of Chartered Accountants in Australia* (Queensland Branch), April 1977.

"Some Problems Associated with the Prices Justification Tribunal," *The Chartered Secretary,* April–June 1975, pp. 67–74.


**Work in Progress**

"Why Nasdaq Market Makers Use Even-Eighths Quotes: A Model of Quote Clustering in Dealer Markets," joint with P. Pfleiderer.


**Conferences**

*Practising Law Institute, Securities Litigation & Enforcement Institute 2005,* San Francisco, September 2005: Panelist, "Just How Much Did Those Misrepresentations Actually Cause and to Whom: Damages Measurement in 'Fraud on the Market' Securities Class Actions."

*Practising Law Institute, Securities Litigation 2001,* San Francisco, November 2001: Panelist, "Damages: Illusion or Reality?"

**Exhibit X**

**Page 482**

*Professional Liability Underwriting Society, 2001 PLUS D&O Liability and Insurance Issues Symposium,* New York, February 2001: Panelist, "Causation & Damages Analysis in Volatile Securities Markets."

*Market Microstructure Program Meeting,* December 1998, NBER: Discussant, "The Effects of Market Reform on the Trading Costs and Depths of Nasdaq Stocks."

*Symposium on Electronic Call Market Trading,* New York University Salomon Center, April 1995: Session Chair, "Panel II: The Demand for Immediacy."

*Conference on Financial Markets' Reform,* Financial Markets Research Center, Vanderbilt University, April 1995: "Why do Christie and Schultz Infer Collusion From Their Data?"

*American Finance Association,* Annual Conference, January 1995: Discussant, "Market Making and the Competition for Order Flow," and Discussant, "Speculative Trading and Stock Market Volatility."

*The Microstructure of Foreign Exchange Markets,* Perugia, Italy, July 1994, NBER: "Bid-Ask Spreads in Foreign Exchange Markets: Implications for Models of Asymmetric Information."

*Western Finance Association,* Annual Conference, June 1994: Chair of Session on *Empirical Market Microstructure.*

*Global Competition in the Market for Markets,* The Fuqua School of Business/NYSE, Conference on Market Microstructure, November 1993: "Stock Market Crashes."

*The Internationalization of Equity Markets,* October 1993, NBER: "Price Volatility and Volume Spillovers between the Tokyo and New York Stock Markets: Comment."

*Western Finance Association,* Annual Conference, June 1993: "Round-the-Clock Trading: Evidence from Cross-Listed Securities."

*American Finance Association,* Annual Conference, January 1992: "One Market? Stocks, Futures and Options During October 1987."

*Western Finance Association,* Annual Conference, June 1989: "Exogenous Demand Shocks and Trading Volume: A Model of Intraday Bids and Asks."

Joint *American Economic Association-American Finance Association,* Annual Meetings, December 1987: "The Volatility Debate."

Institute for Mathematical Studies in the Social Sciences, Stanford University, July 1986: "Variance Bounds Tests and Stock Price Valuation Models."

Conference on the Behavioral Foundations of Economic Theory, University of Chicago, October 1985: "Anomalies in Financial Economics: Blueprint for Change?"

*Western Finance Association,* Annual Conference, June 1983: "Stock Return Seasonalities and the 'Tax-loss Selling' Hypothesis: Analysis of the Arguments and Australian Evidence."

*American Finance Association,* Annual Conference, December 1982: "Stock Prices as Rational Forecasters of Future Cash Flows."

*Center for Research in Security Prices,* Seminar on The Analysis of Security Prices, May 1982.

*Accounting Association of Australia and New Zealand,* Annual Conference, August 1976: "Accounting Theories and Practice: Arbitrary? Incorrigible? or Useful?"

**Exhibit X**

**Page 483**

*Accounting Association of Australia and New Zealand,* Annual Conference, August 1977: "The Paradigm of Accounting?"

*Institute of Chartered Accountants in Australia,* Student Congress (Queensland Branch), April 1977: "Mergers and the Trade Practices Act, 1974.

Paper prepared for the Japan Advisory Committee of the New York Stock Exchange

"Liberalization in the Japanese Financial Markets," with Kenneth J. Singleton, *Research Paper Series, Stanford University,* September 1989, Research Paper No. 1069, pp. 1–22.

Papers requested by and sent to Trade Practices Commission, Australian Government, Canberra

"The Structure of the Queensland Liquor Industry:  Brewer-Hotel Ties of Trade, and the Trade Practices Act 1974."

"Theories of Government Regulation and the Queensland Liquor Industry."

"The Trade Practices Act 1974 and Queensland Brewer-Hotel Ties of Trade."

## SOCIETY MEMBERSHIP

American Finance Association

Western Finance Association

Australian Society of Accountants (Senior Associate)

The Econometric Society

Securities Institute of Australia

## OTHER PROFESSIONAL ACTIVITIES

Associate Editor, *Journal of Finance*

Associate Editor, *Journal of Financial Economics*

Referee for:  *National Science Foundation, Econometrica, Journal of Political Economy, American Economic Review, Journal of Monetary Economics, Journal of Money, Credit and Banking, Quarterly Journal of Economics, Journal of Financial Economics, Journal of Business, Journal of Finance, Journal of Financial and Quantitative Analysis, Journal of Accounting Research, Science, Australian Journal of Management, and Journal of Economic Behavior and Organization.*

Research consultant

## PERSONAL

Raised in Toowoomba, Queensland, Australia.  Graduated from Harristown State High School, 1969.  Active in school sports (Sporting House Captain); Army Cadets (Cadet Commanding Officer, Head Cadet Under Officer); drama (President of Drama Club); debating (team captain); school prefect, and Vice School Captain.  Recent interests include sports, music, drama, food and wine, and family.  Birth date: 1/23/53.

**Exhibit X**

**Page 484**

# Exhibit 1

## ALLAN WILLIAM KLEIDON
### *Previous Expert Testimony*
### *Past Four Years*

**TRIAL AND ARBITRATION TESTIMONY**

*Halifax Hospital Medical Center v. Citigroup Global Markets Inc. and UBS Securities LLC*
March 9, 2016

*Confidential Arbitration Testimony*
October 7 and 8, 2014

**DEPOSITIONS**

*Robert Englehart, et al. v. Charles M. Brown, et al.*
April 18, 2016

*Barclays Bank PLC Securities Litigation*
March 30, 2016

*Tutor Perini Corp. v. Banc of America Securities LLC*
April 29, 2015

*In re St. Jude Medical Inc. Securities Litigation*
July 15, 2014

*Confidential Arbitration*
July 10, 2014

*In re Gatekeeper Pharmaceuticals Inc. Litigation*
June 6, 2013

*Cunha v. Hansen Natural Corporation et al.*
March 14, 2013

*Dow Corning Corp. and Hemlock Semiconductor Corp. v. BB&T Corp. and Scott & Stringfellow, LLC*
April 25, 2012

*In re New Jersey Carpenters Health Fund v. DLJ Mortgage Capital Inc. et al.*
February 16, 2011 and January 14, 2015

**DECLARATIONS AND REPORTS**

*Abu Dhabi Investment Authority v. Citigroup Inc.*
January 29, 2016 and June 30, 2016

*Robert Englehart, et al. v. Charles M. Brown, et al.*
February 16, 2016 and March 14, 2016

*Barclays Bank PLC Securities Litigation*
December 15, 2015, February 2, 2016, March 18, 2016, and December 14, 2016

*In the Matter of Dendreon Corporation Shareholder Litigations Derivative*
August 26, 2015 and September 25, 2015

*In the Matter of Tutor Perini Corp. v. Banc of America Securities LLC*
March 19, 2015 and April 16, 2015

*In the Matter of AirTouch Communications, Inc., Hideyuki Kanakubo and Jerome Kaiser, CPA*
December 16, 2014

**Exhibit X**

**Page 485**

# Exhibit 1

## ALLAN WILLIAM KLEIDON
### *Previous Expert Testimony*
### *Past Four Years*

**DECLARATIONS AND REPORTS (CONT'D.)**

*In re Green Mountain Coffee Roasters, Inc., HO-11484*
October 3, 2014

*Confidential Arbitration*
May 19, 2014 (revised on July 9, 2014)

*In re St. Jude Medical Inc. Securities Litigation*
October 14, 2013, February 3, 2014, and June 2, 2014

*BNP Paribas v. The Bank of New York Trust Company, N.A.*
June 3, 2013

*Marie Gaudin v. Saxon Mortgage Services, Inc.*
May 30, 2013

*In re Gatekeeper Pharmaceuticals Inc. Litigation*
May 3, 2013

*In re Diamond Foods Inc. Securities Litigation*
April 11, 2013

*Cunha v. Hansen Natural Corporation et al.*
February 19, 2013 and May 30, 2013

*In re STEC Inc. Securities Litigation*
July 10, 2012 and July 24, 2012

*Dow Corning Corp. and Hemlock Semiconductor Corp. v. BB&T Corp. and Scott & Stringfellow, LLC*
March 2, 2012 and April 2, 2012

*Class v. Towers, Perrin, Forster & Crosby Inc. et al.*
January 31, 2012

*United Food and Commercial Workers Union v. Chesapeake Energy Corporation et al.*
December 14, 2011 and August 20, 2012

*In re New Jersey Carpenters Health Fund v. DLJ Mortgage Capital, Inc., et al.*
January 17, 2011, June 13, 2014, September 30, 2014, December 19, 2014, February 26, 2015, April 28, 2015, June 29, 2015, and July 28, 2015

**Exhibit X**

**Page 486**

Exhibit 2

# Documents Relied Upon
# by Allan W. Kleidon

**Legal Documents**
- Consolidated Amended Class Action Complaint                    December 18, 2015

**Expert Reports**
- Report on Market Efficiency Professor Steven P. Feinstein, Ph.D., CFA    November 1, 2016

**Depositions**
- Deposition of Thomas Bartsch                    January 10, 2017
- Deposition of Joe Elek                          January 19, 2017
- Deposition of Diana Choi                        January 24, 2017
- Deposition of Jedrzej Borowczyk                 January 26, 2017
- Deposition of Steven P. Feinstein, Ph.D.        January 31, 2017

**Public Press**
- "Silver Wheaton Remains Confident in Business Structure Following    July 6, 2015
  Receipt of CRA Proposal Letter," *Bloomberg English CNS*

**SEC Filings**
- Silver Wheaton Corp. Form 40-F for the Fiscal Year Ended December 31,    March 27, 2012
  2011

**Company Documents**
- Silver Wheaton Corp. 2005 Annual Report
- Silver Wheaton Corp. 2006 Annual Report
- Silver Wheaton Corp. 2007 Annual Report
- Silver Wheaton Corp. 2008 Annual Report
- Silver Wheaton Corp. 2009 Annual Report
- Silver Wheaton Corp. 2010 Annual Report
- Silver Wheaton Corp. 2015 Annual Report
- Silver Wheaton Press Release, "Silver Wheaton Remains Confident in    July 6, 2015
  Business Structure Following Receipt of CRA Proposal Letter"

**Academic Literature**
- Fama, Eugene F., "Efficient Capital Markets: A Review of Theory and
  Empirical Work," *Journal of Finance* 25, No. 2 (May 1970), pp. 383-417.

**Exhibit X**
**Page 487**

Exhibit 2

**Case Rulings**

- *Huddleston v. Herman & MacLean*, 640 F.2d 534 (5th Cir. 1981).
- *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013).
- *Ludlow v. BP, PLC*, 800 F.3d 674 (5th Cir. 2015).

**Miscellaneous**

- "Company Profile," Silver Wheaton, available at: http://web.archive.org/web/200150401065128/http://www.silverwheaton .com/company/company-profile/defaults.aspx.

**All other materials cited in this report and in the exhibits to this report.**

**Exhibit X**

**Page 488**