UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL          'O'

| Case No. | 2:15-cv-05146-CAS (JEMx) | Date | May 11, 2017 |
| | 2:15-CV-05173-CAS (JEMx) | | |
| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

Present: The Honorable    CHRISTINA A. SNYDER

| Catherine Jeang | Not Present | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys Present for Plaintiffs:          Attorneys Present for Defendants:

Not Present                    Not Present

**Proceedings:**       (IN CHAMBERS) - PLAINTIFFS' MOTION TO CERTIFY
CLASS (Filed November 1, 2016, dkt. 91)

## I.    INTRODUCTION

On July 8, 2015, plaintiff Chris Masilionis commenced this putative class action alleging violations of the Securities Exchange Act of 1934, 15 U.S.C. § 78(a), et seq. ("the Exchange Act"), against defendants Silver Wheaton Corp. ("Silver Wheaton"), Randy V. J. Smallwood ("Smallwood"), Peter Barnes ("Barnes"), and Gary Brown ("Brown") (collectively, "defendants"). Dkt. 1. On October 19, 2015, the Court consolidated this action with a related action, Steve Klein, et al. v. Silver Wheaton Corp., et al., Case No: 2:15-cv-5173-CAS-JEM, and appointed Joe Elek as lead plaintiff in the consolidated action. Dkt. 55. The plaintiffs in the consolidated action filed an amended complaint ("CAC") on December 18, 2016. Dkt. 60. The CAC asserts two claims for relief: (1) violation of Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder (17 C.F.R. § 240.10b-5) against all defendants, and (2) violation of Section 20(a) of the Exchange Act against all individual defendants. Id. Plaintiffs allege that the class period runs from March 30, 2011 to July 6, 2015, inclusive ("the Class Period"). Id. ¶ 1.

On January 29, 2016, defendants filed a motion to dismiss the CAC. Dkt. 61. On June 6, 2016, the Court denied the motion to dismiss. Dkt. 79.

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:15-cv-05146-CAS (JEMx) | Date | May 11, 2017 |
|---|---|---|---|
| | 2:15-CV-05173-CAS (JEMx) | | |
| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

On November 1, 2016, plaintiffs filed a motion for class certification. Dkt. 91. In support of their motion, plaintiffs filed a memorandum, dkt. 92 ("Mot."), and a declaration by plaintiff's counsel, Jonathan Horne, dkt. 93 ("Horne Decl."), to which most of plaintiffs' supporting evidence is attached. Exhibit 1 to the Horne declaration is a report by Steven P. Feinstein (the "Feinstein Report"), discussed at length in this order. Plaintiffs also appended declarations from the named plaintiffs. See generally Dkt. 93 Exs. 3-10. On November 2, 2016, plaintiffs filed a declaration by named plaintiff Jeffrey Frohwerk, dkt. 94-1, which counsel evidently received a day later than expected, dkt. 94.[1]

Thereafter, the parties agreed to a briefing schedule for the motion. On February 24, 2017, defendants filed an opposition, dkt. 122 ("Opp'n"); a declaration by defendants' counsel, dkt. 122-2 ("Watts Decl."); and exhibits in support of the opposition, dkts. 122-2:122-26. One such exhibit, discussed in this order, is a report by Allan W. Kleidon (the "Kleidon Report"). Dkt. 122-26.

On March 27, 2017, plaintiffs' filed a reply in support of their motion, dkt. 135 ("Reply"); a second declaration by Horne, dkt. 136 ("Horne Reply Decl."); and a rebuttal report by Feinstein, dkt. 136 Ex. 1 ("Feinstein Rebuttal"), among other exhibits. On April 17, 2017, the Court held oral argument on the instant motion and thereafter took the matter under submission. Dkt. 147.

Having carefully considered the parties' arguments the Court finds and concludes as follows.

## II.    BACKGROUND

### A. Silver Wheaton Corporation

Defendant Silver Wheaton is a Canadian Company, headquartered in Vancouver, British Columbia whose shares are traded on the NYSE under the ticker symbol "SLW". CAC ¶ 18. Silver Wheaton and its subsidiaries purchase and sell gold and silver worldwide. Id. ¶¶ 2-3. Silver Wheaton enters into so-called "streaming agreements,"

---

[1] As discussed below, the parties have since stipulated that Frohwerk should not be considered for the role of class representative.

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:15-cv-05146-CAS (JEMx) | Date | May 11, 2017 |
| | 2:15-CV-05173-CAS (JEMx) | | |
| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

whereby it obtains the rights to a portion of precious metals produced by mines located in politically stable regions around the world such as Canada, Mexico, Portugal, Brazil, Peru, and Sweden. Id. ¶ 19. According to Silver Wheaton, it is the "largest pure precious metals streaming company in the world." Dkt. 61-12 at 793. Under the terms of a typical streaming agreement, Silver Wheaton or its subsidiaries would agree to purchase a specified percentage of the future production of silver or gold from a mine operator for an upfront payment plus, on delivery, an amount equal to the lesser of an agreed upon price or the then-current market price. Id. Silver Wheaton and its subsidiaries earn profits by selling the silver and gold purchased pursuant to its streaming agreements. Id. at 847.

Plaintiffs allege that Silver Wheaton derives revenues principally from streaming agreements entered into by one of its subsidiaries located in the Cayman Islands ("SW Cayman"). CAC ¶ 3. Plaintiffs further allege that, pursuant to the laws of the Cayman Islands, SW Cayman paid no income tax in the Cayman Islands on its profits derived from these agreements. Id. ¶ 4. Nor did Silver Wheaton pay any income tax in Canada on the profits earned by SW Cayman because Silver Wheaton took the position that SW Cayman was a separate entity and that no income tax on SW Cayman's profits was owed to Canada. Id.

The individually named defendants are all current and former executives of Silver Wheaton. Defendant Smallwood has served as Silver Wheaton's President since January 2010, and as the company's Chief Executive Officer ("CEO") since April 11, 2011. Id. ¶ 20. Defendant Barnes served as Silver Wheaton's CEO and as a member of the company's board of directors from 2006, until April 11, 2011. Id. ¶ 21. Defendant Brown joined Silver Wheaton in 2008, and served as the company's Chief Financial Officer ("CFO") throughout the Class Period. Id. ¶ 22.

### B. Canada's Transfer Pricing Rules

The merits of this case turn, in large part, on Silver Wheaton's financial reporting based on defendants' interpretation of Canada's corporate income tax laws. Accordingly, the Court begins with a brief overview of several pertinent provisions of the Canadian Income Tax Act.

CIVIL MINUTES – GENERAL            'O'

| Case No. | 2:15-cv-05146-CAS (JEMx) | Date | May 11, 2017 |
|----------|---------------------------|------|--------------|
|          | 2:15-CV-05173-CAS (JEMx)  |      |              |
| Title    | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

Pursuant to the Canadian Income Tax Act, when a person or corporation sells something of value, they are generally required to include the amount they received from the purchaser when computing their taxable income. See generally R.S.C. 1985, c. 1. (5th Supp.) (The "Canadian Income Tax Act"). In addition, Canadian corporations are subject to Canada's transfer pricing rules. See generally R.S.C. 1985, c. 1. (5th Supp.) § 247. Transfer pricing refers to the prices at which services, tangible property, and intangible property are traded across international borders between related entities. The transfer pricing rules govern the amount a corporation must report as taxable income based on such transactions. M.N.R., Canadian Revenue Agency Information Circular 87-2R "International Transfer Pricing" (September 27, 1999) ("CRA Circular"), ¶¶ 2, 5. In general, Canada's transfer pricing rules require that when a taxpayer engages in a non-arm's length transaction the taxpayer must report income from that transaction in such a manner so as to approximate the amount of income the taxpayer would have received had the transaction been negotiated at arm's length. Id. ¶ 7.

According to Canada's tax authority, the Canada Revenue Agency ("CRA"), Canadian courts consider the following criteria in assessing whether parties to a transaction are not dealing at arms' length: (1) was there a common mind which directs the bargaining for both parties to a transaction; (2) were the parties to a transaction acting in concert without separate interests; and (3) was there "de facto" control. M.N.R. Interpretation Bulletin IT-419R2 "Meaning of Arm's Length" (June 8, 2004), ¶ 23.2. If a Canadian corporation enters into a non-arm's length transaction with a non-resident and does not use arm's length pricing, the CRA may (a) recompute the taxable income of the corporation to reflect arm's length pricing, and (b) reassess the income tax payable by applying the income tax rate to the adjusted income. See R.S.C. 1985, c. 1. (5th Supp.), § 247(2); CRA Circular, at ¶ 13. In addition, the CRA may also assess penalties to corporations that fail to report income using arm's length pricing and fail to make contemporaneous records documenting their reasonable efforts to establish arm's length prices. R.S.C. 1985, c. 1. (5th Supp.), §§ 247(3)-(4); CRA Circular ¶ 14-18.

## C.    Silver Wheaton's Tax Position with Regard to SW Cayman

According to plaintiffs, during the Class Period, Silver Wheaton derived its profits principally from streaming agreements Silver Wheaton attributed to its subsidiary, SW Cayman. CAC ¶ 3. Silver Wheaton paid no Cayman Islands or Canadian taxes on these

| | CIVIL MINUTES – GENERAL | | | 'O' |
|---|---|---|---|---|
| Case No. | 2:15-cv-05146-CAS (JEMx) | Date | May 11, 2017 | |
| | 2:15-CV-05173-CAS (JEMx) | | | |
| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | | |

profits. Id. ¶ 4. This is so because Silver Wheaton took the position that SW Cayman was a separate entity and that it was SW Cayman and not Silver Wheaton that had earned these profits. Id. Nevertheless, plaintiffs contend that Silver Wheaton provided an extensive range of services, commercial opportunities, capital, know-how, intellectual property, strategic support, contractual support, and other property to SW Cayman that were critical to generating the revenue purportedly earned by SW Cayman. Id. ¶ 57. Indeed, plaintiffs go so far as to assert that SW Cayman was a mere "conduit" for Silver Wheaton's business operations, id. ¶¶ 72, 98, and that all substantive strategic, managerial, and operational direction relating to the activities of SW Cayman was provided by Silver Wheaton, id. ¶ 58. Plaintiffs contend that the employees of SW Cayman lacked the requisite professional experience and training to perform all of the activities Silver Wheaton attributes to SW Cayman during the Class Period. Id. ¶ 61.

Notwithstanding the substantial services Silver Wheaton provided to SW Cayman, plaintiffs allege that, during the Class Period, Silver Wheaton "recognized no material revenue for tax purposes" with respect to the provision of these services. CAC ¶ 106. Silver Wheaton reported income of $33,605,338 (Canadian Dollars or "Cdn $") for the services it provided to SW Cayman. Dkt. 61-27 at 367. By contrast, SW Cayman reportedly earned profits of Cdn $715 million during the Class Period. CAC ¶ 106. Plaintiffs aver that the manner in which Silver Wheaton reported its income from these sales was in "express contravention" of Canada's transfer pricing rules. Id.

### D.    CRA and Silver Wheaton's Response

Plaintiffs allege that, in May 2011, CRA officials visited SW Cayman to begin an audit of SW Cayman's transactions with Silver Wheaton to determine if Silver Wheaton had violated transfer-pricing rules. Id. ¶ 143. Plaintiffs contend that, pursuant to the CRA's internal procedures, Silver Wheaton would have been informed of the CRA's intention to conduct this audit no later than February of 2011. Id. ¶ 144. Plaintiffs allege that the Class Period commenced on March 30, 2011.

The alleged Class Period ends on July 6, 2015, when Silver Wheaton issued a press release announcing that the CRA was proposing to reassess Silver Wheaton's tax liability ("the Press Release"). Id. ¶ 175. The Press Released stated, in pertinent part:

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:15-cv-05146-CAS (JEMx) | Date | May 11, 2017 |
|---|---|---|---|
|  | 2:15-CV-05173-CAS (JEMx) |  |  |
| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION |  |  |

> Silver Wheaton Corp. . . . announces that it has received a proposal letter dated July 6, 2015 (the "Proposal") from the Canada Revenue Agency (the "CRA") in which CRA is proposing to reassess Silver Wheaton under various rules contained in the Income Tax Act (Canada).
>
> The Proposal outlines CRA's position that the transfer pricing provisions of the Income Tax Act (Canada) relating to income earned by our foreign subsidiaries outside of Canada should apply such that the income of Silver Wheaton subject to tax in Canada should be increased for the 2005 to 2010 taxation years (the "Relevant Taxation Years") by approximately Cdn $715 million (US$567 million).
>
> * * *
>
> If the CRA reassesses Silver Wheaton on the basis outlined in the Proposal, and assuming that Silver Wheaton would be assessed taxes on the foreign subsidiaries' income on the same basis as its Canadian income, Silver Wheaton currently estimates on a preliminary basis that it would be subject to federal and provincial tax of approximately US$150 million in respect of the Relevant Taxation Years. The Proposal also indicates that the CRA is seeking to apply transfer pricing penalties of approximately Cdn $72 million (US$57 million) in respect of the Relevant Taxation Years. . . .

Id. The Press Release also stated that "Management believes that [Silver Wheaton] has filed its tax returns and paid applicable taxes in compliance with Canadian tax law." Id. The Press Release quoted defendant Smallwood saying, "We remain confident in our business structure which we believe is consistent with that typically used by Canadian companies, including Canadian streaming companies, that have international operations." Id. The Press Release concluded by noting that "Silver Wheaton intends to vigorously defend its tax filing positions." Id.

On July 7, 2015, the day after Silver Wheaton issued the Press Release, Silver Wheaton's share price fell $2.08 or approximately 12% to close at $15.46 per share. Id. ¶ 176. Shortly thereafter, two analysts covering Silver Wheaton issued reports

CIVIL MINUTES – GENERAL      'O'

| Case No. | 2:15-cv-05146-CAS (JEMx) | Date | May 11, 2017 |
|---|---|---|---|
|  | 2:15-CV-05173-CAS (JEMx) |  |  |
| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

estimating that the CRA tax audit could reduce Silver Wheaton's value by 40% and 30% respectively.  Id. ¶¶ 177, 178.

### E.  Defendants' Allegedly False or Misleading Statements

During the Class Period, defendants submitted a number of annual and quarterly reports to the SEC detailing Silver Wheaton's financial position.  Defendants appended consolidated financial statements for Silver Wheaton and its subsidiaries to Silver Wheaton's annual and quarterly reports, and these financial statements included balance sheets for fiscal years 2009 through 2014.  See, e.g., id. ¶¶ 139, 150, 157.  Defendants represented that Silver Wheaton's consolidated financial statements were prepared in accordance with either Generally Accepted Accounting Principles ("GAAP") or International Financial Reporting Standards ("IFRS").  See, e.g., id. ¶¶ 138, 148, 156.

Plaintiffs contend that each of the balance sheets included in defendants' annual and quarterly reports was false and misleading because they failed to disclose a tax liability of USD$207 million (USD$150 million for unpaid income tax plus USD$57 million in mandatory penalties) for violating Canada's transfer pricing rules.  See, e.g., id. ¶¶ 140, 146, 151.  According to plaintiffs, under applicable provisions of GAAP and IFRS, defendants were required to recognize and record any tax liability that Silver Wheaton was "more likely than not" to incur.  Id. ¶¶ 141, 152.  In this case, plaintiffs contend that it was more likely than not that the CRA would reject Silver Wheaton's interpretation of transfer pricing rules and thus require Silver Wheaton to pay unpaid income tax plus appropriate penalties.  Id.  Accordingly, in plaintiffs' view, it was a violation of GAAP and IFRS for defendants not to recognize and record a tax liability of USD$207 million on Silver Wheaton's balance sheets.  Id.  Alternatively, even if Silver Wheaton was not more likely than not to incur a tax liability of USD$207 million, plaintiffs contend that, pursuant to other provisions of GAAP and IFRS, defendants were still required to disclose a "contingent" tax liability of USD$207 million.  Id. ¶ 153.  By failing to either record or disclose an actual or contingent tax liability of USD$207 million, plaintiffs contend that the balance sheets incorporated into defendants annual and quarterly reports to the SEC contained false and misleading financial information regarding Silver Wheaton.  See, e.g., id. ¶¶ 140, 146, 151.

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:15-cv-05146-CAS (JEMx) | Date | May 11, 2017 |
| | 2:15-CV-05173-CAS (JEMx) | | |
| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

Plaintiffs contend that the price of Silver Wheaton's securities was artificially inflated by defendants purportedly wrongful conduct.  Id. ¶ 239.  Accordingly, plaintiffs, all of whom purchased Silver Wheaton securities, allegedly suffered damages when it was disclosed that defendants had been disseminating inaccurate financial statements to the investing public.  Id. ¶ 242.

### F.    Plaintiffs and the Proposed Class

Lead Plaintiff Joe Elek and Named Plaintiffs Thomas Bartsch, Larry Brandow, Diana Choi, Ben Potaracke, Jedrzej Borowczyk, and Charles Remmel[2] seek to be appointed class representatives for the following class (the "Class"):

All persons and entities who purchased the publicly traded securities of Silver Wheaton Corp. ("SW") (i) on a United States exchange, or (ii) in a transaction in the United States, during the period from March 30, 2011 to July 6, 2015, inclusive, and did not sell such securities prior to July 6, 2015. Excluded from the Class are Defendants, all present and former officers and directors of SW and any subsidiary thereof, members of such excluded persons' families and their legal representatives, heirs, successors or assigns and any entity which such excluded persons controlled or in which they have or had a controlling interest.

Dkt. 91 at 2.  Accordingly, for purposes of this order, the Court refers to Elek, Bartsch, Brandow, Choi, Potaracke, Borowcyzk, and Remmel collectively as "plaintiffs" or "class representatives."

## III.   LEGAL STANDARDS

"Class actions have two primary purposes: (1) to accomplish judicial economy by avoiding multiple suits, and (2) to protect rights of persons who might not be able to present claims on an individual basis."  Haley v. Medtronic, Inc., 169 F.R.D. 643, 647

---

[2] On February 6, 2017, the parties submitted a joint stipulation that Montgomery and Frohwerk no longer wish to be considered for the role of Class representative.  Dkt. 108.

| | | | |
|---|---|---|---|
| **CIVIL MINUTES – GENERAL** | | | **'O'** |
| Case No. | 2:15-cv-05146-CAS (JEMx) | Date | May 11, 2017 |
| | 2:15-CV-05173-CAS (JEMx) | | |
| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

(C.D. Cal. 1996) (citing <u>Crown, Cork & Seal Co. v. Parking</u>, 462 U.S. 345 (1983)). Federal Rule of Civil Procedure 23 governs class actions. A class action "may be certified if the trial court is satisfied after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." <u>Gen. Tel. Co. of the Southwest v. Falcon</u>, 457 U.S. 147, 161 (1982).

To certify a class action, plaintiffs must set forth facts that provide prima facie support for the four requirements of Rule 23(a): (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. <u>Wal-Mart Stores, Inc. v. Dukes</u>, 131 S.Ct. 2541, 2548 (2011); <u>Dunleavy v. Nadler (In re Mego Fir. Corp. Sec. Litig.)</u>, 213 F.3d 454, 462 (9th Cir. 2000). These requirements effectively "limit the class claims to those fairly encompassed by the named plaintiff's claims." <u>Falcon</u>, 457 U.S. at 155 (quoting <u>Califano v. Yamasaki</u>, 442, U.S. 682, 701 (1979)).

If the Court finds that the action meets the prerequisites of Rule 23(a), the Court must then consider whether the class is maintainable under Rule 23(b). <u>Dukes</u>, 131 S.Ct. at 2548. Rule 23(b)(3) governs cases where monetary relief is the predominant form of relief sought, as is the case here. A class is maintainable under Rule 23(b)(3) where "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and where "a class action is superior to other available methods for fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). "The Rule 23(b)(3) predominance inquiry tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." <u>Hanlon v. Chrysler Corp.</u>, 150 F.3d 1011, 1022 (9th Cir. 1998) (citing <u>Amchem Products, Inc. v. Windsor</u>, 521 U.S. 591 (1997)). The predominance inquiry measures the relative weight of the common to individualized claims. <u>Id.</u>

"Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy." <u>Zinser v. Accufix Research Inst., Inc.</u>, 253 F.3d 1180, 1189 (9th Cir. 2001) (citing <u>Valentino v. Carter-Wallace, Inc.</u>, 97 F.3d 1227, 1234 (9th Cir. 1996)). In determining superiority, the court must consider the four factors of Rule 23(b)(3): (1) the interests members in the class have in individually controlling the prosecution or defense of the separate actions, (2) the extent and nature of any litigations concerning the controversy already commenced by or against members of the class, (3) the desirability or undesirability of concentrating the

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:15-cv-05146-CAS (JEMx) | Date | May 11, 2017 |
| | 2:15-CV-05173-CAS (JEMx) | | |
| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

litigation of the claims in the particular forum, and (4) the difficulties likely encountered in the management of a class action. Id. at 1190–1993. "If the main issues in a case require the separate adjudication of each class member's individual claim or defense, a Rule 23(b)(3) action would be inappropriate." Id. (citing 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1778 at 535–39 (2d. 1986)).

More than a pleading standard, Rule 23 requires the party seeking class certification to "affirmatively demonstrate . . . compliance with the rule—that is he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." Dukes, 131 S.Ct. at 2551. This requires a district court to conduct "rigorous analysis" that frequently "will entail some overlap with the merits of the plaintiff's underlying claim." Id.

## IV.    DISCUSSION

### A.    Rule 23(a) Requirements

#### 1.    Numerosity

Rule 23(a)(1) requires the class to be so numerous that joinder of individual class members is impracticable. See Fed. R. Civ. P. 23(a)(1). "As a general rule . . . classes of 40 or more are numerous enough." Ikonen v. Hartz Mountain Corp., 122 F.R.D. 258, 262 (S.D. Cal. 1988). "Where 'the exact size of the class is unknown, but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied.'" In re Abbott Labs. Norvir Anti-Trust Litig., No. C 04-1511 CW, 2007 WL 1689899, at *6 (N.D. Cal. June 11, 2007) (quoting 1 Alba Cone & Herbert B. Newberg, Newberg on Class Actions § 3.3 (4th ed. 2002)).

Where several million shares of stock were purchased during the class period, courts regularly find that class members are sufficiently numerous to render joinder impracticable. See In re Unioil Sec. Litig., 107 F.R.D. 615, 618 (C.D. Cal. 1985); In re Cooper Companies Inc. Sec. Litig., 254 F.R.D. 628, 634 (C.D. Cal. 2009). On average, 5.5 million shares of Silver Wheaton stock are exchanged on a daily basis. Feinstein Report ¶ 46.

CIVIL MINUTES – GENERAL      'O'

| Case No. | 2:15-cv-05146-CAS (JEMx) | Date | May 11, 2017 |
|----------|--------------------------|------|--------------|
|          | 2:15-CV-05173-CAS (JEMx) |      |              |
| Title    | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

Defendants do not dispute that the Class satisfies the requirement of numerosity. Horne Decl. Ex 11. Accordingly, the Court finds that the Class is sufficiently numerous to satisfy the requirements of Rule 23, sub-section (a)(1).

## 2. Commonality

Under Rule 23(a)(2), plaintiffs must demonstrate that "there are questions of law or fact in common to the class." Fed. R. Civ. P. 23(a)(2). "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury . . . [and t]heir claims must depend upon a common contention . . . of such nature that it is capable of classwide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Dukes, 131 S.Ct. at 2551 (internal quotation marks and citations omitted). "What matters to class certification ... is not the raising of common 'questions' — even in droves — but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." Id.

Plaintiffs allege a course of conduct that misled investors over a period of several years.

> The overwhelming weight of authority holds that repeated misrepresentations of the sort alleged here satisfy the 'common question' requirement. Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable

Blackie v. Barrack, 524 F.2d 891, 902 (9th Cir. 1975). "[A]uthority in this circuit indicates that a continuing scheme to inflate the price of the stock by misrepresentations and manipulative purchases is a common question of law and fact to all those who purchased during the period when the relevant information was being distributed." Unioil, 107 F.R.D. at 619.

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:15-cv-05146-CAS (JEMx) | Date | May 11, 2017 |
| | 2:15-CV-05173-CAS (JEMx) | | |
| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

Defendants do not oppose a finding of commonality. Horne Decl. Ex. 11. Applying the common sense approach of <u>Blackie</u>, the Court finds that this action presents questions of law and fact common to the proposed Class. The Class's claims depend upon a common contention – that Silver Wheaton was required to disclose a risk that its taxes would be reassessed by the CRA in light of its allegedly untenable transfer pricing position in relation to SW Cayman and that, by failing to disclose the risk, Silver Wheaton materially inflated the price of its stock.

### 3. Typicality

Rule 23(a)(3) requires that the "claims or defenses of the representative parties [be] typical of the claims or defenses of the class." "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." <u>Wolin v. Jaguar Land Rover North Am., LLC</u>, 617 F.3d 1168, 1175 (9th Cir. 2010). "The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" <u>Ellis v. Costco Wholesale Corp</u>, 657 F.3d 970, 984 (9th Cir. 2011) (quoting <u>Hanon v. Dataproducts Corp.</u>, 976 F.2d 497, 508 (9th Cir. 1992)). Thus, typicality is satisfied if the plaintiff's claims are "reasonably co-extensive with those of absent class members; they need not be substantially identical." <u>Hanlon</u>, 150 F.3d at 1020.

Defendants do not argue that the Class's proposed representatives are atypical of the Class. It is undisputed that, like all members of the proposed Class, plaintiffs purchased Silver Wheaton common stock during the Class Period and were allegedly damaged by the same misstatements and omissions by Silver Wheaton. Accordingly, the Court finds that plaintiffs' claims are typical of the Class.

### 4. Adequacy

Under Rule 23(a)(4), a named plaintiff must "fairly and adequately protect the interests of the class." To establish adequacy of representation, the issue is whether "the named plaintiffs and their counsel have any conflicts of interest with other class members" and whether "the named plaintiffs and their counsel will prosecute the action

CIVIL MINUTES – GENERAL          'O'

| Case No. | 2:15-cv-05146-CAS (JEMx) | Date | May 11, 2017 |
|----------|--------------------------|------|--------------|
|          | 2:15-CV-05173-CAS (JEMx) |      |              |
| Title    | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

vigorously on behalf of the class." <u>Hanlon</u>, 150 F.3d at 1020. Here, there is no dispute regarding whether the interests of plaintiffs and the Class are aligned. Nor is there a dispute that the Rosen Law Firm can adequately serve as Class counsel.

### i.       Plaintiffs' Knowledge and Involvement in the Case

Each plaintiff has submitted a declaration in which they explain, using the same language, that they:

- "have read the initial complaint and reviewed and authorized the filing of the Consolidated Amended Class Action Complaint[;]"
- understand the core allegations of the CAC;
- are aware that this case is alleged as a class action;
- "understand that a class representative is someone who acts on behalf of other class members in directing the litigation[;]"
- "[are] willing to serve as a class representative . . . [and] have a responsibility to the absent class members to oversee the litigation and ensure that counsel for plaintiffs prosecute the case vigorously and in the interest of all class members equally[;]"
- have and will continue to communicate with their counsel in this matter to oversee the litigation; and
- are willing to diligently perform their duties as class representatives.

<u>See</u> Horne Decl. Ex. 3-5;7-10. Plaintiffs have also submitted a resume for the firm that is representing plaintiffs in this matter. Horne Decl. Ex. 2.

According to defendants, the plaintiffs' declarations are "obviously lawyer-created documents" that are "entitled to little or no evidentiary weight." Opp'n at 4. Defendants argue that plaintiffs must produce credible evidence that they, not the lawyers, are directing the litigation. Opp'n at 3 (citing <u>In re Kosmos Energy Ltd. Sec. Litig.</u>, 299 F.R.D. 133, 145 (N.D. Tex. 2014)). Defendants primarily rely upon a line of cases in the Fifth Circuit, which have held that the PSLRA raised the adequacy threshold in securities fraud cases. <u>See</u> <u>Berger v. Compaq Computer Corp.</u>, 257 F.3d 475, 483 (5th Cir. 2001) (PSLRA raises the adequacy standard and requires that securities class actions be

CIVIL MINUTES – GENERAL      'O'

| Case No. | 2:15-cv-05146-CAS (JEMx) | Date | May 11, 2017 |
|----------|--------------------------|------|--------------|
|          | 2:15-CV-05173-CAS (JEMx) |      |              |
| Title    | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

"managed by active, able class representatives who are informed and can demonstrate they are directing the litigation"); Kosmos, 299 F.R.D. 133 (relying substantially upon Berger). Defendants also aver that no plaintiff could explain during their deposition what transfer pricing is. Opp'n at 9 (citing transcripts of each plaintiff's deposition, except Remmel's).

As an initial matter, the Ninth Circuit has expressly rejected the holding of Berger. See In re Cavanaugh, 306 F.3d 726, 738–39 (9th Cir. 2002) ("Although Congress made several important changes in the Reform Act, it pointedly did not change the requirements of Rule 23"). While it is true that plaintiffs must offer "affirmative evidence" demonstrating that they satisfy the requirements of Rule 23(a), Stockwell v. City & Cty. of San Francisco, 749 F.3d 1107, 1111 (9th Cir. 2014), the evidentiary burden upon plaintiffs "is low; a class representative will be deemed inadequate only if 'startlingly unfamiliar' with the case," Hodges v. Akeena Solar, Inc., 274 F.R.D. 259, 267 (N.D. Cal. 2011).

Although the plaintiffs' declarations use the same language, that does not disqualify them or render the declarations meaningless. See Mauss v. NuVasive, Inc., No. 13CV2005 JM (JLB), 2017 WL 1080654, at *3 (S.D. Cal. Mar. 22, 2017) ("identical declarations . . . prepared by counsel, establish their competency to serve as class representatives"). Each plaintiff appears to have reviewed their declaration and signed it under penalty of perjury. Whereas a self-serving declaration may sometimes be insufficient to withstand summary judgment, defendants cite no authority for their contention that a plaintiff can only become a class representative by drafting a declaration in their own words or by including personal details. The plaintiffs' declarations more than satisfy the requirement that plaintiffs present some affirmative evidence that they are familiar with this case, the claims within it, and the role of a class representative.

Nor does plaintiffs' apparent inability to define or explain transfer pricing during their depositions render them inadequate as Class representatives. Each plaintiff whose knowledge of the case is now challenged by defendants has demonstrated an adequate understanding of the Class claims to assert them vigorously in this case.[3] "Rule 23

_____

[3] Plaintiffs note the following portions of each plaintiff's deposition. Potaracke explained during his deposition:

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:15-cv-05146-CAS (JEMx) | Date | May 11, 2017 |
|----------|--------------------------|------|--------------|
|          | 2:15-CV-05173-CAS (JEMx) |      |              |
| Title    | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

---

The claim that I'm bringing is that Silver Wheaton had a shell company that was being used as a tax dodge, Silver Wheaton Cayman, where they were funneling the money in and out. They were visited by the Canadian IRS and -- which was fine, but they failed to disclose that information that there was a probability or possibility that they would be reassessed.

Horne Reply Decl. Ex. 6, 23:12-21. Borowczyk explained, "I think the claim is simply against Silver Wheaton Corporation because they didn't reveal the full information about taxes in some period of time." Id. Ex. 8, 25:21-24. During Brandow's deposition the following exchange took place:

[Q] So can you explain to me again what information that you would have liked to have known about Silver Wheaton that you believe that the company didn't provide to you?
 . . .
[A]: Okay. Had I known that there was a looming tax bill of hundreds of millions of dollars, I would not have bought the company – I would not have bought stock.
. . .
Q. What do you mean by looming?
A. It was pending, in my opinion. They knew that they were going to be assessed for monies made out of Canada, and that they were going to be made to pay income tax on it.
Q. Okay. I just want to dig in a little bit on this, what do you mean by pending? Is it your belief that the company had already been issued a notice of reassessment by the beginning of the class period?
A. It is my belief that Randy Smallwood, Barnes, and Brown knew that they were going to have to pay this . . . tax bill.

Id. Ex. 9, 20:8-16. Elek explained:

I think they should have disclosed it, they should have disclosed that they have this -- perhaps that they have this tax liability because they were just

CIVIL MINUTES – GENERAL        'O'

| Case No. | 2:15-cv-05146-CAS (JEMx) | Date | May 11, 2017 |
| | 2:15-CV-05173-CAS (JEMx) | | |
| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

should not be used to defeat the ends of justice by facilitating the dismissal of class action complaints involving unsophisticated named plaintiffs." Buus v. WAMU Pension Plan, 251 F.R.D. 578, 587 (W.D.Wash.2008); Rankin v. Rots, 220 F.R.D. 511, 521 (E.D.Mich.2004). A representative plaintiff's lack of detailed, comprehensive knowledge about the legal technicalities of the claims asserted in class litigation therefore provides no basis on which to deny a motion for class certification. Gunnells v. Healthplan Services, Inc., 348 F.3d 417, 430 (4th Cir.2003) ("It is hornbook law . . . that in a complex lawsuit, such as one in which the defendant's liability can be established only after a great deal of investigation and discovery by counsel against a background of legal knowledge, the representative need not have extensive knowledge of the facts of the case in order to be an adequate representative."); Baffa v. Donaldson, Lufkin & Jenrette Securities Corp., 222 F.3d 52, 61 (2d. Cir.2000). Without involvement in the case and a basic knowledge of the facts, a class representative is unable to make informed decisions about the litigation or guard against potential conflicts of interest involving class counsel. Maywalt v. Parker & Parsley Petroleum Co., 67 F.3d 1072, 1077–78 (2d Cir.1995). However, rudimentary knowledge of the claims asserted suffices to satisfy adequacy. See Rankin, 220 F.R.D. at 521. Plaintiffs have demonstrated sufficient knowledge of defendants' alleged securities fraud to represent the class, regardless of whether they can independently explain the niceties of Canadian transfer pricing tax regulations.

---

skating around paying no tax. I mean that's like heaven . . . I think they should have disclosed they may have some tax liability. Perhaps I wouldn't have bought my stock.

Id. Ex. 10, 32:1-12. Bartsch stated, "Silver Wheaton and the executives concealed contingent tax liability . . . They never detailed the – they never communicated the details of the potential tax liability." Id. Ex. 11, 12:25-13:7. Lastly, when asked "How is the company's tax position inconsistent with Canadian transfer pricing law?" Choi responded, "My understanding of how it's inconsistent is that Silver Wheaton claimed that all of the income between, what, 2005 and 2010 I believe? -- was generated in the Cayman Islands and therefore wasn't liable to Canadian tax while the CRA disagrees." Id. Ex. 12, 21:24-22:5. The Court finds this testimony sufficient to demonstrate plaintiffs' basic knowledge of the claims in this case.

CIVIL MINUTES – GENERAL          'O'

| Case No. | 2:15-cv-05146-CAS (JEMx) | Date | May 11, 2017 |
|----------|--------------------------|------|--------------|
|          | 2:15-CV-05173-CAS (JEMx) |      |              |
| Title    | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

### ii.    Plaintiffs' PSLRA Certifications

Defendants also argue that four plaintiffs have submitted false certifications regarding their Silver Wheaton transactions during the Class Period. The PSLRA requires every plaintiff seeking to serve as a class representative to provide a sworn, personally signed certification setting forth "all of the transactions of the plaintiff in the security that is the subject of the complaint during the class period[.]"  15 U.S.C. § 77z-1(a)(2)(A)(iv).

The parties appear to agree that Remmel[4], Borowczyk[5], Potaracke[6], and Brandow[7] each provided a sworn certification that contained errors – omitting many of these

---

[4] Remmel's first certification stated that he had made two trades, but on January 19, 2017, he signed an amended certification acknowledging nine trades. Horne Reply Decl. Ex. 13. Remmel has submitted a declaration explaining that his first certification inadvertently omitted two trades in August 2014, when he sold and bought back 10,000 shares within a week. Id. ¶ 6. He also states that he was unaware that he should have included four trades in Silver Wheaton *options* in his original certification. Id. ¶ 7.

[5] Borowczyk's original certification included two trades in Silver Wheaton stock, but he has since executed a certification acknowledging 120 trades. Horne Reply Decl. Ex. 14. Borowczyk explains in his declaration that he engaged in a series of transactions in 2012 and 2013 which resulted in the sale of all of his, then existing, stock in Silver Wheaton by the end of 2013. Id. ¶ 5. Borowczyk explains that when he completed his original certification "it was my understanding because the market remained ignorant of Defendants' misleading statements until Silver Wheaton announce the proposed Reassessment . . . I believed that I could not recover for my losses from the 2012-2013 Transactions and therefore these earlier transactions were not relevant to the class action or the complaint." Id. ¶ 7. Borowczyk's original certification only disclosed the two trades (purchases) of Silver Wheaton stock which resulted in ownership of Silver Wheaton stock when the Class Period ended and the alleged disclosure of the CRA's proposed tax reassessment occurred. Id. ¶ 8.

[6] Potaracke certified having two trades in Silver Wheaton stock during the Class Period. One of the two trades was in an account that he holds with his wife in joint

CIVIL MINUTES – GENERAL          'O'

| Case No. | 2:15-cv-05146-CAS (JEMx) | Date | May 11, 2017 |
|----------|--------------------------|------|--------------|
|          | 2:15-CV-05173-CAS (JEMx) |      |              |
| Title    | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION |||

plaintiffs' pertinent trades in Silver Wheaton securities. Defendants do not dispute that each plaintiff has now corrected the errors in their certifications.

"Multiple district courts have held that minor or inadvertent mistakes made in a sworn certification do not strike at the heart of Rule 23's adequacy requirement." In re Solar City Corp. Sec. Litig., No. 16-CV-04686-LHK, 2017 WL 363274, at *6 (N.D. Cal. Jan. 25, 2017) (Koh, J.) (quotation marks omitted) (collecting cases). Although the plaintiffs' errors in their trade certifications may demonstrate carelessness, they are not the types of errors that would normally preclude a finding of adequacy to represent the Class. The errors do not demonstrate a conflict with the Class, nor do they make plaintiff's claims atypical of the Class. A plaintiff's lack of credibility or bad faith may render them inadequate to represent a class, but there must be "admissible evidence so severely undermining plaintiff's credibility that a fact finder might reasonably focus on plaintiff's credibility, to the detriment of the absent class members' claims." Dubin v. Miller, 132 F.R.D. 269, 272 (D. Colo. 1990).

With the exception of Brandow's error, which is unexplained, the plaintiffs have offered reasonable explanations for what amount to clerical errors in their prior certifications. Whatever the explanation for Brandow's errors, they appear to have been promptly corrected. Accordingly, these four plaintiffs' errors in their certifications do not

---

tenancy and one was in his wife's Roth IRA account. Horne Reply Decl. Ex. 15 ¶¶ 5-6. The two trades were agreed upon by his wife and used money they considered jointly owned, but the trade in his wife's IRA account was not his own trade in Silver Wheaton securities. Plaintiffs aver that Potaracke has since obtained an assignment of claims from his wife, which has been produced to defendants such that it was unnecessary for him to amend his certification. Id. The Court assumes for present purposes that the foregoing assignment, which defendants do not dispute, cured any defect in Potaracke's certification.

[7] Brandow's original certification stated that he had made eight trades during the Class Period, but on January 20, 2017, Brandow provided an amended certification in which he acknowledged 50 pertinent trades during the class period. See Horne Reply Decl. Ex. 16. Plaintiffs do not explain the apparent error in Brandow's original certification.

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:15-cv-05146-CAS (JEMx) | Date | May 11, 2017 |
| | 2:15-CV-05173-CAS (JEMx) | | |
| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

render them inadequate class representatives. See S. Ferry LP No. 2 v. Killinger, 271 F.R.D. 653, 660 (W.D. Wash. 2011) (errors in PSLRA certification were harmless insofar as they were corrected "as soon as they were brought to his attention"); In re Initial Pub. Offering Sec. Litig.., 227 F.R.D. 65, 98 (S.D.N.Y. 2004) (omission of trades from certification did not render representative inadequate), vacated and remanded on other grounds In re Initial Pub. Offerings Sec. Litig., 471 F.3d 24 (2d Cir. 2006).

### iii.    Discovery Conduct

Defendants also argue that plaintiffs have refused to take discovery seriously, militating against a finding that they adequately represent the class.  Under certain circumstances, a *failure* to comply with discovery obligations may bear upon a class representative's willingness to live up to his or her fiduciary obligations to the Class. See Kline v. Wolf, 88 F.R.D. 696, 700 (S.D.N.Y. 1981), aff'd, 702 F.2d 400 (2d Cir. 1983) (refusal to answer "critical and relevant questions as to whether she would have purchased . . . shares . . . may be considered" with respect to a representative's adequacy).  However, the alleged discovery violation must be "glaring." In re AM Int'l, Inc. Sec. Litig., 108 F.R.D. 190, 197 (S.D.N.Y. 1985).

Defendants have offered no evidence of any material discovery violation – let alone a failure to comply with discovery obligations that undermines any plaintiff's credibility or risks damaging the Class.  Instead, defendants argue that plaintiffs are, to varying degrees, insufficiently familiar with the document responses produced on their behalf, failed to conduct sufficiently thorough searches for responsive documents, or have been slow to produce responsive documents.  Having carefully considered defendants arguments and examples of purported discovery violations, the Court finds that none disqualifies any plaintiff from acting as a representative here.  Defendants do not aver that they have been denied production or that any plaintiff has refused to answer critical questions.  The ongoing discovery process does not provide a basis for denying the instant motion.

In light of the foregoing, the Court finds that plaintiffs have demonstrated that they will be adequate representatives of the proposed class.

CIVIL MINUTES – GENERAL          'O'

| Case No. | 2:15-cv-05146-CAS (JEMx) | Date | May 11, 2017 |
| | 2:15-CV-05173-CAS (JEMx) | | |
| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

## B.    Rule 23(b)(3) Requirements

Having concluded that the Rule 23(a) requirements are met, the Court turns to Rule 23(b).  Under Rule 23(b)(3), class certification is appropriate "if Rule 23(a) is satisfied" and if "the court finds that [1] the questions of law or fact common to class members predominate over any questions affecting only individual members, and that [2] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3); Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc., 244 F.3d 1152, 1162–63 (9th Cir. 2001).

### i.    Presumption of Reliance

In order to succeed in their claims, plaintiffs must have relied upon defendants' failure to disclose the risk that Silver Wheaton would have to pay back-taxes and a penalty because of its tax position in relation to SW Cayman.  Plaintiffs contend that they are entitled to a presumption of reliance pursuant to either Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128 (1972) (establishing a presumption of reliance in certain cases based primarily upon omissions), or Basic Inc. v. Levinson, 485 U.S. 224 (1988) (establishing a presumption of reliance where plaintiffs claim to have relied upon a stock's price in an efficient market).

### 1.    Affiliated Ute

In Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128 (1972), the Supreme Court held that where a securities fraud involves "primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision." 406 U.S. at 153.  Accordingly, the Court must "analytically characterize the action as either primarily a nondisclosure case (which would make the presumption applicable), or a positive misrepresentation case."  Binder v. Gillespie, 184 F.3d 1059, 1064 (9th Cir. 1999).

During oral argument on the instant motion, the parties discussed whether this case should be characterized as a case that is primarily about omissions or misrepresentations. Plaintiffs argued, as they did in their moving papers, that this is strictly and primarily an

CIVIL MINUTES – GENERAL          'O'

| Case No. | 2:15-cv-05146-CAS (JEMx) | Date | May 11, 2017 |
| | 2:15-CV-05173-CAS (JEMx) | | |
| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

omissions case.  Defendants argue in their opposition that this is primarily a
misrepresentations case.  During oral argument, defendants requested that the Court enter
a pretrial order stating that this is an omissions case and committing plaintiffs to one
theory or another.  Defendants appear to seek a ruling that, in light of plaintiffs' position
in the context of this motion, plaintiffs should be forced to elect one theory or the other
and be estopped from later pursuing misrepresentation claims.  The Court declines to
enter such an order.

    In contrast to the parties' contention during oral argument, the Court finds that this
is *not* primarily a case about omissions and plaintiffs are not entitled to an <u>Affiliated Ute</u>
presumption of reliance.  The reasoning of <u>In re Interbank Funding Corp. Sec. Litig.</u>, 629
F.3d 213 (D.C. Cir. 2010), is persuasive.  In <u>Interbank</u>, the plaintiff sought the benefit of
the <u>Affiliated Ute</u> presumption where she had purchased stock in Interbank, a Ponzi
scheme.  The defendant was a company, Radin, which had audited the Ponzi scheme and
publicly attested to the accuracy of its balance sheets.  The plaintiff argued that it was
entitled to a presumption of reliance upon Radin's failure to disclose that Interbank had
been a Ponzi scheme.  The court rejected plaintiff's argument, observing that plaintiff's
claims were predicated upon two types of purported "omissions," inaccuracies in
Interbank's balance sheets and that Radin's audit had not conformed with GAAP.  <u>Id.</u> at
220.  Both were better characterized as misrepresentations because accurate balance
sheets would have revealed the Ponzi scheme and because Radin had "affirmatively
misrepresented the accuracy of [the financial statements] by stating that they fairly
presented Interbank's financial position and conformed with GAAP."  <u>Id.</u>  The complaint
in <u>Interbank</u> alleged that Radin had made public statements about Interbank's balance
sheets which proved to be false – accordingly, plaintiff was not entitled to the <u>Affiliated
Ute</u> presumption of reliance upon Radin's purported omissions.  <u>Id.</u>

    The allegations in <u>Interbank</u> are analogous to the allegations here.  Plaintiffs allege
that Silver Wheaton's financial statements were inaccurate because they did not include a
tax liability (i.e. some numbers were inflated).  <u>See e.g.</u> CAC ¶¶ 140, 146, 151.
Additionally, plaintiffs allege that defendants certified that their financial statements were
prepared in conformity with GAAP or IFRS, but that the statements were not.  <u>See e.g.</u>
<u>Id.</u> ¶¶ 138, 149, 156.  Plaintiffs similarly allege that defendants repeatedly certified the
accuracy of the financial statements, notwithstanding the inflated numbers.  <u>See e.g. Id.</u>

CIVIL MINUTES – GENERAL          'O'

| Case No. | 2:15-cv-05146-CAS (JEMx) | Date | May 11, 2017 |
| | 2:15-CV-05173-CAS (JEMx) | | |
| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

¶¶ 154, 161, 168.  The CAC is replete with alleged *misrepresentations* akin to those in Interbank.  That plaintiffs may now portray the foregoing misrepresentations as omissions is of no moment.  Any false statement might also be portrayed as a failure to disclose the truth, but that does not render it an omission in the sense that the term is used in Affiliated Ute and its progeny.  See Interbank, 629 F.3d at 220-21 ("Appellants portray these errors as failures to disclose, but 'the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions, [Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009)], so we need not accept this characterization").[8]  In light of the foregoing, the Court concludes that this case is not "primarily a nondisclosure case," Binder, 184 F.3d at 1064, instead it is primarily a positive misrepresentation case, to which the Affiliated Ute presumption does not attach.

## 2.     Basic

However, plaintiffs are entitled to a presumption of reliance under Basic.  "[T]o invoke the Basic presumption, a plaintiff must prove that: (1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed." Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2413, 189 L. Ed. 2d 339 (2014).  The Basic presumption is rebuttable if defendants make "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price[.]"  Basic, 485 U.S. at 248.

---

[8] As plaintiffs point out, several district courts have reached conclusions at odds with Interbank.  The court in Interbank acknowledged these same cases, none of which is binding upon the Court here.  The Court agrees with the Interbank court that these cases are unpersuasive. Id. at 221 (citing  Katz v. MRT Holdings, LLC, No. 07–61438–CIV, 2008 WL 4725284 (S.D.Fla. Oct.24, 2008); Getty v. Harmon, No. C98–178, 1998 WL 919368 (W.D.Wash. Oct.23, 1998); Walco Invs., Inc. v. Thenen, 168 F.R.D. 315 (S.D.Fla.1996); In re Home–Stake Prod. Co. Sec. Litig., 76 F.R.D. 351 (N.D.Okla.1977)).

CIVIL MINUTES – GENERAL          'O'

| Case No. | 2:15-cv-05146-CAS (JEMx) | Date | May 11, 2017 |
|----------|--------------------------|------|--------------|
|          | 2:15-CV-05173-CAS (JEMx) |      |              |
| Title    | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

Here, defendants do not dispute that the alleged misrepresentations were publicly known, that they would be material to investors, and that plaintiffs owned Silver Wheaton securities when the alleged disclosure occurred. Nor do defendants dispute that Silver Wheaton is traded on an efficient market. The Feinstein Report establishes as much and the Court will not belabor the point by reciting his findings here. See generally Feinstein Report. Instead, defendants contend that plaintiffs have actually alleged two separate sub-classes.

The CAC alleges that:

> [h]ad Plaintiff and the other members of the Class known the truth, they
> would not have purchased [Silver Wheaton stock], or would not have
> purchased [the stock] at the inflated prices that were paid.

CAC ¶ 239. In defendants view, this allegation demonstrates the existence of two separate sub-classes: (1) a class of risk-averse investors who would not have purchased Silver Wheaton stock at all if they had known the undisclosed risk ("Sub-Class A" in defendants' nomenclature) and (2) a class of investors who would have purchased Silver Wheaton stock nonetheless, but at a lower price ("Sub-Class B"). Defendants argue that Sub-Class A is not entitled to the Basic presumption because they did not trade in reliance upon the integrity of Silver Wheaton's stock price, but rather based upon the perceived riskiness of Silver Wheaton stock. Defendants argument is without merit and has no basis in Basic and its progeny.

To rebut the presumption of reliance, defendants must sever the link between the alleged misrepresentation or omission and either (1) the price paid or (2) the decision to purchase. Basic, 485 U.S. at 248. That some plaintiffs may have been motivated by different reasons in their decisions to purchase does not sever their decision to purchase Silver Wheaton stock from defendants' alleged misrepresentation. On the contrary, any class members who would not have bought the stock if they had known about the alleged risk of a tax reassessment were plainly motivated to purchase by defendants' alleged omission of that risk. Such plaintiffs cannot and should not be required to prove "a speculative state of facts, i.e., how he would have acted if omitted material information

CIVIL MINUTES – GENERAL          'O'

| Case No. | 2:15-cv-05146-CAS (JEMx) | Date | May 11, 2017 |
|----------|--------------------------|------|--------------|
|          | 2:15-CV-05173-CAS (JEMx) |      |              |

| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION |
|-------|--------------------------------------------------|

had been disclosed." Id. at 245. This is precisely why the Basic presumption was adopted. Id. at 245.[9]

Plainly, if Silver Wheaton had disclosed a substantial risk of being assessed US $207 million in unpaid tax liabilities, the price might have reflected such a risk during the Class Period. In such a hypothetical world, the Class might *theoretically* be subdivided into more than two groups: (1) members who would have chosen not to buy Silver Wheaton because of their aversion to risk, (2) others who would have purchased the stock because, in their view, the lower price reflected the appropriate amount of risk, and (3) still others who would have been unwilling to buy at the prevailing price because, in their view, it did not adequately account for the risk. Defendants' expert acknowledges that the individualized inquiry defendants' say precludes certification is based on the determination of the "different potential investment decisions of putative class members in a but-for world in which the alleged truth had been disclosed." Kleidon Report ¶ 20. However, Basic stands for the proposition that *none* of the foregoing hypothetical investor groups are required to prove how they would have acted, but-for the alleged fraud. Although defendants might seek to sub-divide the Class in theory, all of the Class members are entitled to the presumption of reliance because the market in which they traded was efficient and market prices reflected all of the publicly available information

---

[9] Furthermore, in Halliburton, the Court expressly considered and rejected an analogous argument about "value investors" who are indifferent to price but purchase stock based upon their evaluation of where the price stands relative to true value. Halliburton, 134 S. Ct. at 2411. The Court ruled that, to be entitled to the Basic presumption, such an investor "need only trade stock based on the belief that the market price will incorporate public information within a reasonable period." Id.

That same reasoning applies to a risk-averse investor, who trades based upon the belief that the market price incorporates all publicly available information about the stock and the market price is not distorted due to undisclosed material risks to the company that issues the stock. Notably, although there are no doubt many investors trading in stocks based upon their perceived risks and/or their perceived value rather than picking a stock based solely on its price, defendants do not direct the Court to any instance in which such distinctions rebutted the Basic presumption.

## CIVIL MINUTES – GENERAL     'O'

| Case No. | 2:15-cv-05146-CAS (JEMx) | Date | May 11, 2017 |
|---|---|---|---|
| | 2:15-CV-05173-CAS (JEMx) | | |
| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

at the time. Indeed, defendants' argument appears to be based on confusing two situations. A defendant may be able to make out a defense as to an individualized class member who would have purchased the stock in question even if he had known of the existence of the alleged fraud, see Blackie, 524 F.2d at 906 n.22 ([t]he right of rebuttal, however, does not preclude the predominance of common questions), but that is different from the present situation where an investor would have bought the stock after the public disclosure of the alleged fraud and after the stock price had already declined based on that disclosure. This second type of investor is entitled to the same presumption of reliance that is available to an investor who would not have purchased the stock at all if he or she had known of the existence of the fraud.

If it were necessary to separate the Class into groups based upon whether members were motivated by risk or by price, such an individualized inquiry might provide a basis for denying certification. However, with respect to the presumption of reliance, no such distinction is necessary – the entire Class is entitled to the presumption of reliance upon defendants' alleged omissions under the fraud on the market doctrine.

### ii.     Methodology for Calculating Damages

In order to satisfy Rule 23(b)(3)'s predominance standard, plaintiffs must demonstrate that "damages are capable of measurement on a classwide basis." Comcast Corp. v. Behrend, 133 S.Ct. 1426, 1433 (2013). Defendants argue that plaintiffs have failed to make such a showing and, thus, that individualized damages determinations will predominate over issues subject to classwide proof.

As the Ninth Circuit has reiterated post-Comcast, "[i]n this circuit . . . damage calculations alone cannot defeat certification." Leyva v. Medline Indus. Inc., 716 F.3d 510, 513 (9th Cir. 2013) (quoting Yokoyama v. Midland Nat'l Life Ins. Co., 594 F.3d 1087, 1094 (9th Cir.2010)). Comcast stands for the proposition that "plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability" for a class to be certified under Rule 23(b)(3). Leyva, 716 F.3d at 514. The Court need not "decide the precise method for calculating damages at this stage," but rather must find "that calculation of damages will be sufficiently mechanical that whatever individualized inquiries need occur do not defeat class certification." Jordan v.

| Case No. | 2:15-cv-05146-CAS (JEMx) | Date | May 11, 2017 |
|---|---|---|---|
|  | 2:15-CV-05173-CAS (JEMx) |  |  |
| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

<u>Paul Fin., LLC</u>, 285 F.R.D. 435, 466 (N.D. Cal. 2012) (Illston, J.). Plaintiffs must offer a method that tethers their theory of liability to a methodology for determining the damages suffered by the Class.

In his report, Feinstein explains that damages can be calculated on a per share basis for the entire Class.[10] Feinstein Report ¶¶ 177-179. Feinstein explains that this can be accomplished by first using valuation tools to determine if the alleged fraud caused Silver Wheaton stock prices to be artificially inflated. To do this Feinstein proposes examining whether the corrective disclosure on July 7, 2015, caused the stock price to decline after controlling for other potentially confounding non-fraud-related information. <u>Id.</u> ¶ 177(i). In other words, Feinstein proposes an event-study of Silver Wheaton's stock price before and after Silver Wheaton disclosed that it had received a proposed tax reassessment letter from the CRA. Once the amount of inflation at the time of the disclosure has been estimated based upon the disclosure's effect on the stock price, Feinstein proposes constructing an inflation ribbon to indicate how much artificial inflation from the alleged fraud was embedded in the price of Silver Wheaton common stock on each day of the Class Period. <u>Id.</u> ¶ 177(ii). Such an inflation ribbon is often constructed by working backwards from the time of the final corrective disclosure, <u>id.</u>, in a process commonly referred to as back-casting. Thereafter, each class member's damages can be calculated as "the difference between the inflation on the date shares were purchased and the inflation on the date those same shares were subsequently sold." <u>Id.</u> ¶ 177(iii).

---

[10] Neither party argues that either expert is unqualified or that their opinions are otherwise inadmissible. Feinstein is an Associate Professor of Finance at Babson College and the president of a financial-research consulting firm. Feinstein Report ¶ 6. He holds a Ph.D. in Economics from Yale University. <u>Id.</u> Kleidon, defendants' expert, is a former Associate Professor at the Graduate School of Business as well as the law school at Stanford University. Kleidon Report ¶ 1. Kleidon is now Senior Vice President at a financial and economic consulting firm and an Honorary Professor at the School of Business at the University of Queensland in Australia. <u>Id.</u> The Court is satisfied, for present purposes, that each is qualified to offer their opinions in regard to the appropriate method for calculating damages here.

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:15-cv-05146-CAS (JEMx) | Date | May 11, 2017 |
|---|---|---|---|
| | 2:15-CV-05173-CAS (JEMx) | | |
| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

"The event study method is an accepted method for the evaluation of materiality damages to a class of stockholders in a defendant corporation," In re Imperial Credit Indus., Inc. Sec. Litig., 252 F.Supp.2d 1005, 1014 (C.D.Cal. 2003), as is the back-casting method proposed in relation to the event study, see e.g. Ludlow v. BP, PLC, 800 F.3d 674, 684 (5th Cir. 2015) ("BP II") (approving of back-casting methodology where revelations allegedly dissipated stock-price inflation). The question before the Court is not whether plaintiffs will ultimately be successful in demonstrating a causal connection between the public disclosure and the decline in Silver Wheaton's stock or whether they will otherwise succeed in proving damages. In re Diamond Foods, Inc., Sec. Litig., 295 F.R.D. 240, 252 (N.D. Cal. 2013). Instead, the Court must determine whether plaintiffs have demonstrated that common questions regarding damages predominate over individual ones. Plaintiffs have made the requisite showing.

Defendants present several interrelated arguments in opposition to the Court's conclusion. First, defendants argue simply that plaintiffs have failed to satisfy their burden of *offering* a method of calculating damages at all. The Court disagrees. Insofar as the Feinstein Report sets forth a proposal for how damages might be calculated on a classwide basis, that is sufficient to meet plaintiffs' burden here. Plaintiffs' have offered a plan. See In re Diamond Foods, Inc., Sec. Litig., 295 F.R.D. 240, 252 (N.D. Cal. 2013) (plaintiffs' event-study proposal satisfied their burden where "defendant does not identify any specific complications that would make such a calculation impossible or ill-advised in this case").

Defendants further argue that, if plaintiffs have offered a plan, it is not appropriately tied to the theory (or theories) of liability, as required by Comcast. Defendants rely principally upon BP II, wherein the Fifth Circuit affirmed the denial of class certification based upon its interpretation of Comcast. The BP II court determined that a proposed class wide damages methodology was not appropriately linked to the theory of liability. Leaving aside whether or not BP II was properly decided, it is distinguishable and does not bind this Court.

As discussed above, all members of the Class here are entitled to a presumption of reliance – a presumption that they purchased Silver Wheaton stock in reliance upon on an efficient market, where the price reflected all publicly available information (including risks). Because the price of Silver Wheaton stock was allegedly inflated by defendants'

CIVIL MINUTES – GENERAL          'O'

| Case No. | 2:15-cv-05146-CAS (JEMx) | Date | May 11, 2017 |
|---|---|---|---|
| | 2:15-CV-05173-CAS (JEMx) | | |
| Title | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

nondisclosure of a substantial tax liability risk, Class members are entitled to damages based on the losses resulting from the disclosure of the alleged fraud. In Comcast, the plaintiffs conceded that their proposed damages model did not control for factors unrelated to their theory of liability. Comcast, 133 S. Ct. at 1431. Here, plaintiffs propose an event-study that attempts to isolate only the decline in Silver Wheaton's stock value which can be attributed to the alleged fraud. Accordingly, plaintiffs' proposed methodology will attempt to isolate damages suffered as a result of defendants' alleged fraud. Damages for every class member can be mechanically calculated according to Feinstein's proposed methodology and are therefore subject to class wide proof. Whether plaintiffs will ultimately succeed in meeting their full evidentiary burden and whether defendants may be able to rebut the presumption of reliance are questions for another day. Comcast does not require any more of a showing than plaintiffs have made here. See Leyva, 716 F.3d at 514 ("the amount of damages is invariably an individual question and does not defeat class action treatment" (quoting Blackie, 524 F.2d at 905)). [11]

---

[11] During oral argument, defense counsel argued that, if the risk of a tax liability changed over the course of the Class Period, plaintiffs' proposed damages methodology would be inadequate. Defendants argued that the risk of a potential tax liability or tax reassessment likely increased over the Class Period as the CRA audited SW Cayman. Defendants argue and that plaintiffs have not adequately proposed a method by which to calculate the amount of price inflation over time in light of the changing risk of tax liability.

This argument, raised for the first time during oral argument, is unpersuasive. If, as plaintiffs allege, defendants were always aware of a serious risk that Silver Wheaton would be assessed a tax liability because of an untenable tax position, the only *hypothetical* changes in the inflation ribbon relate to uncertainty about whether the CRA would discover and take action based on Silver Wheaton's conduct – defendants do not contend that Canada's tax laws changed. In this circumstance, it is possible that there would be no change in the inflation ribbon during the Class Period. Defendants have offered no evidence supporting their contention that the amount of price inflation might have changed over the course of the Class Period. Plaintiff's expert has offered his opinion that he could adapt his damages method to deal with changes in inflation during

CIVIL MINUTES – GENERAL          'O'

| Case No. | 2:15-cv-05146-CAS (JEMx) | Date | May 11, 2017 |
|----------|--------------------------|------|--------------|
|          | 2:15-CV-05173-CAS (JEMx) |      |              |
| Title    | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

In light of the foregoing, the Court concludes that questions of law or fact common to class members predominate over any questions affecting only individual members.

### iii.     Superiority

In addition to a predominance of common questions, a class proponent must also demonstrate that the class action is superior to other methods of adjudicating the controversy. See Valentino, 97 F.3d at 1235 (explaining that the party seeking certification needs to make a "showing [as to] why the class mechanism is superior to alternative methods of adjudication"). A class action may be superior where "class-wide litigation of common issues will reduce litigation costs and promote greater efficiency." Id. at 1234. Rule 23(b)(3) provides the following non-exhaustive list of four factors to consider in this assessment:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;

(D) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3).

the Class Period, but has not observed evidence that inflation changed. Feinstein Rebuttal ¶¶ 54, 57, 63.

Even if the Court were to accept defendants' hypothetical scenario in which the inflation ribbon changed over time, damages would still be subject to class-wide proof. Defendants' concern goes to whether plaintiffs can ultimately prove damages using a class-wide method of proof. Rule 23(b)(3) is concerned with whether class-wide questions predominate over questions affecting only individual class members. Whether the inflation ribbon changed over the course of the Class Period, does not alter the fact that this would be a class-wide question.

**CIVIL MINUTES – GENERAL**   **'O'**

| Case No. | 2:15-cv-05146-CAS (JEMx) | Date | May 11, 2017 |
|----------|--------------------------|------|--------------|
|          | 2:15-CV-05173-CAS (JEMx) |      |              |
| Title    | IN RE SILVER WHEATON CORP. SECURITIES LITIGATION | | |

Here, the Court finds that each factor militates in favor of certification. The Court is unaware of any other actions initiated by members of the Class and there do not appear to be any potential management problems. Furthermore, "[w]here thousands of identical complaints would have to be filed, it is superior to concentrate claims through a class action in a single forum." In re Juniper Networks, Inc. Sec. Litig., 264 F.R.D. 584, 592 (N.D. Cal. 2009). Accordingly, the Court concludes that resolution on a class wide basis will be superior to other methods of resolving claims by members of the Class.

## V.   CONCLUSION

In light of the foregoing, plaintiffs' motion for Class certification is **GRANTED**.

IT IS SO ORDERED.

|  | 00 | 00 |
|--|----|----|
| Initials of Preparer | CMJ | |