REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiffs/Class Representatives*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re Silver Wheaton Corp. Securities Litigation | Master File No:  2:15-cv-05146-CAS-PJWx c/w: 2:15-cv-05173-CAS(PJWx) |
| | **CONSOLIDATED SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES LAWS** |
| | JURY TRIAL DEMANDED |
| | Complaint Filed: July 8, 2015 Trial Date: None Set |

Plaintiffs and Class Representatives (together "Plaintiffs"), by Plaintiffs' undersigned attorneys, individually and on behalf of all other persons similarly situated, alleges the following based upon personal knowledge as to Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of Defendants' public and other documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding

- 1 -

Silver Wheaton Corp. ("Silver Wheaton Canada,")[1] interviews with former Silver Wheaton employees, depositions, documents produced in discovery, consultation with Canadian operational and legal experts on Canadian tax transfer pricing rules, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action brought on behalf of a class consisting of all persons and entities who purchased the publically traded securities of Silver Wheaton Canada (i) on a United States exchange, or (ii) in a transaction in the United States, during the period from March 30, 2011 to July 6, 2015, inclusive, and did not sell such securities prior to July 6, 2015. Excluded from the Class are Defendants, all present and former officers and directors of Silver Wheaton and any subsidiary thereof, members of such excluded persons' families and their legal representatives, heirs, successors or assigns and any entity which such excluded persons controlled or in which they have or had a controlling interest.

2.     Silver Wheaton, a precious metals streaming company, pioneered the business in 2004. Put simply, Silver Wheaton makes large, up-front payments to mines it neither owns nor operates in exchange for the guaranteed right to buy a large portion of the mine's future silver output at roughly the costs of producing it, reselling it in the liquid silver market for much higher prices. This Complaint refers to such agreements as "streaming agreements" and the silver from any particular mine "streams."

---

[1] This Complaint uses the term "Silver Wheaton" to refer to activities undertaken by Silver Wheaton Canada together with its subsidiaries. "Silver Wheaton Canada" refers to Silver Wheaton Corp. alone. "Silver Wheaton Caymans" refers to activities undertaken solely by Silver Wheaton (Caymans) Ltd.

Consolidated Second Amended Class Action Complaint

3.      The up-front payments often amount to several hundred million dollars. Accordingly, Silver Wheaton must select mines and negotiate up-front payments and other streaming agreement terms with great care. The seasoned industry professionals who staff Silver Wheaton's Vancouver, Canada headquarters (i.e., Silver Wheaton Canada), many of whom have long careers in the mining sector, work long hours to carefully model future profitability of silver mines under a host of conditions, while calculating and considering carefully whether various political, geological, and operational risks exist, and if so whether they fall within tolerable limits. Silver Wheaton Canada conducts ongoing due diligence of the mines even after entering into streaming agreements, negotiating favorable outcomes when unexpected events occur at the mines. Beyond that, Silver Wheaton Canada's skilled staff are taken seriously, leveraging their professional reputations to confidently approach both financers and mines.

4.      These activities, undertaken by the skilled staff of Silver Wheaton Canada, accounted for nearly all of Silver Wheaton's activities. There was a small remainder, however. Someone had to physically sign the streaming agreements. And someone had to perform the back-office function of selling the silver received, which Silver Wheaton never takes physical possession of, to brokers.

5.      ███████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

Consolidated Second Amended Class Action Complaint

1 ███████████████████████████████████████████████████████████

2 ███████████████████████████████████████████

3      6.      During the Tax Period of 2005 through 2010, Canada had in place

4 transfer pricing rules eliminating the opportunity for multi-national enterprises to

5 obtain a tax advantage by adopting intra-group pricing strategies that shift income to

6 a related party that is resident in a low tax jurisdiction. These rules required such

7 enterprises to ensure, for tax purposes, that the amounts included in the income of a

8 Canadian taxpayer for transactions entered into with non-resident persons with which

9 the taxpayer does not deal at arm's length reflect the price that arm's length parties

10 would agree to pay.

11      7.      Deloitte LLP (Canada) ("Deloitte"), which was both Silver Wheaton

12 Canada's auditor ████████████████████████████████████████████

13 ███████████████████████████████████████████████████████████

14 ███████████████████████████████████████████████████████████

15 ███████████████████████████████████████████████████████████

16 ███████████████████████████████████████████████████████████

17 ███████████████████████████████████████████████████████████

18 ███████████████████████████████████████████████████████████

19 ███████████████████████████████████████████████████████████

20 ███████████████████████████████████████████████████████████

21 ███████████████████████████████████████████████████████████

22 █████████████████████████████████

23      8.      ███████████████████████████████████████████

24 ███████████████████████████████████████████████████████████

25 ██████████████████████████████████████

26      9.      ███████████████████████████████████████████

27 ███████████████████████████████████████████████████████████

28 ███████████████████████████████████████████████████████████

Consolidated Second Amended Class Action Complaint

1

2

3

4

5

6    10.

7

8

9

10

11

12

13

14

15

16

17    11.

18

19

20

21

22

23

24

25    12.    Deloitte nevertheless signed off on Silver Wheaton Canada's financial

26    statements, even though the statements did not record or disclose Silver Wheaton's

27    potential tax liability because it attributed income to Silver Wheaton Caymans.

28

Consolidated Second Amended Class Action Complaint



Consolidated Second Amended Class Action Complaint

1    19.    In October 2009, the CRA told Silver Wheaton that it would audit its
2 international transactions.

3    20.    ████████████████████████████████████████
4 ████████████████████████████████████████████████████
5 ████████████████████████████████████████████████████
6 ████████████████████████████████████████████████████
7 ████████████████████████████████████

8    21.    ████████████████████████████████████████
9 ████████████████████████████████████████████████████
10 ████████████████████████████████████████████████████
11 ████████████████████████████████████████████████████
12 ████████████████████████████████████████████████████
13 ████████████████████████████████████████████████████
14 █████████████████████

15    22.    ████████████████████████████████████████
16 ████████████████████████████████████████████████████
17 █████████████████████████████████████  Recharacterization meant ignoring
18 Silver Wheaton Canada's characterization that Silver Wheaton Canada merely
19 provided "routine services" to Silver Wheaton Caymans, instead treating the
20 transactions in an economically rational way. ████████████████████
21 ████████████████████████████████████████████████████
22 ████████████████████████████████████████████████████
23 ████████████████████████████████████████████████████
24 █████████████████████████

25    23.    ████████████████████████████████████████
26 ████████████████████████████████████████████████████
27 ████████████████████████████████████████████████████
28

Consolidated Second Amended Class Action Complaint

1 ██████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3     24.    ████████████████████████████████████████

4 ██████████████████████████████████████████████████

5 ██████████████████████████████████████████████████

6 ██████████████████████████████████████████████████

7 ██████████████████████████████████████████████████

8 ████████████████████████████████████████

9     25.    But even though Deloitte knew that disclosure was required if it was

10 reasonably possible that the CRA would invalidate Silver Wheaton Canada's tax

11 position, and even though Deloitte actually knew that it was at least reasonably

12 possible that it would do so, Silver Wheaton's 2011 financial statements did not

13 disclose either that it was more likely than not or that there was a reasonable

14 possibility that the CRA would invalidate Silver Wheaton's tax position, resulting in

15 an enormous tax reassessment and a much less profitable enterprise.

16     26.    Thus, even though Deloitte knew that it was more likely than not, or that

17 there was a reasonable possibility, that the CRA would invalidate Silver Wheaton's

18 tax position, it nonetheless certified to investors that Silver Wheaton's 2011 financial

19 statements were materially accurate.

20     27.    In May 2012, the CRA conducted interviews of Silver Wheaton

21 Caymans personnel. ████████████████████████████████

22     28.    ████████████████████████████████████████

23 ██████████████████████████████████████████████████

24 ██████████████████████████████████████████████████

25 ██████████████████████████████████████████████████

26 ██████████████████████████████████████████████████

27 ██████████████████████████████████████████████████

28

Consolidated Second Amended Class Action Complaint

1  ███████████████████████████████████████████████████

2  ███████████████████████████████████████████████████

3      29.    ███████████████████████████████████████████

4  ███████████████████████████████████████████████████

5  ███████████████████████████████████████████████████

6  ███████████████████████████████████████████████████

7  ███████████████████████████████████████████████████

8  ███████████████████████████████████████████████████

9  ██████████████████████████

10     30.    ███████████████████████████████████████████

11  ███████████████████████████████████████████████████

12  █████████████████████████████████

13     31.    Silver Wheaton Canada's 2012 financial statements, filed in 2013, did

14  not disclose that it was more likely than not, or even that there was a reasonable

15  possibility, that the CRA would invalidate Silver Wheaton's tax position. Deloitte

16  again certified the financial statements.

17     32.    ███████████████████████████████████████████

18  ███████████████████████████████████████████████████

19  ███████████████████████████████████████████████████

20  ███████████████████████████████████████████████████

21  ███████████████████████████████████████████████████

22  ████████████████████████████████████████

23     33.    ███████████████████████████████████████████

24  ███████████████████████████████████████████████████

25  ███████████████████████████████████████████████████

26  ███████████████████████████████████████████████████

27  ███████████████████████████████████████████████████

28  ███████████████████████████████████████████████████

Consolidated Second Amended Class Action Complaint

1 ███████████████████████████████████████████

2 ███████████████████████████████████████████

3 ███████████████████████████████████████████

4 ███████

5     34. ████████████████████████████████████

6 ███████████████████████████████████████████

7 ███████████████████████████████████████████

8 ███████████████████████████████████████████

9 █████████████████

10     35.    On July 6, 2015, Silver Wheaton Canada issued a press release,

11 announcing that the CRA had reassessed Silver Wheaton Canada's 2005-2010

12 income (the "Reassessment"). The Reassessment determined that the transfer pricing

13 provisions of the Income Tax Act (Canada) ("Tax Act") should be applied to

14 recharacterize Silver Wheaton Caymans income as Silver Wheaton Canada income.

15 As a result, Silver Wheaton Canada's taxable income increased by approximately

16 CDN$715 million for the Tax Period, resulting in more than CDN$261 million in

17 additional taxes and penalties assessed against Silver Wheaton Canada.

18     36. ████████████████████████████████████

19 ███████████████████████████████████████████

20 ██████████████████████

21     37.    On this news, the Company's share price fell $2.08 per share, or almost

22 12%, to close at $15.46 per share on July 7, 2015.

23     38.    Shortly thereafter, several Wall Street analysts commented that the news

24 that the CRA had determined that Silver Wheaton's transfer pricing tax position

25 violated Canadian tax laws had reduced Silver Wheaton's net asset value by 30-40%.

26     39. ████████████████████████████████████

27 ███████████████████████████████████████████

28 ███████████████████████████████████████████

Consolidated Second Amended Class Action Complaint

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ████████████████████████████████████████████████

4 ██████████████

5 **JURISDICTION AND VENUE**

6      40.     The claims asserted herein arise under and pursuant to Sections 10(b)

7 and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5

8 promulgated thereunder (17 C.F.R. § 8 240.10b-5).

9      41.     This Court has jurisdiction over the subject matter of this action pursuant

10 to § 27 of the Exchange Act (15 USC. § 78aa) and 28 U.S.C. § 1331.

11      42.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15

12 U.S.C. §78aa and 28 U.S.C. §1391(b), as the misleading statements entered into this

13 District.

14      43.     In connection with the acts, conduct and other wrongs alleged in this

15 Complaint, Defendants, directly or indirectly, used the means and instrumentalities of

16 interstate commerce, including but not limited to, the United States mail, interstate

17 telephone communications and the facilities of the national securities exchange.

18                                        **PARTIES**

19      44.     Court-appointed Class Representatives Joe Elek, Thomas Bartsch, Larry

20 Brandow, Diana Choi, Ben Potaracke, Jedrzej Borowczyk, and Charles Remmel

21 acquired Silver Wheaton securities at artificially inflated prices during the Class

22 Period and were damaged upon the revelation of the alleged corrective disclosures.

23 Their PSLRA certifications were previously filed with the Court and are incorporated

24 by reference.

25      45.     Defendant Silver Wheaton pioneered the business of precious metal

26 streaming. Silver Wheaton is headquartered in Vancouver, British Columbia, Canada

27 and during the Class Period traded on the NYSE under the ticker symbol "SLW."

28

46.     Defendant Randy V. J. Smallwood has served as Silver Wheaton Canada's President since January 2010 and as CEO from April 11, 2011 to the present.  Smallwood is one of the founding members of Silver Wheaton. In 2005, he joined Silver Wheaton Canada as Executive Vice-President of Corporate Development, primarily focusing on growing Silver Wheaton through the evaluation and acquisition of silver stream opportunities. Smallwood's career in the mining industry began in the early 1980's. He joined Wheaton River Minerals, from which Silver Wheaton was spun off, in 1993.

47.     Defendant Peter Barnes is a Chartered Accountant and was one of Silver Wheaton's founders in 2004. Mr. Barnes served as Silver Wheaton Canada's Executive Vice-President and Chief Financial Officer from 2004 until his appointment as Chief Executive Officer in April 2006.  He then served as the Company's CEO and a director from 2006 until his resignation effective April 11, 2011.  He was director of Deloitte's Vancouver office's audit practice from 1983 to 1990. Barnes had over 15 years' experience as an auditor before he moved to senior management in 1995.

48.     Defendant Gary Brown joined Silver Wheaton Canada as its CFO in 2008 and has served in that position since.

49.     Smallwood, Barnes, and Brown are sometimes collectively referred to herein as the "Individual Defendants."

50.     The Individual Defendants and Silver Wheaton are the "Silver Wheaton Defendants."

51.     Deloitte LLP (Canada), Chartered Professional Accountants, is an Ontario, Canada partnership. Deloitte has been Silver Wheaton's registered independent auditor for Silver Wheaton's entire existence.

52.     Defendants Silver Wheaton, Deloitte, and the Individual Defendants are referred to herein, collectively, as the "Defendants."

Consolidated Second Amended Class Action Complaint

# RELEVANT NON-PARTIES

*Silver Wheaton Canada employees*

53.    Nolan Watson served as Silver Wheaton Canada's CFO from 2005 through July 2008. Watson worked as a consultant in Deloitte's Vancouver office for two years immediately before joining Silver Wheaton, with Amy Cheema.

54.    Mark Reineking served as Silver Wheaton's Controller from June 2007 through November 2008. He continued to serve as Silver Wheaton's Director of Finance until April 2011. Reineking is a CFA and a CPA.

55.    Jamie Beirnes has served as Silver Wheaton's Controller since December 2008. Beirnes' career in accounting began in 1991 at the latest, and prior to joining Silver Wheaton Canada as its Controller, he had 9 years of experience as controller of progressively larger enterprises.

56.    Bettina Charpentier was a partner at PwC until May 2010, when she joined Silver Wheaton as its Vice-President of Tax, a position she retains to this day.

███████████████████████████████████████████████████

*Silver Wheaton Caymans employees*

57.    Nik Tatarkin has been the head of Silver Wheaton Caymans since December 2007.  Nik Tatarkin served as Silver Wheaton Canada's Treasurer from January 2007 through December 2007. Tatarkin graduated from college with a Bachelor's degree in 2001.

58.    Brad Carpenter joined Silver Wheaton Caymans as its Controller, and second employee, in July 2006. Carpenter became its Director of Contract Compliance in 2013. █████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

- 13 -

Consolidated Second Amended Class Action Complaint

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ████████████████████████████████████████████████

4 ██████████████████████████████

5     59.    Juan Jose Granados joined Silver Wheaton Caymans ████████

6 ████████████████████████████████████████████████

7 ████████████████████████████████████████████████

8 ████████████████████████████████████████████████

9 █████████████████████████████████

10     60.    Bill Koutsouras was a third-party contractor and employee of Endeavour

11 Mining ██████████████████████████████████████████

12 ████████████████████████████████████████████████

13 ████████████████████████████████████████████████

14 ███████████████████████████ Koutsouras graduated from college

15 with a B.A. in 1997.

16     61.    Eduardo Luna served as Silver Wheaton Canada's Chairman from

17 October 2004 through May 2009 and was its Interim Chief Executive Officer from

18 October 2004 through April 2006. He has also served as a Silver Wheaton Canada

19 director since the Company's inception. ██████████████████████

20 ████████████████████████████████████████████████

21 ███████████████████████████████████

22     62.    Former Employee 1 ("FE1") was an Accountant at Silver Wheaton

23 Caymans from December 2007 to November 2013. FE1, one of the first employees

24 hired in the Caymans, was hired to help open Silver Wheaton's Caymans Islands

25 office in March 2008. She performed bookkeeping tasks, such as reconciliation, data

26 entry and making sure the company was receiving payments it was expecting.

27     63.    FE1 reported to Brad Carpenter and Nik Tatarkin. FE1 also reported to

28 Giselle Fedalizo, who was Manager of Corporate Accounting at Silver Wheaton

- 14 -

Canada, when Fedalizo began working as the Assistant Controller in the Caymans Islands office in July 2013.

*PwC employees*

64.     Elizabeth Finch was elevated to PwC's partnership in July 2007. █████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

65.     Andrew McCrodan was ███████████████████████████████████████

████████████████████ McCrodan worked out of PwC's Toronto office.

*Deloitte employees*

66.     █████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

█████████████

67.     Shiraj Keshvani was a Deloitte tax dispute resolution partner. ████████

███████████████████████████████████████████████████████████████████████

█████████████

68.     Amy Cheema worked as an auditor for Deloitte and an audit firm it acquired since the beginning of her career in 2000 until April 2008, when she joined Silver Wheaton as its Director of Financial Reporting & Operations. Cheema returned to Deloitte in August 2009. ██████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████ Cheema was elevated to Deloitte partnership in May 2011, ████████████████████████████

██████████████████████████████████████████ Cheema left Deloitte in December 2012.

Consolidated Second Amended Class Action Complaint

69.     Robert Stewart was a Deloitte partner specializing in transfer pricing

███████████████████

70.     ████████████████████████████████████

████████████████████████████████████████

███████████████████

71.     ████████████████████████████████████

████████████████████████████████████████

███████████████████

72.     ████████████████████████████████████

████████████████████████████████████████

███████████████

## DELOITTE'S PRODUCTION

73.     In March 2017, Judge McDermott issued letters rogatory seeking the assistance of the British Columbia Supreme Court in compelling production of documents from Deloitte and PwC.

74.     Deloitte opposed Plaintiffs' request before the British Columbia Supreme Court. Following a contested hearing, The Hon. Justice Milman issued an Order, dated August 17, 2017, requiring Deloitte to produce documents (the "BC Order"):

1. All audit working papers and audit permanent files subject to claims of privilege, concerning Deloitte's audit of Silver Wheaton s financial statements for the years ended December 31, 2009 through 2015 that touch on, are related to, or concern, in any respect Silver Wheaton's transfer pricing tax position on Silver Wheaton (Cayman), contingent tax liability related to transfer pricing or recharacterization concerning Silver Wheaton (Cayman) or the CRA Audit including but not limited to:

- 16 -

Consolidated Second Amended Class Action Complaint

a. Estimates, costs projections or reserves for legal or other costs in connection therewith;

b. Silver Wheaton's compliance with ASC 740, IAS 12 IAS 37, and FASB *5* in connection therewith;

c. Risk analysis, damages, calculations, loss reserves fines penalties taxes, or withholding of any distributions to shareholders in connection therewith;

d. Compliance with Sections 247 and 251 of the Income Tax Act in connection with Silver Wheaton (Cayman) for the 2005-2010 tax year;

e. All management representations in connection with the above.

75.    The BC Order contemplated that Deloitte would complete production on or before October 6, 2017.

76.    Deloitte refused to conduct a wholesale review of particular audit files in response to the BC Order. Instead, Deloitte represented that it would only employ search terms to narrow the documents subject to review.

77.    Deloitte made a production on October 6, 2017, purportedly in complete satisfaction of the BC Order.

78.    Upon review, Plaintiffs determined that Deloitte's October 6, 2017 production excluded critical documents. Plaintiffs further determined that it was quite easy to identify the missing but highly relevant subsections in the audit working papers that Deloitte should review for production.

79.    Accordingly, on October 31, 2017, Plaintiffs contacted Deloitte, seeking to have Deloitte review specified subsections of its audit working papers, as well as use additional search terms for relevant documents.

80.    Deloitte produced more relevant documents on January 5, 2018.

Consolidated Second Amended Class Action Complaint

81.     Deloitte represented that, in response to the BC Order, it (among other things) reviewed relevant sections of its audit working papers and produced responsive documents.

82.     When this Second Amended Complaint refers to the absence of documents from Deloitte's working papers, it is because the documents were not produced in either Deloitte's October 6, 2017, or January 5, 2018 productions.

## DEFENDANTS' MISCONDUCT

### Canadian Transfer Pricing Rules Related to Income Taxes

(a)     *Transfer Pricing Rules in Canada*

83.     Corporations that reside in Canada for the purposes of the Income Tax Act (Canada)[2] (the "Tax Act") are subject to tax on their worldwide income from all sources.[3]

84.     When computing taxable income, Canadian tax law generally does not look to the economic substance of a transaction to determine its tax treatment.[4]

85.     Nevertheless, the Canadian government recognized that parties not dealing with one another at "arm's length" will frequently be motivated to structure their dealings in a manner that deviates from what would prevail in the open market, in an effort to reduce the aggregate amount of income tax payable.  In particular, absent statutory restrictions, parties may seek to structure transactions that, while legally effective, are premised on pricing that is not consistent with the pricing that would have been agreed to by parties dealing with one another at arm's length.

86.     In light of such concerns, the government enacted a detailed set of transfer pricing provisions to ensure that, for tax purposes, the amounts included in the income of a Canadian taxpayer in respect of transactions entered into with non-resident persons with which the taxpayer does not deal at arm's length ("Related

_____

[2] R.S.C. 1985, c. 1 (5th Supp.), as amended.
[3] *Id*. at §2(1).
[4] *Shell Canada Ltd. v. The Queen*, [1999] 3 S.C.R. 622, 99 D.T.C. 5669.

Non-Residents") accurately reflect the pricing that would have been established if the transactions had instead been undertaken by independent parties at arm's length (the "Transfer Pricing Rules").

### (b) *The Transfer Pricing Rules – First Principles*

87.    From a tax perspective, the price paid for property, services, commercial opportunities, the assumption of risk, or any other right or advantage (collectively, "Property") is of great significance.  Most notably, a person that sells Property is generally required to include the amount receivable in exchange for the Property when computing its taxable income.[5]

88.    When a transaction is undertaken by parties that do not deal with one another at "arm's length," an incentive may arise to price the transaction in a manner that artificially increases or decreases the price payable for Property.  For example, if the seller of Property is subject to high income tax rates, or the purchaser will derive limited benefit from being able to claim a tax deduction in respect of the amount paid for the Property, the parties may attempt to minimize the operative transfer price.

89.    The Transfer Pricing Rules seek to eliminate the opportunity for multi-national enterprises to obtain a tax advantage by adopting intra-group pricing strategies that shift income to a related party that is resident in a low tax jurisdiction.

90.    The Transfer Pricing Rules apply to adjust the amounts paid by one party for Property provided by another party with which it does not deal at "arm's length" to reflect market prices.

91.    Statutory provisions substantively similar to the Transfer Pricing Rules have been widely adopted by most developed nations.  The Transfer Pricing Rules are premised on the "arm's length principle" (the "Arm's Length Principle"), which has been endorsed by the member states of the Organisation for Economic Co-operation

---

[5] Tax Act, *supra* note 2 at Part I, Division B.

Consolidated Second Amended Class Action Complaint

and Development (the "OECD"), including Canada,[6] as the international standard to be applied when determining transfer prices for tax purposes.

92.     The Arm's Length Principle provides that where:

> conditions are made or imposed between… two enterprises in their commercial or financial relations which differ from those which would be made between independent enterprises, then any profits which would, but for those conditions, have accrued to one of the enterprises, but, by reason of those conditions, have not so accrued, may be included in the profits of that enterprise and taxed accordingly.[7]

**(c)     *The Transfer Pricing Rules – Statutory Framework***

93.     The Transfer Pricing Rules took effect in 1988 and are found principally in section 247 of the Tax Act.

94.     The range of transactions that may fall within the ambit of the Transfer Pricing Rules is extremely broad.  The sale of goods and services, the licensing of intellectual property, the provision of commercial opportunities, the assignment of existing contractual rights, and a host of different types of lending, hedging, insurance, and derivative arrangements are all potentially subject to the Transfer Pricing Rules.

95.     The Transfer Pricing Rules apply in respect of transactions between parties that do not deal with one another at "arm's length."[8]  The circumstances under which persons are considered not to be dealing with one another at "arm's length" are set out in section 251 of the Tax Act.

96.     Both "related persons" and persons that factually do not deal with one another at arm's length are defined by statute as not dealing with one another at

---

[6] M.N.R., Information Circular 87-2R "International Transfer Pricing" (27 September 1999).

[7] OECD, *Transfer Pricing Guidelines for Multinational Enterprises and Tax Administrations*, (Paris: OECD, 2001) at ¶1.6.

[8] Tax Act, *supra* note 2 at §247(2).

Consolidated Second Amended Class Action Complaint

"arm's length."[9]   The Tax Act describes the categories of persons that are deemed to be "related persons,"[10] including a corporation and its wholly owned subsidiary, and two corporations that are controlled by the same person or group of persons.[11]

### (i)   Charging Provision

97.   Subsection 247(2) of the Tax Act is the main charging provision in the Transfer Pricing Rules.   Subsection 247(2) provides that where a taxpayer and a Related Non Resident are participants in a transaction or a series of transactions (a "Related Party Transaction") and

(a)  the terms or conditions made or imposed between any of the participants in respect of the transaction or series differ from those that would have been made between persons dealing at arm's length, or

---

[9] The Canadian courts have frequently been called upon to consider when parties may factually be considered not to deal with one another at arm's length.   During the "Period" (as defined herein), the Canada Revenue Agency summarized the applicable jurisprudence in this regard by stating:

> The following criteria have generally been used by the courts in determining whether parties to a transaction are not dealing at "arm's length":
> - was there a common mind which directs the bargaining for both parties to a transaction;
> - were the parties to a transaction acting in concert without separate interests; and
> - was there "*de facto*" control.

[M.N.R., Interpretation Bulletin IT-419R2 "Meaning of Arm's Length" (8 June 2004) at ¶23.]

[10] Tax Act, *supra* note 2 at §251(2).

[11] In this context, "control" is defined as *de jure* control, which typically is considered to arise in a corporate context where a person has the right to exercise "effective control" over the affairs of the corporation.   Effective control of a corporation generally is considered to exist where a person enjoys the right to elect a majority of the directors of the corporation.

- 21 -

    (b)    the transaction or series

        (i)    would not have been entered into between persons dealing at arm's length, and

        (ii)    can reasonably be considered not to have been entered into primarily for bona fide purposes other than to obtain a tax benefit,[12]

any amounts that, but for the transfer pricing rules and certain other anti-avoidance provisions, would be determined for the purposes of the Tax Act in respect of the taxpayer are to be adjusted to equal the amounts that would have been determined if,

    (c)    where only paragraph (a) applies, the terms and conditions made or imposed between the participants in respect of the transaction or series had been those that would have been made between persons dealing at arm's length, or

    (d)    where paragraph (b) applies, the transaction or series is recharacterized to reflect the transaction or series that would have been entered into between persons dealing at arm's length, under terms and conditions that would have been made between persons dealing at arm's length.

    98.    In effect, the Transfer Pricing Rules may, for tax purposes, adjust the prices agreed to by a Canadian taxpayer and a Related Non-Resident in two different ways.   First, if the subject transaction is of the type that would otherwise have occurred in the market between persons dealing at arm's length, the pricing of the transaction is adjusted to reflect the pricing that would have arisen in an arm's length context.   Second, if the transaction is not the type that would have been entered into between persons dealing at arm's length, and it can reasonably be considered not to have been entered into primarily for bona fide purposes other than to obtain a tax advantage, the pricing of the transaction is adjusted to reflect the pricing that would have been set in a replacement transaction that would have been entered into between

---

[12] For these purposes, a "tax benefit" is defined as including a reduction, avoidance or deferral of tax or other amounts payable under the Tax Act.

Consolidated Second Amended Class Action Complaint

persons dealing at arm's length, under terms and conditions that would have been agreeable to arm's length parties.

99.    If the Canadian tax authority, the CRA, believes that a taxpayer has contravened the Transfer Pricing Rules (i.e., the transactions between the taxpayer and the Related Non-Resident do not reflect arm's length transfer prices), the CRA may (i) recompute the taxable income of the taxpayer on the basis of the arm's length transfer prices that the CRA believes would have applied to the subject transactions, and (ii) reassess the income tax payable by the taxpayer by applying the applicable income tax rate to the adjusted taxable income of the taxpayer.[13]  Where a taxpayer is assessed for additional income tax payable, late filing or other penalties may also be assessed.[14]

100.   The CRA ordinarily need not obtain approval from any internal committees in order to reassess taxes. However, if the CRA wishes to recharacterize transactions, it must obtain the approval of the Transfer Pricing Review Committee (the "Review Committee"). The CRA also requires the Review Committee's approval merely to explore recharacterization.

101.   The CRA obtains the Review Committee's authorization to recharacterize transactions through a recharacterization referral, with notice to, and with an opportunity to comment by, the taxpayer.

*(ii)    Penalty Provision*

102.   In addition to potentially increasing the taxable income arising from a Related Party Transaction, the application of the Transfer Pricing Rules can also result in the assessment of a special transfer pricing penalty.[15]

103.   A taxpayer may be liable for the special transfer pricing penalty where the relevant transfer pricing adjustment exceeds a prescribed threshold.[16]  If

---

[13] Tax Act, *supra* note 2 at §152 and §247(11).
[14] *See*, for example, *id.* at §162-163.
[15] *Id.* at §247(3).

Consolidated Second Amended Class Action Complaint

applicable, the special transfer pricing penalty is generally equal to 10% of the sum of (i) the relevant transfer pricing adjustments, minus (ii) the total of all transfer pricing adjustments that relate to transactions for which the taxpayer has made "reasonable efforts to determine [and use] arm's length transfer prices."

104. In determining whether a taxpayer has made reasonable efforts to determine and use arm's length transfer prices, the CRA has stated that it will consider whether the taxpayer took all reasonable steps to ensure that its transfer prices conformed with the Arm's Length Principle.[17] However, a Canadian taxpayer will be deemed not to have made reasonable efforts to determine and use arm's length transfer prices if it does not make or obtain "contemporaneous documentation" in respect of the transaction on or before the "documentation-due date"[18] for the taxation year in which the transaction occurred.[19]

105. The Transfer Pricing Rules define "contemporaneous documentation" as records or documents that provide a description that is complete and accurate in all material respects of

> (i)    the property or services to which the transaction relates,
>
> (ii)   the terms and conditions of the transaction and their relationship, if any, to the terms and conditions of each other transaction entered into between the participants in the transaction,
>
> (iii)  the identity of the participants in the transaction and their relationship to each other at the time the transaction was entered into,

---

[16] The Transfer Pricing Rules generally provide that a taxpayer may only be subject to the special transfer pricing penalty if the "net adjustment" from the application of the Transfer Pricing Rules is greater than the lesser of (i) CDN$5 million, and (ii) 10% of the Canadian taxpayer's prescribed gross revenue for the year.

[17] Information Circular 87-2R, *supra* note 6 at ¶179.

[18] The "documentation-due date" is typically the date on which the Canadian taxpayer is required to file its income tax return.

[19] Tax Act, *supra* note 2 at §247(4).

(iv)    the functions performed, the property used or contributed and the risks assumed in respect of the transaction by the participants in the transaction,

(v)    the data and methods considered and the analysis performed to determine the transfer prices in respect of the transaction, and

(vi)    the assumptions, strategies and policies, if any, that influenced the determination of the appropriate transfer prices in respect of the transaction.

**(d)    *Application of the Transfer Pricing Rules***

106.    The Transfer Pricing Rules require a Canadian taxpayer transacting with a Related Non-Resident to (i) fully and accurately define the Property being provided by one party to another, and (ii) ascertain and adopt the price that would be paid for such Property by parties dealing with one another at arm's length.

107.    The CRA has published a large number of statements that outline the agency's interpretation of section 247 of the Tax Act.

108.    In September 1999, the CRA issued a detailed Information Circular that set out its views on the application of section 247 and the related transfer pricing compliance obligations of Canadian taxpayers (the "CRA Circular").[20]    The CRA Circular contains an extensive discussion of the attributes of each property, service or advantage provided by a Canadian taxpayer to a Related Non-Resident that need to be considered when assessing the applicable arm's length transfer price of such Property.

109.    The CRA Circular states that, in the absence of independent comparable transactions from which arm's length transfer prices may be derived, the

---

[20] Information Circular 87-2R, *supra* note 6.   The CRA Memorandum contains a broad cross-referencing paragraph that reads "The OECD Guidelines should be consulted for a more detailed discussion of the principles contained in Parts 2 to 6 of this circular."   Parts 2 to 6 contain the core sections of the CRA Circular.

Consolidated Second Amended Class Action Complaint

determination of an arm's length transfer price in respect of a transaction generally requires that each of the functions performed, the assets used or applied, and the risks assumed by each party be fully delineated and quantified.  The relevance of such criteria is affirmed by the express wording of section 247 of the Tax Act, which stipulates that the contemporaneous documentation maintained by a taxpayer must provide a complete and accurate description of "the functions performed, the property used or contributed and the risks assumed, in respect of the transaction, by the participants in the transaction."

110.   The CRA Circular incorporates by reference many of the interpretive principles expressed by the OECD in its Transfer Pricing Guidelines for Multinational Enterprises and Tax Administrations (the "OECD Guidelines").[21] OECD Guidelines provide that compensation between independent enterprises "usually will reflect the functions that each enterprise performs (taking into account assets used and risks assumed)."[22]   In this regard, the OECD Guidelines direct that the "functional analysis [to be performed as part of a transfer pricing analysis] is incomplete unless the material risks assumed by each party have been considered since the assumption or allocation of risks would influence the conditions of transactions between the associated enterprises."[23]   In considering the allocation of risk, the OECD Guidelines also caution that it is necessary to consider whether the purported allocation of risk by the parties to a transaction is consistent with the economic substance of the transaction.[24]

**(e)**   ***Calculating Arm's Length Prices***

111.   The CRA Circular recognizes 5 different methods of determining an appropriate transfer price, of which three are relevant here: the *cost plus* method (the

---

[21] OECD Guidelines, *supra* note 7.
[22] *Id*. at ¶1.20.
[23] *Id*. at ¶1.23.
[24] *Id*. at ¶1.26.

"cost plus method"), the *residual profit split* method (the "profit split method"), and the *transactional net margin* method (the "net margin method").  CRA Circular, ¶48.

112.   Each of the methods aims to determine appropriate transfer prices by reference to prices paid by similar businesses in a truly arm's length relationship. There are multiple methods because the CRA Circular recognizes that each of the methods may not be appropriate to every kind of business.

113.   The profit split method attempts to distribute the combined enterprise's profits between the taxpayer and the non-arm's length party.  In applying the profit split method, the taxpayer begins by segregating the readily identifiable functions of the combined enterprises.  CRA Circular, ¶101 (citing manufacturing or distribution as kinds of businesses where it is appropriate to employ the residual profit method). The taxpayer then identifies which of the related parties is responsible for these functions and provides that entity with a profit margin for those functions based on available information from other companies (e.g., the entity that engages in manufacturing might be entitled to a 10% return on manufacturing costs, based on comparables). *Id.* The residual profits that remain after this step are divided between the two entities based on "any information [] that indicates how arm's length parties would divide the profit or loss in similar circumstances," with a focus on the party contributing intangible assets. The taxpayer's taxable income is then calculated as the sum of income from the segregable functions and the residual profits attributable to the taxpayer. Because in using the residual profit split method the taxpayer analyzes **both** parties to the transaction, it is referred to as a ***two-sided method***.

114.   In contrast, the cost plus and net margin methods are one-sided methods, because they only focus on the activities of one of the parties. In both methods, the taxpayer begins by identifying which of the two parties to the transaction is the least complex. Application of the methods then focuses entirely on the least complex party.

115.   After identifying the least complex party, the taxpayer then identifies the functions performed by that least complex party. Having identified the functions, the

Consolidated Second Amended Class Action Complaint

1   taxpayer determines the costs of providing the functions. The taxpayer then includes
2   as taxable income of the Canadian party both the costs identified and an appropriate
3   gross (under the cost plus method) or net (under the net margin method) margin, as
4   determined by reference to comparable companies.

5       116.   Importantly, the cost plus and net margin methods are only appropriate
6   where the least complex party contributes no non-routine intangibles. CRA Circular,
7   ¶¶76-89, 106-119. This category includes know-how, customer lists and data, and
8   technical data. It also includes items that convey reputation, such as trademarks.
9   OECD Guidelines, Chapter VI, ¶6.2.  "Know-how" in turn is broadly defined as "all
10  the undivulged technical information, whether capable of being patented or not, that
11  is necessary for the industrial reproduction of a product or process, directly and under
12  the same conditions." *Id.* at ¶6.5.

13      117.   Because the markup can only be determined with reference to persons
14  performing similar functions, the cost plus and net margin methods require that the
15  taxpayer identify such parties (i.e., comparables).  CRA Circular, ¶¶77, 107.

16  **Silver Wheaton's Business and Control of Silver Wheaton Caymans**

17      118.   Silver Wheaton is the world's first, and largest, precious metals
18  streaming company.

19      119.   A precious metals streaming agreement is essentially an option to
20  purchase the future output of a mine. When it enters into a precious metals streaming
21  agreement, Silver Wheaton makes a large up-front payment and in turn receives the
22  right to buy a portion of the mine's future silver output for a low price. That price is
23  calculated as the average global cost of silver production. Silver Wheaton then earns
24  profits by buying silver at the low price and reselling it to brokers at the market price.
25  Silver Wheaton receives advance notice of silver deliveries, and sells the silver before
26  delivery, such that it never takes title to it except for a moment, if at all, and never
27  takes physical possession of the silver.
28

- 28 -

Consolidated Second Amended Class Action Complaint

120.   Silver Wheaton's principal operations are conducted by Silver Wheaton Corp., a Canadian company operating out of Vancouver, Canada. Silver Wheaton also holds a subsidiary based in the Caymans Islands, Silver Wheaton Caymans. The Caymans Islands do not impose taxes on income companies earn outside of the Cayman Islands.

121.   Nearly all of Silver Wheaton's activities are conducted by Silver Wheaton Canada. Silver Wheaton Canada identifies potential streaming opportunities throughout the world, and then analyzes them for profitability using complex models that consider silver price, various discount rates, the cost of capital, and numerous other factors. Silver Wheaton Canada also analyzes whether these transactions are sufficiently safe from political, geological, and operational risks, among others, requiring the well-seasoned judgment of professionals in a variety of fields, including geology, mining engineering, the mining business, and finance.[25] Silver Wheaton Canada personnel then approach the mines and negotiate complicated streaming agreements, relying on the skills and credibility they have built up over decades-long careers as business persons in Vancouver and in the mining industry. Silver Wheaton Canada negotiates for and secures hundreds of millions of dollars of financing. Silver Wheaton Canada's board of directors considers, in lengthy meetings, each of these agreements, asking pointed questions, weighing the advice of financial and other professionals retained to advise it, and occasionally changing the terms of agreements. ████████████████████████████████████

---

[25] Silver Wheaton Canada has rejected a host of potential Streaming Agreements for a variety of reasons, including: political risk (San Cristobal); poor operating partner (Aranzazu); high permitting risk (Revett); economic viability of the mine (Atacocha); concerns regarding geological interpretation, resource estimates, metallurgy or mine planning (Wolverine); and low exploration potential (El Mochito). Deposition of Bettina Charpentier in Canadian Tax Appeal ("Charpentier Canada Testimony"), as filed with the Tax Court of Canada on August 4, 2017,  Response to Undertaking 487.

Consolidated Second Amended Class Action Complaint

1   ███████████████████████   When an agreement is signed, Silver Wheaton Canada

2   conducts ongoing due diligence with the mines, ensuring that the mine performs as

3   promised. ████████████████████████████████████████████

4   ████████████████████

5   122.   ████████████████████████████████████████

6   ███████████████████████████████████████████████████████

7   ███████████████████████████████████████████████████████

8   ███████████████████████████████████████████████████████

9   ███████████████████████████████████████████████████████

10  ███████████████████████████████████████████████████████

11  ███████████████████████████████████████████████████████

12  ███████████████████████████████████████████████████████

13  ██████████████████████████████████

14  123.   ████████████████████████████████████████

15  ███████████████████████████████████████████████████████

16  ███████████████████████████████████████████████████████

17  ███████████████████████████████████████████████████████

18  ███████████████████████████████████████████████████████

19  ███████████████████████████████████████████████████████

20  ███████████████████████████████████████████████████████

21  ███████████████████████████████████████████████████████

22  ████████████████████████████

23  124.   Silver Wheaton Canada thereby avoided paying more than two hundred

24  million dollars in Canadian income taxes in the period between 2005 and 2010.

25  _____

26  ███████████████████████████████████████████████████████

27  ███████████████████████████████████████████████████████

28  ████████████████████

Consolidated Second Amended Class Action Complaint

125. [REDACTED]

126. [REDACTED]

**(a) *Silver Wheaton Caymans's Employees Did Not Have Serious Responsibilities***

127. In respect of each taxation year during the Period, all substantive strategic, managerial and operational direction relating to the activities of Silver Wheaton Caymans was provided by Silver Wheaton Canada. The Annual Information Forms ("AIF")[27] filed by Silver Wheaton Canada during the Period indicated that Silver Wheaton had 18 employees by 2008 (as per the AIF for the period ending December 31, 2007) and later 24 employees (as per the AIF for the period ending December 31, 2010). Of these employees, at most six were Silver Wheaton Caymans employees.

[27] An Annual Information Form in Canada is similar to the Form 10-K annual report that is filed with the U.S. Securities & Exchange Commission, except that it doesn't include audited financial statements, which are filed separately.

128.   FE1 reports that none of the employees of Silver Wheaton Caymans had meaningful, unfettered strategic or managerial decision-making authority. The documents produced in this case confirm FE1's account.

129.   Until November 2005, Silver Wheaton Caymans' entire operations were conducted by a third-party contractor for a flat rate of $2,000/month.

130.   In November 2005, Silver Wheaton hired ███████████ to conduct Silver Wheaton Caymans's silver selling activities. ████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████

131.   In July 2006, Silver Wheaton hired ███████████ to manage Silver Wheaton Caymans's accounting. ████████████████████████████
████████████████████████████████████████████████████
████████████████████████

132.   ████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████

133.   In August 2007, Silver Wheaton Canada offered ███████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████

Consolidated Second Amended Class Action Complaint

134.   Silver Wheaton Caymans's employee levels remained substantially similar through the end of 2010.

135.   ████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

136.   FE1 states that she observed and/or was informed by her Silver Wheaton Caymans superiors that all material operational and strategic decisions in respect of Silver Wheaton Caymans were subject to the direction and approval of officers or employees of Silver Wheaton Canada, and substantially all material agreements to which Silver Wheaton Caymans was a party were drafted by, and executed with the required approval of, officers or representatives of Silver Wheaton Canada.   FE1 states that, with the exception of those that performed clerical or local compliance tasks, all employees of Silver Wheaton Caymans reported to, or accepted instructions from, officers or employees of Silver Wheaton Canada.

137.   ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

138.   The Silver Wheaton Caymans employees lacked the professional experience and the training necessary to identify the commercial opportunities purportedly sought by Silver Wheaton Caymans and to negotiate the relevant arrangements, as well as the ability to administer the complicated agreements and activities that were purportedly executed by Silver Wheaton Caymans during the Period.

Consolidated Second Amended Class Action Complaint

139. ███████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
██████████

140. ███████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
████████████████████████████████████
█████████████
███████████████████████████████
████████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
██████████
█████████████████████████████████

141. ███████████████████████████████████
███████████████████████████████████████
██████████

142. ███████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

Consolidated Second Amended Class Action Complaint

1 ███████████████████████████████████████████████████

2 ███████████████████████████████████

3      143.   FE1 said that when Tatarkin visited mines and clients he did so together

4 with Silver Wheaton Canada employees, which is confirmed by the documents Silver

5 Wheaton produced. ████████████████████████████████████

6 ███████████████████████████████████████████████████

7 ███████████████████████████████████████████████████

8 ███████████████████████████████████████████████████

9 ███████████████████████████████████████████████████

10 ███████████████████████████████████████████████████

11 ███████████████████████████████████████████████████

12 ███████████████████████████████████████████████████

13 ███████████████████████████████████████████████████

14 ████████████████████████

15      144.   Tatarkin told FE1 that his participation in negotiations of Silver

16 Wheaton Caymans's streaming contracts and other material agreements was "on

17 behalf of [Silver Wheaton] as a whole and not just [Silver Wheaton Caymans]." ██

18 ███████████████████████████████████████████████████

19 ███████████████████████████████████████████████████

20 ███████████████████████████████████████████████████

21 ███████████████████████████████████████████████████

22 ███████████████████████████████████████████████████

23 ███████████████████████████████████████████████████

24 ███████████████████████████████████████████████████

25 ███████████████████████████████████ And FE1 stated that she never saw

26 anyone at the Silver Wheaton Caymans office preparing the contract documents, and

27 she believes "they were prepared in the [Silver Wheaton] corporate office in Canada."

28 █████████████████████████████████████████

Consolidated Second Amended Class Action Complaint

145.   On a number of occasions, usually when FE1 was making a request of Tatrkin for something that needed his financial approval, Tatarkin told FE1 that he was not his own boss.  FE1 recalled how Tatarkin put it to her: "You report to Brad, Brad reports to me, I, in turn, am not my own person."

146.   Tatarkin made it clear to FE1 that he "had to report to Randy [Smallwood]" regarding any financial decisions that were outside Tatarkin's pre-approved authority.

147.   Silver Wheaton Caymans was not regarded by Silver Wheaton Canada or by Silver Wheaton Caymans employees as an entity or enterprise separate and distinct from Silver Wheaton Canada.  FE1 reports that Silver Wheaton Caymans was simply viewed as a branch of Silver Wheaton Canada by employees of Silver Wheaton Canada and Silver Wheaton Caymans.  FE1 states that staff at Silver Wheaton "always referred to the Cayman office as a branch office to [Silver Wheaton Canada]."  The content of the Tartarkin Resume similarly refers to Silver Wheaton Caymans as "the Cayman Islands office for Silver Wheaton Corp." and as "the Cayman Islands based operating arm of Silver Wheaton."

148.   

Consolidated Second Amended Class Action Complaint

1

2

3

4    149.

5

6

7    150.

8

9

10

11

12

13

14

15

16

17

18    151.

19

20    152.

21

22

23

24

25

26    153.

27

28

Consolidated Second Amended Class Action Complaint



Consolidated Second Amended Class Action Complaint

154. ████████████████████████████████████
████████████████████████████████████████
██████████████████████████
███████████████████████████████
████████████████████████████████████████
████████████

155. ████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████

156. ████████████████████████████████████
████████████████████████████████████████
██████████████████████████████

157. ██████████████████████

158. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████

159. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████

160. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

Consolidated Second Amended Class Action Complaint



161.

162.

163.    Indeed, Silver Wheaton Caymans' board members, unlike Silver Wheaton Canada's, did not sign any agreements to become directors or even accept their position in writing. Charpentier Canada Testimony, Response to Undertakings 49, 55.

Consolidated Second Amended Class Action Complaint

1    164. ██████████████████████████████████████
2    ████████████████████████████████████████████████
3    ████████████████████████████████████████████████
4    ████████████████████████████████████████████████
5    ████████████████████████████████████████████████
6    ████████████████████████████████████████████████
7    ████████████████████████████████████████████████
8    ████████████████████████████████████████████████
9    ████████████████████████████████████████████████
10   ████████████████████████████████████████████████
11   ████████████████████████████████████████████████
12   ████████████████████████████████████████████████
13   ████████████████████████████████████████████████
14   ████████████████████████████████████████████████
15   ████████████████████████████████████████████████
16   ████████████████████████████████████████████████
17   ████████████████████████████████████████████████
18   ████████████████████████████████████████████████
19   ██████████████
20   165. ██████████████████████████████████████
21   ████████████████████████████████████████████████
22   ████████████████████████████████████████████████
23   ████████████████████████████████████████████████
24   ██████████████████████████████████████████
25   166. ██████████████████████████████████████
26   ████████████████████████████████████████████████
27   ████████████████████████████████████████████████
28   ████████████████████████████████████████████████

Consolidated Second Amended Class Action Complaint

1   ████████████████████████████████████████████████████████

2   ██████████████████████████

3   167.   ████████████████████████████████████████████

4   ████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████

10   ███████████████████

11   ██████████████████████████████████████████████

12   ██████████████████████████████████████████████

13   █████████████████████

14   ████████████████████████████████████████████████████████

15   ████████████

16   168.   ████████████████████████████████████████████

17   ████████████████████████████████████████████████████████

18   ██████████████████████████████

19   169.   Likewise, Silver Wheaton Canada's Board approved entering into a

20   Streaming Agreement with Farallon Resources Ltd. on March 27, 2008. Silver

21   Wheaton Caymans then approved the Farallon Streaming Agreement on May 7,

22   2008. █████████████████████████████████████████████

23   ████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████

26   ████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████████

28   ████████████████████████████████████████████████████████

Consolidated Second Amended Class Action Complaint

170.

171.

172.

173.

Consolidated Second Amended Class Action Complaint

1

2

3

4

5

6       174.

7

8

9

10

11

12       **(c)** *Silver Wheaton Canada Conducted Substantially All of Silver Wheaton*

13 *Caymans's Activities*

14       175.   The 2006 Annual Report of Silver Wheaton Canada emphasized the

15 significance of the "Silver Wheaton brand name" to the business operations of the

16 Silver Wheaton corporate group during the Period.  There is no evidence to indicate

17 that any reputational or brand-related intellectual property or any material,

18 sophisticated know-how that was utilized by Silver Wheaton Caymans during the

19 Period was internally developed by Silver Wheaton Caymans, rather than obtained

20 from Silver Wheaton Canada.

21       176.   All streaming contracts to which Silver Wheaton Caymans was a party

22 were identified, originated, and secured by the efforts of Silver Wheaton Canada.  All

23 commercial leads, introductions, opportunities and agreements were pursued and

24 executed by, or at the direction of, Silver Wheaton Canada and were provided to

25 Silver Wheaton Caymans without consideration.

26       177.   In addition to performing all material commercial functions for Silver

27 Wheaton Caymans, Silver Wheaton Canada also assumed all material financial and

28 contractual risks on behalf of Silver Wheaton Caymans during the Period, whether

- 44 -

Consolidated Second Amended Class Action Complaint

through the funding of agreements to which Silver Wheaton Caymans was a party in respect of future streaming rights, or through guarantees under agreements to which Silver Wheaton Caymans was a party. FE1 states that Silver Wheaton Caymans functioned as a conduit for large amounts of money passing from the Silver Wheaton corporate office in Vancouver to the mines through Silver Wheaton Caymans in one direction and money from silver sales flowing back through Silver Wheaton Caymans to Silver Wheaton Canada.

178. FE1 stated that Silver Wheaton Caymans kept a very small percentage of the revenue and income it earned in its bank accounts, passing most of it to the Silver Wheaton corporate office accounts.

179. Beginning in March 2008 when the Silver Wheaton Caymans Islands office opened, FE1 began to wire transfer large sums of money from the Silver Wheaton Caymans office's revenue accounts to Silver Wheaton corporate headquarters in Vancouver.

**(d)** *Silver Wheaton treated Silver Wheaton Caymans as a mere pit stop for its money*

180. Silver Wheaton treated Silver Wheaton Caymans as a mere pit stop for its cash on its way to its final destination. ███████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████

181. ███████████████████████████

███████████████████████████████████████████████

███████████████████████████████

182. ███████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

1 ████████████████████████████████████████████████████████████

2 ███████████████████████████████

3     183.   ██████████████████████████████████████████████████

4 ████████████████████████████████████████████████████████████

5 ████████████████████████████████████████████████████████████

6 ████████████████████████████████████████████████████████████

7 ████████████████████████████████████████████████████████████

8 ████████████████████████████████████████████████████████████

9 ██████████████████████████████████████████████████████

184.   Silver Wheaton Canada also guaranteed certain obligations of Silver Wheaton Caymans, such as the Silver Purchase Agreement among Silver Wheaton Canada, Silver Wheaton Caymans, Barrick International Bank Corp., and Barrick Gold Corporation, dated September 8, 2009.   In the absence of any independent assets, any default by Silver Wheaton Caymans in respect of such guaranteed obligations would also be borne by Silver Wheaton Canada.

185.   Ultimately, no third party would have contracted independently with Silver Wheaton Caymans, absent its wholly-owned relationship with Silver Wheaton Canada.   Absent the efforts and involvement of Silver Wheaton Canada in securing and funding streaming agreements and managing and directing the activities that were undertaken in the name of Silver Wheaton Caymans, Silver Wheaton Caymans would have had no operations or revenue during the Period.

**Silver Wheaton Consciously Violated Transfer Pricing Rules**

**(a)   *Silver Wheaton Was Aware it Violated Transfer Pricing Rules***

186.   Throughout the Period:

(i)      the Transfer Pricing Rules were well established,

(ii)     by virtue of (A) the detailed publications issued by the CRA prior to, and during, the Period, including the CRA Circular, ten separate CRA Transfer Pricing Memoranda, and additional materials posted on the CRA's website, and (B) frequent

Consolidated Second Amended Class Action Complaint

seminars and publications on transfer pricing issues released by leading industry groups in Canada, including the Canadian Tax Foundation, the interpretation and assessment practices of the CRA with respect to the application of the Transfer Pricing Rules were well-known to all commercial enterprises in Canada, including Defendants, and

(iii)   the T106 transfer pricing information returns that Canadian corporations were obligated to file with the CRA in respect of any transaction with a Related Non-Resident (as described in more detail below) clearly demanded the provision of detailed transfer pricing information in respect of the transaction.

187.   Silver Wheaton Canada was repeatedly made aware of its reporting and compliance obligations under the Transfer Pricing Rules in the course of completing its annual tax filings.  The second page of the general corporation income tax return that Silver Wheaton Canada was required to file each year posed the express question whether Silver Wheaton Canada "had any non-arm's length transactions with a non-resident" during the year.  If the answer was "yes," Silver Wheaton Canada was directed to file a special T106 Transfer Pricing Information Return (a "T106 Return") with the CRA.

188.   The circumstances under which a taxpayer is required to file a T106 Return are set out in section 233.1 of the Tax Act.  Subsection 233.1(2) of the Tax Act provides that a person who is resident in Canada (a "Reporting Person") is required to file an information return (i.e., a T106 Return) in respect of each non-resident person with whom the Reporting Person does not deal at arm's length in respect of all "reportable transactions" with the non-resident in a year.  Subsection 233.1(1) of the Tax Act generally defines a "reportable transaction" as a transaction or series of transactions that relate in any manner whatever to a business carried on by a Reporting Person in a taxation year.[28]  Except for a de minimis exception that

---

[28] For these purposes, a "transaction" is defined expansively as including an arrangement or event.

Consolidated Second Amended Class Action Complaint

applies where the total fair market value of all property or services relating to all "reportable transactions" of a Reporting Person (and certain other non-arm's length persons) for a particular taxation year does not exceed CDN$1 million, the obligation to file a T106 Return is generally absolute.

189.   The T106 Return expressly requires a Canadian taxpayer to report arrangements involving the provision of all types of Property, including intangible property, to a Related Non-Resident, regardless of whether consideration is payable by the non-resident for such property.  The T106 Return also requires taxpayers to indicate whether they have prepared or obtained contemporaneous documentation in respect of all transactions with a Related Non-Resident in respect of each year.

190.   A knowledgeable authorized officer of Silver Wheaton Canada was required to review, ensure the accuracy of, and sign the T106 Return.

191.   The CRA's Audit Manual underscores the significance that the CRA placed on the T106 Return during the Period.  The Audit Manual indicated that the T106 Return "was introduced in 1988 to combat abuses in transfer pricing and provide the CRA with information on non-arm's length transactions with non-residents."  The Audit Manual also contained a special "grid" of "tax havens,"[29] and the Audit Manual expressly stipulated that "the T106 return, as well as its related database, are key audit screening and planning tools for tax haven issues."

192.   Both Deloitte and PwC specifically called Silver Wheaton's attention to the requirements to maintain contemporaneous documentation, and Silver Wheaton falsely claimed to have done so.

193.   ███████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

---

[29] Although protected from disclosure, the "grid" is widely believed to have included the Cayman Islands.

Consolidated Second Amended Class Action Complaint



194.

195.

196.

197.

Consolidated Second Amended Class Action Complaint



198.

199.

**(b) *Silver Wheaton Canada Faced Daunting Odds in the CRA Audit***

200.   If the commercial activities of Silver Wheaton Canada in respect of the Period were audited by the CRA as they related to the interactions between Silver Wheaton Canada and Silver Wheaton Caymans, there was no reasonable basis to believe that the CRA would not seek to (i) ascribe arm's length transfer prices to the Property provided by Silver Wheaton Canada to Silver Wheaton Caymans during the Period, (ii) include such additional revenue amounts in the computation of the taxable income of Silver Wheaton Canada in respect of the relevant taxation years, and (iii) reassess Silver Wheaton Canada for additional income tax payable, computed on the basis of the increased taxable income of Silver Wheaton Canada.

201.   In proceedings before the Tax Court of Canada, the taxpayer generally bears the burden of "demolishing" each of the factual assumptions made by the

Minister of National Revenue (Canada) in support of a reassessment.[30] There is no material basis upon which Silver Wheaton Canada could successfully establish that a person dealing at arm's length with Silver Wheaton Caymans would have been willing to provide the Property provided by Silver Wheaton Canada to Silver Wheaton Caymans during the Period for nominal consideration.

202.  Accordingly, it was readily apparent at all material times that it was clearly more likely than not, and indeed nearly certain, that, if Silver Wheaton Canada was subject to a comprehensive tax audit by the CRA, (i) the income tax payable by Silver Wheaton Canada would be reassessed on the basis of an increased level of taxable income that included additional revenue from the provision of the Property to Silver Wheaton Caymans, computed on the basis of arm's length transfer prices, and (ii) any attempt to appeal any such reassessments to the Canadian courts would not be entirely successful.

203.  The assessment practices of the CRA during the Period and during the Class Period were consistent with the statements made by the agency in its external publications.  There was information in the market in Canada, obvious and known to Silver Wheaton Canada senior officers beginning in 2009, that the CRA was prioritizing audits of Canadian companies with large foreign income in low tax jurisdictions, particularly in the natural resources industry.  That year saw public announcement of the well-known tax transfer pricing case involving Cameco Corporation ("Cameco").  With basic facts mirroring those here, the CRA issued a sizeable transfer pricing reassessment of Cameco during the Period in a highly publicized case that was principally premised on the assertion that Cameco had failed to adhere to the Transfer Pricing Rules when transacting with a non-resident subsidiary in connection with the purchase and sale of uranium.

---

[30] See, for example, *Hickman Motors Ltd. v. The Queen*, [1997] 2 S.C.R. 336, 97 D.T.C. 5363.

Consolidated Second Amended Class Action Complaint

204.   In the Cameco case, the CRA undertook an extensive review of the functions performed by Cameco, the risks assumed by Cameco, and the assets used and deployed by Cameco in connection with the subject transactions relative to those of its Swiss subsidiary and asserted, among other things, that all of the material functions and risks associated with the transactions undertaken by the two parties were performed or borne by Cameco.  Accordingly, the CRA asserted that all of the profits derived from the activities of Cameco and its Swiss subsidiary should accrue to Cameco and be included in Cameco's income.   The CRA founded its reassessments on both the application of the Transfer Pricing Rules, as well as the application of the sham doctrine and subsection 56(2) of the Tax Act.

205.   The circumstances of the Cameco case and Silver Wheaton Caymans bear broad similarities.  In each case, the Canadian corporate parent (i.e., Cameco and Silver Wheaton Canada) provided significant Property to a Related Non-Resident subsidiary (Swiss subsidiary, Silver Wheaton Caymans) at prices that were materially less than the transfer prices that would have been mutually agreeable to parties dealing with one another at arm's length.  In each case, the Canadian corporate parent wished to divert business opportunities and expected future profits to an entity situated outside of Canada that would not be directly subject to Canadian income tax filing and payment obligations.  In each case, substantive commercial functions of value were performed by the corporate parent for the benefit of the Related Non-Resident subsidiary without material compensation.

206.   Silver Wheaton Canada closely monitored developments in the Cameco case, and understood the import of a ruling against Cameco on its own fortunes vis-à-vis the CRA.  ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Consolidated Second Amended Class Action Complaint

1 ███████████████████████████████████████████████████

2 ███████████████████████████████████████████████████

3 ███████████████████████████████████████████████████

4 ██████████████████████████████████

5      207.  That Silver Wheaton Canada was an extremely large and profitable

6 entity and the vast majority of its profits were shifted to Silver Wheaton Caymans,

7 which was subject to zero income tax, would have been a red flag for the CRA to

8 initiate a transfer pricing audit, as the CRA had with Cameco.  Thus, Defendants

9 knew that Silver Wheaton Canada's tax position vis-à-vis Silver Wheaton Caymans

10 was indefensible and without any reasonable basis and it was probable, possible, and

11 indeed highly likely to result in a future tax assessment for past due income taxes,

12 penalties and interest in material amounts.

13 ███████████████████████████████████

14 ███████████████████████

15 ████████████████████████████████████████████████

16 ██████████████

17     208.  ████████████████████████████████

18 ███████████████████████████████████████████████████

19 ██████████████████

20     209.  Silver Wheaton Canada hired Deloitte as its auditor and, initially, its tax

21 consultant. Yet, though it had advised Silver Wheaton on its tax structure, Deloitte

22 was initially sharply critical of Silver Wheaton's tax position.

23     210.  ████████████████████████████

24 ███████████████████████████████████████████████████

25 ███████████████████████████████████████████████████

26 ███████████████████████████████████████████████████

27 ███████████████████████████████████████████████████

28 ████████████████████

Consolidated Second Amended Class Action Complaint



Consolidated Second Amended Class Action Complaint

219.   From 2007 onwards, Silver Wheaton Canada continued to spend huge sums on tax consultants – but the tax consultant was PwC, not Deloitte.

220.   Deloitte felt the loss keenly. With its complicated tax issues, Silver Wheaton Canada was an ideal tax client, generating nearly half a million dollars of tax work per year. The vast majority of this work went to PwC, with only a few tens of thousands of dollars thrown to Deloitte:

### AUDITING AND TAX CONSULTING FEES

| Year | Deloitte All Other Fees[1] | Deloitte Tax Consulting Fees[1] | PWC Tax Consulting Fees[2] |
|---|---|---|---|
| 2005 | $144,561 | $38,200 | █████████ |
| 2006 | $242,448 | $166,900 | █████████ |
| 2007 | $299,565 | $169,100 | █████████ |
| 2008 | $522,058 | $17,000 | █████████ |
| 2009 | $762,353 | $22,759 | █████████ |
| 2010 | $673,468 | $56,853 | █████████ |
| 2011 | $856,237 | $26,187 | █████████ |
| 2012 | $603,796 | $141,233 | █████████ |
| 2013 | $738,987 | $77,096 | █████████ |

1: Source – Silver Wheaton annual reports filed with SEDAR.

████████████████████████████████████████████████████████

████████████████

**(c)**   *Silver Wheaton Canada Obtains a Frivolous Transfer Pricing Study from PwC*

221.   ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Consolidated Second Amended Class Action Complaint

222.

223.

224.

225.

Consolidated Second Amended Class Action Complaint

226.

227.

228.

- 57 -

229. ███████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
█████████████████████████

230. ████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
█████████████████████████████████

231. ████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

_____

██████████████████████████████████████████████████████
███████████████████████████████████████████████

Consolidated Second Amended Class Action Complaint

1
2
3      232.
4
5
6
7
8
9
10
11
12
13
14
15      233.
16
17      234.
18
19
20
21
22
23
24
25
26
27
28

Consolidated Second Amended Class Action Complaint

235.

236.

237.

238.

Consolidated Second Amended Class Action Complaint

239. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████

240. ███████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████

241. ██████████████████████████████████
████████████████████████████████

242. ████████████████████████████████████
███████████

243. ███████████████████████████████████
████████████████████████████████████████
██████████████████████

Consolidated Second Amended Class Action Complaint

1    244.

2

3

4

5

6

7

8

9

10

11   245.

12

13        **(e)**    ***Deloitte Ignores Additional Obvious Signs of Fraud***

14   246.

15

16

17

18

19

20

21   247.

22

23

24

25

26   248.

27

28

Consolidated Second Amended Class Action Complaint



Consolidated Second Amended Class Action Complaint

1  **All Defendants Were Aware That There Was A Substantial Risk That the**

2  **CRA Would Invalidate Silver Wheaton's Tax Position**



254.

255.

256.

257.

258.

259.

Consolidated Second Amended Class Action Complaint

260.

261.

262.

263.

264.

265.

266.

Consolidated Second Amended Class Action Complaint



Consolidated Second Amended Class Action Complaint

1  ████████████████████████████████

2  ██████████████████████████████████████

3  ██████████████████████████████████████

4  ████████████████

5  ████████████████████████████████████████

6  ██████████████████████████████████████

7  ████████

8  ████████████████████████████████████████

9  ██████████████████████████████████████

10 ██████████████████

11  **(b)**      ***The CRA Begins an Audit of Silver Wheaton's International***

12  ***Transactions***

13       272.   In October 2009, the CRA announced to Silver Wheaton that it would

14  audit its international transactions from 2005-2010.  ████████████████

15  ████████████████████

16       273.  ████████████████████████████████████

17  ██████████████████████████████████████

18  ██████████████████████████████████████

19  ██████████████████████████████████████

20  ██████████████████████████████████████

21  ██████████████████████████████████████

22  ██████████████████████████████████████

23  ████████████████████████████████████

24       274.  ████████████████████████████████████

25  ██████████████████████████████████████

26  ██████████████████████████████████████

27  ██████████████████

28

Consolidated Second Amended Class Action Complaint

275.

276.

277.   Under Canadian tax law, the taxpayer must point to a bona fide non-tax reason for the transactions. Thus, if Silver Wheaton disclosed to the CRA that the true purpose of Silver Wheaton Caymans was to reduce Silver Wheaton's tax burden, Silver Wheaton would automatically be reassessed.

278.

Consolidated Second Amended Class Action Complaint

1   279. ████████████████████████████████████████

2   ████████████████████████████████████████████████

3   █████████████████

4   280. ████████████████████████████████████████

5   ████████████████████████████████████████████████

6   ████████████████████████████████████████████████

7   ████████████████████████████████████████████████

8   ████████████████████████████████████████████████

9   ████████████████████████████████████████████████

10  ████████████████████████████████████████████████

11  ████████████████████████████████████████████████

12  ██████████

13  281. ████████████████████████████████████████

14  ████████████████████████████████████████████████

15  ████████████████████████

16  282. ████████████████████████████████████████

17  ████████████████████████████████████████████████

18  ████████████████████████████

19      ████████████████████████████████████

20      ██████████████████████

21      ████████████████████████████████████

22      █████████████████

23      ████████████████████████████████████

24      ████████████████████████████████████

25      ███████████████████████████████████████

26      ██████████████████

27      █████████

28

Consolidated Second Amended Class Action Complaint

283. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████
██████████████████████████████████████
███████████████████████████████
██████████████████████████████████
████████████████████████████
███████████████

284. ███████████████████████████████████████
██████████████████████████████████████████
█████████████

285. ███████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████

286. ███████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████

Consolidated Second Amended Class Action Complaint

287. ████████████████████████████████████
████████████████████████████████████
████████████

288. ████████████████████████████████████
████████████████████████████████████
██████████████████████

289. The Brown Script was generally circulated to Silver Wheaton employees. Charpentier Canada Testimony, Response to Undertaking 104.
████████████████████████████████████
████████████████████████████████████
████

290. ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████████

291. ████████████████████████████████████
██████████████

292. ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████

293. ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

████████████████████████████████████
████████████████████████████████████
██████████████

- 71 -

Consolidated Second Amended Class Action Complaint



294.

295.

296.   Along with Tatarkin, Charpentier "grilled" FE1 and other employees in practice sessions to make sure they were answering questions professionally and in a way that would not raise suspicion.

297.   "From my experience with other companies, that was not the first time being questioned (by officials), but it was the first time a company had me practice what to say and they told you what they wanted you to say," FE1 said.

298.   She recalled that four Canadian government officials set up in the office boardroom and each employee went in for a private interview. After each interview, the Canadian government officials met with Charpentier and Tatarkin to discuss the employee's answers.

299.   FE1 said the government officials were there to determine if the Cayman Islands office was a separate entity from the Vancouver corporate headquarters and also to review the taxes the company filed.

300.   "They wanted to confirm that these two companies, Silver Wheaton in Caymans and Silver Wheaton (corporate) was not one operation, that they were two separate entities," she said. "And that the income they were making was applied correctly on their taxes. That the amount they declared on their taxes was correct."

301.   The functional interviews were devastating to Silver Wheaton.

302.   CRA officials told FE1 "We're here because we feel Silver Wheaton had not been paying their taxes, and we want to see if you know or you saw anything to help us to confirm this."

303.   When the officials asked her directly if she had seen anything that raised red flags in her mind, she said no. But she noted that Tatarkin and Charpentier later expressed displeasure with her that her facial expression had not assured the officials that she was being fully truthful.

304.   ███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

Consolidated Second Amended Class Action Complaint



305.

306.

Consolidated Second Amended Class Action Complaint

1    307.

2

3

4

5

6    308.

7

8

9

10

11   309.

12

13

14

15

16

17   310.

18

19

20

21   311.

22

23

24   312.

25

26

27

28

Consolidated Second Amended Class Action Complaint



313.

Consolidated Second Amended Class Action Complaint

314. ███████████████████████████████████

**(f)    *The Noose Tightens***

315. ███████████████████████████████████

316. ███████████████████████████████████

317. ███████████████████████████████████

Consolidated Second Amended Class Action Complaint

318. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████

319. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████

320. ████████████████████████████████████
████████████████████████████████████████
███████

321. ████████████████████████████████████
███████████████████████

322. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████

323. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

Consolidated Second Amended Class Action Complaint

1 ██████████████████████████████████████████████████

2 ██████████████████████████████████████████████████

3 ██████████████████████████████████████████████████

4 ███████████████████████████████████████████

5 324. ████████████████████████████████████████

6 ██████████████████████████████████████████████████

7 ██████████████████████████████████████████████████

8 █████████████████████████████████████████████████

9 325. ████████████████████████████████████████

10 ██████████████████████████████████████████████████

11 ██████████████████████████████████████████████████

12 ███████████████████████████

13 326. ████████████████████████████████████████

14 ██████████████████████████████████████████████████

15 ██████████████

16 327. ████████████████████████████████████████

17 ██████████████████████████████████████████████████

18 ██████████████████████████████████████████████████

19 ██████████████████████████████████████████████████

20 ██████████████████████████████████████████████████

21 ██████████████████████████████████████████████████

22 ██████████████████████████████████████████████████

23 ██████████████████████████████████████████████████

24 ██████████████████████████

25 328. ████████████████████████████████████████

26 ████████████████████████████████████

27 329. ████████████████████████████████████████

28 ██████████████████████████████████████████████████

Consolidated Second Amended Class Action Complaint

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████

4 ████████████████████████████████████████████████████

5 ████████████████████████████████████████████████████

6 ████████████████████████████████████████████████████

7 ███████████████████████████

8    330.   ████████████████████████████████████████████

9 ████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████

16 ██████████████████

17   331.   ████████████████████████████████████████████

18 ████████████████████████████████████████████████████

19 ████████████████████████████████████████████████████

20 ████████████████████████████████████████████████████

21 ████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████

23 █████████████

24    **<u>Deloitte Conducted a Pretend Audit of Silver Wheaton's Tax Positon,</u>**

25    **<u>Ignoring IFRS and GAAP Requirements</u>**

26   332.   ███████████████████████████████████████

27   333.   ████████████████████████████████████████████

28 ████████████████████████████████████████████████████

Consolidated Second Amended Class Action Complaint

███████████████████████████████████████████

██████████████████████████████

334.    Deloitte was well aware that the risk of misstatement of Silver Wheaton's tax liabilities was one of the most serious audit risks. Yet eager to preserve its relationship, and hired to advocate on Silver Wheaton's behalf before the CRA, Deloitte abandoned its role as auditor and allowed Silver Wheaton to avoid even disclosing the risk that the CRA would invalidate its transfer pricing tax position.

335.    For each of the 2012, 2013, and 2014 audits, Deloitte provided unqualified audit opinions for Silver Wheaton stating the consolidated financial statements present fairly, in all material respects, the Company's financial position, financial performance, and cash flows.

**(a)    *Auditing Standards***

336.    PCAOB auditing standards require auditors to: obtain sufficient evidence to afford a reasonable basis for the opinion on the audited financial statements and document the audit work completed.[35]

337.    PCAOB Auditing Standard No. 3 – Audit Documentation states: "Audit documentation must contain sufficient information to enable an experienced auditor, having no previous connection with the engagement: [t]o understand the nature, timing, extent, and **results of the procedures performed, evidence obtained, and conclusions reached.**" Accordingly, if Deloitte's audit working papers do not record a procedure as having been performed, then the procedure was not performed.

338.    In addition, PCAOB AU Section 333 Management Representations states: "During an audit, management makes many representations to the auditor, both oral and written, in response to specific inquiries or through the financial statements. Such representations from management are part of the evidential matter

---

[35] PCAOB AU Section 150 – Generally Accepted Auditing Standards, Standards of Field Work

Consolidated Second Amended Class Action Complaint

1   the independent auditor obtains, but **they are not a substitute for the application of**

2   **those auditing procedures necessary to afford a reasonable basis for an opinion**

3   **regarding the financial statements under audit**."

4         339. ███████████████████████████████████████

5   ███████████████████████████████████████████████

6   ███████████████████████████████████████████████

7   ███████████████████████████████████████████████

8   ███████████████████████████████████████████████

9   ███████████████████████████████████████████████

10        340. ███████████████████████████████████████

11  ███████████████████████████████████████████████

12  ████████████████████

13      ████████████████████████████████████████████

14        ██████████████████████████████████████████

15      █████████████████

16      ███████████████████████

17      ████████████████████████████

18        341. ██████████████████████████████████████

19  ████████████████████████████████████████████████

20  ███████████████████████████████████

21        **(b)    *2011 Audit***

22        342. ███████████████████████████████████████

23  ████████████████████████████████████████████████

24  ████████████████████████████████████████████████

25  ████████████████████████████████████████████████

26  ████████████████████████████████████████████████

27  ████████████████████████████████████████████████

28

Consolidated Second Amended Class Action Complaint

343.

344.

345.

346.

Consolidated Second Amended Class Action Complaint

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 █████████████

4 347. ███████████████████████████████████████████

5 █████████████████████████████████████████████████████

6 █████████████████████████████████████████████████████

7 █████████████████████████████████████████████████████

8 █████████████████████████████████████████████████████

9 █████████████████████████████████████████████████████

10 █████████████████████████████████████████████████████

11 ████████████████████████

12 348. ███████████████████████████████████████████

13 █████████████████████████████████████████████████████

14 █████████████████████████████████████████████████████

15 █████████████████████████████████████████████████████

16 █████████████████████████████████████████████████████

17 █████████████████████████████████████████████████████

18 █████████████████████████████████████████████████████

19 ██████████████████

20 █████████████████████████████████████████████

21 █████████████████████████████████████████████

22 █████████████████████████████████████████████

23 █████████████████████████████████████████████

24 █████████████████████████████████████████████

25 █████████████████████████████████████████████

26 █████████████████████████████████████████████

27 █████████████████████████████████████████████

28 █████████████████████████████████████████████

Consolidated Second Amended Class Action Complaint

**(b)** *2012 Audit*

350.

351.

Consolidated Second Amended Class Action Complaint

1

2

3

4      352.

5

6

7

8

9

10      **(c)   *2013 Audit***

11      353.

12

13

14      354.

15

16

17

18

19

20      355.

21

22

23

24      356.

25

26

27

28

Consolidated Second Amended Class Action Complaint



357.

358.

**(d)**     *2014 Audit*

359.

Consolidated Second Amended Class Action Complaint

1      360. 
2
3
4
5
6      361.
7
8
9
10
11
12     362.
13
14
15
16
17     363.
18
19
20
21
22
23
24
25
26
27
28

Consolidated Second Amended Class Action Complaint

1 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

2 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

3 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

4 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

5 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

6 364.   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

7 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

8 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

9 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

10 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

11 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

12 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

13 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

14 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

## Deloitte's Violations of its Auditor's Duty of Independence

### (a)   *The revolving door between Silver Wheaton and Deloitte*

365.   Amy Cheema worked as an auditor for Deloitte or its predecessor from the beginning of her career in 2000 until April 2008. ▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

366.   In April 2008 Cheema took up a position as Director of Financial Reporting & Operations for Silver Wheaton. She remained in this position until August 2009, when she returned to Deloitte.

367.   While at Silver Wheaton Canada, Cheema ▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Consolidated Second Amended Class Action Complaint



Consolidated Second Amended Class Action Complaint

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ████████████████████████████████████████████████

4 ██████████████████████████████████

5    372.   ████████████████████████████████████████

6 ████████████████████████████████████████████████

7 ███████████████████████████████

8    373.   Cheema was not the first alumnus of Deloitte's Vancouver office to join

9 Silver Wheaton Canada. CFO Nolan Watson (2005-2008) had worked at Deloitte's

10 Vancouver office for two years, ██████████████████████████, immediately

11 before joining Silver Wheaton Canada. Likewise, Defendant Barnes, Silver Wheaton

12 Canada's CEO until 2011, was an accountant at Deloitte from 1980 through 1995,

13 and was Director of Deloitte Vancouver's audit practice from 1983 to 1990.

14    374.   In August 2009, Cheema left Silver Wheaton Canada to return to

15 Deloitte. ██████████████████████████████████

16    375.   ████████████████████████████████████████

17 ████████████████████████████████████████████████

18 ███████████████████████

19 ██████████████████████████████████████████████

20 ██████████████████████

21    376.   ████████████████████████████████████████

22 ████████████████████████████████████████████████

23 ████████████████████████████████████████████████

24 ████████████████████████████████████████████████

25 ███████████████████

26    377.   ████████████████████████████████████████

27 ████████████████████████████████████████████████

28 ████████████████████████████████████████████████

Consolidated Second Amended Class Action Complaint



378.

379.

380.

381.   Public Company Accounting Oversight Board (PCAOB) ET Section 101 provides auditors with guidance on Independence.   ET 101.02 provides an "Application of the Independence Rules to Covered Members Formerly Employed by a Client or Otherwise Associated With a Client," which states:

> An individual who was formerly (i) employed by a client or (ii) associated with a client as a(n) officer, director, promoter, underwriter,

1    voting trustee, or trustee for a pension or profit-sharing trust of the client

2    would impair his or her firm's independence if the individual—

3        Participated on the **attest engagement team** or was an **individual**

4    **in a position to influence the attest engagement** for the client when

5    the **attest engagement** covers any period that includes his or her former

6    employment or association with that client; or []

7    (emphasis added).

8    382. ███████████████████████████████████

9    █████████████████████████████████████████

10   █████████████████████████████████████████

11   ██████████

12   ████████████████████████████████████████

13   383.    In October 2009, Silver Wheaton was informed of the CRA Audit.

14   384. ███████████████████████████████████

15   █████████████████████████████████████████

16   █████████████████████████████████████████

17   █████████████████████████████████████████

18   █████████████████████████████████████████

19   █████████████████████

20   385. ███████████████████████████████████

21   █████████████████████████████████████████

22   █████████████████████████████████████████

23   ███████████████████████████████████████

24   386. ███████████████████████████████████

25   █████████████████████████████████████████

26   █████████████████████████████████████████

27   █████████████████████████████████████████

28   █████████████████████████████████████████

Consolidated Second Amended Class Action Complaint

387.

388.

389.

Consolidated Second Amended Class Action Complaint

1 ████████████████████████████████████████████████

2 ████████████████ s with the CRA.

3     *(d)*   If Deloitte Acknowledged That It Was More Likely Than Not That

4 Silver Wheaton's Tax Position Would Not Be Upheld, It Would Have To Withdraw

5 From The Audit

6     390.  Glenn Ives and Brad Gordica were Deloitte audit and tax partners,

7 respectively. Ives and Gordica advised Silver Wheaton on its transfer pricing tax

8 structure and the structuring of Silver Wheaton's tax transactions. In particular,

9 beginning in April 2004, Ives and Gordica "provided tax advice [to Silver Wheaton's

10 predecessor] in planning the structure [of Silver Wheaton's first Streaming

11 Agreement]." Charpentier Canada Testimony, pp. 847-855, and Response to

12 Undertakings 270, 271. ████████████████████████████

13 ████████████████████████████████████████████████

14 ████████████████████████████████████████████████

15 ████████████

16     391.  PCAOB Rule 3522 provides, in relevant part:

17     A registered public accounting firm is not independent of its audit client

18     if the firm, or any affiliate of the firm, during the audit and professional

19     engagement period, provides any non-audit service to the audit client

20     related to marketing, planning, or opining in favor of the tax treatment

21     of, a transaction [if]

22     *        *        *        *        *

23     (b)  **[the]**  **Tax**  **Position**  **Transaction[]-** that was initially

24     recommended, directly or indirectly, by the registered public accounting

25     firm and a significant purpose of which is tax avoidance, unless the

26     proposed tax treatment is at least more likely than not to be allowable

27     under applicable tax laws.

28

392.   The "audit and professional engagement period" is defined to include the time beginning when the auditor signs an initial engagement agreement right up until the auditor resigns. PCAOB Rule 3501(a)(iii).

393.   Ives and Gordica provided non-audit services opining that the tax treatment of Silver Wheaton Caymans's income would not be subject to Canadian taxes.

394.   Beginning 2010, Deloitte provided further non-audit services "related to [] opining in favor of the treatment of [] a transaction," ███████████ ██████████████████████

395.   "A significant purpose" ██████████████████████ of Silver Wheaton's tax structure is tax avoidance. In addition, through Ives and Gordica, Deloitte initially recommended Silver Wheaton adopt its transfer pricing tax structure.

396.   Accordingly, unless it is more likely than not that Silver Wheaton's tax position will be upheld, Deloitte is not independent of Silver Wheaton.

397.   If Deloitte is not independent of Silver Wheaton, it cannot issue an opinion on Silver Wheaton's financial statements. AU Section 220.01-.02. Accordingly, unless Deloitte finds that it is more likely than not that Silver Wheaton's tax position will be upheld, then it cannot serve as Silver Wheaton's auditor.

398.   Further, in order to meet Rule 3522, Deloitte must "establish, based on an analysis of the pertinent facts and authorities [which analysis is objectively reasonable] that there is a greater than 50-percent likelihood that the tax treatment of the transaction would, if challenged, be upheld." PCAOB Release No. 2004-014, at 28-29. ██████████████████████████ ███████████████████████

Consolidated Second Amended Class Action Complaint

**Violations of GAAP Render Financial Statements False and Misleading**

399.   Generally accepted accounting principles ("GAAP") constitutes those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.

400.   GAAP are the common set of accounting principles, standards, and procedures that companies in the United States and Canada use to compile their financial statements.

401.   SEC and NYSE rules and regulations require that publicly traded companies such as Silver Wheaton include financial statements that comply with GAAP in their annual and quarterly reports filed with the SEC.  See Sections 12 and 13 of the Exchange Act; Rule 10-01(d) of Regulation S-X.

402.   SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1) (emphasis added).

**Accounting Principles Imposed a Duty to Disclose Silver Wheaton 's Tax Liabilities**

403.   As a Canadian corporation for the fiscal years ended December 31, 2005 through 2010, Silver Wheaton prepared its financial statements according to Canadian GAAP.

404.   During the Class Period, SEC regulations required that all financial statements Silver Wheaton filed with the SEC that were prepared under Canadian GAAP must provide footnotes reconciling any material differences between Canadian and US GAAP.

405.   For the fiscal years ended December 31, 2011 through 2014, Silver Wheaton prepared and was required to file with the SEC financial statements prepared in accordance with International Financial Reporting Standards ("IFRS").

IFRS are accounting principles that are substantially similar to U.S. GAAP and Canadian GAAP.

406.  Under U.S. GAAP and Canadian GAAP, as well as under IFRS, an uncertain tax position liability is generally defined as a present or possible obligation that arises from past events in which there is uncertainty as to the probability that the obligation will result in an outflow of resources, or uncertainty as to the amount of the outflow.

407.  As of March 31, 2011, U.S. GAAP (and Canadian GAAP) required that an issuer record the existence of an uncertain tax position liability in the financial statements if that liability was "more likely than not" to be incurred. ASC 740.  Silver Wheaton stated in its 2010 Annual Report, at page 71, that it adopted ASC 740 with regards to accounting for uncertainty in income taxes.

408.  In applying ASC 740 to determine whether a liability must be recorded for its tax position under Transfer Pricing Rules concerning profits earned by Silver Wheaton Caymans, Silver Wheaton was first required to assume that the CRA would audit its transfer pricing position, and then  to determine whether it was "more likely than not" (i.e. 51% or higher likelihood") that Silver Wheaton's transfer pricing tax position violated the CRA Transfer Pricing Rules, and whether the CRA would assess Silver Wheaton additional income taxes, penalties and interest for the years 2005-2010.

409.  IFRS, IAS 37 and IAS 12, the applicable accounting principles for uncertain tax positions for Silver Wheaton from fiscal 2011 through 2015, is similar to ASC 740.  Under IFRS 37 and 12, Silver Wheaton was required to recognize a tax liability for income taxes based on its transfer pricing tax position for shifting income from Silver Wheaton Canada to Silver Wheaton Caymans, if it was "more likely than not" (i.e. 51% or higher likelihood") that Silver Wheaton's transfer pricing tax position violated CRA Transfer Pricing Rules and that the CRA would assess Silver Wheaton additional income taxes for the years 2005-2010.

410.   Even if, hypothetically, Silver Wheaton was not required to recognize and record an uncertain tax position liability as being "more likely than not" (as detailed above), which it was, IFRS 12 and IFRS 37¶86, still mandated that Silver Wheaton disclose in the notes to its financial statements the existence of the uncertain tax position liability resulting from its dealings with Silver Wheaton Caymans because the chance of being assessed the income tax was not "remote."  Under 37¶86, Silver Wheaton was therefore required to disclose (a) an estimate of the dollar amount of the uncertain tax position liability, (b) an indication of the uncertainties relating to the amount or timing of any outflow; and (c) the possibility of any reimbursement.

411.   The egregiousness of Silver Wheaton's tax position, and the probability the CRA would assess additional income taxes when Silver Wheaton was audited, is exemplified by the CRA's determination that "the transfer pricing provisions of the Act relating to income earned by the Company's foreign subsidiaries outside of Canada should apply such that the income of Silver Wheaton subject to tax in Canada should be increased by an amount equal to ***substantially all of the income earned outside of Canada by the Company's foreign subsidiaries.***" [emphasis added].

412.   Thus, the CRA determined that Silver Wheaton didn't just make a small mistake in its transfer pricing tax position.  The CRA found the entirety of Silver Wheaton's tax position to be wholly unjustified and unlawful.

413.   The lack of any reasonable basis for Silver Wheaton's transfer pricing tax position is further evidenced by the fact that CRA assessed Silver Wheaton a penalty equal to 10% of the income that was unlawfully not declared.  This penalty is required to be assessed where the tax payer has not complied with its obligation to file the necessary documentation with its tax returns that the transactions between the Canadian entity and the offshore entity are on arm's length or fair market value terms.

Consolidated Second Amended Class Action Complaint

## **Materially False And Misleading Statements Issued During the Class Period**

414.   The Class Period starts on March 30, 2011, when Silver Wheaton filed a Form 40-F for the fiscal year ended December 31, 2010 (the "2010 40-F") with the SEC, which provided Silver Wheaton's year-end financial results and position and stated that Silver Wheaton's internal control over financial reporting was effective as of December 31, 2010. The 2010 40-F was signed by Defendant Barnes. The 2010 40-F contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Barnes and Brown, which stated that the financial information contained in the 2010 40-F was accurate and disclosed any material changes to Silver Wheaton's internal control over financial reporting.

415.   The 2010 40-F stated that "The Company prepares its financial statements in accordance with Canadian generally accepted accounting principles which are reconciled to United States generally accepted accounting principles in Note 14 of the audited consolidated financial statements of the Company as of December 31, 2010 and 2009 and for each of the years in the three year period ended December 31, 2010, including the reports of the Independent Registered Chartered Accountants with respect thereto, included as Exhibit 99.2 of this annual report on Form 40-F (the "Audited Financial Statements")."

416.   Exhibit 99.2 of the 2010 40-F contained Silver Wheaton's financial statements beginning on page 36 with a statement by CEO Barnes and CFO Brown that the financial statements "were prepared by management, which is responsible for the integrity and fairness of the information presented, including the many amounts that must of necessity be based on estimates and judgments. These consolidated financial statements were prepared in accordance with Canadian generally accepted accounting principles ("Canadian GAAP") and include a footnote providing a reconciliation from Canadian GAAP to accounting principles generally accepted in the United States ("US GAAP").

417.    The financial statements contained balance sheets for fiscal years ended December 31, 2009 and 2010.

418.    The balance sheets for 2009 and 2010 were false and misleading for omitting to include a then present tax position liability of $207 million (consisting of $150 million of unpaid income tax and $57 million of mandatory penalties, but not including interest). Silver Wheaton's violation of the CRA Transfer Pricing Rules rose from its decision to avoid paying Canadian corporate income tax on $567 million of income by unlawfully shifting Silver Wheaton's income to its subsidiary, Silver Wheaton Caymans, located in the Cayman Islands, a jurisdiction without income taxes.

419.   Under then operative U.S. GAAP, ASC 740, Silver Wheaton was required to recognize and record a tax position liability of $207 million if it was "more likely than not" that its transfer pricing tax position with respect to Silver Wheaton's transactions with Silver Wheaton Caymans, specifically Silver Wheaton's provision of property, services, advantages, and other rights to Silver Wheaton, did not conform to CRA Transfer Pricing Rules and would therefore result in the assessment of additional taxes.

420.   In addition, the 2010 Form 40-F and exhibits thereto were misleading for failing to disclose the existence of the CRA audit of Silver Wheaton's transfer pricing transactions with Silver Wheaton Caymans and Silver Wheaton's transfer pricing tax position as of the date the Form 40-F was filed with the SEC on March 30, 2011.

421.   According to FE1, in May 2011, the CRA visited the Caymans and began its audit of its transactions with Silver Wheaton to determine if transfer pricing rules were violated and income tax payable. Prior to arrival of CRA auditors, Silver Wheaton sent a team of internal accountants and auditors to Silver Wheaton Caymans's offices to prepare the staff and office for the audit.

422.   Defendants were aware of the CRA Audit because they were notified of it by ████████ in October 2009.

Consolidated Second Amended Class Action Complaint

423.   On May 9, August 8, and November 9, 2011, the Company filed Form 6-Ks with the SEC attaching its first, second and third quarter results for the periods ending March 31, June 30, and September 30, 2011 respectively (the "2011 Qs") each of which was signed by Defendant Smallwood. The 2011 Qs each also contained signed certifications on FORM 52-109F2 by Defendants Smallwood and Brown, who both certified that:

> 2.  No misrepresentations: Based on my knowledge, having exercised reasonable diligence, the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, with respect to the period covered by the interim filings.

> 3.  Fair presentation: Based on my knowledge, having exercised reasonable diligence, the interim financial report together with the other financial information included in the interim filings fairly present in all material respects the financial condition, financial performance and cash flows of the issuer, as of the date of and for the periods presented in the interim filings.

424.   The 2011 Qs were false and misleading for the same reasons that the 2010 40-F and exhibits thereto were false and misleading, as described above, i.e., for failing to recognize and record $207 million of income tax position liabilities.

425.   On March 27, 2012, Silver Wheaton filed a Form 40-F for the fiscal year ended December 31, 2011 (the "2011 40-F") with the SEC, which provided Silver Wheaton's year-end financial results and position and stated that Silver Wheaton's internal control over financial reporting was effective as of December 31, 2011. The 2011 40-F was signed by Defendant Smallwood. The 2011 40-F contained signed SOX certifications by Defendants Smallwood and Brown, which stated that the

1  financial information contained in the 2011 40-F was accurate and disclosed any
2  material changes to the Company's internal control over financial reporting.

3      426.  The 2011 40-F stated that "On January 1, 2011, the Company adopted
4  International Financial Reporting Standards ("IFRS") for financial reporting
5  purposes, using a transition date of January 1, 2010. The Company's audited annual
6  Consolidated Financial Statements for the year ended December 31, 2011, including
7  2010 required comparative information (the "Audited Financial Statements"), have
8  been prepared in accordance with IFRS, as issued by the International Accounting
9  Standards Board ("IASB")."

10      427.  Exhibit 99.2 of the 2011 40-F contained an annual report, with Silver
11  Wheaton's audited financial statements beginning on page 37 with a statement by
12  CEO Smallwood and CFO Brown that: "The accompanying consolidated financial
13  statements of Silver Wheaton Corp. ("Silver Wheaton") were prepared by
14  management, which is responsible for the integrity and fairness of the information
15  presented, including the many amounts that must of necessity be based on estimates
16  and judgments. These consolidated financial statements were prepared in accordance
17  with International Financial Reporting Standards ("IFRS") as issued by the
18  International Accounting Standards Board."

19      428.  The financial statements contained balance sheets for fiscal years ended
20  December 31, 2011 and 2010.

21      429.  The balance sheets for 2010 and 2011 were false and misleading for
22  omitting to include a then present tax position liability of $207 million (consisting of
23  $150 million of unpaid income tax and $57 million of mandatory penalties, but not
24  including interest). Silver Wheaton's violation of the CRA Transfer Pricing Rules
25  rose from its decision to avoid paying Canadian corporate income tax on $567
26  million of income by unlawfully shifting Silver Wheaton's income to its subsidiary,
27  Silver Wheaton Caymans, located in the Cayman Islands, a jurisdiction without
28  income taxes.

Consolidated Second Amended Class Action Complaint

430.   Under IFRS 12 and 37, Silver Wheaton was required to recognize and record a tax position liability of $207 million if it was more likely than not that its transfer pricing tax position with respect to Silver Wheaton's transactions with Silver Wheaton Caymans, specifically Silver Wheaton's provision of property, services, advantages, and other rights to Silver Wheaton Caymans, did not conform to CRA Transfer Pricing Rules and would therefore result in the assessment of additional taxes.

431.   In the alternative, even if the tax position liability was not properly considered to be "more likely than not" under IFRS 12 and 37, and recording a tax position liability was not required (which it was), Silver Wheaton was still obligated to disclose in the footnotes to its 2011 40-F financial statements the existence of a contingent tax position liability in the amount of approximately $207 million for unpaid income tax and penalties.  Silver Wheaton did not include any disclosure of the $207 million contingent tax position liability, and therefore its financial statements violated IFRS 12 and 37 and were false and misleading.

432.   The 2011 40-F also included also included an audit report from Deloitte that provided:[38]

### Report of Independent Registered Chartered Accountants

To the Board of Directors and Shareholders of Silver Wheaton Corp.

We have audited the accompanying consolidated financial statements of Silver Wheaton Corp. and subsidiaries (the "Company"), which comprise the consolidated balance sheets as at December 31, 2011, December 31, 2010 and January 1, 2010, and the consolidated statements of earnings, comprehensive income, cash flows and shareholders' equity for the years ended December 31, 2011 and

---

[38] Because of the statute of repose, Plaintiffs only bring claims against Deloitte beginning with its audit report for the year ended December 31, 2012.

Consolidated Second Amended Class Action Complaint

December 31, 2010, and a summary of significant accounting policies and other explanatory information.

**Management's responsibility for the consolidated financial statements**

Management is responsible for the preparation and fair presentation of these consolidated financial statements in accordance with International Financial Reporting Standards as issued by the International Accounting Standards Board, and for such internal control as management determines is necessary to enable the preparation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's responsibility**

Our responsibility is to express an opinion on these consolidated financial statements based on our audits. We conducted our audits in accordance with Canadian generally accepted auditing standards and the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we comply with ethical requirements and plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements.

Consolidated Second Amended Class Action Complaint

We believe that the audit evidence we have obtained in our audits is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

***In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of Silver Wheaton Corp. and subsidiaries as at December 31, 2011, December 31, 2010 and January 1, 2010 and their financial performance and cash flows for the years ended December 31, 2011 and December 31, 2010 in accordance with International Financial Reporting Standards as issued by the International Accounting Standards Board.***

**Other matter**

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Company's internal control over financial reporting as of December 31, 2011, based on the criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated March 22, 2012 expressed an unqualified opinion on the Company's internal control over financial reporting.

*/s/ Deloitte & Touche LLP*

Independent Registered Chartered Accountants

Vancouver, Canada
March 22, 2012

(emphasis added)

433. ██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

Consolidated Second Amended Class Action Complaint



434.   On April 2, 2013, the Company filed a Form 40-F for the fiscal year ended December 31, 2012 (the "2012 40-F") with the SEC, which provided Silver Wheaton's year-end financial results and position and stated that Silver Wheaton's internal control over financial reporting was effective as of December 31, 2012. The 2012 40-F was signed by Defendant Smallwood. The 2012 40-F contained signed SOX certifications by Defendants Smallwood and Brown, which stated that the financial information contained in the 2012 40-F was accurate and disclosed any material changes to Silver Wheaton's internal control over financial reporting.

435.   The 2012 40-F stated that the Company's audited annual consolidated financial statements for the year ended December 31, 2012, and related notes thereto, had been prepared in accordance with IFRS, as issued by the International Accounting Standards Board.

436.   Exhibit 99.2 of the 2012 40-F contained an annual report with Silver Wheaton's audited financial statements beginning on page 45 with a statement by CEO Smallwood and CFO Brown that: "The accompanying consolidated financial statements of Silver Wheaton Corp. ("Silver Wheaton") were prepared by management, which is responsible for the integrity and fairness of the information presented, including the many amounts that must of necessity be based on estimates and judgments. These consolidated financial statements were prepared in accordance with International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board."

Consolidated Second Amended Class Action Complaint

437.    The financial statements contained balance sheets for fiscal years ended December 31, 2012 and 2011.

438.    The balance sheets for 2011 and 2012 were false and misleading for omitting to include a then present tax position liability of $207 million (consisting of $150 million of unpaid income tax and $57 million of mandatory penalties, but not including interest). Silver Wheaton's violation of the CRA Transfer Pricing Rules rose from its decision to avoid paying Canadian corporate income tax on $567 million of income by unlawfully shifting Silver Wheaton's income to its subsidiary, Silver Wheaton Caymans, located in the Cayman Islands, a jurisdiction without income taxes.

439.    Under IFRS 12 and 37, Silver Wheaton was required to recognize and record a tax position liability of $207 million if it was more likely than not that its transfer pricing tax position with respect to Silver Wheaton's transactions with Silver Wheaton Caymans, specifically Silver Wheaton's provision of property, services, advantages, and other rights to Silver Wheaton Caymans, did not conform to CRA Transfer Pricing Rules and would therefore result in the assessment of additional taxes.

440.    In the alternative, even if the tax position liability was not properly considered to be "more likely than not" under IFRS 12 and 37, and recording a tax position liability was not required (and it was required), Silver Wheaton was still obligated to disclose in the footnotes to its 2012 40-F financial statements the existence of a contingent tax position liability in the amount of approximately $207 million for unpaid income tax and penalties.  Silver Wheaton did not include any disclosure of the $207 million contingent tax position liability and therefore its financial statements violated IFRS 12 and 37 and were false and misleading.

441.    The 2012 40-F also included an audit report from Deloitte that provided:

Consolidated Second Amended Class Action Complaint

### Report of Independent Registered Chartered Accountants

To the Board of Directors and Shareholders of Silver Wheaton Corp.

We have audited the accompanying consolidated financial statements of Silver Wheaton Corp. and subsidiaries (the "Company"), which comprise the consolidated balance sheets as at December 31, 2012 and December 31, 2011, and the consolidated statements of earnings, consolidated statements of comprehensive income, consolidated statements of cash flows and consolidated statements of shareholders' equity for the years then ended, and a summary of significant accounting policies and other explanatory information.

### Management's responsibility for the consolidated financial statements

Management is responsible for the preparation and fair presentation of these consolidated financial statements in accordance with International Financial Reporting Standards as issued by the International Accounting Standards Board, and for such internal control as management determines is necessary to enable the preparation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

### Auditor's responsibility

Our responsibility is to express an opinion on these consolidated financial statements based on our audits. *We conducted our audits in accordance with Canadian generally accepted auditing standards and the standards of the Public Company Accounting Oversight Board (United States).* Those standards require that we comply with ethical requirements and plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the consolidated

Consolidated Second Amended Class Action Complaint

financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements.

We believe that the audit evidence we have obtained in our audits is sufficient and appropriate to provide a basis for our audit opinion.

### Opinion

*In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of Silver Wheaton Corp. and subsidiaries as at December 31, 2012 and December 31, 2011 and their financial performance and their cash flows for the years then ended in accordance with International Financial Reporting Standards as issued by the International Accounting Standards Board*.

### Other matter

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Company's internal control over financial reporting as of December 31, 2012, based on the criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated March 21, 2013 expressed an unqualified opinion on the Company's internal control over financial reporting.

/s/ Deloitte LLP
Independent Registered Chartered Accountants
Vancouver, Canada
March 21, 2013

(emphasis added)

- 110 -

Consolidated Second Amended Class Action Complaint

442. ██████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████

443. On March 31, 2014, Silver Wheaton filed a Form 40-F for the fiscal year ended December 31, 2013 (the "2013 40-F") with the SEC, which provided Silver Wheaton's year-end financial results and position and stated that Silver Wheaton's internal control over financial reporting was effective as of December 31, 2013. The 2013 40-F was signed by Defendant Smallwood. The 2013 40-F contained signed SOX certifications by Defendants Smallwood and Brown, which stated that the financial information contained in the 2013 40-F was accurate and disclosed any material changes to Silver Wheaton's internal control over financial reporting.

444. The 2013 40-F stated that the Company's audited annual consolidated financial statements for the year ended December 31, 2013 had been prepared in accordance with IFRS, as issued by the International Accounting Standards Board.

445. Exhibit 99.2 of the 2013 40-F contained an annual report with Silver Wheaton's audited financial statements beginning on page 47 with a statement by CEO Smallwood and CFO Brown that: "The accompanying consolidated financial statements of Silver Wheaton Corp. ("Silver Wheaton") were prepared by management, which is responsible for the integrity and fairness of the information presented, including the many amounts that must of necessity be based on estimates

1   and judgments. These consolidated financial statements were prepared in accordance
2   with International Financial Reporting Standards ("IFRS") as issued by the
3   International Accounting Standards Board."

4       446.    The financial statements contained balance sheets for fiscal years ended
5   December 31, 2013 and 2012.

6       447.    The balance sheets for 2012 and 2013 were false and misleading for
7   omitting to include a then present tax position liability of $207 million (consisting of
8   $150 million of unpaid income tax and $57 million of mandatory penalties, but not
9   including interest). Silver Wheaton's violation of the CRA Transfer Pricing Rules
10   rose from its decision to avoid paying Canadian corporate income tax on $567
11   million of income by unlawfully shifting Silver Wheaton's income to its subsidiary,
12   Silver Wheaton Caymans, located in the Cayman Islands, a jurisdiction without
13   income taxes.

14       448.  Under IFRS 12 and 37, Silver Wheaton was required to recognize and
15   record a tax position liability of $207 million if it was more likely than not that its
16   transfer pricing tax position with respect to Silver Wheaton's transactions with Silver
17   Wheaton Caymans, specifically Silver Wheaton's provision of property, services,
18   advantages, and other rights to Silver Wheaton Caymans, did not conform to CRA
19   Transfer Pricing Rules and would therefore result in the assessment of additional
20   taxes.

21       449.  In the alternative, even if the tax position liability was not properly
22   considered to be "more likely than not" under IFRS 12 and 37, and recording a tax
23   position liability was not required (and it was required), Silver Wheaton was still
24   obligated to disclose in the footnotes to its 2013 40-F financial statements the
25   existence of a contingent tax position liability in the amount of approximately $207
26   million for unpaid income tax and penalties.  Silver Wheaton did not include any
27   disclosure of the $207 million contingent tax position liability and therefore its
28   financial statements violated IFRS 12 and 37 and were false and misleading.

450.   The 2013 40-F also included an audit report from Deloitte that provided:

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Shareholders of Silver Wheaton Corp.

We have audited the accompanying consolidated financial statements of Silver Wheaton Corp. and subsidiaries (the "Company"), which comprise the consolidated balance sheets as at December 31, 2013 and December 31, 2012, and the consolidated statements of earnings, consolidated statements of comprehensive income, consolidated statements of cash flows and consolidated statements of shareholders' equity for the years then ended, and a summary of significant accounting policies and other explanatory information.

**Management's Responsibility for the Consolidated Financial Statements**

Management is responsible for the preparation and fair presentation of these consolidated financial statements in accordance with International Financial Reporting Standards as issued by the International Accounting Standards Board, and for such internal control as management determines is necessary to enable the preparation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on these consolidated financial statements based on our audits. *We conducted our audits in accordance with Canadian generally accepted auditing standards and the standards of the Public Company Accounting Oversight Board (United States).* Those standards require that we comply with ethical requirements and plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements.

- 113 -

The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements.

We believe that the audit evidence we have obtained in our audits is sufficient and appropriate to provide a basis for our audit opinion.

### Opinion

*In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of Silver Wheaton Corp. and subsidiaries as at December 31, 2013 and December 31, 2012 and their financial performance and their cash flows for the years then ended in accordance with International Financial Reporting Standards as issued by the International Accounting Standards Board.*

### Other Matter

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Company's internal control over financial reporting as of December 31, 2013, based on the criteria established in *Internal Control — Integrated Framework (1992)* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated March 20, 2014 expressed an unqualified opinion on the Company's internal control over financial reporting.

*/s/ Deloitte LLP*

Chartered Accountants
Vancouver, Canada
March 20, 2014

Consolidated Second Amended Class Action Complaint

(emphasis added)

451. ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████

452.   On March 31, 2015, the Company filed a Form 40-F for the fiscal year ended December 31, 2014 (the "2014 40-F") with the SEC, which provided Silver Wheaton's year-end financial results and position and stated that Silver Wheaton's internal control over financial reporting was effective as of December 31, 2014. The 2014 40-F was signed by Defendant Smallwood. The 2014 40-F contained signed SOX certifications by Defendants Smallwood and Brown, which stated that the financial information contained in the 2014 40-F was accurate and disclosed any material changes to Silver Wheaton's internal control over financial reporting.

453.   The 2014 40-F stated that Silver Wheaton's audited annual consolidated financial statements for the year ended December 31, 2014 had been prepared in accordance with IFRS, as issued by the International Accounting Standards Board.

454.   Exhibit 99.2 of the 2014 40-F contained an annual report with Silver Wheaton's audited financial statements beginning on page 51 with a statement by CEO Smallwood and CFO Brown that: "The accompanying consolidated financial statements of Silver Wheaton Corp. ("Silver Wheaton") were prepared by

management, which is responsible for the integrity and fairness of the information presented, including the many amounts that must of necessity be based on estimates and judgments. These consolidated financial statements were prepared in accordance with International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board."

455.    The financial statements contained balance sheets for fiscal years ended December 31, 2014 and 2013.

456.    The balance sheets for 2013 and 2014 were false and misleading for omitting to include a then present tax position liability of $207 million (consisting of $150 million of unpaid income tax and $57 million of mandatory penalties, but not including interest). Silver Wheaton's violation of the CRA Transfer Pricing Rules rose from its decision to avoid paying Canadian corporate income tax on $567 million of income by unlawfully shifting Silver Wheaton's income to its subsidiary, Silver Wheaton Caymans, located in the Cayman Islands, a jurisdiction without income taxes.

457.    Under IFRS 12 and 37, Silver Wheaton was required to recognize and record a tax position liability of $207 million if it was more likely than not that its transfer pricing tax position with respect to Silver Wheaton's transactions with Silver Wheaton Caymans, specifically Silver Wheaton's provision of property, services, advantages, and other rights to Silver Wheaton Caymans, did not conform to CRA Transfer Pricing Rules and would therefore result in the assessment of additional taxes.

458.    In the alternative, even if the tax position liability was not properly considered to be "more likely than not" under IFRS 12 and 37, and recording a tax position liability was not required (and it was required), Silver Wheaton was still obligated to disclose in the footnotes to its 2014 40-F financial statements the existence of a contingent tax position liability in the amount of approximately $207 million for unpaid income tax and penalties.  Silver Wheaton did not include any

- 116 -

Consolidated Second Amended Class Action Complaint

disclosure of the $207 million contingent tax position liability and therefore its financial statements violated IFRS 12 and 37 and were false and misleading.

459.   The 2014 40-F also included an audit report from Deloitte that provided:

### Report of Independent Registered Public Accounting Firm

To the Board of Directors and Shareholders of Silver Wheaton Corp.

We have audited the accompanying consolidated financial statements of Silver Wheaton Corp. and subsidiaries (the "Company"), which comprise the consolidated balance sheets as at December 31, 2014 and December 31, 2013, and the consolidated statements of earnings, consolidated statements of comprehensive income, consolidated statements of cash flows, and consolidated statements of shareholders' equity for the years then ended, and a summary of significant accounting policies and other explanatory information.

### Management's Responsibility for the Consolidated Financial Statements

Management is responsible for the preparation and fair presentation of these consolidated financial statements in accordance with International Financial Reporting Standards as issued by the International Accounting Standards Board, and for such internal control as management determines is necessary to enable the preparation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

### Auditor's Responsibility

Our responsibility is to express an opinion on these consolidated financial statements based on our audits. *We conducted our audits in accordance with Canadian generally accepted auditing standards and the standards of the Public Company Accounting Oversight Board (United States).* Those standards require that we comply with ethical requirements and plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

- 117 -

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements.

We believe that the audit evidence we have obtained in our audits is sufficient and appropriate to provide a basis for our audit opinion.

### Opinion

***In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of Silver Wheaton Corp. and subsidiaries as at December 31, 2014 and December 31, 2013, and their financial performance and their cash flows for the years then ended in accordance with International Financial Reporting Standards as issued by the International Accounting Standards Board.***

### Other Matter

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Company's internal control over financial reporting as of December 31, 2014, based on the criteria established in *Internal Control — Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated March 18, 2015 expressed an unqualified opinion on the Company's internal control over financial reporting.

*/s/ Deloitte LLP*

Consolidated Second Amended Class Action Complaint

Chartered Accountants
Vancouver, Canada
March 18, 2015

(emphasis added)

460. ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████

## **The Truth Emerges**

461.   On July 6, 2015, after market close, the Company issued a press release announcing that the CRA proposed to reassess Silver Wheaton under various rules under the Income Tax Act (Canada), and that the CRA takes the position that Silver Wheaton owes $567 million of taxes from the taxation years of 2005 to 2010 from income generated by Silver Wheaton's foreign subsidies. The press release stated  in relevant part:

> VANCOUVER, July 6, 2015 /PRNewSilver Wheatonire/ - Silver Wheaton Corp. ("Silver Wheaton" or the "Company") (SILVER WHEATON) (SILVER WHEATON) *announces that it has received a proposal letter dated July 6, 2015 (the "Proposal") from the Canada Revenue Agency (the "CRA") in which the CRA is proposing to reassess Silver Wheaton under various rules contained in the Income Tax Act (Canada).*

- 119 -

*The Proposal outlines CRA's position that the transfer pricing provisions of the Income Tax Act (Canada) relating to income earned by our foreign subsidiaries outside of Canada should apply such that the income of Silver Wheaton subject to tax in Canada should be increased for the 2005 to 2010 taxation years (the "Relevant Taxation Years") by approximately Cdn$715 million (US$567 million).* The issuance of the Proposal does not require the Company to pay any amount to the CRA at this time.

Management believes that the Company has filed its tax returns and paid applicable taxes in compliance with Canadian tax law. Silver Wheaton intends to vigorously defend its tax filing positions and is now in the process of preparing its response to the Proposal.

"We remain confident in our business structure which we believe is consistent with that typically used by Canadian companies, including Canadian streaming companies, that have international operations," said Randy Smallwood, President and Chief Executive Officer of Silver Wheaton.

"Generally a company is taxable in Canada on its income earned in Canada, while non-Canadian income earned by foreign subsidiaries is not subject to Canadian income tax. However, with this Proposal, the CRA is seeking to tax, within Canada, streaming income earned outside of Canada by our foreign subsidiaries related to mines located outside of Canada," added Smallwood.

Failing a resolution at the Proposal stage, the CRA may proceed to issue notices of reassessment for one or more of the Relevant Taxation Years. If the CRA reassesses Silver Wheaton on the basis outlined in the Proposal, and assuming that Silver Wheaton would be assessed taxes on the foreign subsidiaries' income on the same basis as its Canadian income, Silver Wheaton currently estimates on a preliminary basis that it would be subject to federal and provincial tax of approximately US$150 million in respect of the Relevant Taxation Years. The Proposal also indicates that the CRA is seeking to apply transfer pricing penalties of approximately Cdn$72 million (US$57 million) in respect of the Relevant Taxation Years. The Proposal does not indicate the amount of interest or other penalties in respect of the

Consolidated Second Amended Class Action Complaint

Relevant Taxation Years. Further, taxation years subsequent to 2010 remain open to audit by the CRA.

Should Silver Wheaton receive a notice of reassessment from the CRA based upon the Proposal, we intend to file a notice of objection within the required 90 day period provided under the *Income Tax Act (Canada)*. In such a circumstance, Silver Wheaton would be required to pay 50% of the reassessed amount of tax, interest and penalties. This amount, plus interest, would be refunded if the Company were ultimately successful in challenging a reassessment. Any notice of objection would be reviewed by the CRA's Appeals Division. Silver Wheaton also has the right to appeal directly to the Tax Court of Canada 91 days after the date of filing of any notice of objection.

The timing for the Proposal process, the CRA appeals process and/or court process (if necessary following the issuance by CRA of any notices of reassessment), is uncertain. Regardless of the timing, Silver Wheaton intends to vigorously defend its tax filing positions.

(Emphasis added).

462.   The next morning, on this news, the Company's share price opened $0.90 lower and continued falling.  On July 7, 2015, as a result of the disclosure that Silver Wheaton had been concealing a Canadian tax liability in excess of $207 million, Silver Wheaton's share price fell $2.08 per share, or approximately 12%, to close at $15.46 per share.

463.   In a July 8, 2015 analyst report titled "Coping With 'Guilty Until Proven Innocent,'" Dundee Capital Markets reduced its target price from CDN $33/share to CDN $28/share, estimating that the CRA tax audit could reduce Silver Wheaton's Net Asset Value by 40%.

464.   In an August 12, 2015 analyst report titled "Q2/15 Results; All Eyes Still On CRA Audit," CIBC reduced its estimate of the Net Asset Value of, and price target for, Silver Wheaton by 30% in response to the CRA audit.

465.   An August 13, 2015 a JP Morgan analyst report noted that the "CRA Tax Audit Likely to Overhang the Stock."

466.  As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## ADDITIONAL EVIDENCE OF DELIBERATE MISCONDUCT

*(a)*  *Suspicious Behavior when Canadian Government Officials visited Silver Wheaton Caymans's Offices in May 2011 to Review its Tax Filings and Conduct an Investigation*

467.  Officials from the Canadian government visited Silver Wheaton's Cayman Islands office in May 2012 for a review of its operations and financial records, to determine if the operation was a separate entity from the corporate operation in Vancouver. The Canadian officials were also there to determine if the company filed the correct amount of taxes.

468.  Prior to the CRA officials' visit, Silver Wheaton sent down a team of internal accountants and auditors to the Silver Wheaton Caymans office to prep the Silver Wheaton Caymans employees on what to say to the CRA officials.

469.  FE1 said the government officials were there to determine if the Silver Wheaton Caymans office was a separate entity from the Vancouver corporate headquarters and also to review the taxes the company filed, stating "They wanted to confirm that these two companies, Silver Wheaton in Caymans and Silver Wheaton (corporate) was not one operation, that they were two separate entities," she said. "And that the income they were making was applied correctly on their taxes. That the amount they declared on their taxes was correct."

470.  FE1 suspected that Silver Wheaton Canada might have been dodging Canadian taxes because of her bosses' behavior prior to the visit from Canadian government officials, and that the company might have been hiding something from Canadian tax officials when they visited Silver Wheaton Caymans in May 2011.

471.  FE1 recalled that four Canadian government officials set up in the office boardroom and each employee went in for a private interview. After each interview,

Consolidated Second Amended Class Action Complaint

the Canadian officials met with Charpentier and Tatarkin to discuss the employee's answers.

472. The officials asked FE1 a series of questions. They told her, "We're here because we feel Silver Wheaton had not been paying their taxes, and we want to see if you know or you saw anything to help us to confirm this."

473. When the officials asked her directly if she had seen anything that raised red flags in her mind, she said no. But she noted that Tatarkin and Charpentier later expressed displeasure with her that her facial expression had not assured the officials that she was being fully truthful. FE1 felt uncomfortable being instructed how she should substantively answer each question, stating that "From my experience with other companies, that was not the first time being questioned (by officials), but **it was the first time a company had me practice what to say and they told you what they wanted you to say**" (emphasis added).

474. Carpenter and Tatarkin falsely told Silver Wheaton Caymans employees that the company passed the review (tax audit). FE1 never heard about any problems discovered by Canadian officials.

475. ████████████████████████████████████
████████████████████████████████████████
██████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
█████████████████
██████████████████████████████

476. ████████████████████████████████████
████████████████████████████████████████
██████████████████████████

- 123 -

Consolidated Second Amended Class Action Complaint

1        (b)      Additional Facts Showing Defendants' Subjective Awareness of Tax
2   Law Violations

3        477. ████████████████████████████████████████████
4   ████████████████████████████████████████████████████████
5   ████████████████████████████████████████████████████████
6   ████████████████████████

7        478. ████████████████████████████████████████████
8   ████████████████████████████████████████████████████████
9   ████████████████████████████████████████████████████████
10  ████████████████████████████████████████████████████

11       479. ████████████████████████████████████████████
12  ████████████████████████████████████████████████████████
13  ████████████████████████████████████████████████████████
14  ████████████████████████████████████████████████████████
15  ████████████████████████████████████████████████████████
16  ████████████████████████████████████████████████████████
17  ████████████████████████████████████████████████████████
18  ████████████████████████████████████████████████████████
19  ████████████████████████████████████████████████████████
20  ████████████████████████████████████████████████████████
21  ████████████████████████████████████

22       480. ████████████████████████████████████████████
23  ████████████████████████████████████████████████████████
24  ████████████████████████████████████████████████████████
25  ████████████████████████████████████████████████████████
26  ██████████████████████████████████████████████
27  _____
28  ████████████████████████████████████████████████████████
    ████████████████

Consolidated Second Amended Class Action Complaint

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

481.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Silver Wheaton securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of Silver Wheaton Canada, Silver Wheaton Caymans, or Deloitte, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

482.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Silver Wheaton securities were actively traded on the New York Stock Exchange ("NYSE"). While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Silver Wheaton Canada or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

483.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

484.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

485.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Silver Wheaton;

- whether the Individual Defendants caused Silver Wheaton to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Silver Wheaton securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

486.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

487.   Plaintiffs may rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

Consolidated Second Amended Class Action Complaint

- •     Silver Wheaton securities are traded in an efficient market;

- •     Over 8 billion of Silver Wheaton's shares were traded with moderate to heavy volume on the NYSE during the Class Period;

- •     Silver Wheaton was covered by multiple analysts;

- •     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of Silver Wheaton's securities; and

- •     Plaintiffs and members of the Class purchased, acquired and/or sold Silver Wheaton securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

488.   Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## COUNT I

### Violations of Section 10(b) of The Exchange Act and Rule 10b-5
### Against The Silver Wheaton Defendants

489.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

490.   This Count is asserted against the Silver Wheaton Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

491.   During the Class Period, the Silver Wheaton Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was

1  intended to, and, throughout the Class Period, did: (i) deceive the investing public,
2  including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate
3  and maintain the market price of Silver Wheaton securities; and (iii) caused Plaintiffs
4  and other members of the Class to purchase or otherwise acquire Silver Wheaton
5  securities at artificially inflated prices. In furtherance of this unlawful scheme, plan
6  and course of conduct, the Silver Wheaton Defendants, and each of them, took the
7  actions set forth herein.

8     492.  Pursuant to the above plan, scheme, conspiracy and course of conduct,
9  each of the Defendants participated directly or indirectly in the preparation and/or
10 issuance of the annual reports, SEC filings, press releases and other statements and
11 documents described above, including statements made to securities analysts and the
12 media that were designed to influence the market for Silver Wheaton securities. Such
13 reports, filings, releases and statements were materially false and misleading in that
14 they failed to disclose material adverse information and misrepresented the truth
15 about Silver Wheaton's business and financial statements.

16    493.  By virtue of their positions at Silver Wheaton, the Silver Wheaton
17 Defendants had actual knowledge of the materially false and misleading statements
18 and material omissions alleged herein and intended thereby to deceive Plaintiffs and
19 the other members of the Class, or, in the alternative, the Silver Wheaton Defendants
20 acted with reckless disregard for the truth in that they failed or refused to ascertain
21 and disclose such facts as would reveal the materially false and misleading nature of
22 the statements made, although such facts were readily available to the Silver Wheaton
23 Defendants. Said acts and omissions of the Silver Wheaton Defendants were
24 committed willfully or with reckless disregard for the truth. In addition, each of the
25 Silver Wheaton defendants knew or recklessly disregarded that material facts were
26 being misrepresented or omitted as described above.

27    494.  Information showing that the Silver Wheaton Defendants acted
28 knowingly or with reckless disregard for the truth is peculiarly within the Silver

Wheaton Defendants' knowledge and control. As the senior officers of Silver
Wheaton, the Individual Defendants had knowledge of the details of Silver
Wheaton's internal affairs, including its untenable transfer pricing tax position.

495.   The Individual Defendants are liable both directly and indirectly for the
wrongs complained of herein. Because of their positions of control and authority, the
Individual Defendants were able to and did, directly or indirectly, control the content
of the statements of Silver Wheaton. As officers and/or directors of a publicly-held
company, the Individual Defendants had a duty to disseminate timely, accurate, and
truthful information with respect to Silver Wheaton's businesses, operations, and
financial condition.

496.   During the Class Period, Silver Wheaton securities were traded on an
active and efficient market. Plaintiffs and the other members of the Class, relying on
the materially false and misleading statements described herein, which the Silver
Wheaton Defendants made, issued or caused to be disseminated, or relying upon the
integrity of the market, purchased or otherwise acquired shares of Silver Wheaton
securities at prices artificially inflated by the Silver Wheaton Defendants' wrongful
conduct. Had Plaintiffs and the other members of the Class known the truth, they
would not have purchased or otherwise acquired said securities, or would not have
purchased or otherwise acquired them at the inflated prices that were paid. At the
time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of
Silver Wheaton securities was substantially lower than the prices paid by Plaintiffs
and the other members of the Class. The market price of Silver Wheaton securities
declined sharply upon public disclosure of the facts alleged herein to the injury of
Plaintiffs and Class members.

497.   By reason of the conduct alleged herein, the Silver Wheaton Defendants
knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the
Exchange Act and Rule 10b-5 promulgated thereunder.

Consolidated Second Amended Class Action Complaint

498. This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's and the Class's purchases of securities giving rise to the cause of action.

499. As a direct and proximate result of the Silver Wheaton Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### Violations of Section 20(a) of The Exchange Act
### Against The Individual Defendants

500. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

501. During the Class Period, the Individual Defendants participated in the operation and management of Silver Wheaton, and conducted and participated, directly and indirectly, in the conduct of Silver Wheaton's business affairs. Because of their senior positions, they knew the adverse non-public information about Silver Wheaton's current financial position and future business prospects.

502. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Silver Wheaton's business practices, and to correct promptly any public statements issued by Silver Wheaton which had become materially false or misleading.

503. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Silver Wheaton disseminated in the marketplace during the Class Period concerning the Company's business, operational and accounting policies. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Silver Wheaton to engage in the

- 130 -

Consolidated Second Amended Class Action Complaint

wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Silver Wheaton within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Silver Wheaton securities.

504.   Each of the Individual Defendants, therefore, acted as a controlling person of Silver Wheaton. By reason of their senior management positions and/or being directors of Silver Wheaton, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Silver Wheaton to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Silver Wheaton and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

505.   This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's and the Class's purchases of securities giving rise to the cause of action.

506.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Silver Wheaton.

## COUNT III

### Violations of Section 10(b) of The Exchange Act
### Against Deloitte

507.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

508.   This cause of action is asserted against Defendants.

509.   During the Class Period, Deloitte carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other members of the Class to purchase Silver Wheaton

securities at artificially inflated and distorted prices. In furtherance of this unlawful scheme, plan and course of conduct, Deloitte issued knowingly false audit reports during the Class Period. Deloitte's accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.

510.   Deloitte, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to misrepresent the true financial condition or Silver Wheaton and conceal adverse material information about the business, operations and future prospects of Silver Wheaton as specified herein.

511.   Deloitte employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Silver Wheaton's value, performance and continued substantial growth, as well as the absence of contingent tax liabilities, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Silver Wheaton and its business operations and financial condition in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Silver Wheaton securities during the Class Period.

512.   Deloitte had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that failed to ascertain and to disclose such facts, even though such facts were available to them. Deloitte's material misrepresentations and/or omissions were done knowingly

Consolidated Second Amended Class Action Complaint

1    or recklessly and for the purpose and effect of concealing Silver Wheaton's financial
2    condition from the investing public and supporting the artificially inflated price of its
3    securities. As demonstrated by Deloitte's false and misleading statements during the
4    Class Period, Deloitte, if it did not have actual knowledge of the misrepresentations
5    and omissions alleged, was highly reckless in failing to obtain such knowledge by
6    failing to take steps necessary to discover whether those statements were false or
7    misleading.

8        513.   As a result of the dissemination of the materially false and misleading
9    information and failure to disclose material facts, as set forth above, the market price
10   for Silver Wheaton's securities was artificially inflated during the Class Period.

11       514.   In ignorance of the fact that market prices of Silver Wheaton's publicly-
12   traded securities were artificially inflated or distorted, and relying directly or
13   indirectly on the false and misleading statements made by defendants, or upon the
14   integrity of the market in which Silver Wheaton's securities trade, and/or on the
15   absence of material adverse information that was known to or recklessly disregarded
16   by Defendants but not disclosed in public statements by defendants during the Class
17   Period, Plaintiffs and the other members of the Class acquired Silver Wheaton
18   securities during the Class Period at artificially high prices and were damaged
19   thereby.

20       515.   At the time of said misrepresentations and omissions, Plaintiffs and other
21   members of the Class were ignorant of their falsity, and believed them to be true. Had
22   Plaintiffs and the other members of the Class and the marketplace known the truth
23   regarding Silver Wheaton's financial results and condition, Plaintiffs and other
24   members of the Class would not have purchased or otherwise acquired Silver
25   Wheaton securities, or, if they had acquired such securities during the Class Period,
26   they would not have done so at the artificially inflated prices or distorted prices at
27   which they did.

28

Consolidated Second Amended Class Action Complaint

516.   By virtue of the foregoing, Deloitte has violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

517.   As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of Silver Wheaton's securities during the Class Period.

518.   This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of securities giving rise to the cause of action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class representatives;

B.   Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.   Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as her reasonable attorneys' fees, expert fees and other costs; and

D.   Awarding such other and further relief as this Court may deem just and proper.

Consolidated Second Amended Class Action Complaint

1

**DEMAND FOR TRIAL BY JURY**

2

Plaintiffs hereby demand a trial by jury.

3

4

Dated: April 12, 2018                Respectfully submitted,

5

**THE ROSEN LAW FIRM, P.A.**

6

/s/ Laurence M. Rosen

7

Laurence M. Rosen, Esq. (SBN 219683)

8

355 S. Grand Avenue, Suite 2450

Los Angeles, CA 90071

9

Telephone: (213) 785-2610

10

Facsimile: (213) 226-4684

Email: lrosen@rosenlegal.com

11

12

*Counsel for Plaintiffs/Class Representatives*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 135 -

Consolidated Second Amended Class Action Complaint

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>CERTIFICATE OF SERVICE</u>

I, Laurence Rosen, hereby declare under penalty of perjury as follows:

I am attorney with the Rosen Law Firm, P.A., with offices at 355 South Grand Avenue, Suite 2450, Los Angeles, CA, 90071. I am over the age of eighteen.

On April 12, 2018, I electronically filed the foregoing CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to counsel of record.

Executed on April 12, 2018

/s/ Laurence Rosen
Laurence Rosen

Consolidated Second Amended Class Action Complaint